RECEIVED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN FORD

Write the full name of each plaintiff.

19 CV 6327

_____ CV _____
(Include case number if one has been
assigned)

-against-

THE BOARD OF EDUCATION OF
THE CITY SCHOOL DISTRICT OF THE CITY
OF NY (a/k/a NYC BOE, NYC DOE)

Write the full name of each defendant. The names listed
above must be identical to those contained in Section I.

Do you want a jury trial?

☑ Yes   ☐ No

## EMPLOYMENT DISCRIMINATION COMPLAINT

---

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with
the court should therefore *not* contain: an individual's full social security number or full birth
date; the full name of a person known to be a minor; or a complete financial account number. A
filing may include *only*: the last four digits of a social security number; the year of an individual's
birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule
of Civil Procedure 5.2.

---

# I.    PARTIES

## A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

BRIAN                P            FORD

First Name                        Middle Initial            Last Name

19 WEST  110ᵗʰ St  #45

Street Address

NEW YORK                          NY                    10026

County, City                      State                 Zip Code

646 713 8285                      bpford1@gmail.com

Telephone Number                  Email Address (if available)

## B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. (Proper defendants under employment discrimination statutes are usually employers, labor organizations, or employment agencies.) Attach additional pages if needed.

Defendant 1:    THE BOARD OF ED OF CITY SCHOOL DISTRICT (NYC DOE)

                Name OFFICE OF LEGAL SERVICES

                52 CHAMBERS STREET

                Address where defendant may be served

                NEW YORK,                NY                10007

                County, City             State             Zip Code

                PH 212 374-4244

Defendant 2:    _____

                Name

                _____

                Address where defendant may be served

                _____

                County, City             State             Zip Code

Defendant 3:

_____
Name

_____
Address where defendant may be served

_____
County, City                    State           Zip Code

## II.   PLACE OF EMPLOYMENT

The address at which I was employed or sought employment by the defendant(s) is:

NEW YORK CITY D.O.E. / BRONX GUILD HS
Name

52 Chambers St    / 1980 Lafayette Ave
Address

NEW YORK, NY  10007 /Bronx, NY. 10473
County, City                    State           Zip Code

## III.   CAUSE OF ACTION

### A.  Federal Claims

This employment discrimination lawsuit is brought under (check only the options below that apply in your case):

☐ **Title VII of the Civil Rights Act of 1964**, 42 U.S.C. §§ 2000e to 2000e-17, for employment discrimination on the basis of race, color, religion, sex, or national origin

The defendant discriminated against me because of my (check only those that apply and explain):

☐ race: _____

☐ color: _____

☐ religion: _____

☐ sex: _____

☐ national origin: _____

☐ **42 U.S.C. § 1981**, for intentional employment discrimination on the basis of race

   My race is: _____

☑ **Age Discrimination in Employment Act of 1967**, 29 U.S.C. §§ 621 to 634, for employment discrimination on the basis of age (40 or older)

   I was born in the year:    *1958*

☐ **Rehabilitation Act of 1973**, 29 U.S.C. §§ 701 to 796, for employment discrimination on the basis of a disability by an employer that constitutes a program or activity receiving federal financial assistance

   My disability or perceived disability is: _____

☐ **Americans with Disabilities Act of 1990**, 42 U.S.C. §§ 12101 to 12213, for employment discrimination on the basis of a disability

   My disability or perceived disability is: _____

☐ **Family and Medical Leave Act of 1993**, 29 U.S.C. §§ 2601 to 2654, for employment discrimination on the basis of leave for qualified medical or family reasons

**B. Other Claims**

In addition to my federal claims listed above, I assert claims under:

☑ **New York State Human Rights Law**, N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status

☑ **New York City Human Rights Law**, N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status

☑ Other (may include other relevant federal, state, city, or county law):

   *NY STATE 'WHISTLE BLOWER' STATUTE*

## IV.    STATEMENT OF CLAIM

### A.  Adverse Employment Action

The defendant or defendants in this case took the following adverse employment
actions against me (check only those that apply):

- ☐  did not hire me

- ☑  terminated my employment

- ☐  did not promote me

- ☐  did not accommodate my disability

- ☑  provided me with terms and conditions of employment different from those of
  similar employees

- ☑  retaliated against me

- ☑  harassed me or created a hostile work environment

- ☑  other (specify):  Removed me from classroom so as
  to give students passing grades to ensure graduation

### B.  Facts

State here the facts that support your claim. Attach additional pages if needed. You should
explain what actions defendants took (or failed to take) *because of* your protected
characteristic, such as your race, disability, age, or religion. Include times and locations, if
possible. State whether defendants are continuing to commit these acts against you.

① See attached notarized affidavit
labelled 'Ford Complaint'

② See attached 'Letter to Chancellor'
& list of 'inaccurate Statements'

③ See complaint to OSPRA / NYSED

④ See copy Original NY State Div of HR Complaint

As additional support for your claim, you may attach any charge of discrimination that you filed
with the U.S. Equal Employment Opportunity Commission, the New York State Division of
Human Rights, the New York City Commission on Human Rights, or any other government
agency.

## V.   ADMINISTRATIVE PROCEDURES

For most claims under the federal employment discrimination statutes, before filing a lawsuit, you must first file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) and receive a Notice of Right to Sue.

Did you file a charge of discrimination against the defendant(s) with the EEOC or any other government agency?

☑ Yes (Please attach a copy of the charge to this complaint.) *NY STATE DIV OF HUMAN RIGHTS*

When did you file your charge? *25 MAY 2018*

☐ No

Have you received a Notice of Right to Sue from the EEOC?

☑ Yes (Please attach a copy of the Notice of Right to Sue.)

What is the date on the Notice? *APRIL 2, 2019*

When did you receive the Notice? *APRIL 8, 2019*

☐ No

## VI.   RELIEF

The relief I want the court to order is (check only those that apply):

☐ direct the defendant to hire me

☑ direct the defendant to re-employ me

☐ direct the defendant to promote me

☐ direct the defendant to reasonably accommodate my religion

☐ direct the defendant to reasonably accommodate my disability

☑ direct the defendant to (specify) (if you believe you are entitled to money damages, explain that here):

*① Pay back pay, pension benefits.*
*② Investigate charges of false testimony, destruction of evidence, etc against DOE OFFICERS*
*③ Restore me to an appropriate teaching position*
*④ Pay appropriate damages that are present in*
*⑤ Access the defects that were evident in the system that were evident in my case and rectify them.*

RECEIVED

## VII.    PLAINTIFF'S CERTIFICATION

2019 JUL -5  PM 3: 26

By signing below, I certify to the best of my knowledge, information, and belief that
(1) the complaint is not being presented for an improper purpose (such as to harass,
cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are
supported by existing law or by a nonfrivolous argument to change existing law; (3) the
factual contentions have evidentiary support or, if specifically so identified, will likely
have evidentiary support after a reasonable opportunity for further investigation or
discovery; and (4) the complaint otherwise complies with the requirements of Federal
Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I
understand that my failure to keep a current address on file with the Clerk's Office may
result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to
proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | |
|---|---|
| _July 5 2019_ | _S Ford_ |
| Dated | Plaintiff's Signature |
| _BRIAN_ | _P._ | _FORD_ |
| First Name | Middle Initial | Last Name |
| _19 WEST 110th St, #95_ | |
| Street Address | |
| _NY_ | _NY_ | _10026_ |
| County, City | State | Zip Code |
| _646 7138285_ | _bpford2@gmail.com_ |
| Telephone Number | Email Address (if available) |

I have read the attached Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☐ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your
complaint. If you do not consent, please do not attach the form.

I, Brian Ford, being duly sworn, deposes and says the following:

First, for purposes of clarity I will be  writing in the third person.

RECEIVED

2019 JUL -5  PM 3: 27

U.S. COURT OF APPEALS
SECOND CIRCUIT

Second, that this case involves age discrimination, retaliation, a hostile work environment and

denial of due process.


Third, the plaintiff, Brian Ford, is a teacher who began teaching with the DOE in 1995 and was

granted tenure with in 2004; with the exception of taking leave when his daughter was

younger, he then taught at Bronx Guild High School from 2005 until the school was absorbed

into a larger school and renamed Gotham Collaborative High School at the end of the 2016-17

school year.  With the exception of one year at the beginning of which he was in an auto

accident and during which he filed a complaint against the school for not following Special Ed

regulations, he had uniformly high ratings, receiving either the highest rating available or an

effective rating for the previous years of his service.  He received the only Ineffective Rating of

his career in 2015-16; it was based on only 3 Evaluation Reports delivered between March 9th

and May 18th, one of which was found lacking by the Hearing Officer, one of which was

delivered to him 4 months after the observation and one of which was altered by the

Administration prior to being entered into the Advance system.  Near the end of the 2016-17

school year, for which he received a Developing Rating (adequate under the Danielson Rubric),

his principal, Samuel Decker, signed a Determination of Probable Cause which, though

defective in several regards, initiated 3020-a hearings.


Fourth, the hearings  resulted in a decision from Hearing Officer Robert H. Barron which

called for Mr. Ford's termination approximately 2 to 3 years prior to his planned retirement and

thus inflicted severe financial damage in terms of lost wages and a much lower pension. In addition, the emotional stress and heightened anxiety Mr. Ford endured during the charged period of 14 to 17 months, during the 3020-a hearings and after the hearings all resulted in the infliction of emotional distress.

Fifth, the DOE's case raised major concerns. Mr. Ford was supposed to have a co-teacher for his Integrated Co-teaching classes, but one was not provided for 7 of the 9 observations. Mr. Barron dismissed this as unimportant, stating that Mr. "Ford's role as teacher was to teach the students he had, regardless of their needs," (Decision, p. 49) thus contravening the Strong Public Policy on issues of education for special needs students by both developing a new standard for how teachers should be assessed when teaching special needs students and seriously damaging the accountability system for Special Education when it comes to how schools fulfill their mandate in implementing Individual Education Plans.

Sixth, there is also some concern about the DOE counsel's statements in her closing, which are recounted below; this is a secondary matter, but converges with questions Mr. Ford has raised regarding Mr. Barron's deference and bias, specifically 'in group' bias that would favor people, such as Ms. Cox, who were part of the same group as Mr. Barron.

Seventh, perhaps the foremost concern is that the DOE's chief witness, Samuel Decker, made numerous false statements, some of which Mr. Barron recognized but downplayed, some of which he did not acknowledge.[1] He also testified during the hearing that he destroyed relevant

---

1   A chart detailing these false statements is included below. While some of these Mr. Barron might not have been aware of, those he was aware of should have been sufficient in number to keep Mr. Barron from deeming Mr. Decker's testimony credible.

evidence – he shredded the Low Inference Notes on which his 6 observations were based.  In addition, at least one piece of evidence was altered before being entered into the Advance system, it seems by Assistant Principal Rauner.  Mr. Ford argued that this raised crucial due process rules, for the DOE produced a lot of evidence and it should not have been up to DOE witnesses to select which evidence would be delivered and which would not.

Eight, while Mr. Ford does not have currently have access to 'a smoking gun' to point to age discrimination, there is a pattern of improper behavior that corresponds to Mr. Ford's last years as a teacher, when he was in his late 50s.  Moreover, there is a history of statements by DOE officials which leads any reasonable person to believe that targeting older teachers was a likely result.  In addition, older teachers have been targeted by the DOE; examples include Mr. Ford's school, where 2 of the 4 teachers over the age of 50 have gone through 3020-a hearings and the Office of Adult and Continuing Education (OACE), where of roughly 140 UFT, the 28, who were rated poorly, all were over the age of 40.  Finally, the DOE did not act in such a fashion to prevent or remedy the improper behavior, despite being made aware of it.  Indeed, one can make the argument that the DOE, a public agency with a public trust, did such a bad job in protecting the rights of older teachers that it is de facto age discrimination.

Ninth, on the issues of retaliation, there are three separate issues:

1. Mr. Ford had previously filed a complaint about the Special Education practices at Bronx Guild and had raised these issues in meetings at the school in 2015-16 and 2016-17.

2. Mr. Ford took a sabbatical in the Spring of 2015.  His had been opposed on 'hardship grounds' by his District Superintendent, but he was able to go over her head to have it granted.  Prior to taking that Sabbatical, Mr. Ford had not received any negative evaluations for

classroom observations and, with a single exception, had received either Effective Ratings or

the highest rating available for ever year he had taught in the New York system.

3. Mr. Ford was under pressure from his principal, Mr. Decker, to pass students who were not

doing sufficient work and, in some cases, were not attending class on a regular basis.

Eventually, Mr. Decker did not allow Mr. Ford to put in grades for his students for the Spring

of 2017, but somehow all the students were graduated despite Mr. Ford's class being required

for graduation; while most of the students (roughtly 55 of 60), would have pased, several

students who would have not earned an adequate grade were among them, including one

student whose attendance rate was 20%.  Mr. Ford filed a complaint with the Office of School

Personnel Review and Accountability (OSPRA) of the New York State Education Department

in January 2018, but is not aware of any OSPRA action in this regard.


Tenth, Mr. Ford suffered in a hostile work environment which was memorialized in a

complaint filed with his union, the United Federation of Teachers, in the Fall of 2016.


Eleventh, as regards being denied due process rights, as already indicated, the DOE, a public

agency with a public trust, did such a bad job in protecting the rights of older teachers that it is

*de facto* age discrimination.


After his Appeal was denied in June of 2017, Mr. Ford went through 3020-a hearings in the

Fall of 2017.  The Hearing Officer issued a decision on January 4, 2018 which allowed the

DOE to terminate Mr. Ford from his employment.  While the DOE only has 15 days to

implement the decision according to statute, they waited until January 29, 2018 to have him

escorted by school security officers from his school.  Nonetheless, Mr. Ford, while he was cut

off pay roll, did not receive official notice of his termination until March of 2018.

Mr. Ford filed an Article 75 petition in State Supreme Court on or about January 12, 2018. That case (Index # 100062) was eventually decided by Justice St. George and gave Mr. Ford partial relief, finding that the penalty was too harsh, not in keeping with precedent and shocked the conscience. The case was remanded to the DOE for determination of a lesser penalty, but it presently stalled as the DOE has both filed a motion to Reargue and a Notice of Appeal with the New York State Courts.

