**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

1:19-CV-6327

**BRIAN FORD**

　　　　　　　　　　　Plaintiff,

　　　–against–

**THE NEW YORK CITY BOARD OF EDUCATION**
**(a/k/a the Department of Education)**
**Carmen Farina, in her official capacity as Chancellor,**

　　　　　　　　　　　Defendants

**AMENDED BRIEF**
**FOR COMPLAINT**
**WITH DEMAND FOR**
**TRIAL BY JURY**

---

　　　　I, Brian Ford, the plaintiff in this case ("Ford" or "plaintiff"), appearing in this case *pro se,*

complaining of defendants The New York City Board of Education, a/k/a the Department of Education

("BOE" or "DOE"), and Carmen Farina, then in her official capacity as Chancellor ("Farina"),

including the actions of DOE officers as indicated below, and being sworn, respectfully alleges as

follows:[1]

<u>NATURE OF CLAIM</u>

1. This is an Amended Brief. Plaintiff's claim is that I, Brian Ford, was unfairly terminated after 3020a

proceedings initiated by the NYC Department of Education (DOE) and held under the auspices of the

New York State Education Department. ("NYSED") The names and titles of the following DOE

officers involved are:  Samuel J. Decker, Principal of Bronx Guild High School from 2006 to 2017;

---

1　 I add this explanatory note as an apology for the length and any irregularities that follow.  I had
　 thought I would be represented by counsel on a contingency fee basis, but after a long process the
　 counsel I expected to represent me declined on February 27th.  I then went to my back up plan,
　 preparing this myself with advice from NYLAG.  While I appreciate the help from NYLAG, it was
　 not the same as having an attorney and I am unsure of what to include and exclude.  Thus this is
　 lengthy. Also, as the Court is aware, I put in a request for counsel to be assigned counsel on
　 February 28th. The Court denied the application because  the merits had not yet been established.
　 This denial was without prejudice, and if this brief established the merits, then I do anticipate
　 putting in a second application.  Anything that expedites the process would be welcome and may
　 avoid lenthy filings in the future.

Cecillee Rauner, Asst. Principal of Bronx Guild High School from 2012 to 2017; Christine Ghaznowi (nee Peters), of Bronx Guild High School, 2016 – 2017; Cameron Staple, District Superintendent; Gary Wittenberg, [find title]; Philip Weinberg [exact title]. In addition, Angel Cox, DOE Counsel during the 3020-a hearings and Robert H. Barron, the Hearing Officer for those proceedings are referenced.

2. I began as a teacher with the NYC BOE in 1995 and taught in the system until 2018. During that time I was a highly respected teacher who had entered the teaching service with two Masters Degrees from Columbia University, a Masters in International Affairs (1989) and a Masters of Philosophy in Political Science (1995); the later degree recognized that I had completed all requirements for a PhD with the exception of the dissertation. I had previously taught middle school in Kanye, Botswana as a Peace Corps volunteer and at both Columbia, as a Teaching Assistant, and at the University of Pennsylvania, as an adjunct lecturer.

3. I received the highest rating possible in 1995-96, -97, -98, -99, 2000, at which point I moved to Cambodia (with the future mother of my child, who had been awarded a US State Department Teaching Fellowship) and taught at the Royal University of Phnom Penh. After returning to New York, I joined the faculty of Walton High School in the Bronx, again receiving the highest rating possible in 2002-03, -04 and -05. I also earned tenure during this time. Upon notification that Walton would be closing, I moved to Bronx Guild High School and again received the highest rating possible in 2005-06 under founding Principal Michael Soguero; I also earned the highest rating possible in 2006-07, -08 and 2009-10 and an Effective Rating in 2013-14 under Principal Samuel J. Decker. Only once in the 13 years I was taught and rated prior to the 2015-16 year did I receive a less than Satisfactory rating; that was 2008-09, a year during which I not only was in an auto accident that required extensive medical attention, but also initiated complaints regarding both uncompensated

overtime and unallowable Special Education practices at Bronx Guild High School.[2]

4. Shortly after returning from my half-year Sabbatical in the Fall of 2016, I was subject to a set of observations and Evaluation Reports ("ERs") that resulted in a negative Annual rating despite the school's administration not following either a) proper protocols as set out in the the Collective Bargaining Agreement ("CBA") and the UFT-NYC DOE Advance Guide to Evaluation or b) mandates for Special Education that called for there being a co-teacher in the classroom. Among the protocol deficiencies were: an inadequate number of classroom observations (4 instead of 6), the absence of a Initial Planning Conference, an absence of feedback, Evaluation reports that were delivered long after the observation, a lack of coaching, Evaluation Reports that did not have sufficient factual content but were composed mainly of cut and paste snippets from the overarching rubric (the Danielson Rubric ("Danielson")) and Evaluation Reports that were tampered with before being entered into the Advance data system for use in calculating my annual rating.

5. As regards Special Education mandates, an Individual Education Program (IEP), "demonstrate[s] the educational setting that a student is legally required to be placed in for certain classes." (Tr 35)[3] The IEPs of many of my students called for Integrated Co-Teaching (ICT) in all four core subject areas (English, Math, Social Studies, Science), but the administration did not assign a Special Education co-teacher to my classes in the Fall of 2015. I taught them by myself and was observed and evaluated under those conditions.. In addition, some of the class rosters contained over 40% IEP students, which is another violation under which I was observed and evaluated.

6. I taught under trying conditions that year and was treated differently then other teachers. The trying

---

2  A fuller account is given below. I was on leave for three years (2010-11,-12,13) to accompany my wife and family after she accepting a position as a Foreign Service Officer with the US Department of State. I should note there were two times I was not rated, Spring 2002, because I was not considered a full-time teacher, and 2014-15, since I was on sabbatical leave in the Spring.

3 All 'TR' references are to the compiled Transcript in the Matter of NEW YORK CITY DEPARTMENT OF EDUCATION v. BRIAN FORD Section 3020-a Education Law Proceeding, File #31,318.

conditions included a break down of discipline, especially after our AP Stephanie Downing (nee Eliot),

who was responsible for the Restorative Justice program went on maternity leave near Thanksgiving.

According to Mr. Decker's testimony at the 3020-a hearings, at one point, in February of 2017, I

requested specific strategies for dealing with specific students in my classes, the response to that was

that I should look at the Danielson Framework as a lens. (TR 583)  We had just had a riot in January,

and I had made these requests before, but here I am directed to a Framework in which I was never

trained and which the DOE was changing from year to year.

7. But there were other school-wide problems, the result being that BG was put on the NYSED Priority

list for a declining graduation rate, low Math scores and a 3% college readiness rate.  This, of course,

affected all teachers and the conditions under which they were observed and evaluated, but in addition I

was singled out.  We have already mentioned that I was not given a co-teacher.  In addition, I was the

only core subject area teacher in the school that did not have a dedicated classroom, something which is

actually a major obstacle to creating an atmosphere of trust and order for your students.  Furthermore,

at least two students have related to me that they heard Mr. Decker say he wanted to have me fired, or

words to that effect, thus undermining my authority with the students.

8. This was all at a time that a significantly revised version of a new evaluation system was introduced.

The Danielson Rubric was first introduced in 2013 and set out 22 domains of teaching on which

teachers would be assessed.  In 2015, a new, 'more focused' version of the rubric was introduced,

looking at only 8 domains mainly having to do with instruction.  I was never trained in these rubrics.

While the administration was trained in them, their actual evaluation processes indicates that they did

not observe all the lessons.  Still, the DOE introduced significant changes in the evaluation system

without insuring that teachers at Bronx Guild were properly trained.  In addition, for reason that will

become clear below, I want to point out that 2015 was also the year that the 3020-a switched from a 3

man panel to a single hearing officer.

9. Jumping ahead a bit on the chronology, in addition, this rating was appealed, with Gary Wittenberg as Presiding Officer for the May 26, 2017 hearing and Fact Finder for the Chancellor, and Philip Weinberg as the Chancellor's Designee in writing, signing and sending the denial letter by US Post in June or July of 2017. The denial letter, however, contradicted the testimony and documents introduced at the hearing, including evidence submitted by the DOE. In fact, the letter seems to be little more than a cut and paste of the Position Statement the DOE had introduced prior to the hearing.

10. Returning to the chronological account, when I returned for the 2016-17 year violations of some of the protocols persisted. Again there was no IPC, moreover, the administration ignored the timelime for introducing a Teacher Improvement Plan (TIP), a plan which can be imposed on a teacher who was rated as ineffective the previous year. The TIP timeline calls for there to be collaboration between the teacher and the principal prior to the deadline for finalization of the TIP, which was on or about September 22, 2016. Instead, without any consultation and after the deadline, Principal Decker presented the TIP to me at our first coaching meeting on September 26, 2016. Only when I refused to sign other than to acknowledge receipt was there any discussion of the items in the TIP and even then Principal Decker was clear that he would not remove any items. The TIP became a way of keeping track of failings and to impose pressure while I was being asked to develop new competencies, especially in the area of literacy-based pedagogy that are distinct from the project-based pedagogy on which the school was originally founded. Other new competencies also included: much longer and more detailed lesson plans – I was told at times it should read like a screen play --; multiple techniques of differentiation (without the help of a Special Ed co-teacher) among students whose skills varied from the 4th grade to the college level; on the spot assessment techniques; and assorted data collection techniques.

11. What did not change in 2016-17 was that I was treated differently and in some ways it was worse. I still did not have a dedicated classroom. As regards having a Special Education co-teacher, while I did

have one for some classes in Spring 2016, I did not for the entire 2016-17 school year. Moreover, there were instances of hostility. Mr. Decker yelled at me for putting my coat down on a book cart after coming back from lunch (I did not have an assigned place to put my coat and personal belongings) and angrily made remarks about my hygiene and that I 'should check into getting a new laundry' or words close to that; he also barely acknowledged me when passing in the hallway, not saying hello, but making a grunting noise. I felt shunned, but Ms. Rauner was worse. She was disdainful and contemptuous, including in front of students, and once claimrd I had verbally abused a student based on a written anecdotal report that was limited in its circulation to staff members. I add that neither Ms. Downing/Eliot nor Ms. Ghaznowi/Peters acted in this way, but the former was respectful and supportive and the latter was at least respectful.

12. More troubling are the false statements that accumulated in administration documents, including the Coaching Notes and February 7, 2017 letter to file. These were a harbinger of the 3020-a hearings, in which these documents were entered into evidence and administration testimony, esp that of Mr. Decker, was full of inaccurate statements.

13. The 3020-a proceedings were held in the fall of October 2017. The charges were not for misconduct, but for ineffective teaching. These charges were based for the greatest part on Mr. Decker's own observations and written evaluation reports of Mr. Ford's teaching. Of 9 sub-specifications in Specification One, six were based on classroom observations conducted by Mr. Decker. Overall, since there was no misconduct (Tr p. 4) and my MOSL was not only Effective, but superior and near the top of the effective range, the *only* evidence that alleged I was 'ineffective' came from the observations of the Administrators at a school that was had itself been deemed ineffective by the state, being deemed a 'Priority School' by New York State (Tr 433-4), the lowest ranking outside of the renewal school system.[4] Moreover, the principal of the school placed pressure on teachers to pass

---

4 This is from Mr. Decker's testimony, who said the school was ranked as a Priority school because of

students, especially seniors, which would improve one of the principle metrics on which the school was

evaluated.[5] The entire process seems to have been rife with corruption. First and foremost Chancellor's

Designee in the Appeal hearing did not consider the evidence presented fairly and even handedly.

14. Indeed, it appears that in significant aspect the Chancellor's Designee may not have considered the

evidence at all.[6] There are supposed to be two artifacts to emerge from classroom observations – Low

Inference Notes (LINs) which are taken in the class and an Evaluation Report (ER) that is supposedly

drawn directly from the the notes. In 8 of 9 cases, only the ERs were produced during discovery; the

LINs were not. Mr. Decker testified that the documents were shredded and, according to his account, it

was done because he no longer had an office. (TR 471-2) Since he still had an office when he signed

the Determination of Probable Cause, he thus shredded the LIN documents after he initiated the

proceeding. Whether they contained exculpatory evidence is an open question that cannot be

---

having not met "federal guidelines on students having scores in math." (Tr 434) Petitioner notes that
while this is true so far as it goes, it is not the whole truth as Mr. Decker himself presented it to the
staff when announcing the Priority school status. He mentioned, in addition, that the college
readiness rate was 3% and that the Graduation rate had been declining.

5  Thus we see a principal who takes or is forced into retirement and sees his school merged into
another, who manufactures grades for students (See OSPRA Complaint re 08x452) and who does
not always stay as close to the truth as one would hope; we also see a situation in which the
decisions of administrators when they go against the established norms of education, or violate the
regulations governing the schools – which clearly is the case with the school's Special Education
program, which clearly is the case with  the way it short changes student on instructional hours,
which may well be the case with its program for English Language Learners and which seems to be
the case as the school has  gotten into the habit of awarding credit to students who did not attend or
were regularly absent from the majority of their scheduled classes.  While all the arguments above
were not introduced at the Appeals Hearing, they are relevant in showing an overall pattern of
disregard on the part of DOE officers for following regulations and thus creating an atmosphere of
suspicion and mistrust that had to be navigated by a teacher on his own.