Mr. Ford had intended to file an Article 78 Petition on the Appeal, but was informed, incorrectly, by the City Comptroller's Office that his notice of claim was not timely. Despite Education Law (Section 3813) stating that there is 3 months to file such a claim, the Comptroller held that the time limit was 90 days, and that September 14, 2017 was too late to file as the Determination Letter denying the appeal had been dated June 14, 2017. The Comptroller's Office did not consider the argument that the letter was not received until July, not that it was not sent on the 14th; the only date on the envelope was not from the US Postal Service, but from a Pitney Bowes metering machine and that this was the 15th, making it highly improbable, even if it had been mailed on the 15th (of which there is not proof), that it would have been received before the 16th. That certainly would have made the 90 day deadline, but having the Notice of Claim kicked out by the Comptroller's Office, Mr. Ford did not pursue the Article 78 claim until it was too late.

Instead, he filed a complaint with the New York State Division of Human Rights on May 25, 2018. This argued that "the facts lead one to no other conclusion than that something is

terribly amiss." pointing to "multiple factors . . . age, tenure and associated salary level were chief among them.  Moreover, this did not involve merely one person, but several officers of the DOE acting, seemingly in concert, but, if not, then in accordance with a set of principles that see older, experienced teachers not as an asset, but as an additional expense and an obstacle to their being able to do as they see fit, even if it is not in accordance with State Law, DOE regulations and the Collective Bargaining Agreement (CBA) between the DOE and theUnited Federation of Teachers. (UFT)"

In addition, Mr. Ford argued that he believed that his exercising his contractual option of taking a sabbatical in the Spring of 2015, his previously having filed a complaint about his school's lack of compliance with Special Education standards, his noting their continuing non-compliance, were factors that resulted in retaliation and that the ratings he received on his Evaluation Reports were artificially and systematically low. Similarly, his  refusal to pass students so as to bring up the school's graduation rate resulted in retaliation.  Finally, his availing myself of my rights as a UFT member –not only to take a sabbatical, but also challenge Evaluation Reports through the APPR system-- was a contributing factor that led the administration staff to engage in behavior that was harassing and abusive.

Mr. Ford was treated differently from other teachers in several ways.  First, unlike nearly every other core subject teacher in the school, he was not given a dedicated classroom, which had negative effects on his teaching, limited him to teaching techniques that did not rely on previous preparation of the classroom, made it more difficult to develop relationships with students since he did not have a space he could offer them to relax, 'chill' and feel more at home, and kept him from fully implementing many of the recommendations that came from

administration.  Second, he was assigned to teach new Curricula that had not been tested, that

differed from the State Curricula and which Mr. Ford had no part in developing.  Third, he was

given rosters that included a high percentage of students who had Individual Education Plans

that called for Integrated co-teaching, but he was not assigned a co-teacher, thus he was in

effect doing the work of two teachers.  Fourth, the Bronx Guild administration did not follow

protocols that are meant to enable teachers to properly engage in teaching, including having an

Initial Planning Conference, having regular coaching meetings, offering an option as to how he

would be evaluated, allowing him UFT representation at meetings for his Teacher

Improvement Plan in 2016-17 and many others.

Moreover, during the 3020-a hearings, which the DOE introduced in arguing against Mr. Ford's

Human Rights complaint with the New York State Division of Human Rights, Mr. Ford's due-

process rights were denied in several ways.

First, with a single exception, the DOE could not produce the Low-Inference Notes on which

the Evaluation Reports were based; 8 of the 9 Evaluation Reports written by Bronx Guild

Administrators were unsupported by Low-Inference Notes, as were the three reports prepared

by Joshua Frost, the so-called Peer Validator.  Indeed, in Mr. Decker's case, who wrote 6 of the

9 reports that were indicated in Specification 1, this was intentional; principal Decker testified

that he had deliberately shredded them because he no longer had an office and had no where to

keep them.  Mr. Ford notes that Mr. Decker continued to have an office until late June of that

year and was aware of the case against Mr. Ford prior to that, having initiated it himself in late

May of 2017 and having participated in Mr. Ford's Appeal  Hearing.  There should be no

excuse for not preserving the notes.  It was at a minimum a lack of due diligence and perhaps

something more insidious that resulted in the notes being shredded, but there is not way to tell

if the Evaluation Reports he produced were in keeping with the Low Inference Notes that he

was supposed to keep.

At the very least, the Low Inference Notes should have been subject to discovery, but they

were not. According to the Danielson Rubric, the Low Inference Notes are the basis of all

assessment. No teacher should be expected to trust the memory of the administrator as regards

the correspondence between the Low Inference Notes and the Evaluation Reports; moreover, in

this case the testimony of the Bronx Guild Administrators was not reliable. This brings us to

our second and third points.

Second, Mr. Decker gave false testimony on a number of issues. It is a long list and suggests

an indifference to the truth, which I have brought to the attention of the DOE on several

occasions hoping they would take action. I include one instance, a letter to then Chancellor

Carmen Farina dated February 21, 2018 and sent to her by email and a revision of this letter

from April of 2018. (A similar letter was delivered by hand to 52 Chambers Street and

received by Lizette Roman in late January/early February of 2018.)

Third, other evidence was tampered with or contained documentably false statements. The

Evaluation Report for the observation of April 1, 2016 was changed from an informal

observation to a formal observation on or about June 24, 2016, long after it had been delivered

to Mr. Ford for his signature; it was the tampered version, which was unsigned, that was

entered into the DOE's Advance system and which was used to calculate his end of year rating.

This issue was raised not only at the 3020-a hearings, but also at the Appeal Hearing in May

2017, where copies of the two conflicting Evaluation Reports were produced as evidence.

Nonetheless, when Phil Weinberg wrote his determination letter this was not noted; to the contrary, the decision of Philip Weinberg [writing after Gary Wittenberg had presided over the hearing], ignored documentary evidence and other evidence affecting all three observations on which the rating was based. Thus, he ignored that the Observation Report submitted for the Appeal had been manipulated. There were other problems as well. First, the decision of the hearing officer stated that all observations lasted the minimum required time; he thus ignored the Evaluation Report of 1 April 2016, marked as a Formal Observation, which requires the Evaluator to be present for the entire period. Second, he dismissed the claim that feedback was not timely by stating that all Evaluation reports were delivered with 45 schools days; as the documents the DOE presented show, the Evaluation report for the November 20, 2015 was not delivered until mid-March 2016, a period of well over 60 school days. Third, Mr. Weinberg's decision stated that Mr. Ford's supervisors "analyzed the observational evidence under the Danielson Rubric, and issued the rating based on what was observed" was contradicted by independent arbitrator Robert A. Barron, the Hearing Officer in the 3020-a case, who found that the Evaluation Report for the March 7, 2016 observation, conducted by Assistant Principal Rauner, "does not include much evidence to support her ratings, and for some ratings she provided no evidence at all," adding both that "the lack of evidence is a significant deficiency" and that all but two components of the eight in the Evaluation were not being sustained due to the lack of evidence." (Barron Decision, p. 51; admittedly, Mr. Weinberg did not have the benefit of reading the decision, but the defects of the Evaluation Report should have nonetheless been evident.)

Thus, all three observations on which the annual rating was based should have been dismissed or, at least modified, but Mr. Weinberg's decision does not acknowledge this. Instead Mr. Weinberg's decision is in larger part seemingly cut and paste from the DOE position statement; the position statement and Mr. Weinberg's decision both contain 14 bullet points; moreover, each bullet point is substantially the same as the DOE position statement and nearly identical in wording, indicating an reprobate indifference to the facts of the case as presented at the hearing. Finally, Mr. Weinberg seemingly accepted false statements and manipulation of evidence by Mr. Ford's administrators without question.

Also, Mr. Ford received an overall Ineffective Rating for the 2015-2016 school year, but was nonetheless deemed "Effective" in both the "Local Measures" components and the "State Measure" component. Mr. Ford was neither rated nor observed in the 2014-15 year, the explanation from the school administration being that he was on sabbatical for the spring semester, which accounts for there not being a rating, but Mr. Ford should have had observations and feedback in the fall term, but did not. According to the Advance Guide "All teachers serving students should be observed and provided with meaningful feedback," but Mr. Ford went from June of 2014 to March of 2016 without receiving a written evaluation report. Mr. Ford received an overall Effective Rating for the 2013-2014 school year.

Thus, Mr. Decker not only testified that he deliberately destroyed relevant evidence (Tr 471), but also engaged in false testimony . Moreover, he or his administrators tampered with evidence, thus making a finding that the DOE met its burden of proving its case with a preponderance of the evidence impossible.

As regards Age Discrimination, even if the Principal was not motivated by age discrimination, he was nonetheless encouraged to pursue his actions by the DOE and the DOE has a history in this regard, a history that begins when the DOE was created in 2002. IN this regard, Mr. Ford's age and salary level seem to be likely motivations for it has roots in an attack on tenure that came not from the State legislature –which has enacted a strong public policy in favor of teacher tenure--, but from the Administration of Mayor Bloomberg and Chancellor Klein. Chancellor Klein identified as obstacles "the three pillars of civil service:  lock-step pay, seniority and life tenure.  Together, they act as handcuffs and prevent us from making the changes that will encourage excellence in our system."2  Mayor Bloomberg said many times that he wanted to 'end tenure as we know it.'3   This was part of an attack on tenure that has

---

2 Remarks by Joel Klein, Business Breakfast Forum:  Crain's New York Business/ Partnership for New York City, Jan 27, 2004;
  http://www.parentadvocates.org/nicecontent/dsp_printable.cfm?articleID=1803]
3  "Remarks of Mayor Michael R. Bloomberg at NBC News' 'Education Nation' Summit," schools.nyc.gov, Sep. 27, 2010.
      The then Mayor cited a statistic saying that 99.1% of teachers received tenure.  I am not sure where he got the statistic, but if he did not create it our of whole cloth, I assume it was for a limited period among teachers who applied for tenure and that it did not include teachers who were not going to get tenure were discouraged from applying.  I know that with the turnover rate in NYC schools being a high as 25% per year, that the 99.1% figure cannot be representative of the entire teaching pool.  Here is his full statement (emphasis added):
"We'll do more to support teachers and reward great teaching – and that includes ending tenure as we know it so that tenure is awarded for performance, not taken for granted. Teachers and principals are professionals. They deserve to be paid like professionals, treated like professionals, and evaluated like professionals. But for too long, the tenure evaluation process for both principals and teachers has been a formality – a rubber stamp. It used to be that 99.1 percent of teachers received tenure. That's right, 99.1 percent. But last year, we started using data to make tenure decisions, and the tenure number dropped to 89 percent. For the other 11 percent, they were just not ready to receive a lifetime job protection... It's time for us to end the 'last-in, first out' layoff policy that puts children at risk here in New York – and across our wonderful country. *With more budget cuts looming*, principals across the country will have no choice but to make layoffs based only on seniority – so their newest teachers would be the first ones to go, even if they happen to be the best teachers. That makes no sense. Remember our one and only question: is it good for children?"

withstood the test of time, being implemented Mr. Bloomberg's term by those he and

Chancellor Klein appointed to the DOE. The DOE has demonstrated since that time that it has

little patience for teachers who question the wisdom of its judgements. That this was a concert

among DOE officers must be considered as a possibility. Another question that must be

considered in this regard is why the DOE would rush ahead with the case prior to the issuance

of a determination in the Appeal of my 2015/16 rating instead of waiting for a result? It was

not to remove Mr. Ford from the classroom because he was not removed from the classroom

until June 9, 2017, one day before classes ended for the school year.4 The pattern of actions

indicates the DOE assumed all along that the outcome would align with its original position

statement, an outcome that they should have not had been able to predict if the hearing had

been fair and even-handed.


Thus, the DOE, in allowing Mr. Decker to ignore protocols left and right, in not responding to

Mr. Ford's complaints, was engaged in a pattern of age discrimination.

---

4 To round out the picture, I taught in the classroom after the Specifications in the 3020-a were
issued on May 23rd, after Mr. Decker signed the Determination of Probable Cause on the 26th
and after I was served with the papers on May 31st. Mr. Decker came to my classroom near
the end of the day on Friday June 9, 2017 and asked me to come to the office. I pointed out
that there was no one to cover the class, but Mr. Decker insisted. In the office I was given a
letter reassigning him to the library on a different floor of the building and told to not return
to the school. Mr. Decker told me to return to my class and also that I needed to take
anything I wanted to remove from the school before the end of the day. At this point it was
nearly 3 pm, the school day ending at 3:15. Many materials that I might have potentially used
in the hearings were thus unavailable to me. In addition to everything else, I was prejudiced
by the timing.
I was reassigned to the Library where I was still in close contact with students. There was no
urgency to remove him from the classroom and that might have been avoided because it
likely would have caused a disruption of Bronx Guild's schedule as I was heavily involved in
student preparation for the Regents exams. The only day in the classroom I missed was the
last day, a low-attendance day, June 12th. Mr. Weinberg dated his letter June 14th.

Some background:

Mr. Ford, born in the year 1958, was in his 18th or 19th year of service al(depending on how one counts) and roughly two years from his projected retirement when he was brought up on charges of Ineffective Teaching by his Principal, Samuel Decker, in May of 2017. Mr. Decker himself signed the Determination of Probable Cause and then proceeded to become the chief witness in the case; this is one of many questionable actions in a case that is full of questionable actions.

Mr. Decker should not have been filling that triple roles of Evaluator, witness and of determining probable cause in the same case. To allow such a procedure is more than a conflict of interest, but an invitation to abuse. We also note that the Determination of Probable Cause was inaccurate, for it indicated that the Board met to make the Determination of Probable Cause , not that the task was delegated to Mr. Decker, and in that it listed the school district as 'Bronx Guild High School' – not only is there no such district, but there is no longer even a Bronx Guild High School since it was merged with another school and Mr. Decker has retired, apparently forces to do so due to poor performance.

This one indication that something was amiss. Others will be listed in turn, but let us first note that Mr. Decker signed the Determination of Probable Cause on May 26, 2017; this was the same day as Mr. Ford's Appeals Hearing of his only Ineffective Rating. If Mr. Ford had won that Appeal, which he should have since all the Evaluation Reports used for his rating had significant defects, then it is unlikely that the 3020a hearings would have commenced. The

DOE, however, seemed to have decided prior to this to initiate 3020a proceedings, some of the paperwork being signed on May 23, 2017 and the Determination of Probable Cause being signed by Mr. Decker himself on the same day as the hearing, May 26, 2017. What this suggests is another instance of 'Backward Engineering' in which the decision of the Appeals Hearing was predetermined – a denial of the appeal cleared the deck so that the the 3020a hearings could commence.