6 Rather, the Chancellor's Designee in the proceedings reported that he accepted as fact the assertions
of the DOE in its Position Statement when they were, in important and specific instances, clearly
contrary to the facts laid out in the hearing by both sides. This suggests a *predetermination* rather than
a determination, a predetermination that betrays the imperatives of justice and impartiality, making the
hearing into a farce that must be overturned.  Moreover, I brings to the Court's attention that this is just
one of many steps in the overall process that led to my termination that are not in accordance with the
protocols established by the governing statutes, the regulations of the DOE and/or the agreements
entered into by the DOE with the UFT.

determined because of their destruction. But it is not only that they might have been exculpatory – any assessment of the veracity of the ERs should rightly be made by seeing if they align with the LINs.[7]

## B. MOTIVATIONS

15. As I said in my original complaint, I cannot look into the souls of my NYC Department of Education (DOE) administrators and determine their motives precisely, but the facts lead one to no other conclusion than that something was terribly amiss.

16. Motivations other than improving education or fairly evaluating a teacher seem to have been at play. I cite the closing statement of DOE Atty, Angel. Cox during the 3020a:

> Principal Decker testify [was] that he did not believe that he was required to allow a
>
> union rep at a teacher improvement plan meeting because it was not disciplinary in
>
> nature. Now whether or not he was correct is not the point here. . . . Principal Decker
>
> testified he believed the Respondent was not entitled to a union rep, but that he agreed to
>
> let him have one because it would make him more comfortable. Now this is in reference
>
> to that initial teacher improvement plan meeting, in September of 2016. Principal Decker
>
> testified that he set up another meeting to allow the union rep to come and that he did not
>
> show. Now the Respondent's testimony is that Principal Decker emailed him and told
>
> him that the representative couldn't come. However, although the Respondent introduced
>
> other emails between himself and Principal Decker, he did not introduce that email to
>
> corroborate that claim. What motive would Principal Decker have to lie about doing
>
> something that he wasn't required to do? *And what would be the motivation or reason*
>
> *behind going through the motions of setting up another meeting that was for the purpose*
>
> *of allowing the union representative to come, and then not allowing the union*

---

7 This seemed to me to be a compelling issue, one that was a clear violation of due process and I brought it the attention of my NYSUT Atty, Jennifer Hogan. She indicated that this would not be a matter for a motion, but would be brought up for the Hearing Officer's consideration, which it was.

*representative to come?* (TR 1747, emphasis added)

17. Ms. Cox indicates that one must conclude Principal Decker was did not lie because there was no email. However there was a corroborating email of Oct 6, 16 regarding this additional meeting reads:

> "Brian- The chapter chair does not get to sit in on TIP or coaching meetings. This is not a disciplinary meeting. Sam." (R 85)[8]

18. So, "what would be the motivation or reason behind going through the motions of setting up another meeting that was for the purpose of allowing the union representative to come, and then not allowing the union representative to come?" Similarly, what would the motivation for repeated false testimony?

- Why would Mr. Decker falsely state the curriculum for the Fall 2015 class 'Participation in American Government' was offered to Mr. Ford during the summer of 2015 (Tr 466), despite Mr. Decker's having emailed the Mr. Ford that the curriculum would not be ready until after Labor Day?

- Why would Mr. Decker falsely state Mr. Ford gave students a reading from a 'college level' text book by Howard Zinn; (Tr 413; transcript reads 'Zen"), despite the fact that the reading, included with lesson plans submitted to Mr. Decker, was from Zinn's 'Young People's History of the US,' a middle school level book, something Mr. Decker seems to be aware of from his testimony, " Howard Zen [sic] is a very popular history writer that lots of teachers reference and use." (Tr 368)

- Why would Mr. Decker falsely state he and Mr. Ford wrote the the Teacher Improvement Plan (TIP) together and that it had been produced collaboratively (Tr 228, 515) despite that,

---

8 The notation 'R' refers to the record compiled by the DOE in their Appeal of the Supreme Court Article 75 petition, Index Number 100062. A copy of his email was provided to my NYSUT counsel on 3 October 2017; I had thought she introduced it, but she seems not to have done so. I sent it to her because it directly contradicted Mr. Decker's testimony, adding, he "is just making things up while on the stand. Whatever is convenient."

according to the Coaching Notes, it having been presented as a finished product ready for signature?

- Why would Mr. Decker falsely state that in Fall 2016, Mr. Ford taught only "three class periods," plus Hallway duty with two "periods or to use as he wished." (Tr 248) despite Mr. Ford having 4 teaching assignments and a hallway assignment out of the 6 class periods that term, leaving his with one prep period

- Why would Mr. Decker falsely state "He did not. I asked Robin," when asked, "do you know if Mr. Ford took [fellow teacher Robin Link] up on that offer [of help] in designing lessons?" (Tr 343) Mr. Decker responded without hesitation despite the fact that when Mr. Link was asked, "did Mr. Ford ever seek your assistance in terms of academic support or help?" he answered "Yes . . .he would show me something he was doing or ask me . . . what I thought of that question." (Tr 1178)

- Why would Mr. Decker falsely state that Mr. Ford did not hand in Lesson Plans as directed in the TIP and did not submit them on particular dates memorialized in a letter dated 7 February 17 (Tr 520-23, 559, 608; DOE exhibit 13 in 3020-a case), despite the 7 February Letter listing dates that do not exist, such as 31 November and 'the week of 7 December' (which was a Wednesday) and dates (21 Nov, 23 Nov, 6 February) that other evidence shows Mr. Ford did hand, such as Mr. Decker's own coaching notes state, "The lesson for Monday, 2/6/17 also focuses on immigration," indicating Mr. Ford had given his coaches a lesson plan for that day.

19. Mr. Decker gave false testimony on a number of other issues as well. Add to this the shredding of the LINs. Then there is a different level of inaccuracy – making general statements that are not supported by events and claiming that things 'happened all the time' when it was either an isolated event or happened not all. It is a long list and suggests an indifference to the truth, which I have

brought to the attention of the DOE on several occasions hoping they would take action. They did not.[9]

20. The Appeals hearing presented an opportunity to correct this, but it did not. My termination was based in large part on my rating for the 2015-16 school year, which was the subject of the appeal hearing on or about May 26, 2017. We note the following: the decision ignored documentary evidence and other evidence affecting all three observations on which my rating was based. First, it dismissed the claim that feedback was not timely by stating that all Evaluation reports were delivered with 45 schools days; as the documents the DOE presented show, the Evaluation report for the November 20, 2015 was not delivered until mid-March 2016, a period of well over 60 school days. Second, the decision of the hearing officer stated that all observations lasted the minimum required time; this thus ignored the Evaluation Report of 1 April 2016, marked as a Formal Observation, which requires the Evaluator to be present for the entire period, which he was not; he also ignored that the Observation Report submitted for the Appeal had been manipulated. Third, the decision stated that my supervisors "analyzed the observational evidence under the Danielson Rubric, and issued the rating based on what was observed" was contradicted by independent arbitrator Robert A. Barron, the Hearing Officer in the 3020-a case, who found that the March 7, 2016 observation, conducted by Assistant Principal Rauner, "does not include much evidence to support her ratings, and for some ratings she provided no evidence at all," adding both that "the lack of evidence is a significant deficiency" and that all but two components of the eight in the Evaluation were not being sustained due to the lack of evidence." (Barron Decision, p. 51)

---

9 I wrote one letter to then Chancellor Carmen Farina dated February 21, 2018 and sent to her by email. A similar letter was delivered by hand to 52 Chambers Street and received by Lizette Roman in late January/early February of 2018. Similar letters were sent to Chancellor Carranza as well. All asked actions the DOE would take to determine if there was either misfeasance or malfeasance, but the only response I received was an short email on January 22, 2019 from Karen Solimando, the Director of the Office of Labor Relations saying "The Department has reviewed the appeal of the 2015-2016 Ineffective rating and will not be revising its decision to uphold the rating." Apparently they have no process to (or lack the political will to) raise complaints about DOE officers who might not have performed their duty properly.

20. Thus, all three observations on which the annual rating was based should have been dismissed or, at least modified, but Mr. Weinberg's decision does not acknowledge this. Instead Mr. the decision is in large part seemingly cut and paste from the DOE position statement; the position statement and Mr. Weinberg's decision both contain 14 bullet points; moreover, each bullet point is substantially the same as the DOE position statement and nearly identical in wording, indicating an reprobate indifference to the facts of the case as presented at the hearing. Finally, Mr. Weinberg seemingly accepted false statements and manipulation of evidence by Mr. Ford's administrators without question.

21. Again, what was the motivation for this? As regards Mr. Decker, since there seemed to be a sudden change in the middle of November 2015, I eventually connected it to a visit from the Superintendent that occurred earlier that month, but there were numerous candidates for that change. (TR 1556)

22. One candidate would be simply to not acknowledge the conditions under which I was observed and evaluated.

a. Special Education

23. One condition is non-adherence to Special Education requirements. According to my students' IEPs, they should have had ICT classes. This was true for only two of the 9 times I was evaluated; 7 of the 9 observations resulting in an ER were of lessons for which there should have been a Special Education co-teacher in the room. Moreover, 4 of the 9 observations resulting in an ER were of classes with rosters of over 40% Special Education Students.

24. I did complain about the Special Education practices, both over the years and in the specific years where I was charged with being ineffective. This goes back to the 2008-09 school year, during which I wrote Mr. Decker on the issue and raised it with my union, the United Federation of Teachers ("UFT"); the union eventually filed a complaint in the Spring of 2009, prompting a DOE investigation and an

eventual reprimand of Mr. Decker. There were consequences. Bronx Guild had to devote additional resources to Special Ed in 2009-10 and afterwards. Also, I believe another consequence was that, for the first and only time in my career, I received an Unsatisfactory rating.

25. In addition, in my 2012 book, published while I was on leave, I spoke at length about Special Education practices, including, after removing identifying quoting the letter Mr. Decker had written me in response to my original query.[10] Also, while I don't know that anyone read it, it was known at the school that I had written a book. Moreover, much of the content, including critiques of the NYC DOE, were included in my Sabbatical materials as submitted to the DOE; those first round of materials, in the application state, were sent to Ms. Staple, so she would have had an opportunity to read them and, I believe, an obligation to review. Finally, I also brought this up in 2015-16, but did not make a complaint as I felt I had suffered for doing the same thing in 2008-09 and feared retaliation.

26. Thus, in asserting the DOE retaliated against me for complaining about Special Education Practices at Bronx Guild, I have met four conditions established under the Americans with Disabilities Act of 1990 (ADA) or the Rehabilitation Act of 1973 (RA) to assert a retaliation claim. The facts that I am presenting plausibly suggest:

First, that I was engaged in a protected activity, pointing to problems at my school and contributing to the critical discourse on education reform.

Second, Mr. Decker knew of all these activities; he knew of my letter to him, he heard my comments, he knew there was a complaint filed with the UFT, he suffered a reprimand, he needed to resign the school budget and none of these things was he likely to forget,. Also, he was aware I had written a book and he was the person to whom I first communicated with about my Sabbatical project, submitting the application to him en route to Ms. Staple. Also, Ms.

---

10 *Brian Ford, Respect for Teachers: The Rhetoric Gap and How Research on Schools has Laid the Ground for New Business Models in Education.* (Lanham, MD: Rowman and Littlefield, 2012.)

Staple, who became District Superintendent in 2011, should likely have known of the complaint against BG in reviewing the school's history as part of her duties. Similarly, Ms. Staple had access to the Sabbatical materials. I don't know if she knew about the book.

Finally, regarding the DOE officers, while it is not particularly plausible that other DOE officers mentioned may have seen the book or heard about my views, perhaps from other DOE officers, it is at least possible.

Third, it is not in dispute that an adverse course of action was taken against me, one resulting in my removal from the classroom.

Fourth, a causal connection exists between the protected actitvity and adverse action. Actually, there are potentially two causal conhnections: one from the original events in 2008-2010, the other from the 2015-17. The first would be a fairly long causal chain, but a long rope can still put a boat and Mr. Decker has a long memory that could result in retaliatory animus. The second would be much shorter, from November 2015, when Mr. Decker's attitude towards me changed suddenly and his actions included no longer holding coaching sessions; to my negative 2015-16 rating based on too few observations, all ERs being given to me after March 7th, 2015, so with little time to improve my performance before the end of the year; to his signing the Determination of Probable cause to initiate the 3020-a on May 26, 2017; to his shredding the LINs; to his giving multiple examples of false testimony at the 3020a hearings. And these two chains could possibly wrap around one another like two strands of DNA, making them all the stronger

27. The involvement of other DOE officers is not fully known, but it is reasonable to ask questions, especially as regards the roles of Ms. Staple, and of Mr. Wittenberg and Mr. Weinberg in the Appeal Hearing and Post-Hearing Process and what may have amounted to due-process problems regarding the denial letter. It is worth noting that the hearing happened on the same day, May 26, 2017, Mr. Decker

signed the Determination of Probable for the 3020-a process.[11] For the DOE to start the 3020-a process suggests that they were not worried the Appeal would go in my favor; if it had gone in my favor, they would have had to scrap the case or, at the very least, drastically rewrite it. I would not bring this up, but I have never understood why the denial letter contradicts evidence, including evidence the DOE introduced.