Mr. Ford had, previous to 2015, a good to excellent record. This changed sometime in the fall of 2015 when he returned from a half year sabbatical. The sabbatical was originally denied in December 2014, by Carron Staple, the District Superintendent on the  grounds that "taking of the sabbatical will create a hardship for the school." Ms. Staple also visited the school, and Mr. Ford's classroom in November of 2015 and shortly afterwards Mr. Ford began receiving not only negative evaluations, but systematically negative evaluations in which every category or domain in the Evaluation Rubric.

Thus the Circumstantial Evidence is Compelling.

1.  With a single exception, Mr. Ford was rated either as an effective teacher or received the highest possible rating for every year he taught from 1995-96 until 2014-15.

2.  He was rated as an effective teacher on both the Local and State Measures; not only that, but he received 15 and 16 possible points out of 20, putting him at the high end of the effective range, which begins at 9 and ends at 17.

Ford Complaint // page 14 of 20

3. His Ineffective Rating in 2015-16 was based on a mere three observations, less than the minimum 6 called for by the Advance System agreed upon by NYC DOE and the UFT.

4. Of those three Evaluation Reports, none was given to Mr. Ford for his signature prior to March 9, 2016, giving him little if any opportunity to change his teaching methods. The other two  Evaluation Reports were

5. One Evaluation Report was delivered in mid-March 2016, more than 65 school days (109 calendar days) after the actual observation (November 20, 2015), far beyond the 45 day limit called for by the Advance system.  Despite this, the Determination Letter signed by Phil Weinberg stated that all Evaluation reports were delivered with 45 schools days.

6. Another Evaluation Report, dated May 18th, for the observation of April 1, 2016, was altered before being entered into Advance.  Despite this, the Determination Letter signed by Phil Weinberg stated stated that all observations lasted the minimum required time; he thus ignored the Evaluation Report of 1 April 2016 submitted by the DOE, marked as a Formal Observation, which requires the Evaluator to be present for the entire period, which he was not; he also ignored that the Observation Report submitted for the Appeal had been manipulated.

7. Third, Mr. Weinberg's decision stated that Mr. Ford's supervisors "analyzed the

observational evidence under the Danielson Rubric, and issued the rating based on what was observed" was contradicted by independent arbitrator Robert A. Barron, the Hearing Officer in the 3020-a case, who found that the March 7, 2016 observation, conducted by Assistant Principal Rauner, "does not include much evidence to support her ratings, and for some ratings she provided no evidence at all," adding both that "the lack of evidence is a significant deficiency" and that all but two components of the eight in the Evaluation were not being sustained due to the lack of evidence." (Barron Decision, p. 51)

Having documented the short comings of the hearings, let me conclude.

The DOE seems to think of itself as a Kingdom unto itself, subject to no one.  This goes beyond the Appeal of my Rating in 2015-16.  The actions of the DOE, from not having Initial Planning Conferences, to not having the minimum number of observations, to handing back observations long after the event, to submitting Evaluation Reports that are mainly cut and paste, to tampering with Evaluation Reports, to false testimony, to documents that were contrary to fact, to the denial of arguments in the Appeals process of claims that were substantiated by evidence presented in the hearing, to observing under trying conditions,5 to

_____

5 In the Denial letter, Mr. Weinberg replied that the  contention regarding being "observed under challengeing conditions should be dismissed as Evaluators may conduct observtions at any time," repeating nearly word for word the blanket statement from the DOE position paper and not allowing for any situation in which an observation would be unwarranted or a wise administrator would demur.  The Observation of Friday November 20, 2015 was on a half-day, with a shortened period.  Further, the students had just returned from a three day camping trip and had not been in class since the previous Friday; in addition, there had been a major incident on the trip resulting in multiple suspensions.  Finally, the students had also been informed they would not have class, but go a field trip, so most did not bring their book bags and were not expecting to be in class. Considering the  circumstances, I was astounded

bringing the 3020-a case prior to the determination of the Appeal, to the destruction of

evidence relevant to the the 3020-a case, to the DOE Attorney implying I was guilty of

Insubordination, when 'Insubordination' was not among the specifications and when I, because

the accusation was in her closing statement, had no chance to reply to this charge (Tr 1775)6 —

all of this and much more point to a pattern of disregard and disdain for the protocols and

procedures established by law and contract, and even to the general rules of evidence and

giving accurate testimony.  I cannot prove that these actions were coordinated, but argue that a

level-headed interpretation raises questions as to the motives for bringing the 3020-a case when

it did and casts in extreme doubt the Determination of the Chancellor's Designee in the Appeal.

Considering all this, it is respectfully requested that, if it is within its powers, the Commision

issue an Order:

1.  Annulling and reversing the denial of my I-Rating appeal for the 2015-2015

school year, thus giving me an Effective Rating (or higher) or no rating at all;

   2.  Providing back pay and associated benefits going back to the date of Mr. Ford's

---

that Mr. Decker would observe the class; not receiving an Evaluation Report until mid-
March, I had thought in the interim that Mr. Decker had thought better of this, not submitting
the report since it would be unfair to do so. (Tr 1307-12 1365; Tr 471-4)

6  Ms. Cox stated "the Respondent did not refuse professional development and remediation
[and] wasn't hostile or outright uncooperative with the administration," but then says "he
repeatedly failed to implement the strategies and suggestions given to him by his
supervisors. *Insubordination is defined as refusal to obey orders.*" (Tr 1775, *e.a.*) Ms. Cox
cited *Dept. of Educ. v. Elligsen*, in which Arbitrator Capon referred to a teacher's "disregard
for the supervisors who repeatedly instructed him on the proper methodology and
techniques to be used in the classroom." (Tr 1776)  I contend I did not disregard, but sought
to implement the suggestions; unfortunately, I found that many were counter-productive or
were contrary to norms established by the State or DOE.  I found myself often wondering if
by following the suggestions I was hurting his performance.  I also note Ms. Cox's cite
assumes that 'proper methodology' is not subject to question, but rather asserts that
differences of professional opinion are not allowed and a teacher's academic freedom, which
NY State's strong public policy in favor of tenure is designed to protect, is of no
consequence.

termination (January 29, 2018);

3. Returning me to my previous position for the remainder of the school year and directing that the DOE place me back in 'Year One' status for the next school year;

4. Vacating the Opinion and Award of Robert H. Barron, dated 4 January 2018, which called for my termination from my tenured position as a teacher with the New York City Department of Education, as it was largely based on the false denial of my appeal of my "Ineffective" rating ("I-Rating") for the 2015-2016 and school year; and

5. Returning me to my position as a tenured teacher with the NYCDOE, or a similar and comparable position, providing compensation for missed employment and pension credit, or providing compensation for the loss incurred; and

6. Granting me legal costs and fees, compensation for missed employment and time spent preparing my pro se defense;

7. Granting me compensation for the infliction of emotional distress and pursuant physical harm, compensation for lost reputation and such other and further relief as the Court deems just and proper;

8. Further, in sum and at risk of repetition, I request that the Commission consider an order reinstating me immediately and forthwith to my previous position or to, with my consent, another suitable position in the DOE, with all the rights, privileges and respect that should be

accorded to that position, including, but not limited to, reinstatement on pay-roll, return to the

status quo ante regarding his pension and health insurance, back pay, additional compensation

and/or punitive damages as the Commission finds appropriate, and to be made whole in all

ways.


☐Respectfully submitted,

Brian Ford

Dated:  July  5ᵗʰ , 2019

New York, NY


                                        Brian Ford

                                        19 West 110th Street, #45

                                        New York, New York 10027

                                              (646) 713-8285



Sworn to before me this


  5ᵗʰ  day of  JUly , 2019                              Brian Ford



New York, NY

Kenneth Cardez
Notary Public, State of New York
Reg No. 04CA6351839
Qualified in New York County
Commission Expires December 12, 2020

Ford Complaint // page 19 of 20

RECEIVED

2019 JUL -5  PM 3:27

U.S. COURT OF APPEALS
SECOND CIRCUIT

19 February 2018
19 West 110th Street, #45
New York, NY 10026
646 713 8285

Carmen Farina, Chancellor
City School District of The City Of New York
52 Chambers Street,
New York, NY 10007

Dear Chancellor Farina:

As you may recall, I sent you two letters previously, both by email and one delivered by hand to Lissette Roman at 52 Court Street. So far I have not gotten any response, so I am following up with this letter.

As I told you, I received an opinion in a 3020-a case brought by the DOE. The Hearing Officer found termination from my tenured position was justified. To say the least, I thought that this was unduly harsh. The 3020-a proceedings were not meant to work the way they did in my case, terminating a teacher with only a single yearly ineffective rating, with that rating being given under a new evaluation system that was implemented improperly, with all the evaluations being delivered within a 15 month period. I have been teaching with the BOE or DOE since 1995 and, with a single exception under unusual circumstances, have gotten satisfactory or effective evaluations until the last two years, when I received one ineffective and one developing (a.k.a., adequate or basic) rating.

But more than that, I felt it was unfair in the extreme because my administration destroyed evidence and gave false testimony (both of which were acknowledged by the Hearing Officer). This continued a pattern of prevarication and harassment that went back to at least November of 2015. My principal, and the school's APs, gave false testimony and destroyed evidence that might have been exculpatory. My principal gave false testimony and submitted evidence that was tampered with not only in my 3020a hearing, but in a May 2016 hearing to appeal my 2015/16 rating.

In addition, there are concerns about the Hearing Officer and his preparation, about the actions of the DOE attorney in pursuing this case and her influence on the Hearing Officer, about violations of Special Ed and other issues of non-compliance at the school and about putting pressure on teachers to pass students who were either excessively absent or did not complete the required work so that they could improve their graduation rate. There is evidence that grades might have been manufactured in order to graduate students.

Thus I have multiple questions on these and other concerns:
1) Will the DOE (or anyone else) investigate witnesses who gave false testimony and who destroyed and tampered with evidence?
2) Will they suffer any penalty? I was careful not to give false testimony, they were not and I ended up on the short end of the decision. Is there not even the threat of a penalty?
3) What are the effects on due process rights of allowing such testimony and such treatment of evidence? If there is no penalty for false testimony, then teachers do not really have due process rights as witnesses against them can say anything they want.
4) Why is the DOE not abiding by the statutory definition for "ineffective teaching" in making decisions stated in section 3012-c of the education law as "a pattern of ineffective teaching or performance shall

1

be defined to mean two consecutive annual ineffective ratings received by a classroom teacher." I ask because they did not do so in my case, as I did not receive two consecutive Ineffective ratings. This is expanded upon below.

5) What sort of training did the Hearing Officer receive prior to the initiation of the case? He seemed to be ignorant of the most basic elements of the evaluation process that was at the core of the case. It would be like a judge in tax court not knowing what a dependent or a deduction was or a football referee being unfamiliar with the concepts of 'offsides' and 'first down.'

6) What measures are taken to ensure Hearing Officers apply appropriate standards? This Hearing Officer did not, and he seems to have made up his own standards out of whole cloth.

7) Why was I never offered the opportunity to enroll in the Peer Intervention Program ("PIP") rather than being charged with incompetence under 3020-a? Under Article 21 of the CBA, someone receiving a low rating for the first time should be afforded that opportunity. The DOE never informed me of this and by the time I knew about PIP, the program was full and I was placed on a waiting list.

8) Why has the DOE not responded to my letters of 21 January (delivered by hand to Lissette Roman at Tweed on 29 January and sent by email to the Chancellor) and 1 February (sent by email to the Chancellor on 2 February) that pointed to a hostile work environment and severe problems at the school, including
   1. Pressure to lower standards and pass students. My principal wanted me to pass seniors at a greater rate than I felt was justified by their work and attendance. Apparently he also graduated quite a few seniors who did not meet all requirements.
   2. The school were so far out of compliance on Special Ed as to be laughable. Many Integrated Co-Teaching (ICT) classes had over 40% IEP students, a clear violation. There were no Co-Teacher in many classes for Students with IEPs calling for ICT; the IEPs called for ICT in all core subjects but generally this was not provided in either Science or Social Studies. I taught Social Studies and during the charged period, 7 of my 9 observations were in classes where my students were mandated to have a co-teacher but did not. (I should also note that I had brought up the issue in the past with my principal and my noting it ended up working against me. As I mentioned, there was one single exception of my receiving Satisfactory or Effective ratings prior to 2015 - that was the year in which I filed a Special Ed complaint on this issue.)

9) What measures can be taken to address and remedy a series of administration violations of Advance and other protocols, including, but not limited to, tampering with evaluation reports and entering that information on to Advance, delivering one evaluation report 4 months after the date, not giving the teacher a choice among evaluation options, not collaborating with (or even asking for input from) the teacher on the Teacher Improvement Plan (TIP), not holding an IPC in either year, not allowing UFT representation at several TIP meetings, not abiding by the TIP, etc. ? These were procedures designed to ensure the fairness and integrity of the rating system, but they were bypassed by the administration.

10) What measures can be taken to address and remedy a series of hostile, abusive and harassing acts, including, but not limited to, calling the teacher in to school during summer recess in order to clean out a closet he was assigned at the end of the previous school year, yelling at the teacher, questioning his hygiene in front of others, placing false and inflammatory information in the teacher's file and initiating a baseless verbal abuse claim?

Of these, I will start with the issue of false testimony. It is one thing to lose my job. It is another to lose my job because of my principal's falsehoods and then see him get away with it.

In particular, my principal, Samuel Decker, made multiple false statements at the hearing. So far by my

count there were at least 15 in his testimony, many of them contradicting documents he himself wrote, such as emails. In addition, other false statements were entered into the record in the form of documents. I have not yet done a thorough search, but I have found another 10 or so in just two DOE documents, 'The Coaching Notes' and a letter to file dated 7 February 2017.

It was not just the number of the false statements which is nettlesome, but their purpose. These were not harmless errors. I cannot believe they were unintentional. They were part of a narrative Mr. Decker and the others were constructing that depicted me as an uncaring, apathetic and ineffectual teacher. In other words, taken together they comprised an effort at character assassination.

I have asked a few people by email, including yourself, whether there are any penalties for false testimony in a 3020-a hearing. No one has told me whether there are (the Chancellor has not responded as yet), so if you could make such an inquiry, I would appreciate it.

Clearly, if DOE witnesses are allowed to give false testimony with impunity, then my due process rights are severely compromised, if they exist at all. As I might have indicated previously, I counted at least 15 false statements my principal made in his testimony, most of them documentable in that they contradicted his own email or something of that nature. In addition, the exhibits contained other false statements. These are documented in my letters to the Chancellor with a list of many of these. They are attached.