28. I want to also note that in order to see if there was any communication between the parties mentioned regarding the case, I have made a FOIA request for email communications between the parties. These will be explained below.

29. Other conditions under which I was evaluated are listed below. In addition, the question of false testimony and other due process, such as evidence manipulation, mentioned above may be covered under the National Labor Relations Act of 1935 (NLRA).

b. Feeling Pressure to Pass Seniors

30. Another condition is that I was pressured to pass students even if they were not meeting minimal requirements, thus creating a situation in which I was putting my teaching license in jeopardy if I succumbed to the pressure. This might constitute a violation of the National Labor Relations Act of 1935 (NLRA). All the observed classes that were the basis for ERs were composed of seniors. My core classes, Economics and Participation in American Government, were also required for graduation, so a failing grade from me would mean having to go to summer school. It would also hurt the school's graduation rate, and I was regularly told by administration of the importance of letting our students go on with their lives, not detaining them at the secondary school and not risk alienating them to the point they would drop out just short of the finish line. I mostly agreed with this thought, but as a classroom teacher I needed to set standards and I felt pressure to pass students.

---

11 That the Determination of Probable Cause was signed by the chief witness in the case is deeply troubling. It also had significant defects, including the listing the *District* as "Bronx Guild High School."

31. Moreover, by the Spring of 2017, this became unreasonable. I was being asked about the progress of some students with very low attendance, as low as 20%. Overall, I had roughly 60 senior students and the majority, 55 or so, were going to receive the necessary credit. Eventually, my grades were not used. When I was removed from the classroom (on or about June 9th), I was also cut off my Skedula account through which I entered my grades. After communication with the Principal, I prepared a spread sheet for the grades; he had said I would enter them 'manually.' But I was never asked to enter them at all, and my principal approved the graduation of students who did not pass my class, along with all those who did pass the class, but which he did not know about because he had never gotten my grades.[12]

c. New Evaluation System and New Pedagogy

32. Another condition under which I was evaluated was the introduction of a new evaluation system in 2013 and its significant revision in 2015. The new system, based on the Danielson Rubric, originally had 22 domains or components that covered all aspects of teaching, including domains in which Mr. Ford felt he excelled. The DOE Rating System for 2015-16 no longer used the 22 Components of the Full Danielson Rubric. Instead of summative Evaluations based on 22 Components, the DOE narrowed its scope and used a more 'focused' version of the Danielson Rubric by limiting Summative Evaluation it to only 8 Components. (The Danielson Framework for Teaching was Joint Exhibit 4 in the 3020-a proceeding.) The following table lists all 22 components with the 8 components in the narrower version in **bold**:

| 1a Demonstrating Knowledge of Content and Pedagogy | 2a Creating an Environment of Respect and Rapport |
|---|---|

---

12 In January of 2018, I entered a Request for Investigation with the NYS Office of School Personnel Review and Accountability (OSPRA), regarding principal knowingly graduating students with insufficient credits. This was after a telephone conversation I had with Anne Zugalla in early January and a follow up email directed to OSPRA@nysed.gov on Tue, Jan 9, 2018 at 12:12 PM. I do not know the outcome of their investigation.

| 1b Demonstrating Knowledge of Students | 2b Establishing a Culture for Learning |
|---|---|
| 1c Setting Instructional Outcomes | 2c Managing Classroom Procedures |
| 1d Demonstrating Knowledge of Resources | **2d Managing Student Behavior** |
| **1e Designing Coherent Instruction** | 2e Organizing Physical Space |
| 1f Designing Student Assessments | |
| 3a Communicating with Students<br>**3b Using Questioning and Discussion Techniques**<br><br>**3c Engaging Students in Learning**<br><br>**3d Using Assessment in Instruction**<br><br>3e Demonstrating Flexibility and Responsiveness | 4a Reflecting on Teaching<br>4b Maintaining Accurate Records<br><br>4c Communicating with Families<br><br>4d Participating in the Professional Community<br><br>**4e Growing and Developing Professionally**<br><br>4f Showing Professionalism |

33. I would like to note the following, which may be contrary to the National Labor Relations Act of 1935 (NLRA):

(1) I was not trained in the Rubric. While administrators giving Evaluations were given extensive training by the DOE and other entities in the use of the Rubric (see Transcript from 3020-a case; Tr 64-5, 439-441, 677-682; 832, 854, 895, 901-05, 1271-73, 1715), teachers at Bronx Guild did not receive such training (Tr 905, 1091, 1127, 1271-73, 1715). Christine Ghaznawi, who was a witness for the DOE and was first a teacher and, beginning in 2016, an Assistant Principal at Bronx Guild, made this clear and found it something the DOE could improve on, "what I found even personally when I was a teacher I didn't feel like I understood the rubric enough because there's not training around the Danielson for teachers." (Tr 905)

(2) I had been rated Effective under the 22 components in 2013-14. I had also been given the highest rating under the previous system in all but one of the roughly 14 years I had taught with the DOE prior to 2013.

(3) Some of my strongest characteristics as a teacher were in those areas that were no longer part of the summative evaluation process. These include (1b) Demonstrating Knowledge of Students, (1d) Demonstrating Knowledge of Resources, (2b) Establishing a Culture for Learning, (3a) Communicating with Students, (3e) Demonstrating Flexibility and Responsiveness, (4a) Reflecting on Teaching, (4c) Communicating with Families and (4d) Participating in the Professional Community. Indeed, I had prided himself on these 9

components and much of my practice was build around them.

34. Thus, the 'newly focused' evaluation rubric, in focusing on 8 domains instead of the 22 of the previous year, excluded many of my strengths and competencies Moreover, I had developed a project-based pedagogy after transferring to Bronx Guild in 2005, but was being asked to develop new/additional competencies, including differentiation strategies and literacy-based pedagogies, that according to the administrators own principles, take years to develop.[13]

d. Speaking in Front of Students, Hostility of Administration

35. I wrote above that "I felt shunned by Mr. Decker, but Ms. Rauner was worse." According to two students, Mr. Decker was heard by students to say he wanted to get rid of me. I first heard of this when students were speaking among themselves during the 2015-16 school year and confirmed it in conversations with two students in the Fall of 2018.

36. Moreover, Ms. Rauner many times was blunt to the point of insult. In one instance, Spring of 2017, I was escorting a student through the halls when he was approached by Ms. Rauner and they began to converse; worried that the student would get in trouble for not having a pass, I began to explain that he was not breaking the rules because I was escorting him. Her response to me was, "I am not talking to you." It should be noted that I did put in claim of harassment with the UFT, but they did not forward it on to the DOE, telling me there was a limit on how many such claims could be submitted. This seems

---

13 As a professional educator, I take issue with the administration claim, one that surfaces in the decision, that 'the same elements . . . have always constituted effective teaching.' I was, eventually, in 2016-17, told to adopt new teaching methods, to adopt a 'set of best practices' from a limited part of the pedagogical spectrum that claimed to encapsulate 'the same elements that have always constituted effective teaching. I attempted to do so in that year, but he was aware that there are respected views on pedagogy other than literacy-based pedagogies and that literacy-based pedagogies have been highly criticized, including in Natalie Wexler's recent book, Natalie Wexler, *The Knowledge Gap: The hidden cause of America's broken education system — and how to fix it,* 2019. This is a new book, but it is an argument that goes back at least to E.D. Hirsch's *Cultural Literacy.* (circa 1990)

The literacy-based pedagogies were a new approach for the school, something of which I was well aware. In 2008, according to some of my own notes, Mr. Decker complained that all the students were 'doing the same thing' rather than engaging in independent projects; in 2016, the complaint was more the reverse. The notes also state that Mr. Ford was not giving 'enough individualized [attention in order to] complete project[s]" and was told to focus on project based work and backward planning. In 2016-17, Mr. Decker not longer feel individual attention was sufficient.

to be an inadequate institutional framework for addressing these concerns about what amount to

bullying, especially as I was not trained in the Rubric, and may violate the National Labor Relations

Act of 1935 (NLRA). Moreover f the motivation was based on my being part of a protected class, that

would violate The Age Discrimination in Employment Act of 1967 (ADEA).


e. Violations of Due Process, the CBA and the Advance System

33. I have referred to several instances of not following protocols and indicated that the destruction of

evidence, false testimony and tampering with evidence should be thought of as constituting violations

of due-process rights and the strong public policy in favor of maintaining them.

34. Their actions, whether engaged in as individuals or in coordination, raise the question as to whether

the rating process, the process of appeal ratings and the standard of review at the hearing followed by

the DOE so deviated from the guidelines as to deprive me of substantial rights. The so-called 'facts'

were found, charged, and testified to by the same people, all employees of the DOE who have interests

in seeing the rating system as it was redesigned and implemented beginning in 2015/16 to be found

authoritative, persuasive and compelling when it was, in reality, new, untested and only one of many

valid approaches to teaching and was moreover implemented by inexperienced practitioners who were,

as the decision and other documents make clear, as likely as not to make errors. I was thus deprived, as

a teacher who had 15 years of experience and only a single unsatisfactory rating – and that during a

year in which he was in an automobile accident that required extensive medical attention and during

which he also had the combination of audacity, temerity and naivete to file a report on his school's non-

compliance with Special Education requirements - , of the opportunity to be observed under proper

conditions and, if found lacking, then improve his performance.

35. The actions at the school level, and perhaps the superintendent level, which led to the negative

ratings on which the 3020-a hearings were predicated, also ignored the procedures mandated by the

Collective Bargaining Agreement and the Advance Guide to Evaluation in order to validate false

allegations which were not true and more importantly which were not proven at the hearing, but instead

found credible accounts based on false testimony, manipulation and destruction of evidence, blatant

disregard of procedures designed to ensure the fairness and integrity of the rating system.

36. Indeed, if there were sufficient evidence to demonstrate that they engaged in a corrupt enterprise,

at least the civil provisions of the Racketeering Influenced and Corrupt Organizations (RICO) act of

1970 could possibly be applicable. I assume it is a long shot, since most of the enumerated crimes

under RICO are things such as 'white slavery' (not applicable) and 'fraud' (the court will apply strict

scrutiny), but there are others: section 1341 (relating to mail fraud), section 1343 (relating to wire

fraud), section 1503 (relating to obstruction of justice), and section 1512 (relating to tampering with a

witness, victim, or an informant.


f. The DOE systematically failed to protect my due process rights, thus constituting Age Discrimination

37. The institutional history of the DOE is relevant as that is the organization under which BG

operated and more senior officers in the DOE were the superiors of my immediate supervisors. My

immediate supervisors, as well as intermediate supervisors were part of an organization that had been

reshaped once Mayoral control was established in 2002 in such a way as to ignore that the quality of

classroom teaching is largely dependent on supports students receive from the school.

38. I recall a conversation ! had with a District Superintendent when I was still at Walton High School.

He told that when he was getting his administrative degree the emphasis was on enabling teachers, but

now it was on assessing them.[14]

---

14  Examples of enabling and empowering approaches were numerous, such as HenryM.Levin,
    "Building School Capacity for Effective Teacher Empowerment: Applications to Elementary
    Schools with At Risk Students," CPRE Research Report Series R1-019, Rutgers, September1991. I
    have not been able to locate the page, but I believe this anecdote is in my *Respect for Teachers: The
    Rhetoric Gap and How Research on Schools has Laid the Ground for New Business Models in*

39. We see measurement of achievement dominating the discourse:

> I know that at the end of the day there's only one metric that counts. That is, did we move student achievement? And when I say move, not incrementally move, but did we substantially improve over a period of time, student achievement.[15]

40. This single metric has weight as the common currency of educational discourse and the direction of institutional change. Increases in test scores is a *sine qua non* for education reform in the current political climate. It thus pushes asides many other functions of the schooling system: providing for socialization and public health, instilling democratic values, aiding a child's emotional and social as well as cognitive development and somehow creating a better society. Thus, by articulating the problem in a such a narrow fashion it predetermines a narrow set of solutions and a narrow set of policy options.