In any case, is there a way to pursue such a complaint? Please advice.

I stress again that these were not random false statements that somehow came together by accident. They were a set of convenient falsehoods that were tied together seemingly with a single purpose -- to portray me as an uncaring, apathetic and recalcitrant teacher. It was an effort at character assassination and, judging from the Hearing Officer's decision, it worked.

Also, it is worth noting that there was also the destruction of evidence and evidence tampering. My principal, Samuel Decker, and my Assistant Principal, Cecilee Rauner, both testified that they had destroyed evidence, specifically the Low Inference Notes on which my Evaluations were based. When they did this, they were well aware that there would be hearings for which they would be relevant because they had initiated the hearings. When I received notice of the hearings, the complaint was signed by Mr. Decker and there was, if I recall correctly, a warning not to destroy or dispose of relevant evidence. They should have been held to that standard. In addition, the other Assistant Principal, Christine Ghaznawi, was only able to produce Low Inference Notes from one class visit. That means that of the 9 observations entered as evidence in the case, *only one was supported by the Low Inference Notes*. Moreover, there should have been many more sets of Low Inference Notes since the Administration was supposed to be in my classroom to give guidance and feedback, not just to observe for the purpose of evaluation on those 9 days.

In addition to Low Inference Notes, other evidence was tampered with, including the APPR Observation Report of 1 April 2016. This is an official document and it was given to the respondent on or about 18 May 2016 for his signature, but was modified at a later date (on or about 24 June 16) and was submitted in altered form for purposes of the respondent's end of year rating for 2015-16 and subsequent administrative hearings related thereto.

Let me make it clear that *both sides* agreed Mr. Decker made false statements at the hearing – the Hearing Officer in his decision recognized that on some points Decker's testimony "was inaccurate, including his testimony on the professional development for 2015/16, and when he gave Ford the 2015/16 curriculum. He

also failed to remember some dates and facts accurately." Nonetheless, he did not think this significant. "However, while those gaps and mistakes undermine his credibility on those specific circumstances, they are not sufficient to draw a broader negative inference about his overall credibility."

So, there are also serious concerns about the Hearing Officer – he was hearing his first 3020-a case and his inexperience showed. He was not informed about the evaluation process prior to the hearing, was insufficiently trained and seemed to opt for 'learning on the job' with his main tutor being the DOE attorney, who misinformed him as to appropriate standards. The Hearing Officer applied the wrong standards, often devising his own novel constructions and, perhaps most important, shifted the burden of proof from the DOE to the teacher. Moreover, the Hearing Officer's own decision was rife was contradictions, inconsistencies and untenable interpretations of testimony.

But I will leave most that for another day. People tend to say my letters are too long.

Still, before I close I have to ask why neither the Hearing Officer nor the DOE Attorney abided by the statutory definition for "ineffective teaching" from section 3012-c as "a pattern of ineffective teaching or performance shall be defined to mean two consecutive annual ineffective ratings received by a classroom teacher." I did not have two consecutive Ineffective Ratings, only one, for 2015/16. Moreover, it was only based on half the year. The 2015/16 rating was based on only 3 informal observations, all three of which had defects, one of which was tampered with (changed from formal to informal) and none of which had a evaluation report delivered or dated prior to March 9 2016; that is, the yearly rating was based on only 3 observations reports dated on or about 9 March, 16 March and 18 May, hardly giving me sufficient time to adapt my practice. My rating for 2016/17 was Developing, which is considered a Basic or Adequate rating.

Indeed, with under the statute this case *should have never been initiated*. After 15 years in which my ratings were with a single exception Satisfactory or Effective, I was terminated based on 9 observations delivered to me in a less than 15 month period from 9 March 2016 to on or about 18 May 2017. My principal filed 3020-a charges against me on or about 26 May 2017. Even if there were no question of false testimony and destruction of evidence, even if the Hearing Officer were not inexperienced and untrained, even if he had not created his own standards which shifted the burden of proof from the DOE to myself, this seems to me not what the 3020-a process was designed to do.

I would greatly appreciate if you could address the list of inquiries. They are not only of specific interest to me, but of general interest to the system as a whole and it's proper functioning. They are worthy of your attention.

I thank you for your time and effort in reading through this.

Sincerely,


Brian Ford

LIST OF INACCURATE DECKER STATEMENTS

(From letter to Chancellor, Dated 1 February 2018; never received a response)

RECEIVED
2019 JUL -5 PM 3:27
U.S. COURT OF APPEALS
SECOND CIRCUIT

It will also argue that the false testimony, if not acted upon by the DOE, violates my Due Process rights by allowing witnesses to give repeated false testimony and to destroy evidence with impunity.  As the colloquial term goes, if there are no checks on false testimony, my due process rights are not worth a pitcher of warm spit.

 The testimony and the documents produced by Mr. Decker contained multiple falsehoods.  This were not just harmless errors, but statements and documents that contributed to the narrative that I was a problem teacher and deflected from the facts indicating that Mr. Decker ran a problem school that was out of compliance on just about everything.  Therefore I assume the the issue of false testimony and the destruction of evidence in my case is relevant.

The rest of this letter is about that issue.

Though instances can be found in the testimony of the two Assistant Principals, Principal Decker's testimony was the chief example of false testimony.  Mr. Decker testified, contrary to documentary evidence - including emails he himself had sent - and/or testimony he himself or one of his Assistant Principal gave.

Below is a partial list of his inaccurate statements.   A summary of Mr. Decker 's testimony is in the first column, the facts as known in the second and the source of these facts in the third.  I had originally presented this is the third person, so please excuse that stylistic blip.

| Mr. Decker's testimony: | Facts as known | Source of Facts |
| --- | --- | --- |
| The curriculum for the Fall 2015 class 'Participation in American Government' | In fact, the curriculum for Fall 2015 was given to the respondent only on | It is documented in an email from Mr. Decker to the Respondent that the curriculum would not be |

| was given to the respondent (Mr. Ford) during the summer of 2015. | the day before classes started – Sept. 8th, the day after Labor Day. | ready until after Labor Day.  It is also in the respondent's testimony. |
|---|---|---|
| Mr. Ford was given the book on which the curriculum was based early in Septemter 2015 term. | In fact, the book, listed on the front of the curriculum, was not given to Mr. Ford until nearly the end of September. | Emails from Mr. Ford to Mr. Decker asking when he might get the book, support this. |
| There was an assigned book for the Economics curriculum. | In fact, there was no assigned book for the Economics curriculum. | Mr. Ford's testimony; emails between Mr. Ford and his co-teacher, Cailin Shiller; the Economics curriculum. |
| Assistant Principals in 2015/16 made numerous materials available to Mr. Ford. | Few, if any materials were made available in 2015/16. | Mr. Ford's testimony. There is no evidence to support Mr. Decker's testimony. |
| Mr. Decker had written the TIP with Mr. Ford and that the TIP had been produced collaboratively. | In fact, the TIP was presented to Mr. Ford at the first meeting of the year on 26 September and Mr. Ford had no input into its creation. | Administration Document written by Mr. Decker 'Coaching with Brian' and Mr. Ford's testimony. |
| Mr. Ford was permitted to have UFT representation at his October 7th TIP meeting, but the UFT rep did not show up. | In fact, Mr. Ford asked for representation, but Mr. Decker denied it. | Email exchange between Mr. Ford and Mr. Decker on 6 October shows that Mr. Ford asked for UFT rep and Mr. Decker denied the request. |

Additional Point on Above Item:
In her closing statement, the DOE Atty, Ms. Cox, said the following:   "Principal Decker testified he believed the Respondent was not entitled to a union rep, but

that he agreed to let him have one because it would make him more comfortable.
Now this is in reference to that initial teacher improvement plan meeting, in
September of 2016.  Principal Decker testified that he set up another meeting to
allow the union rep to come and that he did not show.   Now the Respondent's
testimony is that Principal Decker emailed him and told him that the
representative couldn't come.   However, although the Respondent introduced other
emails between himself and Principal Decker, he did not introduce that email to
corroborate that claim.  What motive would Principal Decker have to lie about
doing something that he wasn't required to do?  And what would be the motivation
or reason behind going through the motions of setting up another meeting that was
for the purpose of allowing the union representative to come, and then not
allowing the union representative to come?"   (In the Matter of  NEW YORK CITY
DEPARTMENT OF EDUCATION v. BRIAN FORD Section 3020-a Education Law Proceeding, File #31,318,
p 1747)
The corroborating email of 6 Oct 16 reads,  "Brian‒ The chapter chair does not get
to sit in on TIP or coaching meetings. This is not a disciplinary meeting. Sam"
It was provided to my NYSUT counsel on 3 October 2017; I had thought she
introduced it, but she may not have. A copy of  the email is at the end of  this
letter.

| | | |
|---|---|---|
| Mr. Ford had 3 prep periods in Spring 2016. Mr. Ford taught 2 Economics classes, one Global History Class, one Credit Recovery Class, Hallway Duty, a lunch period and one prep. | In fact, Mr. Ford had 4 teaching assignments and a hallway assignment out of the 7 class periods that term. | This would need to be reconstructed from available documentation and testimony. |
| Mr. Ford was paired with two teachers – Sarah Moore and Cailin Schiller because they were stronger teachers. That includes Ms. Schiller. | In fact, while that might be true of Moore and that Global class, Ms. Schiller was not considered by anyone, including Ms. Schiller herself or her evaluators, a 'strong' classroom teacher. | Ms. Schiller stated in meetings that the administration,  gave Ms. Schiller developing ratings in Fall 2015. (Incidentally, Mr. Ford believes she is a very gifted Special Education specialist). |
| Mr. Ford was paired | Ms. Moore and Ms. | Ms. Moore was the |

| | | |
|---|---|---|
| with two teachers, Ms. Moore and Ms. Schiller, who were there only for support. | Schiller, were in fact co-teachers with Mr. Ford. | teacher of record for the Global class and email communications indicate Ms. Schiller taught the class, sometimes on her own, more often than did Mr. Ford. |
| Mr. Ford did not put page numbers on materials given to students and Mr. Ford did not put dates on the daily flow. | In fact, the materials presented during the hearing clearly show that he did put page numbers on materials. Indeed, Mr. Ford took pains to organize the class materials so that students could follow their progression. | The materials submitted. Unfortunately, Mr. Ford no longer has the chart paper on which he put the daily Flow, but they included a heading at the top - the date, the class name and the class number. |
| Mr. Ford gave students a reading by Howard Zinn - a college level text book. | In fact, the reading was from Zinn's 'Young People's History of the US,' which is middle school level. | Mr. Ford's Lesson Plans, submitted to Mr. Decker. Please note that Mr. Ford had given Mr. Decker these materials on more than one occasion. |
| Mr. Decker offered Mr. Ford per session to stay after school and work on professional development. | In fact, Mr. Ford was often the last person in the school at night and would have welcomed the opportunity to earn per session money if it had been offered. | Unfortunately, we did not contest this during the hearings. One reason is that you cannot prove a negative, that Mr. Decker *never* said this. But there is no evidence that he did. |

| | | |
|---|---|---|
| Mr. Ford had a 'history' of not handing back documents on time.  He made that comment in trying to explain why it took from 20 November 2015 observation was not given to Mr. Ford until mid-March of 2016 - almost 4 months. | The last time Mr. Ford had received an observation report was June of 2014 - over 20 months - so how could he have had a 'history' at that time?   The only incident that Mr. Decker can point to is the 20 Nov observation. | It is uncontested that Mr. Ford did not receive a written observation report during the 2014/15 school year or during the Fall 2015 term.   I have a copy the 20 Nov observation with his signature dated March 2016. |

Additional point on item above:   The documentary evidence from 2015/16 and 2016/17 shows Mr. Ford either handed back documents in short order or communicated to Mr. Decker that he would not do so because the documents contained false information or were otherwise prejudicial.

| | | |
|---|---|---|
| Mr. Ford did not hand in Lesson Plans as directed in the TIP and did not submit them on particular dates memorialized in a letter dated 7 February 17. | In fact, Mr. Ford did hand in Lesson Plans in accordance with the TIP, which stated that I was to bring lessons to coaching meetings. | Coaching Notes, TIP, letter of 7 February 2017, emails between Mr. Decker and Mr. Ford. |

Additional note on Item above:   Also check calendar as some dates included in the 7 February Letter do not exist, such as 31 November and 'the week of 7 December' which was a Wednesday.   It also states that Mr. Ford only handed in Lesson Plans for 3 February at 3 February meeting, but the coaching notes state,   "The lesson for Monday, 2/6/17 also focuses on immigration."

| | | |
|---|---|---|
| Mr. Ford handed in lessons plans sporadically. | In fact, Mr. Ford emailed or brought LP's to meetings regularly. | Emails from Mr. Ford to Mr. Decker; Mr. Ford has compiled a list an a series of screenshots documenting this. |

| | | |
|---|---|---|
| Mr. Ford said in a meeting on 7 February meeting that doing the lesson plans was 'too much work.' | In fact, Mr. Ford said in that meeting that what Mr. Decker was asking was 'too much' and was counter-productive. | Testimony of Robin Link, UFT Rep who was present at the meeting.  Email from Mr. Ford to Mr. Decker 10 Feb 2017. |
| The Documents presented in the hearing were accurate. | In fact, they are chock full of inaccuracies, suggesting a pattern of consistent misstatement meant to label Mr. Ford recalcitrant. | Two such Documents are considered below. |

- One such example were the 'Coaching with Brian' notes from 26 September which were entered into evidence.  These notes include many false statements and characterizations:
  - The notes state only one Lesson Plan was submitted when 5 Lesson plans were submitted.
  - The notes state that 'lesson plan was 7 pages' when it was one page.  Thee were 7 pages overall, but that included 2 pages of reading material, an illustration of a model-T car and 3 pages for students to do their work.
  - The notes state, 'Goal for the lesson was unclear' and that ' his goal . . . was not stated in the lesson plan.'  These are two different things, but the Goal were neither unclear, nor unstated.  The Goals in the LP were listed as follows:
    - SWBAT define 'productivity,' 'specialization,' and 'division of labor'
    - SWBAT explain how the assembly line increased productivity
    - SWBAT discuss how increases in productivity led to higher wages and . . . how changes in mass production affected US society.
    Mr. Ford thought that was pretty clear.
  - The notes state: 'There were no strategies for struggling

readers,' when the reading was from a text book that was designed for struggling readers.