41. The change was particularly apparent in the early 2000s, with No Child Left Behind and, in New York (as well as other cities), mayoral control. While it is not a legal argument *per se*, it is noted that attacks on tenure have roots that came not from the legislature, but from the Administration of Mayor Bloomberg and Chancellor Klein. Chancellor Klein identified as obstacles "the three pillars of civil service: lock-step pay, seniority and life tenure. Together, they act as handcuffs and prevent us from

---

*Education.* (Rowman and Littlefield, 2012.) I was, however, able to find a passage about an administrator who "truly wanted to enable his teachers," who I compared to "many newer administrators in the early years of the Bloomberg/Klein reforms [who] seemed to forget as they pushed for 'bell to bell instruction' and, in the opinion of many of my colleagues, engaged in a series of exercises in nit picking and fault finding. Indeed, Mr. Herron [not his real name] in some ways could be the hero of this book. As recounted below, instead of fulfilling an imposed quota of 'unsatisfactory' teacher ratings, he placed himself between the mechanisms of assessment and the desire of administrators to cull the ranks. He, along with at least one other Assistant Principal, refused to give unsatisfactory rankings he felt were unjustified and was, in turn, himself given an unsatisfactory ranking. This was, at first, only a rumor, but it was a rumor that was confirmed to me by more than one party to the proceedings."

15 Interview with Robert E Knowling, Jr., CEO of the Leadership Academy, 5 Nov. 2003, conducted by Rafael Pi Roman, "A Year of Change: Leadership in the Principal's Office," *New York Voices*, Channel 13, New York, January 2004.

making the changes that will encourage excellence in our system."[16]

42. I wrote on this extensively and now seems to have swept up in a political movement in which research on education was weaponized to attack teacher rights, including tenure, seniority and the contractual promise of a dignified retirement.

43. Much of this is, even if unwise, legally allowable, but not if it is retaliatory, ignores strong public policy on tenure and academic freedom or involves ignoring due-process protections for the teacher involved. Under such a framework, if a teacher were retaliated against for insisting on taking a Sabbatical or for the views expressed in his Sabbatical work, that might be considered a violation of the National Labor Relations Act of 1935 (NLRA). It could also constitute a violation of The Age Discrimination in Employment Act of 1967 (ADEA) since in order to get to the stage of applying for a sabbatical, one has to be older; it is unlikely that someone under 40 could apply for sabbatical leave. In other words, taking a sabbatical in order to develop views on one's profession could be considered a protected activity.

44. Moreover a systematic undermining of due-process rights in order to remove the obstacle of "the three pillars of civil service" would potentially constitute an unlawful employment practice and be an exception to Court giving preclusive effect to the Hearing Officer's determination; a jury could determine questions of motive by DOE officers not explicitly decided in a 3020-a proceeding and the Hearing Officer's decision would not have preclusive effect. [Cite McMahon p 6]

45. Similarly, if a systematic undermining of due-process rights was found to indicate "bad faith, harassment or irreparable injury that is both serious and immediate" would allow the Federal Court to intervene in the ongoing 3020-a proceedings and their subsequent related actions in NYS Supreme Court. This would require that facts would need to be alleged that would warrant application of this

---

16 Remarks by Joel Klein, Business Breakfast Forum: Crain's New York Business/ Partnership for New York City, Jan 27, 2004; http://www.parentadvocates.org/nicecontent/dsp_printable.cfm?articleID=1803.

exception. (For a discussion, see McMahon Order to Amend, November 6, 2019. p 7)

46. Here I first ask whether the DOE's not ensuring DOE officers adhered to established protocols of the CBA and the Advance system prior to embarking on the 3020-a process would warrant application of this exception. Second, I ask that Court consider whether the intentional destruction of evidence (the LINs), the false testimony and the tampering with evidence do warrant application of this exception, especially when coupled with the DOE's refusal to take any action to sanction such actions. Third, I ask that Court to consider whether the actions of Mr. Wittenberg and Mr. Weinberg do the same. Fourth, I ask the Court to consider the history and the motivations of the DOE in this matter. While the DOE may be justified in trying to reduce legacy costs, they cannot be allowed to do so in a manner that ignores due process rights and procedures mandated by the CBA, the Advance System, the NYSED and NYS Education Law.

47. By not following their own procedures, the DOE engaged in unfair labor practices that led to my termination.

FACTUAL ALLEGATIONS

a. My Background and Pre-Bronx Guild Employment with the BOE and DOE

48. While at work on my dissertation at Columbia, I started teaching in the NYC public schools. Meant to be for a year or two, it ends up being over two decades. I first try to to join the then NYC BOE in 1993. Washington Irving HS offered a spot and temporary credentials I already had teaching experience – 2 years in Kanye, Botswana with the Peace Corps. It seems to add up.

49. But I don't start that year. School opening was delayed because of asbestos; not yet on the school's roster, someone with permanent credentials asks for the job in the interim. It is enough to block me. I go off on a Soros project to reopen the University of Tirana (Albania), closed since the end of Communist rule. (I teach in the renamed Dept of Sociology and Philosophy, the one which succeeded the Dept of Marxist-Leninist Studies.)

50. With the help of the Peace Corps Fellows program at Teacher's College, I again apply in 1995. The first year I end up teaching at JHS 22 (LES) and Clara Barton HS (Brooklyn). Jerry Resnick, the principal at Clara Barton, is encouraging. My rating is in the highest category. The next year, I begin a three year stint at Borough Academies, a transfer school developed for students exiting Rikers, but ended up with a student body from the NYC BOE system who had disciplinary problems. I receive ratings of highest rank (Satisfactory) for 1996-97, -98 and -99. I also teach at Park East HS for a year and receive a rating of Satisfactory for 1999-2000.

51. I move to the same Harlem apartment in which I currently live in 1997. I also meet a fellow teacher; when she takes a position as a US State Dept Teaching Fellow in Cambodia, I follow along, teaching English and History at the Royal University. We return just prior to 9/11. She does not want to return to HS teaching – too draining.

52. I, however, am hired as an appointed, fully credentialed teacher, at Walton, HS, near Kingsbridge. Soon after, I earn tenure. I not only receive Satisfactory ratings in 2002-03, -04 and -05, but I serve on school committees and work regularly with administration. However, after Mayoral Control (2002), the school is slated to be phased out; 6 to 8 smaller schools will make up a new 'Walton Campus.' My principal is fired by email. I start looking elsewhere.

b. Bronx Guild Employment until 2013

53. In 2005, I move to Bronx Guild HS, entering its fourth year of existence under founding Principal Michael Soguero. It is an internship-based school; every student is supposed to have an individualized program centered on that internship, spinning projects out from there. Classes of about 16 are called 'crews' and each crew has a leader who is responsible for the educational program of every student in the class in all subject areas. The pedagogy, developed at the Met (Providence, RI), is student-centered, experiential and project-based. But there are growing pains, esp. since the methodology is not gauged to having student pass mandated state tests. Michael asks me to be a Learning Specialist

for Social Studies and to come up with integrated program to address passing the Regents. There are, however, staffing gaps because of staff taking family leave; even though my daughter is born in February, I take over as a 'crew leader ' in the Spring. I receive a Satisfactory rating for 2005 - 06. .

53. Michael leaves. A new principal, from the Leadership Academy, takes over. While changing it somewhat, Mr. Decker presents himself a true believer in the new pedagogy.[17] I have doubts, we come into what I think is minor conflict. I want to leave, but in 2007 a new funding formula (Fair Student Funding) places strains on school budgets if they hire senior teachers, and by now I am one. A former teaching colleague who has become a principal offers me a job, but then rescincs the offer. I am pretty much stuck. Nonetheless, I teach the same crew in 2006-07 and -08 and I receive a Satisfactory rating for both years.

54. Still, in June of 2008, Mr. Decker suggests this is not the right school for me, that I don't believe in their model. In an unguarded moment he asks, "Why did you ever come to this school?" adding that this was should somehow 'off the record.'

55. Ironically, the principal will later has some of the same doubts. After roughly 6 years, he will adopt a more traditional pedagogy, one he claims is research tested. Mr. Decker testified the change was "necessary because *the school was not providing students with the skills they needed to succeed.*"[18]

---

17 Mr. Decker testified,. "It became clear to me, in the year that I was the interim principal [2005-06], that it wasn't a structure that was really working for students, and so I kept modifying it over the years and bringing it more in line with a traditional school." (Tr 54; R 249) This is inaccurate in both detail (Mr. Decker was not an interim principal, but a Principal's intern in the Leadership Academy program) and in substance (Mr. Decker made some modifications, but he kept the core aspects of the program intact until at least 2011).

18 I am quoting DOE brief in the Appeals case. (Brief, pp 30-31, referencing R248- 49, 253; ea) This will be expanded upon below, but when I was on leave and after Mr. Decker has been principal for roughly 6 years, "the school changed from an internship school to a more traditional setup." (Brief, p 30) Since the school maintained its internship program, this is not exactly correct (see below), but we note that whether the school ever provided the majority of students with those skills under Mr. Decker's leadership is an open question.
Bronx Guild High School (BG) was a school that **twice** failed under Mr. Decker's leadership, once forcing a change in its program between 2011 and 2013,and later, during the 2015-16 school year,

Nonetheless, at this point it is clear he would like me to transfer and I do look, but I will not be in New York during the summer. I apply to and attend an NEH seminar for teachers in Columbus, Ohio, spend extended time with my daughter's grandparents there and attend three family weddings in the Midwest, barely touching foot in New York. I look for jobs remotely, but it is difficult and the question of the Fair Student Funding formula comes up again. Not having secured a transfer, I return in the Fall.

56. In 2008-09, over Columbus Day weekend on an upstate pumpkin picking trip, I am in an automobile accident – my vehicle is rear-ended while I am stopped at a red light and my back is injured. I suffer through back spasms and I go to at least two dozen separate medical appointments, probably more. Mr. Decker tells me in one meeting, just before Christmas Break, that he has no first hand knowledge of this and does not know why he should not think I am faking. He is right on the first half – all of the voluminous paperwork when to our Chief of Operations, Dino Martinez.

57. I cannot be sure of his motivations and there is a lack of trust. Since the young Chapter Leader refuses, early in the year I felt obliged as the senior teacher on the staff to file a complaint regarding unpaid overtime – teachers were not getting prep periods during the day at the beginning of the year. Also, I have raised the question of Special Education and having a co-teacher in the room. Finally, I am missing much more time than I normally do because of my back and being in back pain is not good for my relationship with my students because it reduces patience. For the only time in my career, in 2008-09 I am given a Unsatisfactory annual rating.

58. Nonetheless, I return for one more year before going on leave. In 2009-10 I receive a Satisfactory rating. I am relieved and excited about where the Foreign Service will take our family, but it will also take my wife back to New York in 2013. When I return to Bronx Guild in 2013, I have new doubts, but I am quiet this time. Experience has taught me that the new DOE wants compliance, not

---

being put on the NY State 'Priority' list for inadequate performance. BG was eventually merged into a larger school at the end of 2016-17

constructive engagement. I fear retaliation from Mr. Decker.

59. My ideas for reaching students are supposedly not aligned with the cult-like atmosphere of the new model. But 'literacy' is like phonics. Phonics has its place, but children already proficient are bored to death. Some literacy methods work, but there is a gap – you cannot assume away students' need for background knowledge. Just as phonics should be embedded in whole language, literacy should be embedded in 'whole knowledge.' Positive mention of E.B. Hirsch or Natalie Wexler is deemed apostasy.

60. Still, all of this means I have been a witness to educational reform and institutional change. As justified by George W. Bush, this was 'the civil rights struggle of our time.' However, the subtext of this 'civil rights narrative' seemed to be more about neoliberal privatization. Then, much of its substance was adopted by Arne Duncan.

C. Family Leave (2010-13), Publications and Projects

61. I write about this, publish a book, plus articles in little read academic journals. I want to connect my history to the way the schools have changed, especially in NYC since 2002, but generally. At this point, of all the schools in my history, not one still exists. I prefer a sense of permanence when it comes to educational institutions – you should be able to go back to where you went to school. It is ironic that the Bloombergs, the Kleins and the DFER people give loads of money to their elite *alma maters*, but have as their reform watch words 'creative destruction,' not seeing the value of institutional continuity in public education.

62. I do this at greater length that I should have in my 2012 book, *Respect for Teachers*. (The title is ironic.) In my more recent work I have focused on the nexus between Democracy and Education, with special attention to Gutmann's *Democratic Education*. (1987) In a series of empirically informed commentaries, I argue that business oriented education reform runs almost precisely counter to

Gutmann's project.[19]  Both seek to establish a fourth sphere of authority beyond the three Gutmann

begins with: Parents, the State and Educators. For Gutmann this sphere was meant to be that of

Deliberative Democracy.  For business-oriented reform, this sphere is meant to be shaped by the

Market.