- The notes state: " The video was to take 15 minutes. Brian was told to only use video clips to supplement instruction, none longer than 3-5 minutes." Just to make this clear, this meeting was the first time that directive was given.
- The notes state: 'There were too many questions, and they were all level 1 DOK recall.' The class materials include many higher level questions, including, 'How did [Henry] Ford change the way the businesses were run in the US?', 'How did mass production change the United States?' and 'If you could invent something, what would it be?'

While a thorough review has not been completed, the rest of the coaching notes also contain 'misstatements' that can be documented. For instance, on 14 November it says 'The lesson is not related to the curriculum in Economics.' The curriculum given to Mr. Ford had his students doing a project - writing a letter to the President on economic policy and my lesson had them looking at infrastructure, taxation and immigration and how they affected the economy. This is one of many questions of 'non-alignment' that were not based on fact and created confusion in the coaching sessions. How was Mr. Ford to address this if he had already addressed it? The same might be said of repeated advisories to use the Bronx Guild Template when Mr. Ford was already doing so.
Also, "The lesson has too many handouts; Christine and I cannot organize them or see what relates to what." Administration called for 3 lessons at the same time. Sorting through them was not easy, but their confusion was exactly that - *their* confusion. It was clear in class.
Also, 9 December "You are required by the TIP to provide lesson plans in advance." The TIP does not say that, it says bring lessons to the meetings, which Mr. Ford did for all coaching meetings.
16 December --" Student work was not brought to the meeting as requested last week." Mr. Ford believes it was, but that they just did not ask for it. Admittedly, he has no proof of that, but he does remember printing out student essays that were never reviewed.

This is not meant to be a comprehensive list and then are other
instances.   What it points to is putting the most negative spin
possible on Mr. Ford's performance, but making false accusations,
inventing events that did not occur and stating that Mr. Ford neglected
his duties when he performed them with diligence.   It seems to be part
of an effort to discredit Mr. Ford that placed little value on accurate
reporting of the facts.

FAX COVER SHEET

**TO:** Office of School Personnel Review and Accountability (OSPRA), NEW YORK STATE

**FROM:  BRIAN FORD (NYC DOE TEACHER)**

**RE**: REQUEST FOR INVESTIGATION REGARDING PRINCIPAL KNOWINGLY GRADUATING STUDENTS WITH INSUFFICIENT CREDITS

**FAX:  518 402 5940**

**ATTN: Anne Zugalla (but if she is not available, please pass it on to another investigator)**

**SUMMARY:**  This is a request to investigate certain events at Bronx Guild High School (08x452) during the 2015/16 and 2016/17 school years.

It follows up on a telephone conversation I had with Anne Zugalla in early January and a follow up email directed to OSPRA@nysed.gov on Tue, Jan 9, 2018 at 12:12 PM

 I ask that this be kept confidential, if possible,
but I am willing to come forward and testify if necessary.

Synopsis:  The principal, Samual Decker, now retired (his email was 'Decker Samuel (08X452) Sdecker@schools.nyc.gov') graduated students who had not completed course requitements.
I know of two specific instances, but more generally he encouraged teachers to pass students with little regard as to of how much work they had done or even whether they attended the class. He granted credits that were not earned and  then graduated those students in short order.

The two specific instances involve seniors who graduated in both 2016 and 2017.
The 2017 case nearly involved every member of the senior class.  They never rec'v'd a grade from their teacher of record (that would be me) in Participation in Am Government, which is a required course to complete the Social Studies sequence.
The 2016 case involved only a single student, Anthony -----, who graduated despite not having attended an American History class that was required for him as he had failed it in the previous year. I describe the cases in the pages that follow.  I do not believe they were the only cases, but they are the only cases for which I have evidence.

**3 PAGES TO FOLLOW**

Office of School Personnel Review and Accountability (OSPRA)
New York State Education Department
89 Washington Avenue, Room 981-EBA
Albany, New York 12234
Phone: (518) 473-2998 // Fax: (518) 402-5940 // Email: OSPRA@nysed.gov
OSPRA Fax 518 402 5940

ATTN:  Anne Zugalla

17 January 2018

Dear Ms.  Zugalla:

I spoke to you on Friday 5 January, emailed on 9 January and am faxing this now.
It is substantially the same information as in those previous contacts.

My complaint is about my school, Bronx Guild (08x452).
The school has been consolidated with another school, PNA, and been given a new name,
Gotham Collaborative, but still has the same DBN (08x452).

The principal, Samual J. Decker, is now retired, but for purposes of identification, his
email was 'Decker Samuel (08X452) Sdecker@schools.nyc.gov'
Over the last two year (and likely before) he encouraged teachers to pass students regardless of
how much work they had done, granted credits that were not earned and then graduated those students
in short order.

I had previously contacted SCI about this matter and they passed it on to OSI.
I have asked, but have not rec'v'd confirmation from OSI that they are pursuing the complaint.
The SCI case number is 2017 -6086; Mr. King took the complainton 20 September and referred it to
SCI on 22 September. The information that I gave them was that the administration gave passing
grades to students when they had not earned the credit.  There was a general pressure to pass seniors
(please note that I only taught seniors during the two years in question) which I think I can document.
But it went far beyond that.

Mr. Decker arranged for passing grades for students (and then graduated them) who not only did not
deserve to pass, but in some cases did not even attend classes.

I know of two instances, but there may be more.
The first involved a single student who graduated in 2016.
The second involved the entire senior class of 2017.
Let me treat them in reverse order.

After the initiation of the 3020a proceedings in May of 2017, I was reassigned and removed from  the
classroom at the end of day on 9 June 2017.  I did not expect this – I had rec'v'd a schedule for Regents
proctoring and I did not understand the cause.  There were no charges of misconduct.  Also,
it was the second to last day of classes and if there was a problem I don't know why they did not
remove me immediately instead of waiting until I had served my purpose of manning the classrooms.
It was not based on the well-being of the students.

My students, nearly all seniors, needed a credit  in Participation in Am Govt in order to graduate.
There might have been a few exceptions, but of the 60 or so students, nearly all of them needed this
credit.

Most of them deserved to pass, but I could not enter grades since I had been cut off Skedula and Pads.
The latter serves as the instrument by which we enter grades.  I contacted my Chapter Leader (CL),
who then contacted the principal (I had been informed that I should not contact him directly)
and was told that I would be asked to enter the grades 'by hand.'
I did not know what this meant, but in anticipation of this, I prepared a spread sheet with grades for
seniors, leaving about five blanks for the students who could possibly graduate
but still had work outstanding.  I sent this spread sheet to my CL.
(Note: The email thread with my CL follows below my signature.)

I was never asked to hand in the grades and my CL tells me he was never asked for them either.
Nearly all of those students were graduated, including the ones with blank grades.
Most of them should have been – they had passing grades on my spreadsheet.
But some should not have passed and should not have graduated.
This includes at least one student (initials C.P.) who had attendance in the 20% range.

It is possible that Mr. Decker got some sort of waiver from the district or elsewhere.
 I doubt it, but I don't know.  However, even if he did, it was not appropriate.
I was available to consult about grades and I had the grades ready.
Students who did not meet the class requirements and had minimal attendance in my class
were graduated.  I know this from the graduation announcement.

I also have other documents to back this up.
I still have the spreadsheet and it includes Student ID numbers.
The class numbers on Skedula were  HVS11-02, HVS11-03 and HVS11-04

Incidentally, this was reported to SCI on 20 September.
They, in turn, referred it to OSI on 22 September.
I have asked for an update, but OSI has  not gotten back to me as yet.

The other instance occurred in June of 2016, either Friday the 24th or Monday the 27th – just before
graduation. Along with everyone else who taught seniors, I had been asked to come to the office to
enter any missing grades for seniors.  After doing so, I sat down for a while to do other work.

While I was there, a teacher came in and spoke to the data specialist.
The teacher was asked about a student (A.B.)and his grade in American History.
The teacher's response was that the student had not attended her class and thus received a failing grade.

At that moment Sam Decker walked up and said to the teacher, let's go and have a talk.
A few minutes later they returned.
At that point the teacher said that A.B. had done work independently that
it was sufficient to pass the class and earn the credit.

Less than 5 minutes had passed between
You can draw your own conclusions but let me add a few more points.

This was the last credit the student needed
He was a senior and graduated in June 2016.
I did not teach this class to A.B., but I did teach him both that semester and previously.
I can find his OSIS number.

I can also provide the name of the teacher, but do feel she was under pressure from the principal and
so do not necessarily want to do so.

Some notes; Mr. Decker is retired as of October. Bronx Guild merged with another school (PNA) and changed its name to Gotham Collaborative but retained the BG DBN number   (08x452)
The teacher in question is now an administrator at Gotham.  The email thread with my CL follows below my signature

Thank you.  Feel free to contact me.

Sincerely,
Brian Ford
646 713 8285 bpford1@gmail.com


Email thread with my CL regarding grades for seniors at end of 2016/17 year


On Wed, Jun 14, 2017 at 11:13 AM, Robin Jain-Link <evolvingsoul@gmail.com> wrote:

Hey Brian,

 Sam replied saying that "this is being handled by admin" and that "he will be asked to submit his grades by hand"...

Also that I could see Sam directly for any other concerns,

Let me know,

Robin

On Wed, Jun 14, 2017 at 10:44 AM, Robin <evolvingsoul@gmail.com> wrote:
I'll email Admin immediately.


.. . .

On Wed, Jun 14, 2017 at 9:29 AM, Brian Ford <bpford1@gmail.com> wrote:


Hi Robin --

I have gotten conflicting views on whether I should contact Sam at all.
I have been told not to initiate any contact with students (and I have not) since that might be held against me.  The most I did was to write back when an email came in to say 'thanks.'

It was suggested that you be the conduit. Right now the issue is grades --
 I have been cut off Skedula, so I cannot enter them.

If you could raise the issue, I would appreciate it.

Sorry to put you through so much work this year.

Anyway, if you want to visit the library, I am here.

Cheers,
Brian

Description of alleged discrimination:                          RECEIVED

    I, Brian Ford, being sworn, respectfully alleges as follows:   2019 JUL -5  PM 3: 23

I cannot look into the souls of my NYC Department of Education (DOE) administrators and determine their motives, but the facts lead one to no other conclusion than that something is terribly amiss.  There are a lot of factors, but I believe age and salary level were chief among them, that this did not involve merely one person, but several officers of the DOE acting, if not in concert, then in accordance with a set of principles that see older, experienced teachers not as an asset, but as an obstacle to their being able to do as they see fit, even if it is not in accordance with State Law, DOE regulations and the Collective Bargaining Agreement (CBA) between the DOE and theUnited Federation of Teachers. (UFT)  In addition, I believe that my previously having filed a complaint about my school's lack of compliance with Special Education standards, and my noting their continuing non-compliance, was a factor. Finally, my availing myself of my rights as a UFT member –both to take a sabbatical and to challenge Evaluation Reports through the APPR system-- was a contributing factor.

    I am not in a position to determine what the motivations were – if one wants to hide one's true reasons for doing something and one works for the DOE, there are lots of ways to keep the truth from coming out.  But something is definitely wrong.

    The clearest evidence that something is wrong is in black and white – a letter from the Chancellor's Designee, Phil Weinberg, dated June 14, 2017, that denies my appeal to overturn my negative rating for the School Year 2015-16.  In looking at the letter and comparing it to the DOE Position Statement (provided ahead of the hearing of May 26, 2017), one sees that the content of the letter repeats nearly verbatim the wording of the DOE; in addition, in the context of other documents, the denial letter makes statements that are contrary to the facts as presented at the hearing *by the DOE*, including the types of observations involved, the dates they were provided to me and their adherence to the norms for evaluation as established by the DOE and agreed to by UFT.

    It is also clear that I have an outstanding record as a teacher, receiving only one negative yearly rating prior to 2015, and that was in the year I filed the Special Education complaint referenced above. This complaint, which was because the school was not providing for students who had this mandated in their IEPs,  involved the same Principal and the same school (Bronx Guild HS, 08x452).  The practice of not providing Co-teachers for all classes mandated in the students IEP continued until the principal retired in 2017 and the school was merged with another school.  (It is also worth noting that the school was a Priority School –the lowest rating possible outside of the Renewal School program.

It also clear that despite having superior ratings on the Measures of Student Learning (MOSL) –an Effective rating at the high edge of the range-- I was given an overall 'Ineffective' Rating based on my score on only 3 Evaluation Reports (the minimum is 6) which were used to determine a score for my Measures of Teacher Practice (MOTP). There were numerous problems with these observations. Evaluations are not supposed to commence until a teacher has had his or her Initial Planning Conference (IPC) and the teacher is allowed to choose among different observation options. I never had an IPC in 2015-16 (or, for that matter, 2016-17) and was never given the opportunity of choosing an observation option, but was told my email that I would be had to have 6 observations that would result in Evaluation Reports since I was returning from sabbatical. Of course, I was not given 6 observations, but only 4, one of which was thrown out in an arbitration hearing as being deficient. Not only were two few, they were too late to act on. All of Evaluation Reports were provided to me on or after the beginning of March 2016, with less than 3 months of teaching remaining in the year. Of the three Evaluations that were counted in the MOTP, they too all had difficulties. One Evaluation Report was delivered nearly 4 months (March 16, 2016) after the date of observation (Nov 20, 2015) – the generous limit is 45 school days and this was well beyond the limit. (Incidentally, the report was prepared on the same day as the evaluation, within 90 minutes; no explanation has ever been provided as to why this took so long.) One Evaluation Report (observation date March 7, 2016) was found by an independent arbitrator noted that the Report "does not include much evidence to support [the] ratings, and for some ratings [it] provided no evidence at all" and eventually found that "the lack of evidence is a significant deficiency" and dismissed all but 2 of the reports 8 components. (Tr 51) The third Evaluation Report, for an Observation on April 1, 2016, was not delivered until late May.