63. That creates huge strains.  The task of creating a public will is daunting in any political system, but

a democracy dedicated to the principles of participation and public deliberation faces specific

challenges, including overcoming organized opposition that may not accept democratic tenets.  In the

sphere of eduction (and social reproduction more generally), business influenced movements to reform

public education question many of the established goals and norms of democratic education and thus

may be the vanguard of such opposition. In order to interpret and explore these movements, I enlist

Amy Gutmann's work as a heuristic device to interpret business-influenced movements to reform

public education.  Four articles consider the question of business influence and how we may outline its

major features.  In so doing, it looks at both the task of instituting a unified public school system and

organized opposition to this task within the context of a democratic polity and its deliberative

processes.

d. Bronx Guild Employment after 2013 -15, including Sabbatical

64. When I return after family leave, I contact Bronx Guild and find that Mr. Decker is still principal,

but the two Assistant Principals, with whom I had excellent relationships, had moved on.  One, Jeff

Paladino, became a principal, the other Al Sylvia, moved to another school in the same building.  Also,

---

19  Brian Ford, "Negating Amy Gutmann: Deliberative Democracy, Business Influence and
   Segmentation Strategies in Education" (Forthcoming, *Democracy and Education*, May 2020);
   Brian Ford, "Neoliberalism and Four Spheres of Authority in American Education: Business,
   Class, Stratification and Intimations of  Marketization" (Forthcoming,  *Policy Futures in
   Education*, March 2020); Brian Ford, "The Odd Malaise of Democratic Education and the
   Inordinate Influence of Business" (Forthcoming,  *Policy Futures in Education*, 2020); and Brian
   Ford, "Profit, Innovation and the Cult of the Entrepreneur:  Civics and Economic Citizenship"
   (Forthcoming,  *Policy Futures in Education*, 2020).  That is too much to fit in here, but
   https://independent.academia.edu/BrianFord2 has draft copies.

most of the staff I knew is gone; I am told that 81% of the staff left during the summer of 2011 and that seems about right – I barely know anyone. I also talk to some of the students I had as Freshman and they tell me the school has changed.

65. I do not want to work for Mr. Decker, so I apply to different schools, eventually making a hand shake agreement with Rodney Lofton the Principal of Bread and Roses High School. Since it is after the Open Market transfer period, I needed permission from Mr. Decker, which he gives and Mr. Lofton emails me, "Welcome aboard." However, on the Friday afternoon before school opens, he contacts both myself and Mr. Decker, rescinding the offer for unspecified 'internal reasons.' I suspect my salary is too great, but I do not konw. Given the timing, no transfer seems possible.

66. I report to Bronx Guild to teach Geography and to be a crew leader. I meet the new staff, in particular my new coach, Stephanie Eliot. Ms. Eliot is respectful, polite and supportive. The school, however, is chaotic – fights break out all time. One of my students is in his third year as a Sophomore.

67. Mr. Lofton had made some mention of a new Evaluation system. As I recall, not much is made of it, but we are given large binders with copies of the Danielson Rubric. At the end of the year I receive an Effective annual rating for 2013-14.

68. For 2014-15, I am asked to teach a film of Social Studies class, something I have always wanted to do and pick out three films, *Marie Antoinette, A Tale of Two Cities* and *Ali;* the idea is to supplement the core Global and US History classes by focusing on the French Revolution and the Black Power movement. I *love* teaching the class – the first half of the class is traditional, the second is a stop/start viewing of the film in which students have to answer questions based on that day's portion. I love teaching the class, the students are enthusiastic, but I will not have the opportunity it again, nor will I be able to integrate the techniques I have adopted in either 2015-16 of -17 for reasons outlined below.

69. I find I also have an opportunity to be a guest lecturer at the University of Dhaka, Bangladesh. I put in a sabbatical application for Spring 2015, " in order to complete a project on education that has

two components. . . . a writing and research component on educational policy . . . to be completed

while lecturing on the same subjects at the Institute of Educational Research (IER), Dhaka University,

Dhaka, Bangladesh. . . . The second is a component on the use of films and videos to enhance and/or

provide an alternative to traditional curriculum in high school Social Studies, focusing on Global

History and Geography. . . . The film component consists of Unit Plans for teaching and "builds on

work I have been doing at Bronx Guild . . . both on my own and in collaboration with other staff

members. Each Unit, comprising roughly a dozen 55 minute periods (the norm at Bronx Guild), is

centered on one film that is either historically rooted or exposes students to different cultural milieus."[20]

70.  The application is given to my Principal and he sends it to the Superintendent, Carron Staple for

approval, but she does not approve it.  I am told by the UFT, "The DOE has not officially denied the

sabbatical. Only the superintendent has. The DOE is working with the superintendent because the

superintendent's initial denial was incorrect."[21]  I am told by phone that she wants to deny the

sabbatical because of my three year's of leave.

71. It takes nearly two months, I lose the sub-lettor for my apartment, but in mid-January 2015, the

leave (Case Number: 13273) is approved. I spend the Spring working on the project, sending in about

600 pages to the DOE in late August. Because of the Sabbatical, I receive no annual rating for 2014-15.

e. Bronx Guild Employment, 2015-16 and 2016-17

72.  I contacted Mr. Decker regarding the school year during the summer, telling him I have been

working on Unit plans.  He confirms by email that I will be teaching Participation and Economics, but

emphasizes that BG will provide the curriculum and that I would not use the NYSED curriculum or the

---

20 From Ford Sabbatical Application, submitted to DOE Fall 2014. There are two writing projects, a
   book-length manuscript is tentatively titled *Educational Politics and Hegemonies of Social
   Learning: Education Reform in the US since the 1970s* and the first of a series of connected essays
   examining the positions on slavery of 8 major American figures, as well as John Locke.
21 Email from Amy Arundell <aarundell@uft.org>, Director of Personnel and Special Projects, United
   Federation of Teachers, December 10, 2014.

Unit Plans I had developed during my sabbatical. The last is a disappointment; further the BG curriculum is not ready and I do not get it until the afternoon before classes begin. (Please note that Mr. Decker will testify falsely during the 3020-a hearings that the curriculum was ready and available during the summer.)

73. I do not have an IPC, but I am informed that I will have 6 observations. I am told that since I am coming back from sabbatical, I have no choice in the matter.

74. The school is chaotic as ever. Students seem entitled and the discipline system is strained. Ms. Downing (formerly Ms. Eliot) is teaching while pregnant and will soon take leave. The discipline system will almost cease to function once she leaves.

75. I am the only core subject teacher who does not have a dedicated classroom; I eventually travel from class to class using a cart, but it takes until the end of September until I get a cart. Neither do I have a dedicated work area for the first six weeks of school, but must ask other teachers on their prep if I can work in their rooms after the first six weeks I claim a desk in a break out area, but must leave when other staff members want to use it. (See TR 1305-6)

76. Mr. Decker tells us at the beginning of the year that he will be being evaluated this year on how he evaluates his teachers. He is my coach. I recall clearly that Mr. Decker did make what seemed genuine efforts at the beginning of 2015-16 to boost morale. In September and October he comes into my classroom about 4 or 5 times; feedback is mostly, but by no means completely positive, he approves of some things, criticizes others. Generally, his demeanor is positive and supportive –a bit of a surprise to me. He even writes 'Wow -- great work Brian' in response to a email in which I summarized and analyzed student Lexile scores and reading levels.[22]

77. However, these came to an abrupt halt in mid-November of that year. Suddenly, in November of

---

[22] Full text of the email: Sun, Nov 1, 2015 at 3:06 PM, sam decker <samdec@gmail.com> wrote:
    Wow -- great work Brian. I will dig into these tomorrow. Sam Sent from my iPhone

2015, my principal's attitude changed towards me. I cannot with certainty tell you the reason, but there were a few pertinent events.[23] Someone from the District Office visited not only the school, but my classroom. I believe it was a good class, but perhaps Ms. Staple was reminded that I had gone over her head to get my sabbatical.

78. In addition, there was a problem on the camping trip, which Mr. Decker attended, but I did not. Apparently some students had vandalized buildings, played with fire extinguishers and behaved in such a manner as to get the school banned from the facility in future. Bronx Guild had started in partnership with Outward Bound and had as a requirement that students go on these trips, so this was significant.

79. Also, once I had read the students IEPs and realized I had many students for whom ICT was mandated, I hesitantly brought up the topic to a chilly reception; in addition, I brought up that several of my classes had over 40% Special Ed students, which is a clear violation. It was a chilly reception and a touchy subject. The DOE has been accused of not providing proper educational setting for Special Ed students in order to save money. Most recently, the State Comptroller has been highly critical of the DOE's Special Education program.[24] Since the question of teacher supports is crucial to how well the DOE succeeds in its mission, how much it is influenced by budgetary concerns and how much by political concerns is a relevant question to ask about the conditions under which teachers are evaluated.

80. Finally, while he did not announce it to the staff until March of 2016, this might well have been the time when Mr. Decker was informed that the school was heading for the Priority list. It might have

---

23 Althought there is no certainty it will clear things up, he FOIA request seeks to address this.

24 NYS State Comptroller, "New York City Department of Education Compliance With Special Education Requirements – Evaluations," May 16, 2019; accessed November 2019 at https://osc.state.ny.us/audits/allaudits/093019/17n3.htm. This audit was performed pursuant to the State Comptroller's authority as set forth in Article V, Section 1 of the State Constitution and Article III of the General Municipal Law. It main purpose was to determine compliance with Section 200.4 of the Regulations, which required "the initial evaluation to be completed within 60 calendar days of receipt of parental consent " (p, 9)

also been suggested to him that the school was no longer viable and that perhaps it was time for him to retire, which he did when the school was merged with another school at the end of 2016-17.

81. DOE officers are not always transparent, so I cannot say for sure which reason for retaliation, but I do know that something was amiss. Again, no one announced that Mr. Decker was pressured to resign, but he had redesigned the school once because it was not meeting student needs and now the school was about to be placed on the Priority List. Also, it would surprise me to find out he wanted to retire at that time; he would frequently say that he loved his job, not just in front of his staff, but on the phone – my work space was separated from his office by a thin wall and inevitably I heard snippets of conversation to that effect. I was not trying to, but I also heard him say through the wall that he would stick to this new model and words to the effect that either it would work or it wouldn't, time would tell, let the chips where they lay. I inferred from this that he was under pressure.

82. Clearly, there may have been many motives, and the DOE officers actions and interactions are not transparent. Because of the lack of transparency, I filed a FOIA request with the DOE in July of 2019 for emails from DOE officers.[25]

83. As the month of November progressed, the students returned on the 18th from their Monday to Wednesday camping trip. Some students were suspended, some were agitated by the experience, but

---

25  Requests were for emails mentioning my name from the following DOE officers:
     Samuel Decker, former Principal, Bronx Guild HS (retired 2017)
     Cecilee Rauner, former Assistant Principal, Bronx Guild HS
     Phil Weinberg, former Deputy Chief Academic Officer for Teaching and Learning,
     Gary Wittenberg, DOE officer (Fact -finder for the Chancellors Office)
     Carron Staple, Bronx District Superintendent

    While these names are to have prominent roles in my case, others may also be indicated once I have the FOI report, but I do not have it as yet. The DOE first said they would fulfill my July request by August 26, 2019. They then wrote me on that date saying would fulfill the request by September. In September I received another email saying would fulfill the request by December 18th. On December 18th I instead received a third letter saying they could not now, but would fulfill the request by March 4th. On March 4th I received yet another email, this time putting off the date they would fulfill the request until June 29, 2020.

most were, as was typical of our student body, good natured, forgiving and forward looking. On the 19th they were to report to internships. On Friday the 20th, they were to go on a class trip to the New York Historical Society. In addition, because of parent teacher conferences, Friday had a shortened schedule. While the trip had been cancelled earlier in the week, no one had told the students. It was the last Friday before Thanksgiving, they did not expect to have classes that day and not only do students leave behind their book bags on such days, they also adjust their expectations.

84 This is the day that Mr. Decker choose to observe my class and then, in contrast to the other 4 or 5 times he had observed my class, write up the first Evaluation Report of the year. Because of the conditions, it was not my best class, certainly not representative of the times Mr. Decker had observed me, and I believe a supportive administrator who wants his teachers to do well would be aware of that. Because of the adjusted bell schedule, students were not quite sure where they should be or when they should get there, many coming in at the wrong time. The class time was shorter than normal.

85. Also, I was responsible for teaching students on his roster who had IEPs that called for "Integrated Co-Teaching Services." The IEPs, which all read the same, stating that there should be a Co-Teaching set up in his subject area, "Social Studies," the Location of which was the "General Education Classroom" for "5 Periods per week."[26] All of my classes contained students who had IEPs calling for Integrated Co-teaching (ICT), but there was no co-teacher for the class.[27] In addition, a review of that particular class list for that November 20 2015, shows that there were 22 students, 10 to 12 with IEPs,

---

26 "Recommended Education Programs and Services" Section of IEP for numerous students in my classes; I had redacted versions of some of these IEPs which all seem to be identical. They were produced during by the DOE during the 3020-a hearings and the Hearing Officer, my attorney and I reviewed the IEPs.