I shall document and expand on this at length below. The events and scircumstances lead one to strongly believe that the school administrators and the DOE acted imporperly. I therefore ask for actions which will result in the following: (a)Reversing the denial of my appeal of my "Ineffective" rating ("I-Rating) appeal for the 2015-2016 school year; (b) since this was a major step towards an administrative process that resulted in my termination, returning me to my previous position for the remainder of the school year (or as soon as possible) and directing that respondents place Petitioner back in 'Year One' status for the 2018-19 school year; (c) as it was largely based on the false denial of my appeal of the "Ineffective" rating ("I-Rating") and was a necessary preliminary step, vacating the Opinion and Award of Robert H. Barron, dated 4 January 2018, which called my termination from my tenured position as a teacher with the New York City Department of Education, for the 2015-2016  and

school year; and (d) Returning me to my position as a tenured teacher with the NYCDOE, or a similar position, providing compensation for missed employment and pension credit, or providing compensation for the loss incurred; and granting me legal costs and fees, and compensation for the time spent preparing, but more so compensation for the intentional infliction of emotional distress and pursuant physical harm, compensation for lost reputation and such other and further relief the Commission deems just and proper and is authorized to provide. .

<u>Preliminary Statement</u>

The City School District of the City of New York and Carmen Farina, then in her official capacity as Chancellor of the City School District of the City of New York, and, specifically, Phil Weinberg, then Deputy Chancellor Teaching and Learning and the Chancellor's Designee for the Hearing held on May 26, 2017, Sam Decker, now retired, but then Principal of Bronx Guild High School (08x452) and Cecilee Rauner, then Assistant Principal of the same Bronx Guild High School (the school, incidentally, no longer exists, but was merged with another school), acting separately and seemingly in concert, rated me as Ineffective and then denyied an appeal that "Ineffective" rating ("I-Rating") for the 2015-2016 School year, engaged in conduct that was in violation of lawful procedure, and/or acted in a manner that was arbitrary, capricious, irrational, an abuse of discretion and/or in bad faith. I seek to annul the determination of the Chancellor's designee of June 14, 2017, that with flagrant disregard for my Constitutionally protected rights, upheld my Ineffective rating, which was used as the basis for 3020-a proceedings that resulted in my termination.

Mr. Weinberg, together with the DOE, its officers, its witnesses and other parties, prior to, during and after the hearing on the Appeal of my 2015/16 annual rating on May 26, 2017, rendered a decision, dated June 14, 2017 (but delivered by US mail sometime in July) which contributed significantly to his termination in 2018 from my gainful employment at the age of 59 and ½ and seriously putting in doubt my hope for a dignified retirement. Mr. Weinberg and the other parties wantonly, recklessly, maliciously, knowingly and purposefully, acting *ultra vires* individually and in concert under a ministerial cloak and under color of state law, have deprived me of my protected rights of enjoyment of liberty and property by designating me as an alegedly Ineffective and Incompetent teacher and then obtained a penalty of termination for unproven allegations substantiated without proper foundation in law or fact.

I believe that there are numerous discriminatory factors which influenced the DOE proceedings. These

include Whether out of negligence, for convenience's sake, rooted in animus or out of wilfull disregard for my rights in these matters, numerous protocols were not followed in this case. These include, but are not limited to the following:

(1) I was not given an Initial Planning Conference which is required before observations can commence.

(2) I was not given the opportunity to choose an Observation option as the Advance system mandates.

(3) I was instead informed I had no choice and that would have 6 informal observations (which seems to indicate Option 2 in the Advance system).

(4) I was, however, not then given 6 informal observations, but instead was given only 4 informal observations, below the "Minimum of six informal, unannounced, observations" listed as Option 2.

(5) I was presented with the Evaluation Report for first observation, on 20 November 2015, nearly 4 months after the event, long after the 45 day maximum period allowed and 2/3s of the way through the school year, severely limited the possibility of my following any recommendations.

(6) I was presented with my second observation, for my 7 March 2016 class, prior to receiving any written feedback that year.

(7) I was presented with an Evaluation Report for that second observation that was deficient in that it did not list specifics but was, by and large, cut and paste from the Danielson Rubric, again not following Advance Protocols.

(8) I was given the 1 April 2016 Evaluation Report listing it as 'informal,' which both mu principal and I signed, but my Supervisors entered an unsigned document that had been altered into the Advance system, changing it to 'formal,'apparently to align with Option 1, "a minimum of four observations over the course of the year [including] a minimum of one formal, announced, full-period observation scheduled at a mutually agreed upon time with accompanying pre- and post-observation conferences" [Advance FREQUENTLY ASKED QUESTIONS (FAQs), NYC DOE 2015-16, pp 11-13].

(9) I was given a fourth evaluation for a class for which I was not the teacher of record and the evaluation report for which was thrown out in an arbitration proceeding because it was it did not list specifics but was, by and large, cut and paste from the Danielson Rubric, and because there was not feedback given prior to my receiving the report.

This evidence was presented at the Appeal Hearing on May 26, 2017, but the Chancellor's Designee wrote a letter denying the appeal that **did not incorporate the evidence**. Indeed, beyond that the determination of the Chancellor's Designee was in some of its specific findings **contradicted by the**

**evidence presented** not only by the teacher, but evidence presented by the DOE.

I would like to point out that I was *never* accused of misconduct (Tr p. 4), but only of being an 'ineffective' teacher and that not following this protocols had a large impact on my ability to demonstrate my competence and react to the directives of supervisors.

Moreover, I was not deemed ineffective because of the results of my students on exams – they did well. Student results on standardized exams, or Measures of Student Learning (MOSL) are mandated by state law to be used in teacher evaluation. I was rated not only as Effective on both the State and Local Petitioner's Measures of Student Learning (MOSL), but was in fact much closer to the 'Highly Effective,' scoring 15 and 16 points out of 20, with the Effective range going from 9 to 17 (Education Law 3012-c). The Effective category makes up 45% of the total range, which the Highly Effective makes up only 15%; the total of 31 MOSL points is 172% the minimum 18 points needed to get and approaches twice the minimum.

Thus, since there was no misconduct (Tr p. 4) and my MOSL was not only Effective, but superior and near the top of the effective range, the *only* evidence that aleged I was 'ineffective' came from the observations of the Administrators at a school that was had itself been deemed ineffective by the state, being deemed a 'Priority School' by New York State (Tr 433-4), the lowest ranking outside of the renewal school system.[1] Moreover, the principal of the school placed pressure on teachers to pass students, especially seniors, which would improve one of the principle metrics on which the school was evaluated.[2] The entire process seems to have been rife with corruption. First and foremost Chancellor's

---

1 This is from Mr. Decker's testimony, who said the school was ranked as a Priority school because of having not met "federal guidelines on students having scores in math." (Tr 434) Petitioner notes that while this is true so far as it goes, it is not the whole truth as Mr. Decker himself presented it to the staff when announcing the Priority school status. He mentioned, in addition, that the college readiness rate was 3% and that the Graduation rate had been declining.

2 Thus we see a principal who takes or is forced into retirement and sees his school merged into another, who manufactures grades for students (See OSPRA Complaint re 08x452) and who does not always stay as close to the truth as one would hope; we also see a situation in which the decisions of administrators when they go against the established norms of education, or violate the regulations governing the schools – which clearly is the case with the school's Special Education program, which clearly is the case with the way it short changes student on instructional hours, which may well be the case with its program for English Language Learners and which seems to be the case as the school has gotten into the habit of awarding credit to students who did not attend or were regularly absent from the majority of their scheduled classes. While all the arguments above were not introduced at the Appeals Hearing, they are relevant in showing an overall pattern of disregard on the part of DOE officers for following regulations and thus creating an atmosphere of

Designee in the Appeal hearing did not consider the evidence presented fairly and even handedly. Indeed, it appears that in significant aspect the Chancellor's Designee may not have considered the evidence at all.

Rather, the Chancellor's Designee in the proceedings reported that he accepted as fact the assertions of the DOE when they were, in important and specific instances, clearly contrary to the facts laid out in the hearing by *both sides.* This suggests a *predetermination* rather than a determination, a predetermination that betrays the imperatives of justice and impartiality, making the hearing into a farce that must be overturned. Moreover, I brings to the Commission's attention that this is just one of many steps in the overall process that led to my termination that are not in accordance with the protocols established by the governing statutes, the regulations of the DOE and/or the agreements entered into by the DOE with the UFT.

This set of unspeakable breaches shall be spoken of here and in the main proceeding, beginning with the breach of protocols listed in the Advance guide which governs teacher evaluation.

Parties

I am, or was, a tenured teacher employed by DOE. During the 2015-2016 school year, I was assigned to teach at Bronx Guild High School (08x452) located at 1980 Lafayette Avenue in the Bronx. I began teaching at Bronx Guild in 2005 and had previously been a tenured teacher at Walton High School until 2005; prior to that, I taught as an untenured teacher at several schools in the District 79 of the DOE. Prior to my DOE service, I had taught as a Peace Corps Volunteer in Botswana, at Columbia University, at the University of Pennsylvania and at the University of Tirana in Albania (under a Soros Open Society Foundation grant). In addition, I have been a lecturer at the Royal University of Phnom Penh, Seton Hall and the Institute of Educational Research at Dhaka University in Bangladesh. Finally, I am an established, albeit largely unpaid, academic on the subject of Education and Education Reform, having published a peer-reviewed book (*Respect for Teachers: The Rhetoric Gap and How Research on Schools has Laid the Ground for New Business Models in Education*, Rowman and Littlefield, 2012), articles and numerous papers at academic conferences.[3]

---

suspicion and mistrust that had to be navigated by a teacher on his own.

3   While the book and conference papers do not mention my school, they have been critical of DOE policies. I have wondered if that has had an effect on the way in which I have been treated by the DOE. Again, I would really love ot have access to DOE emails in which I am mentioned.

The City School District of the City of New York commonly does business under the name New York City Department of Education ("Department," "DOE" or "NYCDOE")  is a school board organized under and existing pursuant to the Education Law of the State of New York and, for all relevant purposes, serves as the government or public employer of all persons appointed to teach within the New York City Public Schools.  The Board adopted the title 'Department of Education' sometime after 2002 when the New York state legislature passing enabling legislation and abolished the 32 local boards on June 30, 2003.  Respondent Carmen Farina ("Farina") was then Chancellor of the NYCDOE, pursuant to the Education Law, functioning as the superintendent of schools and chief executive officer of the NYCDOE. Respondent Richard Carranza ("Carranza") is of this date Chancellor of the NYCDOE, pursuant to the Education Law, functioning as the superintendent of schools and chief executive officer of the NYCDOE.  The DOE's principal place☐of business is located in New York County at 52 Chambers Street, New York, New York 10007.☐☐

Background on the Rating System for the 2015-2016 School year

On or about May 28, 2010, Education Law § 3012-c was enacted and established a new structure for evaluating teachers in the State of New York.  Education Law § 3012-c required, among other things, that 40 percent of a teacher's evaluation be based upon student achievement measures with "[20] percent of the evaluation based upon student growth on state assessments as prescribed by the commissioner . . .and [20] percent based on other locally selected measures of student achievement that are determined to be rigorous and comparable across classrooms in accordance with the regulations of the commissioner and as are developed locally in a manner consistent with procedures negotiated pursuant to the requirements of article 14 of the civil service law." Education Law § 3012-c(2)(e).  Pursuant to Education Law § 3012-c, teachers receive a numerical score which correspond with the following ratings: Highly Effective, Effective, Developing, or Ineffective.

Education Law § 3012-c also required, among other things, that 60 percent of a teacher's evaluation be based upon "ratings and effectiveness scores[which] shall be locally developed, *consistent with the standards prescribed in the regulations of the commissioner, through negotiations conducted pursuant*

*to article fourteen of the civil service law." (emphasis added)*  Education Law § 3012-c furthermore

required "A majority of the sixty points for classroom teachers shall be based on multiple classroom

observations conducted by a principal or other trained administrator."

The United Federation of Teachers, Local 2, American Federation of Teachers, AFL-CIO ("UFT") is

the certified bargaining representative for all teachers employed by the DOE.  The Board and UFT are

parties to a collective bargaining agreement ("CBA").  In addition, the UFT and DOE produce the

Advance Guide in collaboration as a way of informing teachers and administrators of how the system

works.

Education Law § 3012-c(2)(m) provided, in part, that if a school district did not have an evaluation

plan consistent with Education Law § 3012-c by a certain date, then the school district and the

collective bargaining representatives for the classroom teachers in such district would be required to

proceed to binding arbitration before the New York State Commissioner of Education

("Commissioner") to implement an evaluation plan consistent with Education Law § 3012-c.

Respondent Board and the UFT failed to reach an agreement for an evaluation plan consistent with

Education Law § 3012-c, and, thus, were required to submit to binding arbitration before the New York

State Commissioner of Education ("Commissioner") pursuant to Education Law § 3012-c(2)(m).

Following a hearing, the Commissioner issued a Determination and Order, dated June 1, 2013

("Commissioner's Decision"), for the Board for the 2013-2014, 2014-2015, 2015-2016 and 2016-2017

school years.  The Commissioner asserted "The plan gives principals the tools they need to improve

instruction in their schools. It will help struggling teachers and principals get better and help good

teachers and principals become great."

Pursuant to the Commissioner's Decision, teachers would be rated in the following areas: (1) State

Assessments or Other Comparable Measures ("State Measures") (20 percent); (2) Locally Selected

Measures ("Local Measures") (20 percent); and (3) Other Measures of Effectiveness a/k/a Measures of

Teacher Practice ("MOTP") (60 percent).   Furthermore, this evaluations were to be in accordance with not only the SED decision, but also the Advance Guide for Educators and related documents.

Petitioner's Previous Ratings, 2015-2016 I-Rating and Appeal

I received an overall Ineffective Rating for the 2015-2016 school year, but was nonetheless deemed "Effective" in both the "Local Measures" components and the "State Measure" component.  I was neither rated nor observed in the 2014-15 year, the explanation from the school administration being that was because I was on sabbatical for the spring semester, which accounts for there not being a rating, but I should have had observations and feedback in the fall term, but did not.  According to the Advance Guide "All teachers serving students should be observed and provided with meaningful feedback," but I went from June of 2014 to November of 2015 without receiving a written evaluation report.  I received an overall Effective Rating for the 2013-2014 school year, the last yearly rating I received prior to June 2016.

At that point I was deemed "Ineffective" for the Measure of Teacher Practice ("MOTP") based on three classroom observations, the Evaluation reports for which were delivered to the Petitioner on or about March 9th, March 17th and May 18th of 2016.

The DOE Rating System for 2015-16 no longer used the 22 Components of the Full Danielson Rubric. Instead of summative Evaluations based on 22 Components, the DOE narrowed its scope and used a more 'focused' version of the Danielson Rubric by limiting  Summative Evaluation it to only 8 Components.  (See The Danielson Framework for Teaching.)