27 According to a sampling of IEPs and prior knowledged, I testified that the students were mandated to have an IEP/ICT setting (see, for example, Tr 1320, 1433, 1451-2, 1469, 1485-6) and my testimony was *uncontested*. This was that both he and the Hearing Officer reviewed, but were not entered into evidence. Ms. Hogan, Mr. Ford's lawyer felt that the uncontested testimony should have been sufficient; the DOE counsel had the opportunity to ask questions of administration witnesses on this issue be did not do so. Mr. Barron's finding this argument 'unpersuasive' is an example of a judgement that should be subject to reversal.

thus 45.5%, 50% or 54.5% of the class, a violation of Special Ed policy. Despite all this, I was observed and evaluated under those conditions. However, while the principal, according to the time stamp, finished the evaluation report within 90 minutes of leaving the class, he did not give me a copy and ask for my signature for so long --almost 4 months-- that I thought he had realized it was not reasonable. Afterwards, he ceased having regular coaching sessions. Also, a review of my email account shows my emails to him went unanswered, that the emails from him were logistical, not pedagogical. The only reply Mr. Ford received was to the November 16th email, which was curt "Brian – please review our notes from our last meeting." Mr. Ford wrote again in reply, hoping to engage Mr. Decker in a professional discussion about next steps, but to no avail.[28]

86. The Specifications in the 3020-a hearings included the 3 Evaluation Reports from the 2015-16 school year, all of which were delivered on March 9th or after, all of which were defective in some way. The next time I would be observed, by Ms. Rauner, would be March 7, 2016, with an evaluation report following on March 9th, too short to allow for proper feedback.[29] Moreover, the Evaluation Report signed by Ms. Rauner on March 9th did not indicate that the minimum 15 minute time period was adhered to; in addition, it was deemed, by HO Barron, no less, to be largely cut and paste from the Danielson Rubric on which the Advance system is based and the charge was dismissed with respect to the six out of the seven rated factors (la, le, 3b. 3c, 3d, 4e) for lack of evidence. (Barron Decision, pp 50-51)

87. The Evaluation Report for the November 20, 2016 observation came later; it was not signed by Mr.

---

28 "Exhibit A – Email Exchange between Decker and Ford, November, 2015," attached to Ford's Supreme Court filing REPLY AFFADAVIT TO [DOE] SUPPLEMENTAL MEMORANDUM OF LAW REGARDING PETITIONER'S APPLICATION FOR A TRO. While Mr. Barron did not have access to this exhibit, it does support Mr. Ford's testimony regarding their being a change in November and that Mr. Decker ceased to fully communicate with him.

29 For the record, my reaction was to send Mr. Decker an email that had been languishing in my Drafts folder, asking if a transfer could possibly be arranged. While there was some back and forth, nothing came of it.

Decker until on or about March 17th·; it was delivered to me 4 months after the date, long after the 45 school day limit. Finally, the Evaluation Report signed by Mr. Decker on May 1st, was not presented to me until May18th, 48 calendar days after the observation (April 1st); while this is within the limits, it nonetheless precluded the opportunity of using the feedback to improve my performance and rating, for the final observation (which was eventually removed in an arbitration hearing because of cut and paste methods) was on May 18th.

88. But there is something else. Shockingly, the Evaluation Report signed by Mr. Decker on May 1st and myself on the 18th of May, was *altered* on June 24th and entered into Advance in altered form. The alteration was simple – instead of being marked as a 'informal' observation, it was changed by Ms. Rauner on June 24th to read 'formal.' The timestamp reads, "Last revised 06/24/16 11:30:28 am by CRauner." The significance of this can be found in the Advance Guide, which offers two options: an annual rating can be based either on 6 informal observations or 3 informal observations and 1 formal observation; by changing this to a formal, the administration met that minimal standard, something they would not have done otherwise.

89. I end up with an Ineffective Annual rating; therefore I am in second year status and can be put on a Teacher Improvement Plan (TIP) for 2016-17. The administration without, prior consultation, produced the TIP after the deadline (see Paragraph 9), introduced in a Sept 26, 2016 meeting in which Mr. Ford's work was misrepresented,[30] Mr. Decker and Ms. Rauner were hostile, and which ended in an

---

30 Examples come from the administration's 'Coaching with Brian' notes from 26 September which were entered into evidence. These notes include many false statements and characterizations:
- The notes state only one Lesson Plan was submitted when 5 Lesson plans were submitted.
- The notes state that 'lesson plan was 7 pages' when it was one page. There were 7 pages overall, but that included 2 pages of reading material, an illustration of a model-T car and 3 pages for students to do their work.
- The notes state, 'Goal for the lesson was unclear' and that 'his goal . . . was not stated in the lesson plan.' These are two different things, but the Goal were neither unclear, nor unstated. The Goals in the LP were listed as follows:
  --SWBAT [that is, 'Students will be able to'] define 'productivity,' 'specialization,' and 'division of labor'

remark about Mr. Ford's hygiene as he was leaving the room to rush to class.

90. In 2016-17 again I do not have an IPC, but I am observed 6 times. Coaching sessions meet almost weekly; I find the sessions with Ms. Ghaznowi to be productive, but I find Mr. Decker to be confusing, high handed, sometimes agitated, largely unhelpful and sometimes insulting. I don't know if there is any federal statute under which I can sue for bullying, but I certainly felt bullied by Mr. Decker.

91. On the 6 observations that ended up as Evaluation Reports that year, all were for classes in which students were mandated for ICT. This aspect of the evaluation process –observing and evaluating a teacher doing the work of two teachers--, if allowed to stand, allows the school to ignore the IEP and not provide a co-teaching setting and then blame the teacher for the failure, *ending in termination*. If generalized to the entire system, then the Special Education Law would be reduced to 'Special Education Suggestions.' [31] The lack of a co-teacher is of the utmost importance, that I was not assigned a co-teacher should make the Evaluation a nullity. If a basketball player fails to stop a 3 on 1 break, no one calls the player ineffective. If a police officer, on foot with no backup, is unable to apprehend a group of men with automatic rifles and fast cars, no one is going to say he was ineffective. In some

--------

--SWBAT explain how the assembly line increased productivity
--SWBAT discuss how increases in productivity led to higher wages and . . . how changes in mass production affected US society.
          Mr. Ford thought that was pretty clear.

- The notes state: 'There were no strategies for struggling readers,' when the reading was from a text book that was designed for struggling readers.
- The notes state: "The video was to take 15 minutes. Brian was told to only use video clips to supplement instruction, none longer than 3-5 minutes." Just to make this clear, this meeting was the first time that directive was given.
- The notes state: "There were too many questions, and they were all level 1 DOK [abbreviation for 'Depth of Knowledge'] recall." The class materials include many higher level questions, including, 'How did [Henry] Ford change the way the businesses were run in the US?', 'How did mass production change the United States?' and 'If you could invent something, what would it be?'

31 Thus, even if someone were to argue that somehow this was not arbitrary, capricious and/or partial – and it is hard how one can imagine such an argument--, it still may reek of bad faith. This is relvent tot he Hearing Officer's decision, for if he reviewed the IEPs as the Hearing Officer stated he did, it certainly indicates partiality--, by allowing this in his decision Mr. Barron was violative of the public policy protecting Special Education students.

cases, the result can be ineffective because of a lack of resources.

92. Despite the TIP stating, "Coach will be present in the classroom, as much as possible, not to evaluate, but to observe and offer feedback," there were the only seven times I recall either Mr. Decker or Ms. Ghaznowi entering the class. Moving on through 2016-17, I was observed on the following dates and evaluated based thereon: October 26, 2016; November 30, 2016; February 6, 2017; February 13, 2017; March 6, 2017; and April 28, 2017. Also, Mr. Decker also observed me on November 14, but never presented me with an evaluation report.

93. In keeping with the history of the instrument used, the Danielson Rubric, a 'developing rating' is an adequate rating. As recently as 2013 the 4 categories were labelled as "unsatisfactory, basic, proficient, and distinguished."[32] Thus a developing rating is, by definition, less than effective, but *not* less than adequate or basic. In the Danielson Rubric, as it was developed over time, the Basic rating was renamed Developing. In other similar rating schemes, it is called 'Adequate.' It is like getting a C. It is not great, but not failing.

94. Also, the Measure of Student Learning (MOSL) component of his ratings were 'effective' both for

---

[32] 2013 Edition of THE FRAMEWORK FOR TEACHING EVALUATION INSTRUMENT [http://www.loccsd.ca/~div15/wp-content/uploads/2015/09/2013-framework-for-teaching-evaluation- instrument.pdf. This scale is used by many districts and states, such as Deleware and Washington; see, for example, Cascade School Distict, Professional Growth and Evaluation Handbook For Teachers; https://www.cascade.k12.or.us/UserFiles/Servers/Server_78848/File/Departments/Human %20Resources/CSD%20Certified%20%20Evaluation%20Handbook%20rev%20Oct2015.pdf.

Other rubrics use 'adequate' to substitute for basic, still others list "Level 4 -Standard of excellence. . . . Level 2 -Meets acceptable standard. Level 1 - Does not yet meet acceptable standard." Other states use different labels, for instance, New Jersey rates the 3rd category as 'partially effective,' which is nestled in between 'ineffective' and 'effective.' (AchieveNJ: Teacher Evaluation Scoring Guide; https://www.state.nj.us/education/AchieveNJ/resources/TeacherEvaluationScoringGuide.pdf)

As it was subject to ongoing development, the NY State version used the HEDI system in which 'unsatisfactory' became 'ineffective' and 'basic' became 'developing.' Moreover, for New York State this was a new evaluation system – and really should have been treated as no more than a pilot project-- the defects of which have not been worked through; the Administrators had some training, but were generally inexperienced and in the case of the Principal, was himself being rated on how he evaluated teachers.

2015-16 and -17. This component is based on improvement in students test scores and is totally separate from the observations of administrators.

95. Irregularities are not limited to the school. Just prior to the end of the year, my appeal hearing is held. The actions of DOE officers Wittenberg (presiding officer) and Weinberg (Chancellor's designee) centered on an appeal of the Ineffective Rating given in 2015-16. My UFT representative at the appeal, Frances Midy, told me as we left, "This cannot stand," but the Appeal was nonetheless denied. Mr. Wittenberg presided over the May 26, 2017 hearing and Mr. Weinberg issued a letter denying the appeal dated June 14, 2017, but mailed not prior to the 16th and not received until July.[33] In letting the Ineffective Rating stand, the Denial letter not only ignored the procedural issues, but also contradicted both testimony and documentary evidence. We note that the decision of Philip Weinberg (writing after Gary Wittenberg had presided over the hearing), ignored documentary evidence and other evidence affecting all three observations on which the rating was based.

95. First, he dismissed the claim that feedback was not timely by stating that all Evaluation reports were delivered with 45 schools days; as the documents the DOE presented show, the Evaluation report for the November 20, 2015 was not delivered until mid-March 2016, a period of well over 60 school days.

96. Second, the denial letter stated that all observations lasted the minimum required time; he thus ignored the Evaluation Report of 1 April 2016 as submitted; it was marked as a Formal Observation, which requires the Evaluator to be present for the entire period. The evaluator was not there the full 59 minute period, but only for 29 minutes from 11:41 to 12:10. Additional requirements are that the visit

---

33 I mention this seemingly innocuous 2 day difference because the City Comptroller rejected my Notice of Claim on this issue because of a two day gap. According to a letter dated October 19, 2017, the Comptroller "disallowed [the] claim [because} it was not filed within 90 days from the date of occurrence." I responded on October 29, stating tha my case was based on State Education Law, Section 3813, in which the time constraint is not 90 days, but 3 months and that I was within that limit. This did not change the mind of the Comptroller.

be announced and that there be both pre-and post-observation conferences; only the last requirement was met. The denial letter also ignored that the Observation Report submitted for the Appeal had been manipulated.

97. Third, Mr. Weinberg's decision stated that Mr. Ford's supervisors "analyzed the observational evidence under the Danielson Rubric, and issued the rating based on what was observed" was contradicted by independent arbitrator Robert A. Barron, the Hearing Officer in the 3020-a case, who found that the March 7, 2016 observation, conducted by Assistant Principal Rauner, "does not include much evidence to support her ratings, and for some ratings she provided no evidence at all," adding both that "the lack of evidence is a significant deficiency" and that all but two components of the eight in the Evaluation were not being sustained due to the lack of evidence." (Barron Decision, p. 51)

98. Thus, all three observations on which the annual rating was based should have been dismissed or, at least modified, but Mr. Weinberg's decision does not acknowledge this. Instead Mr. Weinberg's decision is in larger part seemingly cut and paste from the DOE position statement; the position statement and Mr. Weinberg's decision both contain 14 bullet points; moreover, each bullet point is substantially the same as the DOE position statement and nearly identical in wording, indicating an reprobate indifference to the facts of the case as presented at the hearing. Finally, Mr. Weinberg seemingly accepted false statements and manipulation of evidence by Mr. Ford's administrators without question.

99. Indeed, the Chancellor's Designee, who is an officer of the DOE and not an independent arbitrator, provided a determination that was so similar –nearly identical-- to the DOE's position statement that it could have been written without a hearing and could not have been written by anyone with was paying attention to the facts introduced at the hearing. In produced this determination, the factual basis seems

to have been left by they wayside and the DOE position put in its place without regard to the evidence.