The following table lists all 22 components with the 8  components in the narrower version in **bold**:

| 1a Demonstrating Knowledge of Content and Pedagogy | 2a Creating an Environment of Respect and Rapport |
|---|---|
| 1b Demonstrating Knowledge of Students | 2b Establishing a Culture for Learning |
| 1c Setting Instructional Outcomes | 2c Managing Classroom Procedures |
| 1d Demonstrating Knowledge of Resources | **2d Managing Student Behavior** |
| **1e Designing Coherent Instruction** | 2e Organizing Physical Space |
| 1f Designing Student Assessments | |
| 3a Communicating with Students<br>**3b Using Questioning and Discussion Techniques** | 4a Reflecting on Teaching<br>4b Maintaining Accurate Records |
| **3c Engaging Students in Learning** | 4c Communicating with Families |
| **3d Using Assessment in Instruction** | 4d Participating in the Professional Community |
| 3e Demonstrating Flexibility and Responsiveness | **4e Growing and Developing Professionally** |
| | 4f Showing Professionalism |

I note the following:

(1) I was not trained in the Rubric; while administrators giving Evaluations were given extensive training by the DOE and other entities in the use of the Rubric (see Transcript from 3020-a case; Tr 64-5, 439-441, 677-682; 832, 854, 895, 901-05, 1271-73, 1715),  teachers at Bronx Guild did not receive such training (Tr 905, 1091, 1127, 1271-73, 1715).  Christine Ghaznawi, who was a witness for the DOE and was first a teacher and became, beginning in 2016, an Assistant Principal at Bronx Guild, made this clear and found it something the DOE could improve on, "what I found even personally when I was a teacher I didn't feel like I understood the rubric enough because there's not training around the Danielson for teachers."  (Tr 905)

I had been rated Effective under the 22 components in 2013-14.  I had also been given the highest rating under the previous system in all but one of the roughly 13 years I had taught with the DOE prior to 2013.

(2) Some of my strongest characteristics as a teacher were in those areas that were no longer part of the summative evaluation process.  These include (1b) Demonstrating Knowledge of Students, (1d) Demonstrating Knowledge of Resources, (2b) Establishing a Culture for Learning, (3a) Communicating with Students, (3e) Demonstrating Flexibility and Responsiveness, (4a)

Reflecting on Teaching, (4c) Communicating with Families and (4d) Participating in the Professional Community.  Indeed, I had prided myself on these 9 components and much of my practice was build around them.

(3) I not only did not receive training in the Danielson Rubric, but also I did not even receive an Evaluation Report until March 9th of the rated year – nearly 2/3's of the way through the year. That is to say, I was not make aware that the components had changed since I had last received an Evaluation Report in June of 2014.  Moreover, I had only one observation, dated April 1, 2016, that counted into my end of year rating after that date.

(4) Neither was I informed of the change in my **Initial Planning Conference (IPC)** because I did not have an IPC.

(5) Chancellor's Designee Weinberg stated in denying the Appeal that he rejected the my assertion that I did not receive sufficient professional development and provided a laundry list of 'professional activities' but I did not list having professional development in the Danielson Rubric. I could not, because there had been none.

(6) Chancellor's Designee Weinberg did not bother to respond to my claim in the Appeals Hearing that I did not have an Initial Planning Conference (IPC).  The IPC is defined by the DOE as "a *mandatory* one-on-one meeting between the teacher and evaluator that is held at a mutually agreed upon time and *occurs prior to any formal or informal classroom observations required by Advance*." (Advance Guide for Educators 2016-2017, http://www.uft.org/files/attachments/advance-2016-17.pdf, emphasis added.)  The meeting was not held – the subject matter of such a meeting, including giving the teacher a choice of Evaluation options, was never covered and an IPC form memorializing the meeting was, if it was ever written, was never provided to me; neither was it placed in my file or produced at the 3020-a proceedings.

(7) Given that I did not have an IPC, the  formal or informal classroom observations required by Advance should not have been commenced.  Thus these Evaluation Reports should be nullified and the Rating for 2015-16 thrown out.  We quote yet another document, the 'Advance FAQ' produced by the DOE for  2015-16 states this quite clearly on page 14:  "Evaluators can begin classroom observations for evaluative purposes for a teacher as soon as the teacher has participated in the IPC."

Appeal of 2015-2016 I-Rating and the Chancellor's Designee's Determination

I then appealed my 2015-2016 I-Rating to the Board's Chancellor pursuant to the procedures set forth in the Commissioner's Decision. On June 14, 2016 the Chancellor's Designee, Philip Weinberg, issued a determination ("the Chancellor's Determination"). The Chancellor's Designee denied the appeal and determined that *none* of the grounds I had asserted for reversal of my I-Rating were relevant because, quoting from the June 14th letter:

> --Your assertion that you did not receive sufficient professional development . . . was rejected as you were provided with professional activities which included curriculum development, lesson planning, class visitations . . . which failed to improve your instruction.
>
> --Your contention that you were observed under challenging conditions [was rejected as] observations [may] fall between the IPC and Summative Conferences.
>
> --Your assertion that you did not receive feedback in a timely fashion was rejected as evaluators have 45 school days . . . to share written feedback.
>
> --Your claim that the observations did not last the minimum time required was dismissed as the timing of the formal and informal observations were within the prescribed time frame.
>
> --Your contention that lesson-specific evidence was rated in the Preparation and Professionalism section was rejected as Evaluators rate components ro which there is sufficient evidence to support a determination/rating. . . .
>
> --Your assertion that the timeframe of the observations prevented implementation of the recommendations as the Evaluators may conduct observations at any time after the Initial Planning Conference . . . In addition, observational feedback was provided to you within the prescribed 15 day timeframe. . . .
>
> In sum, there was no evidence to support your claim . . . the decision is final and was based on the written record and testimony provided at the hearing.

A true copy of the Chancellor's Determination is annexed hereto.

Philip Weinberg, the I- rating appeal hearing officer and the Chancellor's Designee allowed myself and my advocate to present testimony and documentary evidence, but systematically disallowed that the evidence was of relevance, including Documentary evidence submitted by the DOE, thus ignoring the facts that were clearly established in the record.

Testimony at the hearing established that I was afforded only 4 classroom visitations when I was designated for six such observations and documentary evidence demonstrated that no written feedback on any of these evaluations was provided prior to March 2016 – the 7th month of a 10 month year. (One of these observations was removed in a previous arbitration hearing.)

Testimony at the hearing established that there was no Initial Planning Conference (IPC) and the administration did not produce the requisite signed document.  Since there was no IPC,  none of the observations feel 'between the IPC and Summative Conferences.'  Note that

> The IPC is a mandatory, one-on-one meeting between the teacher and evaluator that occurs prior to any formal or informal evaluative classroom observation. The IPC is an opportunity to support teachers in planning for the year ahead by discussing student data from previous years (including last year's MOSL results), performance goals for students, and how *Advance* can support teachers to achieve these goals.
>
> . . . There is no minimum length of time for an IPC (i.e., it does not need to be a full class period), but the conference must be long enough to cover all of the requirements. At  this meeting, teachers are required to select an observation option (1, 2, 3, or 4) . . .

**Observation Option 1**

> ☐ Minimum of four observations over the course of the year.
> ☐ Observations must include a minimum of one (1) formal, announced, full-period observation scheduled at a
> mutually agreed upon time with accompanying pre- and post-observation conferences.
> ☐ Observations must include a minimum of three (3) informal, unannounced observations, at least 15 minutes
> in duration.

□ There is no maximum number of observations a teacher may receive.

**Observation Option 2**
□ Minimum of six (6) informal, unannounced, observations that each last at least 15 minutes in duration.
□ There is no maximum number of informal observations a teacher may receive.

[Advance FREQUENTLY ASKED QUESTIONS (FAQs), NYC DOE 2015-16, pp 11-13]

In his denial letter, the Chancellor's Designee indicated that the Petitioner's "Supervisors received the requisite training under Advance" but did not consider the impacts of their not following that training by, among other things, neither having an IPC nor giving the opportunity to select an option. Documentary evidence submitted by the DOE in the form of the Evaluator's Report for the 20 November 2015 Observation shows a signature from the principal of 16 March 2016, approximately 117 calendar days and 67 school days after the date of the observation ; the 1 April 2016 observation shows a signature from the principal of 18 May 2016, 48 calendar days and 33 school days after the date of the observation.  On the other side, the Evaluation Report for the March 7th observation was delivered on March 9th, only 2 days later, and the Evalator did not provide any feedback between the date of observation and the delivery of the report, another violation of Advance protocols.

There were other problems. Documentary evidence submitted by the DOE in the form of the Evaluator's Report for the 1 April 2016 observation listed the observation as a Formal Observation requiring a full period observation, but the timing indicates the observer was there for 29 minutes of a 55 minute period.  Documentary evidence submitted by the DOE in the form of the Evaluator's Report for the 7 March 2016 observation did not indicate how long the evaluator was in the classroom.   Both indicate that the "observations did not last the minimum time required" and thus the associated claim should not have been "dismissed as the timing of the formal and informal observations were within the prescribed time frame," but should rather have been upheld.

The Chancellor's Designee did not cite specific evidence but seemed to rely on cut and paste segments

from the DOE position statement, as when saying "Evaluators rate components to which there is

sufficient evidence to support a determination/rating" without citing the component or the evidence.

The Chancellor's Designee rejected the contention that "the timeframe of the observations prevented

implementation of the recommendations as the Evaluators may conduct observations at any time after

the Initial Planning Conference" when there was no Initial Planning Conference" and when the record

clearly states that the first Evaluator's report was delivered on 9 March 2016 and that there was only

one on the observations (1 April 2016) counted in the final rating occurred after that date;

implementation of recommendations was impossible for the 20 November 2015 and 9 March 2016

since there had been none.

The lack of feedback runs counter to the Advance System:

Frequent classroom observations paired with timely, meaningful feedback and targeted support

to help teachers continuously strengthen their instruction is a central feature of the NYCDOE's

*Framework for Great Schools*, Vision for School Improvement, and *Advance*. *Advance* utilizes

Charlotte Danielson's 2013 *Framework for Teaching* to provide a common language to describe

effective teaching practice, and regular, collaborative reviews of student achievement data to

focus these conversations on improving student outcomes. [Advance FREQUENTLY ASKED

QUESTIONS (FAQs), NYC DOE 2015-16, p 10]

The Chancellor's Designee claimed in his denial letter that "observational feedback was provided to

you within the prescribed 15 day timeframe" when there is no such evidence to indicate that such was

the case; rather the evidence suggests otherwise. I did not meet with my coach (Principal Sam Decker)

from mid-December until mid-May and did not have a substitute coach

Significantly, the Chancellor's Designee's letter simply restates in greater part the DOE Position

Statement prepared prior to the hearing. The DOE position statement has 14 bullet points; the

Chancellor's Designee's letter has the same 14 bullet points. Each bullet point is substantially the same

as the DOE position statement and nearly identical in wording, the only differences in many instances

being a short phrase and the change of pronouns from 'he' to 'you,' and the substitution of the

possessive 'Your' for the possessive 'The Appellant's.'  It was as if the hearing had never happened and

the evidence had never been introduced; the Determination could have been –and in the larger part

was-- written prior to the hearing.  One example follows, showing first the DOE Position Statement and

next the Determination of the Chancellor's Deignee:

> • The Appellant's assertion that I did not receive feedback in a timely manner
> should be dismissed as Evaluators have 45 school days, absent extraordinary circumstances,
> to share written feedback with teachers in accordance with the Memorandum of Agreement.

> • Your assertion that you did not receive feedback a timely manner
>  was rejected as Evaluators have 45 school school days, absent extraordinary circumstances,
> to share written feedback with teachers in accordance with the Memorandum of Agreement.

The only changes are underlined.  This example is particularly important as it points to an instance in

which both statements are contrary to the documentary evidence introduced at the hearing, but this

pattern is applicable to all 14 bullet points, indicating *at a minimum* a lack of due diligence on the part

of the Chancellor's Designee and raises question as to whether there was coordination between the

DOE officers prosecuting the case and the DOE officer determining the case.

The Chancellor's Designee made no mention in his decision of allegations of false statements made by

the administration, including the statement that I had '3 preps' during the Spring of 2016.   This is an

outrageously false claim that the Principal did not document.  Similarly, I did not present documentary

evidence at the Appeals Hearing as I did not have it with me, but I did state this forcefully and would

later be able to establish this.  The Chancellor's Designee may have discounted this claim, but should

nonetheless have acknowledged that there was such a claim and it was incumbent upon him to make a

judgment as to the credibility of administration witnesses in the light of other testimony and

documentary evidence.

Most shockingly, Administrators tampered with at least one of these reports and the Chancellor's

Designee took not notice of this. The Chancellor's Designee arbitrarily excluded from his determination documentary evidence that evidence had been tampered with, as the 1 April 2016 observation report was found in two forms, one marked 'formal' with a time stamp of "6/24/16 . . . By Crauner" and the other marked 'informal' with a time stamp of "4/22/16 . . . By sdecker." The 6/24/16 report was introduced into the Advance rating system despite the fact that it was unsigned and inaccurate; the 4/22/16 report was signed by both myself and the Principal.

That the rating process did not follow the Advance rating system was ignored by the Chancellor's Designee despite the production of documentary evidence and extensive testimony. The Advance rating system normally allows for teachers to choose among two options: a minimum of 6 informal observations or 3 informal observations and 1 formal observation. (See The Advance Guide, which states there must be a "min. of 6 informal" observations or "(a) min. of 1 formal; (b) min. of 3 informal" observations.) I was not allowed a choice, but was told I would have 6 observations. At the end of the school year, I had only been given 4 observations, one in November, one in March, one in April and the last in May, none of them full-period formal observations with a pre-observation and post-observation conference.