100. Moreover, the timeline of the 3020-a hearing suggests that the initiation of the 3020-a hearings and the denial of the appeal were related. If the Ineffective rating had been overturned, then it would have likely been fatal to the DOE 3020-a action. Two consecutive Ineffective ratings is the norm for pursuing termination of a teacher, especially a tenured teacher, in a case such as this when there is no misconduct.[34] I had an Effective rating in 2013-14, no rating in 2014-15 because I took a sabbatical and a Developing rating in 2016-17. The only Ineffective rating, for 2015-16, was not only based on less than half a year, but under the 2016-17 calculation matrix would have also been a Developing Rating. Also, the 2015-16 rating should have been overturned on appeal by the merits, but the two DOE officers involved, Gary Wittenberg, who presided over the hearing and Phil Weinberg, who wrote the denial letter, either singly or in combination, deliberately or incompetently ignored documentary evidence introduced at the hearing, including on Evaluation Report that was delivered four months after the fact and another Evaluation Report that existed in two version, one that was signed by Mr. Ford and was marked as an 'informal observation' and one that was entered into Advance and listed as an 'informal observation.'[35]

101. I was served with papers on May 31, 2017; Mr. Decker asked me to his office even though there was no one to watch my class. Leaving your class unsupervised is something you can be fired for, but he ordered me to do it nonetheless. On the day after the Senior Prom (which I attended), June 9, 2017,

---

34 In my case there was no charge of misconduct. DOE Counsel Cox confirmed this at the beginning of the proceedings during the preliminary hearing, "no misconduct or letters to file charged here." (Tr 4)

35 Mr. Ford has written the DOE about this, asking what actions they would take to determine if there was either misfeasance or malfeasance, but the only response he received was an short email on January 22, 2019 from Karen Solimando, the Director of the Office of Labor Relations saying "The Department has reviewed the appeal of the 2015-2016 Ineffective rating and will not be revising its decision to uphold the rating." Apparently they have no process to raise complaints about DOE officers who might not have performed their duty properly.

a Friday, about 3 pm, I was given additional papers removing me from classroom duties for the rest of the term; there was one teaching day left, Monday June 12th.[36]  Mr. Decker told to take anything I wanted that afternoon, that I would not be allowed in the school henceforth.  I gathered everything I could, but the haste with which I had to do it meant that many artifacts, such as student work or posters from the room, could not be saved for the 3020-a hearings and thus hampered my defense.

102.  So ended my decade or so at Bronx Guild.  I prepared, but was not permitted to enter grades for my students.  I was not permitted to see this class graduate, despite having taught them both as Sophomores and Seniors and having strong ties with many members of the class.

f. 3020-a hearings and Decision

103.  After a preliminary hearing on or about July 12, 2017, the 3020-a hearings were held on 11 days from September to November 2017.  I have a full transcript and copies of all exhibits.

104.  The Hearing Officer, Robert H. Barron, of Philadelphia, was hearing his first 3020-a case and perhaps his first education case of any kind, but almost certainly his first education case in New York state.  He is unfamiliar with case law, Special Education law, the evaluation system and the range of pedagogies engaged in by professional educators.

105.  Also, despite his inexperience and unfamiliarity, he hears the case by himself. While the law talks of 'a panel' that is not longer a concrete reality. As originally conceived, 3020-a hearing were conducted under a panel of three officers, but the disciplinary process changed. Panels of three to decide a case were phased out *just before* Mr. Ford's two charged years began; New York State (NYS) Education Law was amended so that cases brought after July 1, 2015 would "be heard by single hearing officers."[37]  There were many changes including a streamlined process in many cases and that

---

36 I was not sent to the 'rubber room,' but was reassigned to the school library on a different floor, until a decision was rendered in January 2018.  Just as there was no misconduct, there was no question of needing to separate me from the students – I worked with students all day.  Also, my supervisor, Margaret Whitehead, was laudatory, writing a strong letter in my support.

37 NYSUT Research and Educational Services, "Fact Sheet 15-15: Changes to tenure and the tenured

serious consideration must be given to the recommended penalty.[38]

106. Inexperience would likely be ameliorated while serving on a panel of three, but for reasons of expedience and cost-saving, in July 2015 this was done away. In this case a new Hearing Officer acted as a 'panel of one.' In such a situation, there is a greater likelihood of outlier conclusions. A dissent can become a ruling. Thus the change in structure, while expedient and less expensive, decreased rather than increased fairness.

107. In the days when a panel, not a single individual heard these cases, the inexperience and knowledge of one member would be balanced by the knowledge and experience of the others. However, in the name of expediency the panel format was abandoned and a single hearing officer was put in its stead. This is not something, however, that will necessarily lead to just outcomes and New York State should have known there was significant danger in cutting the panel from 3 to only 1.

108. This is, of course, a general issue – the decision to move from a 3 member panel to a single individual was made for reasons of expedience and budget. However, if the process is to have integrity, then a better solution might have been that a newly appointed Hearing Officer would have at least observed the process previously. My livelihood and much of my future on the line, I do not believe that process should be streamlined in the name of the budget in such a way, as it was in this case, that an inexperienced Hearing Officer is learning on the job and without the knowledge base necessary and for that reason prone to mistakes. The implementation of this new system gave no one involved as a teacher being observed a chance to define or give an objective, unbiased view of what actually happened in the class or to determine if it met a reasonable standard of 'effectiveness' for a

---

teacher removal process," August 20, 2015; accessed November 2019 at https://www.nysut.org/resources/all-listing/2015/august/fact-sheet-15-15-changes-to-tenure-and-the-tenured-teacher-removal-process.

[38] NYSUT Research and Educational Services, "Fact Sheet 15-15: Changes to tenure and the tenured teacher removal process," August 20, 2015; accessed November 2019 at https://www.nysut.org/resources/all-listing/2015/august/fact-sheet-15-15-changes-to-tenure-and-the-tenured-teacher-removal-process.

teacher given the multiple failings of the school. The decision of Barron to find credible the testimony of DOE witnesses who gave false testimony repeatedly under oath, who destroyed and tampered with evidence, who placed documents with false information into the teacher's file and into evidence, is literally incredible; it is also unconscionable and reeks of bad faith.

109. Also, eventually, the HO dismissed challenges presented both by schools in areas of concentrated poverty and by students with disabilities, the later as 'unpersuasive.' The argument that I should have a Special Ed co-teacher, that to do otherwise is to undermine the Special Ed system, that to evaluate under such conditions is unreasonable, was found to unpersuasive because "Ford's role as teacher was to teach the students he had, regardless of their needs." (Decision, p. 49)

110. This is a curious logic, for if we spell it out he is saying I should teach *the special needs* students in my class 'regardless of their needs.' He further concluded that "teaching students with IEPs outside of a co-teaching environment had *nothing* to do with" the failures in the classroom as reported in the Evaluation Reports (Decision, p 62, emphasis added). How he came this conclusion is hard to figure; if a teacher is teaching a class that calls for a co-teacher to accommodate students with IEPs, then the absence of such a teacher makes the job much more difficult. If, as in this case, students who acted inappropriately were IEP students, then the absence of a co-teacher has to considered as a factor.

111. By doing so Mr. Barron contravened the Strong Public Policy on issues of education for special needs students both by developing a novel and unacceptable standard for how teachers should be assessed when teaching special needs students and seriously damaging the accountability system for Special Education when it comes to how schools fulfill their mandate in implementing Individual Education Plans. How, after all, is one to teach Special Needs students "regardless of their needs."

112. Mr. Barron was judging a complicated and specialized system without having previously done so or having prepared prior to the commencement of the proceedings. There is no evidence that he was able to make up for these gaps of knowledge and experience. He had not, to Mr. Ford's knowledge,

observed any other 3020-a hearings or learned how the Advance system was supposed to work. He relied, to great degree, on the statements of the DOE Attorney and the NYSUT Attorney to understand the workings of the hearing and seemed to defer to the DOE.

113. I believe the HO demonstrated both bias and a deference to the DOE and that there is much in his decision that reasonable minds would reject outright. These include the finding that "There is no evidence in the record to support Ford's claim that he was treated differently from other Bronx Guild teachers," which contradicts testimony that indicated "Decker had a negative agenda towards Ford." (Decision, p. 47, Ftnt #22 and p. 31)

114. He also rejected the lack of LINs as irrelevant. "The fact that the administrators did not produce their low inference notes does not diminish their credibility. All were clear in what they observed and what they told Ford, and there is no basis to conclude that they were making up facts that had not been observed." This is better in one way, but worse in another. Maybe they did not make up facts, maybe they did, but that is not the point. Where the evidence is determined to have been intentionally or willfully destroyed, the relevancy of the destroyed documents is presumed. (*see Zubulake*, 220 F.R.D. At 220)

115. Nor is that the only problem. Maybe they didn't make up things (or maybe they did), but, also, they *withheld* information that was relevant. Without the LINs there is no way to know that the Evaluation Reports at least adhered to the so-called running transcript they were supposed to keep. Maybe they wrote the reports quickly -as Mr. Decker did on Nov. 20, 2016 when it was finished 90 minutes after the class (but not sent for 4 months)-, maybe they did not remember things properly, maybe the reports did not align with the LINs, maybe a lot of different things. Accordingly, what is pertinent to the point at hand is that the presence of the low inference notes, if produced at a hearing, could demonstrate *subjectivity* and even bias. Maybe they did not produce the LINs because they would raise questions or create issues. I do not know, but neither does Mr. Barron.

116. Apparently the fact that evidence was deliberately destroyed provides no basis to take action. However, when they are not produced and when the lead DOE witness admits he shredded them, that of course raises questions of both substance and process. The questions of substance cannot be answered because of the absence of the notes, but the absence of the notes gives us the answer to the questions about process. *The fact, uncontested, that the DOE witnesses did not produce those notes denied Mr. Ford the opportunity to examine evidence in the case.*

117. Similarly, there are other problems with Mr Barron's mode of inference. One example, "while Ford had every reason to expect six observations, there is no basis to conclude that the additional observations would have made any difference." This is just making an excuse and allowing protocols to be ignored. "There is no basis to conclude that two or three more observations raising the same issues would have made a difference." But Mr. Barron should not have ruled out the possibility.

118. Finally, "there is no basis to conclude that he could improve." Actually there is. He had good ratings in the past, so why couldn't he have them in the future? He asked for help, even applying for a remediation program. But that is not even the point. It was Mr. Barron's job to hold that he could improve unless the DOE met the burden of proof to show that he could not.

119. Thus, the situation was this: having to learn on the job in the middle of an adversarial procedure Mr. Barron had to come to judgments and use standards on issues with which he was not familiar. In the end, he did so in such a manner so as to contravene existing standards that have been established by New York State and the NYC DOE.

120. Also, there were problems of due process. Evidence was not produced. Of 9 observations, there was only one set of notes. The absence of evidence is not inconsequential. The basis for creating Evaluation reports in the Advance system used by the NYC DOE is a set of 'low inference notes' taken by the evaluator; they are then used to create the evaluation, thus purportedly making the evaluation somehow 'objective.' As Principal Decker explained, "objective data [is] obtained through the low-

inference notes during a classroom observation" (Tr 21) and are to be incorporated into the observation report. (See Tr 38, 69-71, 451-2, 492, 514, 537 and many others) As Assistant Principal Rauner explained, "I pull the rubric up and then I take the notes and I plug it into the rating," she determined what she would rate versus what she would not rate "all based on [her] low inference notes." (Tr 833) .

111. He ignored evidence. While his credibility cannot be assumed, perhaps it is true that "Decker saw **no evidence** that Ford was using the strategies Ford had been given during his coaching sessions," but there was substantial evidence that I did implement strategies brought up in coaching and PD sessions. This is seen in the form of methods used including Rock'n'Roll Recall (Nov 30, 2016), story wheels (October 16, 2015), 'Assert-Cite-Explain' structure (see April 28, 2017), cold calling (Nov 20, 2015; Feb 13, 2017), sentence starters, differentiated readings (Feb 3, 2017), grouping, pair shares (Oct 26, 2016) and many others. Mr. Decker may have not liked the way they were implemented, but they were there and Mr. Barron should have recognized them.

g. Post 3020-a Hearing

112. The hearings ended on November 29th and Mr. Barron issued his Opinion and Award over 30 days later, on January 4, 2018, a day school was not in session because of a snow day.[39] He called for termination and by statute the DOE is supposed to implement that order within 15 days, but they did not, instead waiting until January 29th to have School Security Officers escort me outside. Even then, their paperwork was not right – there was not letter of termination and there would not be until on or about March 12, 2018.

113. It is my position that I was not terminated until at the earliest March 12th, when the termination letter was delivered 55 days after January 4th, but really not at all because the 15 day limit to implement was exceeded by 40 days.

---

39 Section 3020-a sets a 30 day limit and that Opinions be issued on a school day.

g. Political Motives

114. While the DOE argues "[a]t the heart of DOE's mission is ensuring teacher quality," that the "disciplinary review process is vital [so as] to provide all of its students with a quality education," that hardly means that the disciplinary process as it has changed is perfect, fair, even-handed or even productive. A review of its history points to a rating system that was rushed into place and a disciplinary process that was altered to be faster and more expedient, but that in the process became less just. This would do harm to the agency.