The transformation of the informal observation to a formal observation was seemingly an effort to end run the system as established, but in doing so it ran into another problem: formal observations require both a pre-observation conference and a post-observation conference, neither of which was provided to the petitioner. This is a procedural violation that should have disallowed the use of the observation in calculating a year end rating and the Chancellor's Designee's responsibility was to see that this was enforced and the Advance Guide followed, but I did neither:

> Formal observations are announced, full-period observations scheduled at a mutually agreed-upon time. The evaluator and teacher must mutually agree upon a time to meet, in-person, for an individual, face-to-face pre- observation conference held within 20 school days preceding

the scheduled date of the formal observation. The purpose of the pre-observation conference

is to review the objectives, activities, and expectations for the lesson that will occur during the

teacher's formal observation; if the pre-observation conference is held within 15 days prior to

the formal observation, the evaluator may collect evidence of planning and preparation to

include on the Evaluator Form. Within 20 school days after the formal observation occurs, the

evaluator and teacher also must agree upon a time to meet, in-person, for a post-observation

conference, which will provide the teacher and evaluator the opportunity to discuss the

observation, engage in a meaningful conversation about the teacher's practice, and discuss

next steps for development. Teachers may be rated on each of the eight components agreed

upon by the NYCDOE and UFT for which evidence is observed.   [Advance FREQUENTLY

ASKED QUESTIONS (FAQs), NYC DOE 2015-16, p 14]

This argument was made forcefully at the Appeals Hearing by Mr. Francis Midy, the UFT advocate

representing me.  So too were forceful arguments made regarding the time period for feedback, the lack

of feedback and the impossibility of implementing feedback for all but one of the 3 evaluations used in

the ratings.

What measures can be taken to address and remedy a series of administration violations of Advance

and other protocols, including, but not limited to, tampering with evaluation reports and entering that

information on to Advance, delivering one evaluation report 4 months after the date, not giving the

teacher a choice among evaluation options or holding an IPC.  This pattern was extended to the next

year –no choice of options, no IPC- and then enlarged upon by   not collaborating with (or even asking

for input from) the teacher on the Teacher Improvement Plan (TIP),  not allowing UFT representation

at several TIP meetings, not abiding by the TIP, etc. ? These were procedures designed to ensure the

fairness and integrity of the rating system, but they were bypassed by the administration.  No such law,

rule or regulation exists allows for this degree of discretionary action by administrators. Neither NY

Education Law Section 3012-c nor the Commissioner's Decision allows for this or states that in an appeal of an "Ineffective" rating these procedural violations can be ignored during the appeal hearing. In the *Matter of Beriguete v New York City Dept. of Educ.* the issue was whether a tenured teacher was properly terminated from my position for just cause pursuant to *Education Law §§ 3012-c* and *3020-a*. The court held the following:

> The failure of a school's assistant principal to observe procedures designed to ensure the fairness and integrity of the rating system deprived the teacher, who had 13 years of experience and 11 years of satisfactory ratings, of the opportunity to improve his performance before receiving two years of ineffective ratings and, ultimately, cost him his employment and livelihood. The court found that the hearing officer's determination that teacher had not rebutted the presumption of incompetence was arbitrary and capricious, and that the teacher showed by clear and convincing evidence that I was not incompetent, and that, in any event, the penalty imposed shocked the conscience.

In the case presented at the the Appeal Hearing, which was Governed by Education Law Section 3012-c(5-a), there were also failures of the school's administration to observe procedures designed to ensure the fairness and integrity of the rating system, including, but not limited to, having only 4 informal observations, not delivering any written evaluation reports until March of the school year, not providing proper feedback, not providing feedback in a timely fashion, tampering with evidence in the form of the Evaluation reports, giving false testimony at the hearing and not providing a co-teacher for Special Education students who were mandated to have Integrated Co-Teaching. (ICT) This not only denied me of the opportunity to improve my performance before receiving one ineffective rating and one developing rating, but it also indicated a desire on the part of the administration to 'do whatever they want' in disregard of established protocols and procedures, including those that call for compliance with Special Education requirements and mandated minimums for instructional time in the classroom.

There is a pattern of playing 'fast and loose' with the procedures and evidence that continued into the 3020-a hearings that commenced two months later, on July 14, 2017. The Appeal Hearing combined with the 3020-a hearings ultimately cost me my employment, my livelihood and a substantial measure of security, my peace of mind and jeopardizing the possiblity of a dignified retirement. I am 3 to 5 years from a planned retirement and had at the time of the hearing over 17 years of experience and had received only one unsatisfactory rating (2008-09) and that of dubious validity as I had filed a complaint regarding Special Education violations which reflected poorly on the rating officer, Mr. Decker. The Chancellor's Designee therefore arbitrarily refused to apply existent rules, came to conclusions contrary to uncontested and documentary evidence and used an obviously incorrect standard when conducting the I-Rating appeal hearing, both in ignoring relevant evidence and in not considering the negative impact of the submitted evidence as regards the process of evaluation as established by the Advance system.

I was therefore deprived of the opportunity to have my testimony and evidence relating to procedural errors, lack of proper feedback, manipulating of evidence, false testimony on the part of the Principal fairly considered as to the effect they had on my overall "Ineffective" rating for the 2015-2016 school year.

This is particularly troublesome because my principal continued with this pattern for the entire 2016-2017 school year and choose, *on the same day* as the Appeal or rating hearing, to sign papers commencing the 3020-a process. Had the evidence not been rejected without consideration for its impacts or for what it said about the administration, I would not have had to face the prospect of 3020-a hearings near the end of my career.

I was therefore deprived of a "substantial right" because I was precluded from having my evidence fully and fairly taken into account, even when the documentary evidence demonstrated that protocols established by the NYCDOE and the UFT had not been followed, when evidence had been tampered

with, when the Advance process had not been followed.

Merely being entitled to present evidence does not mean one has due process; the evidence must be fairly and judiciously considered and in this case it was not. Indeed, the Chancellor's Designee, who is an officer of the DOE and not an independent arbitrator, provided a determination that was so similar – nearly identical-- to the DOE's position statement that it could have been written without a hearing and could not have been written by anyone with was paying attention to the facts introduced at the hearing. In produced this determination, the factual basis seems to have been left by they wayside and the DOE position put in its place without regard to the evidence. In such a case the Appellant is thereby deprived of due process. This case was not only in violation of lawful procedures, but it also demonstrated a crass indifference to the facts as presented by *both* parties at the Appeal hearing of May 26, 2018, showing at a minimum a lack of due diligence and suggesting an unwillingness to consider the evidence presented that is by no measure appropriate in an officer of the Department of Education presiding over such a hearing.

As stated above, the determination of the Chancellor's Designee was in some of its specific findings contradicted by the evidence and, especially, the documents presented in the hearing. Moreover, the Decision denying the Appeal from Philip Weinberg repeats *nearly verbatim* the DOE Position Statement for Appeal of Rating Hearing held May 26, 2017, ignoring the evidence as if it the evidence had never been presented and had never existed.

This would lead any reasonable observer to conclude either that the Chancellor's Designee was somehow lacking in impartiality and diligence, either inattentive and incompetent to a degree that strains one's credulity or showing a lack of due diligence which approaches the sanctionable or that he wrote his denial letter without reference to the evidence presented in the hearing, but instead relied on the DOE position statement which his determination repeats nearly word for word in paragraph after paragraph.

By itself a comparison of the DOE Position Statement for Appeal of Rating Hearing held May 26, 2017 and the Decision denying Appeal from Chancellor's Designee Philip Weinberg, dated June 14, 2017, alerts one that something is terribly amiss. Mr. Weinberg did not perform his duty with due diligence and seems to have brazenly accepted all of the DOE's arguments both without exception and without reference to the evidence presented at the hearing.

Having documented the short comings of the hearings, the remaining question is 'Why?' I have stated possible motivations, including my age and salary level, retaliation for my voicing concerns about Special Ed Age, my refusal to pass students so as to bring up the school's graduation rate and my availing myself of provision of the CBA. My age and salary level seem to be likely, but I would also like to point out that this has roots in an attack on tenure that came not from the legislature –which has enacted a strong public policy in favor of teacher tenure--, but from the Administration of Mayor Bloomberg and Chancellor Klein. Chancellor Klein identified as obstacles "the three pillars of civil service: lock-step pay, seniority and life tenure. Together, they act as handcuffs and prevent us from making the changes that will encourage excellence in our system."[4] The DOE has demonstrated since that time that it has little patience for teachers who question the wisdom of its judgements. That this was a concert among DOE officers must be considered as a possibility.

Another question that must be considered in this regard is why the DOE would rush ahead with the case prior to the issuance of a determination in the Appeal of my 2015/16 rating instead of waiting for a result? It was not to remove Mr. Ford from the classroom because he was not removed from the classroom until June 9, 2017, one day before classes ended.[5] The pattern of actions indicates the DOE

---

4 Remarks by Joel Klein, Business Breakfast Forum: Crain's New York Business/ Partnership for New York City, Jan 27, 2004;
   http://www.parentadvocates.org/nicecontent/dsp_printable.cfm?articleID=1803]
5 To round out the picture, I taught in the classroom after the Specifications in the 3020-a were issued on May 23rd, after Mr. Decker signed the Determination of Probable Cause on the 26th and after I was served with the papers on May 31st. Mr. Decker came to my classroom near the end of the day on

assumed all along that the outcome would align with its original position statement, an outcome that

they should have not had been able to predict if the hearing had been fair and even-handed.

The DOE seems to think of itself as a Kingdom unto itself, subject to no one.   This goes beyond the

Appeal of my Rating in 2015-16.  The actions of the DOE, from not having Initial Planning

Conferences, to not having the minimum number of observations, to handing back observations long

after the event, to submitting Evaluation Reports that are mainly cut and paste, to tampering with

Evaluation Reports, to false testimony, to documents that were contrary to fact, to the denial of

arguments in the Appeals process of claims that were substantiated by evidence presented in the

hearing, to observing under trying conditions,[6] to bringing the 3020-a case prior to the determination of

the Appeal, to the destruction of evidence relevant to the the 3020-a case, to the DOE Attorney

implying I was guilty of Insubordination, when 'Insubordination' was not among the specifications and

---

Friday June 9, 2017 and asked me to come to the office.  I pointed out that there was no one to cover
the class, but Mr. Decker insisted.  In the office I was given a letter reassigning him to the library on a
different floor of the building and told to not return to the school.  Mr. Decker told me to return to my
class and also that I needed to take anything I wanted to remove from the school before the end of the
day.  At this point it was nearly 3 pm, the school day ending at 3:15.  Many materials that I might
have potentially used in the hearings were thus unavailable to me.  In addition to everything else, I
was prejudiced by the timing.
I was reassigned to the Library where I was still in close contact with students.  There was no urgency
to remove him from the classroom and that might have been avoided because it likely would have
caused a disruption of Bronx Guild's schedule as I was heavily involved in student preparation for the
Regents exams.  The only day in the classroom I missed was the last day, a low-attendance day, June
12th.  Mr. Weinberg dated his letter June 14th.
6 In the Denial letter, Mr. Weinberg replied that the  contention regarding being "observed under
challengeing conditions should be dismissed as Evaluators may conduct observtions at any time,"
repeating nearly word for word the blanket statement from the DOE position paper and not allowing
for any situation in which an observation would be unwarranted or a wise administrator would
demur.  The Observation of Friday November 20, 2015 was on a half-day, with a shortened period.
Further, the students had just returned from a three day camping trip and had not been in class since
the previous Friday; in addition, there had been a major incident on the trip resulting in multiple
suspensions.  Finally, the students had also been informed they would not have class, but go a field
trip, so most did not bring their book bags and were not expecting to be in class. Considering the
circumstances, I was astounded that Mr. Decker would observe the class; not receiving an Evaluation
Report until mid-March, I had thought in the interim that Mr. Decker had thought better of this, not
submitting the report since it would be unfair to do so. (Tr 1307-12 1365; Tr 471-4)

when I, because the accusation was in her closing statement, had no chance to reply to this charge (Tr 1775)[7] – all of this and much more point to a pattern of disregard and disdain for the protocols and procedures established by law and contract, and even to the general rules of evidence and giving accurate testimony.  I cannot prove that these actions were coordinated, but argue that a level-headed interpretation raises questions as to the motives for bringing the 3020-a case when it did and casts in extreme doubt the Determination of the Chancellor's Designee in the Appeal.

Considering all this, it is respectfully requested that, if it is within its powers, the Commision issue an Order:

(1) Annulling and reversing the denial of my I-Rating appeal for the 2015-2015 school year, thus giving me an Effective Rating (or higher) or no rating at all;

(2) Returning me to my previous position for the remainder of the school year and directing that the DOE place me back in 'Year One' status for the 2018-19 school year; and

(3) Vacating the Opinion and Award of Robert H. Barron, dated 4 January 2018, which called for my termination  from my tenured position as a teacher with the New York City Department of Education, as it was largely based on the false denial of my appeal of my "Ineffective" rating ("I-Rating") for the 2015-2016  and  school year; and

(4) Returning me to my position as a tenured teacher with the NYCDOE, or a similar and comparable position, providing compensation for missed employment and pension credit, or

---

7   Ms. Cox stated "the Respondent did not refuse professional development and remediation [and] wasn't hostile or outright uncooperative with the administration," but then says "he repeatedly failed to implement the strategies and suggestions given to him by his supervisors. *Insubordination is defined as refusal to obey orders.*" (Tr 1775, e.a.) Ms. Cox cited *Dept. of Educ. v. Elligsen*, in which Arbitrator Capon referred to a teacher's "disregard for the supervisors who repeatedly instructed him on the proper methodology and techniques to be used in the classroom." (Tr 1776)  I contend I did not disregard, but sought to implement the suggestions; unfortunately, I found that many were counter-productive or were contrary to norms established by the State or DOE.  I found myself often wondering if by following the suggestions I was hurting his performance.  I also note Ms. Cox's cite assumes that 'proper methodology' is not subject to question, but rather asserts that differences of professional opinion are not allowed and a teacher's academic freedom, which NY State's strong public policy in favor of tenure is designed to protect, is of no consequence.

providing compensation for the loss incurred; and

RECEIVED

(5) Granting me legal costs and fees,  compensation for missed employment and time spent

preparing my pro se defense, compensation for the infliction of emotional distress and pursuant

physical harm, compensation for lost reputation  and such other and further relief as the Court

deems just and proper.

(6) Further and in sum, at risk of repetition, I request that the Commission consider an order

reinstating me immediately and forthwith to my previous position or to, with my consent,

another suitable position in the DOE, with  all the rights, privileges and respect that should be

accorded to that position, including, but not limited to, reinstatement on pay-roll, return to the

*status quo ante* regarding his pension and health insurance, back pay, additional compensation

and/or punitive damages as the Commission finds appropriate, and to be made whole in all

ways.

☐Respectfully submitted,

Brian Ford

Dated:  May 25, 2018
New York, NY

_____

Brian Ford
   19 West 110th Street, #45
   New York, New York 10027
   (646) 713-8285

Sworn to before me this

_____ day of _____ , 2018

_____
                              Brian Ford

New York, NY

_____

*Notary Public*