115. Unsurprisingly, teacher evaluation is a politically charged topic and poor choices present the possibility of doing harm to the agency and general public. Teachers were once rated "satisfactory" or "unsatisfactory," but in 2010, "in order to win a federal 'Race to the Top' grant . . . New York adopted a new evaluation system."[40] It would not be the last – 2013-14 saw the introduction of the Danielson Rubric (DR); the DR was modified significantly in 2015-16 and again in 2016-17. Furthermore, prior to her July 2019 resignation, "State Education Commissioner MaryEllen Elia has made it clear she wants to oversee a careful redesign process" and "teacher evaluation [remains] one of New York's most politically charged education issues."[41]

116. Joel Klein, former NYC DOE Chancellor, and Michelle Rhee, former DCPS head together published a "manifesto" in the Washington Post claiming that the difficulty of removing incompetent teachers "has left our school districts impotent and, worse, has robbed millions of children of a real future."[42] So, they wanted " to end the "glacial process for removing an incompetent teacher" and give

40 Monica Disare, "New York wants to overhaul its teacher evaluations — again. Here's a guide to the brewing battle, *Chalkbeat*, February 22, 2018; accessed Nov. 2019 at https://www.chalkbeat.org/posts/ny/2018/02/22/new-york-wants-to-overhaul-its-teacher-evaluations-again-heres-a-guide-to-the-brewing-battle/.
41 Monica Disare, "New York wants to overhaul its teacher evaluations — again. Here's a guide to the brewing battle, *Chalkbeat*, February 22, 2018; accessed Nov. 2019 at https://www.chalkbeat.org/posts/ny/2018/02/22/new-york-wants-to-overhaul-its-teacher-evaluations-again-heres-a-guide-to-the-brewing-battle/.
42 "How to Fix Our Schools: A Manifesto by Joel Klein, Michelle Rhee and Other Education Leaders,"

superintendents like themselves the authority to 'get rid of the dead wood' and to pay higher salaries to teachers whose students do well academically. Otherwise, children will remain "stuck in failing schools" across the country.

117. But this is merely opinion. Richard Rothstein's response was to deny the claim was "accurate on its own terms. . . . It has become conventional in educational policy discussion to assert that "research shows" that "teachers are the most important influence on student achievement." There is, in fact, no serious research that shows any such thing.[43]

118. The DOE argues "[a]t the heart of DOE's mission is ensuring teacher quality," that the "disciplinary review process is vital [so as] to provide all of its students with a quality education,"[44] that hardly means that the disciplinary process as it has changed is perfect, fair, even-handed or even productive. It is not at all that teacher quality is unimportant, but the question of how to measure it and what other factors enter into classroom performance is hardly settled. If one were to do a factor analysis, teacher quality would be one factor, likely ranked of lesser importance than parent involvement and socioeconomic status, probably intertwined with the efficacy of the school as a whole and the quality of the principal. However, if one is attempting to give administrators more discretion and move to an at-will employee model, then highlighting the role of the teacher's quality is likely to be a useful way of going about these things.

119. Mike Bloomberg is, of course, not mayor anymore, but his influence has not evaporated. For 12 years he changed the course of city schools, staffing the DOE with people who were likely to have

_____

*Washington Post,* October 10, 2010, B01: http://www.washingtonpost.com/wp-dyn/content/article/2010/10/07/AR2010100705078.html.

43  Ricard Rothstein, "An overemphasis on teachers" Commentary, *Economic Policy Institute,* October 18, 2010; https://www.epi.org/publication/an_overemphasis_on_teachers/. See, also, Rothstein, "How to fix our schools," Issue Brief #286, *Economic Policy Institute,* October 14, 2010; https://www.epi.org/publication/ib286/.

44  DOE Brief in Appeal Case No. 2019-21161, NYSupreme Court Appellate Division: First Dept.

similar perspectives. According to Steve Brill, Mr. Bloomberg has always favored the at-will

employee model, something that shaped his thinking after "the State Legislature granted control of a

new Department of Education to the new mayor, who had become a billionaire by building an immense

media company, Bloomberg L.P., that is renowned for firing employees at will and not giving contracts

even to senior executives."[45]

120. Thus, in considering the time sequence we should consider that this is a way to reshape labor

relations to more closely resemble the Bloomberg L.P. Model. There is a change of law in summer

2015 and all of a sudden I am getting negative ratings under a new evaluation system implemented

without training those who would be evaluated and an appeal process that might be compromised,

Moreover, the conditions of evaluation do not require that State mandates for Special Education

requirements be met. Also, there is a 3020-a process that allows the DOE not to produce evidence, that

does not sanction false testimony, that moves from a panel of 3 to judge cases, to a single individual

who may be inexperienced and will need to learn on the job, that accepts a series of strained judgments

as a reasonable opinion, that allows the DOE Counsel to make inflamatory statements in her

summation[46] without having asked the proper evidentiary questions in the hearings prior to summation,

---

45 Steven Brill, "Annals Of Education; The Rubber Room: The battle over New York City's worst
teachers, The New Yorker, 31 August 2009, read in print, but still accessible as of Sept 2011 at
http://www.newyorker.com/reporting/2009/08/31/090831fa_fact_brill. The arument is made at
greater length in Ford, Respect for Teachers.
46 In her summation, DOE Counsel Cox suggested that I had commited, "Insubordination . . . defined
as refusal to obey orders." (TR 1775-6) There were no misconduct charges and not charges of
insubordination. She should not have been alllowed to bring it up, especially as no response is
allowed; because she gets to go last, neither myself nor my counsel had an opportunity to respond
or correct Ms. Cox on this. In fact, I asked Mr. Barron whether there was an opportunity to respond
and his response was that there was not. Similarly, when I testified I had to contend with a Hostile
Work Environment. (Tr 1556, 1596) DOE counsel Cox dismissed this, "The Respondent's claims
of hostility from Principal Decker are *completely unfounded and uncorroborated by anything in the
record*. Respondent made unsupported claims about a shift in Principal Decker's attitude towards
him." (Tr 1741, ea) But there was quite a bit of evidence of hostility. I assume the idea is since
they have the burden of proof, they can go last, but Mr. Barron did not honor the burden of proof.

then you don't have a working system of justice. You have an adminstrative agency that lacks judicial conscience.

## FIRST CAUSE OF ACTION
### Retaliation for Special Education Advocacy Under
### the Americans with Disabilities Act of 1990 (ADA) and/or the Rehabilitation Act of 1973 (RA)

121. As plaintiff, I repeat and reallege paragraphs 1-120 as if fully set forth herein, but concentraing on paragraphs 3-26, 35, 57, 79, 91, 104 111 and 120.

122. By the acts and practices described above, including but not limited to retaliatory actions for my advocacy for Special Education students. These retaliatory actions included, but are not limited to creating a hostile work environment for plantiff, evaluating him under improper conditions and ignoring plaintiff's complaints regarding Special Education requirements, such as that for Intergrated Co-Teaching, and observation procedures.

123. Defendant DOE and several DOE offiers listed above are liable under the ADA and RA as aiders and abbettors actions indicated above.

124. Defendant DOE is also liabel as plaintiff's employer pursuant to the ADA and RA.

125. Plaintiff is now suffering and will continue to suffer due to his termination and removal from payroll by the DOE; in addition, plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish, bullying and humiliation as a result of defendant's failure to ensure lawful Special Education settings and defendant's retaliatory acts.

126. Defendants acted intentionally and self-interestedly, and acted with malice and/or reckless indifference to student's and plantiff's staturoty rights.

## SECOND CAUSE OF ACTION

### Discrimination Under The Age Discrimination in Employment Act of 1967 (ADEA)

127. As plaintiff, I repeat and reallege paragraphs 1-120 as if fully set forth herein, but concentraing on paragraphs 13-22 and 34-44.

128. By the acts and practices described above, including but not limited to differential treatment and openly disrespectful actions meant to bully and humilate. These actions included, but are not limited to creating a hostile work environment for plantiff, evaluating him under improper conditions and ignoring plaintiff's complaints regarding coaching and observation procedures.

129. Defendant DOE and several DOE offiers listed above are liable under the ADEA as aiders and abbettors actions indicated above.

130. Defendant DOE is also liabel as plaintiff's employer pursuant to the ADEA.

131. Plaintiff is now suffering and will continue to suffer due to his termination and removal from payroll by the DOE; in addition, plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish, bullying and humiliation as a result of defendant's discriminatory acts.

132. Defendants acted intentionally and self-interestedly, and acted with malice and/or reckless indifference to plantiff's staturoty rights.

<u>THIRD CAUSE OF ACTION</u>

<u>A Patten of Due Process Violations at the School level, District Level, DOE level and during the</u>

<u>Administrative Hearings held under the auspices of the NYSED and</u>

<u>Treatment contrary to the National Labor Relations Act of 1935 (NLRA)</u>

133. As plaintiff, I repeat and reallege paragraphs 1-120 as if fully set forth herein, with special attention to paragraphs 11-22 and 32-47.

134. By the acts and practices described above, including but not limited to giving false testimony under oath, intentional destruction of evidence, tampering with evidence, submitting evidence that is false and inaccruate, ignoring CBA and Advance protocols in order to negatively evaluate the plantiff, a compromised appeal process, using the DOE evaluation process as an instrument of animus, using the 3020-a hearings as an instrument of character assassination. These actions included, but are not limited to creating a hostile work environment for plantiff, evaluating him under improper conditions, ignoring plaintiff's complaints regarding coaching and observation procedures and the actions listed above.

135. Defendant DOE and several DOE offiers listed above are liable as aiders and abbettors actions indicated above.

136. Defendant DOE is also liable as plaintiff's employer pursuant to the NLRA.

137. Plaintiff is now suffering and will continue to suffer due to his termination and removal from payroll by the DOE; in addition, plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish, bullying and humiliation as a result of defendant's unlawful acts.

138. Defendants acted intentionally and self-interestedly, and acted with malice and/or reckless indifference to plantiff's staturoty rights.

defendant's acts.

151. Defendants acted intentionally and self-interestedly, and acted with malice and/or reckless indifference to plantiff's staturoty rights.

## RESPECTFUL REQUEST FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter an award:

(a) declaring that the actions and practices complained of are in violation of the Americans with Disabilities Act of 1990 (ADA), the Rehabilitation Act of 1973 (RA). The Age Discrimination in Employment Act of 1967 (ADEA), the National Labor Relations Act of 1935 (NLRA) and other relevant statutes, including, if deemed applicable, the Racketeering Influenced and Corrupt Organizations (RICO) act of 1970;

(b) enjoing and permanently restraining these violations of the Americans with Disabilities Act of 1990 (ADA), the Rehabilitation Act of 1973 (RA). The Age Discrimination in Employment Act of 1967 (ADEA), the National Labor Relations Act of 1935 (NLRA) and other relevant statutes, including, if deemed applicable, the Racketeering Influenced and Corrupt Organizations (RICO) act of 1970;

(c) directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunites;

(d) directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to the employment and advancement opportunites of all teachers subject to the system;

(e) directing defendants to place plantiff in the position he would be in if not for defendants' discriminatory and retailiatory treatment of him, and to make him whole for all earnings and other

benefits he would have received if not for defendants' discriminatory and retailiatory treatment of him, including, but not limited to wages, wage increases, retroactive pay, pension and other lost benefits;

(f) directing defendants to reinstate plaintiff;

(g) directing defendants to pay plaintiff punitive damages to the extent allowable by law;

(h) directing defendants to pay an additional amount to compensate plaintiff for the emotional distress, including periods of separation from his teen-age daughter (as it is difficult for a father without a job to maintain custody), damage to reputation, damage to health and other pains, to the extent allowable by law;

(i) directing defendants to investigate the actions of, especially, Mr. Decker, but also Mr. Wittenberg and Mr. Weinberg, as well as Ms. Rauner and other DOE officer involved, to determine their culpability for the actions described above and to make those results available to the plaintiff and the public in a timely fashion, but certainly prior to the expiration of any applicable statute of limitations;

(j) directing defendants to act on the above investigation and, if merited, refer this to the appropriate authorities, including the NYSED, the NYS Office of School Personnel Review and Accountability (OSPRA), relevant District Attorneys and the New York State Attorney General prior to the expiration of any applicable statute of limitations;

(k) awarding plaintiff such interest as allowed by law;

(l) awarding plaintiff reasonable attorney's fees and costs; and

(m) granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby respectfully demands, pursuant to Rule 38(b) of Federal Rules of Civil

Procedure, a trial by jury in this action.


Dated:  New York, New York

March 8, 2020

Brian Ford
19 West 110th Street, #45
New York, New York 10027
(646) 713-8285


Sworn to before me this

8th day of March, 2020

New York, NY

Brian Ford

_Notary Public_

JULIAN M HILL
Notary Public - State of New York
NO. 01HI6233785
Qualified in New York County
My Commission Expires Dec 27, 2022

USM5
SDNY

Envelo

Express

Fed

FeDeX

PRO SE OFFICE
RECEIVED
MAR - 9 2020

TO:

Pro Se Intake
OFFICE
SDNY
40 Foley Sq
Rm 106

Fed
Pro Bean St
N NOr St
10022