**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**BRIAN FORD**

**Plaintiff,**

–against–

**THE NEW YORK CITY BOARD OF EDUCATION**
**(a/k/a the Department of Education)**
**Carmen Farina, in her official capacity as Chancellor,**

**Defendants**

---

1:19-CV-6327

**AMENDED COMPLAINT
AND AFFIRMATION
WITH DEMAND FOR
TRIAL BY JURY**

## I. BASIS FOR JURISDICTION

1. Federal courts are courts of limited jurisdiction but this Court has federal question jurisdiction. This case involves several federal questions as we claim that federal constitutional or federal statutory rights have been violated. The claims arise under the First, Fifth and 14th Amendments of the United States Constitution and the following federal laws: the Americans with Disabilities Act of 1990 (ADA); the Rehabilitation Act of 1973 (RA); the Age Discrimination in Employment Act of 1967 (ADEA)[1]; 42 USC § 1983 and other relevant statutes, including, if deemed applicable, the Racketeering Influenced and Corrupt Organizations Act of 1970. (RICO)

## II. NATURE OF CLAIM

2. Brian Ford, the plaintiff in this case ("Ford" or "plaintiff"), appearing *pro se,* is complaining of defendants The New York City Board of Education, a/k/a the Department of Education ("BOE" or "DOE"), and Carmen Farina, then in her official capacity as Chancellor ("Farina"), including

---

1   Mr. Ford originally filed a complaint with the NY Division of Human Rights.  He received a letter on or about April 9, 2019 (signed by Kevin J. Berry, dated April 2, 2019)  that (a) advised him that the US EEOC had adopted the findings of the state and (b) advised him he had a right to bring a suit in Federal court.  [See Ex. A]

the actions of DOE officers as indicated below, affirms and respectfully alleges as follows:[2]

3. Plaintiff Brian Ford's claim is that he was unfairly terminated after 3020-a proceedings initiated by the NYC Department of Education (DOE) and held under the auspices of the New York State Education Department. ("NYSED")  There are multiple plausible claims upon which relief can be granted, including, but not limited to, Age Discrimination, Retaliation for protected activities, retaliation for protected speech, and procedural defects, including, but not limited to those that resulted in an insufficient guarantee of due process.

4. The names and titles of the following DOE officers involved are:  Samuel J. Decker, Principal of Bronx Guild High School from 2006 to 2017; Cecillee Rauner, Asst. Principal of Bronx Guild High School from 2012 to 2017; Christine Ghaznowi (nee Peters),  of Bronx Guild High School, 2016 – 2017; Cameron Staple, District Superintendent; Gary Wittenberg, who presided over the hearing for the Appeal of Mr. Ford's Annual Rating in May 2017; Philip Weinberg then Deputy Chancellor for Teaching and Learning, who wrote the denial letter for that Appeal. In addition, Angel Cox, DOE Counsel during the 3020-a hearings and Robert H. Barron, the Hearing Officer for those proceedings are referenced.  Finally, there are several DOE Officers who Mr. Ford contacted by letter or email in 2018 after the hearings were closed, including Chancellors Farina and Carranza, Lisette Roman, then of the Chancellor's Strategic Response Group, and Karen Solimando, then Director in the Office of Labor Relations.

---

2  Mr. Ford adds this explanatory note as an apology for the length, repetition and any irregularities that follow. Lack of legal training is the main reason.  Mr. Ford had thought he would be represented by counsel on a contingency fee basis, but after a long process the counsel he expected to represent him eventually declined after much back and forth; further attempts to obtain representation have so far not been successful.  He then went to his back up plan, preparing this himself with advice from NYLAG.  While Mr. Ford appreciates the help from NYLAG, it is not the same as having an attorney and he is unsure of what to include and exclude.  Thus this is lengthy. Also, as the Court is aware, he put in a request for counsel to be assigned counsel on February 28th. The Court denied the application because  the merits had not yet been established. This denial was without prejudice, and if this affirmation establishs the merits, then he does anticipate putting in a second application.  He does, however, worry that his lack of legal training will result in his not establishing the merits that a trained lawyer might well be able to establish.

The following claims stem principally from two events:

5. (a) The DOE's denial on Appeal of Mr. Ford's End of Year Rating for 2015-16; the original rating was upheld despite numerous irregularities, including an insufficient number of observations (3 as opposed to 6), all observations were deficient (one without substance, one untimely, one altered), sets of disregarded protocols and repeated hostility on the part of the school administration. Mr. Wittenberg presided over the hearing on May 26, 2017; Mr. Weinberg signed a Denial Letter dated June 14, 2017. While the DOE's Pre-Motion letter says appeal was denied "after a BOE Chancellor's Committee Review," it is not at all clear how Mr. Wittenberg and Mr. Weinberg communicated and coordinated regarding this issue. Furthermore, not only did the evidence presented in that hearing presided over by Mr. Wittenberg contradict the denial letter signed by Mr. Weinberg in multiple regards, including, but not limited to, the timeliness of the Evaluation Reports and whether the observation times were sufficient,[3] but Mr. Ford's FOIA requests filed to gain transparency on this matter have gone unfulfilled for over a year and a half.

6. (b) The second event is Mr. Ford's subsequent termination in 2018 from his position as a tenured teacher after 3020-a hearings and the issuance of an award by Arbitrator Barron that

---

[3] The Denial Letter for the Appeal of the Petitioner's 2015/16 rating contained the decision rendered on or about the 14th day of June, 2017, by Phillip Weinberg, Deputy Chancellor for Teaching and Learning, was biased, incoherent and ignored substantial evidence- both testimony and documentary- that directly contradicted the text of his decision, including, but not limited to (a) dismissing the claim that the Petitioner "did not receive feedback in a timely manner as Evaluators have 45 school days" to do so when the time period was well over four months and over 60 school days; (b) conflating the minimum time requirements for formal and informal observations; (c) ignoring or refusing to acknowledge that by delaying delivery of any Evaluator's Reports until nearly 2/3's of the way through the school year denied the Petitioner of the opportunity to adapt his practice before the end of the school year; (d) ignoring or refusing to acknowledge that evidence, in the form of the Observation from 1 April 2016, had been tampered with after delivery to the teacher, changing it from an Informal Observation to a Formal Observation on or about 24 June 2016 without the Petitioner's knowledge and such modified report used to calculate the Petitioner's Annual Rating; and (e) stating that the Petitioner had had an Initial Planning Conference ("IPC") when he did not and there was no evidence he had had one.

resulted in a substantial loss of property and other substantial damages.  Whatever the grounds of the these claims, the circumstances leading up to and surrounding the hearings indicate that the charges were brought in retaliation and that the process had insufficient guarantees of due process.

7. Furthermore, Mr. Ford wishes to establish a stigma plus due process claim as the school makes defamatory statements about him during the course of coaching sessions, disciplining and eventually terminating him.  Among the events are the following:  (1) AP Rauner filed a verbal abuse claim in October of 2017.  The charge, based on a written anecdotal report to the administration, not a face-to-face interaction with the student, was that Mr. Ford had verbally abused a student because he indicated that she was pregnant when everyone knew she was pregnant (students were rubbing her belly in the hallway); nonetheless, AP Rauner said in the report that student did not want anyone to know.  AP also said that I had set the settings for the anecdotal report on our school system so as to allow everyone in the system, including students, to see it, which was not true and my chapter leader showed it.  (2) The Principal's testimony at the 3020-a hearings was often false and otherwise filled with misleading innuendo.  (3) The Principal was overheard by students saying he wanted to get rid of Mr. Ford, or words to that effect). (4) Claimed Mr. Ford did not hand in Lesson Plans when the record says he had.  (5) Principal also showed anger and disdain in his actions, including the following:  accused Mr. Ford of faking an injury after he had been in a auto accident, yelled at him for putting his coat on a pile of books, and angrily said at a meeting with AP Rauner said Mr. Ford should change laundries because there had been complaints about his hygiene.  (5) The DOE entered a code on Mr. Ford's record to indicate that he had been terminated.

8.  As the circumstances strongly indicate, Mr. Ford's termination was in large part a consequence

of animus and of his speaking out.[4]  Thus a claim is allowable under the First Amendment, the 14th Amendment and 42 U.S.C. § 1983.  To state a First Amendment retaliation as (1) Mr. Ford's  speech addressed matters of public concern, (2) Mr. Ford suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action. (Cobb v. Pozzi, 363 F.3d 89, 102 (2d Cir. 2003)).  Mr. Ford spoke out on Special Education and other issues, criticizing school policy that violated the ADA and Rehabilitation Act rights of the students, was terminated and the process leading to his termination began almost immediately upon his returning from his Sabbatical and submitting as part of his project a book draft on Education Reform in August 2015 that was critical of defendants.  In the 2015-16 school year he  started to receive negative evaluations, which ultimately led to his termination.  Mr. Ford's performance did not suddenly change after airing these complaints, thus, a plausible explanation for the sudden flood of negative reviews is that Defendants were trying to punish him for airing their dirty laundry.

9.  In addition to retaliation for free and protected speech, other motivations seem to be in play. As different DOE Officers are involved, different motivations are to be expected, thus there are additional Causes of Action, and for each legally relevant facts that would show an entitlement to relief if proven after discovery.  That some administrators took action against Mr. Ford because of his speech, some for his age and some for other reasons does not lessen their impact. Either they terminated Mr. Ford because of his speech or because of his age, but either way, they acted unlawfully and Mr. Ford is entitled to relief.

10. The ADA and RA claims of retaliation stem primarily from Mr. Decker's being aware of, and once suffered reprimand because of, Mr. Ford's complaints about Special Education at the

---

4    In addition to complaints and statements in school, both Ms. Staple and Mr. Decker had access to Mr. Ford's writings, both published and unpublished, that criticized education reform including specific references to the NYC DOE.

school; he spoke and wrote openly about the school not providing the mandated educations settings for Special Education students and was later terminated.

11. The ADEA claim is not focused solely on Mr. Decker, but more so on Ms. Staple and other DOE Administrators. Since the Chancellorship of Joel Klein beginning in 2002, the DOE has indicated publicly that tenure, seniority and the current pay structure are thought obstacles to the DOE's education agenda. The resulting DOE culture affected all administrator. Ms. Staple, for instance, had previously blocked, albeit temporarily, Mr. Ford's Sabbatical, a contractual privilege that is only conferred on senior teachers; this is part gives rise to the ADEA claim.

12. In addition, Ms. Staple's office showed a disregard for teacher protections; the District office, as Mr. Decker states in his testimony, misinformed and gave incorrect guidance to Mr. Decker regarding protocols and proper procedures. Mr. Decker, subsequently, did not properly follow the protocols, including not conducting coaching sessions from December 2015 to May 2016, not allowing choices as to type and number of evaluations, not having the minimum number thereof, tampering with Evaluation Reports, not properly implementing the Teacher Improvement Plan, not allowing Union representation at key meetings, placing false information into Mr. Ford's file.

13. After all this, Mr. Weinberg and Mr. Wittenberg failed to properly protect Mr. Ford's due process rights. Finally, Chancellor Farina, Chancellor Carranza, Lisette Roman and Karen Solimando failed to adequately respond to, if they investigated at all, complaints from Mr. Ford that documented false testimony on the part of Mr. Decker, destruction of and tampering with evidence in the 3020-a hearings, wholesale flouting of protocols and other irregularities.

14. All this is despite that, under NY State law, these protocols are specifically designed to protect the teacher. (Holt v. Board of Ed. of Webutuck Central School Dist.,52 NY2d 625,632 [981])

Nonetheless, since 2002 the DOE has advocated publically that they want to get rid of tenure, seniority and lock step pay intcreases based on education level and years of service. While there may have been additional motives, it is hardly implausible that such an agenda would mean less attention to following protocols and procedures meant to protect teachers. A culture has been inculcated in which rights and privileges of senior employees are looked at askance. Mr. Ford applied for a Sabbatical, but it was initially turned down by his Dist Supt. Upon returning from Sabbatical Mr. Ford was treated differently from other teachers. He was also not allowed to teach as he had previously, but was directed to adopt new methods. He did not have any input in the curriculum, nor was he permitted to use the units he developed during his Sabbatical, nor was he allowed to use the state curriculum; rather the school gave him their own curriculum at the last minute. After a visit to Mr. Ford's classroom in November, the Principal's attitude changed, he evaluated Mr. Ford under inappropriate conditions shortly thereafter.

15. During the rest of the 2015-16 school year, Mr. Ford was not given the requisite number of Evaluations, evaluations reports were untimely and one was tampered with. In 2016-17 these protocol violations continued and, in addition, Mr. Ford was evaulatued while teaching in an illegal educational setting in that he did not have a co-teacher for Special Ed. In May of 2016, Mr. Ford's Appeal of his annual rating for 2015-16 was heard; the denial letter did not reflect the evidence presented at the hearing, but ignored that evaluations were untimely, that they were tampered with, etc. On the same day as the Appeal Hearing, Mr. Ford's principal , who was to be the chief witness in the case, signed a Determination of Probable Cause that initiated 3020-a hearings that eventually resulted in his termination. At the 3020-a hearings, the principal gave false testimony in at least a dozn instances and admitted to destroying relevant evidence.

16. But for the DOE's lax enforcement of protections for teachers and the DOE's misinformation and misguidance regarding protocol to Mr. Decker, the sequence of events would not have unfolded the way it did. Circumstances point to Mr. Ford's age; these events began shortly after he reached his 15 year increment and the initiation of this process in the semester followed his return from sabbatical; the actions and the timing of actions taken by the District Superintendent, as well as Weinberg and Wittenberg, the general failure to ensure protocols were followed and the failure to take seriously false testimony by a DOE officer, all indicate that motives for removing Mr. Ford for age are plausible explanations.

17. The timeline suggests but for plaintiff's age the process would have unfolded much differently. The District Superintendent had expressed displeasure at Mr. Ford's taking a Sabbatical, which is age related. We don't have to find that the Principal was himself motivated by age discrimination --in fact he likely had other motives-- because, as his testimony reveals, he often was in contact with the District office regarding protocols, including number and type of observations and how the Teacher Improvement Plan would be conducted; while he may have had a personal animus, and the evidence suggests he did, it was the District Office that advised him incorrectly and allowed him to get away with breaking protocols designed to protect the teacher from arbitrary actions. Furthermore, the DOE officers who ran the appeal, whether intentionally or not, also did not follow procedure.

18. Taken together, whatever the motive, these constitute a procedural due process violation under the Fifth Amendment, the 14th Amendment and 42 U.S.C. § 1983, in that (1) Mr. Ford had a protected property interest in his tenured teaching position, which is not disputed, and (2) that he was terminated or disciplined without receiving an appropriate hearing. It is important to note that nder New York State Law, 3020-a hearings permit hearsay evidence and the

credibility judgments of the Arbitrator are largely unreviewable. In a case such as this, where there was no sanction for false testimony, this amounts to deprivation of property without due process.

19. Both the negative Annual Rating and the 3020-a proceedings were based on the ratings from 2015-16 and 2016-17, the former was the year Mr. Ford began to receive his 15 year increment as a senior teacher. It also the year that Mr. Ford returned from a Sabbatical which District Superintendent Staple had attempted to block. (That Mr. Ford applied for and was eventually granted a Sabbatical during the 2014-15 school year is a matter of record, as is the the delay in granting the sabbatical.) During the Sabbatical process, from initial application in October 2014 through delivery of the Sabbatical project in August 2015, both and Mr. Decker and Ms. Staple had access to Mr. Ford's writings and were supposed to review them. Thus the correlation is fairly clear on these matters as Mr. Ford, 'all of a sudden' began to receive negative evaluations in the 2015-16 year.

20. There is another way to look at his. Working backwards from the 3020-a hearings, Mr. Ford was terminated after a hearing in which (a) hearsay evidence was permitted; (b) the school principal, who was the chief respondent witness, both gave false testimony (discussed below) and admitted to destroying potentially exculpatory evidence;[5] (c) despite the fact that the notes

---

5  Specifically the Low Inference Notes on which his Evaluation and ratings were based. While the DOE Pre-motion letter states that the "Plaintiff alleges that low inference notes from his observation had been shredded by Principal Decker prior to the hearing," this is not merely an allegation, but a report about testimony; Mr. Decker testified that he disposed of the material because he did not have an office. Decker's testimony is on page 471 of the 3020-a transcript:

  A: Yes, I kept copies of everything. I have a binder for each teacher and I put all the materials, notes, everything into a binder.
  Q. And do you have that binder sitting here today, not with you, but in you--
  A. [Interposing] No, because I no longer have an office, so [a[ll of those were disposed of.
  Q. And how did you dispose of them?
  A. They were shredded.
  Q. They were shredded.

to support them had been intentionally destroyed, the Arbitrator found that respondents' witnesses were credible at least to the extent they supported the majority of "ineffective" ratings given to petitioner;[6] (d) moreover, under New York case law, the 3020-a Arbitrator's credibility judgments are generally considered to be 'largely unreviewable' (*Lackow v. Dep't of Educ., 51 A.D.3d 563 (1st Dep't 2008)*); (e) this is despite *Lackow* establishing the threshold for credibility as merely 'not incredible; fifth cause' (f) in this case the Supreme Court therefore had limited review and, citing *Lackow,* did not disturb Specifications because credibility judgments are 'largely unreviewable.'   The combination of the hearsay evidence (in accordance with New York Law governing 3020-a precedings) and the application of *Lackow* to both the Arbitrator's decision and the Supreme Court decision denied Mr. Ford constitutionally guaranteed rights to property under the Fifth amendment.

21. The false testimony, which can be and has been documented, and intentional destruction of evidence are events that should color all the events that came prior.  Together they indicate motivations and intent that they should be subject to scrutiny. Thus, going further backwards from this marker, we can present a compelling set of circumstances indicating retaliation was part of the process.

22. In what follows Mr. Ford will first state Factual Allegations (III) and then respond to the Pre-Motion Letter (IV), before providing Further Background (V), considering plausible DOE Motivations (VI) and stating, as best he can, the Causes of Action (VII).

---

6   Arbitrator Barron found both (1) "the fact that the administrators didnot produce their low inference notes does not diminish their credibility," (Decision, p 47) and (2) "assuming that Decker was incorrect about some of Ford's failure to provide lesson plans, that discrepancy is not sufficient to conclude Decker's overall testimony was not credible." (p 48)

a. Background and Pre-Bronx Guild Employment with the BOE and DOE

23. While at work on my dissertation at Columbia, I started teaching in the NYC public schools. Meant to be for a year or two, it ends up being over two decades. I first try to to join the then NYC BOE in 1993. Washington Irving HS offered a spot and, as I already had teaching experience – 2 years in Kanye, Botswana with the Peace Corps - temporary credentials; I had also taught two courses as an adjunct lecturer at the University of Pennsylvania in 1991-92 and hoped that my Political Science training would be useful. It seems to add up.

24. But I don't start that year. School opening was delayed because of asbestos; not yet on the school's roster, someone with permanent credentials asks for the job in the interim. It is enough to block me. I go off on a Soros project to reopen the University of Tirana (Albania), closed since the end of Communist rule. (I teach in the renamed Dept of Sociology and Philosophy, the one which succeeded the Dept of Marxist-Leninist Studies.)

25. With the help of the Peace Corps Fellows program at Teacher's College, I again apply in 1995. The first year I end up teaching at JHS 22 (Lower East Side) and Clara Barton HS (Brooklyn). Jerry Resnick, the principal at Clara Barton, is encouraging. My rating is in the highest category. The next year, I begin a three year stint at Borough Academies, a transfer school developed for students exiting Rikers, but which ended up with a student body from the NYC BOE system who had disciplinary problems. I receive ratings of highest rank (Satisfactory) for 1996-97, -98 and -99. I also teach at Park East HS for a year and receive a rating of highest rank (Satisfactory) for 1999-2000.

26. In 1997 I move to the same Harlem apartment in which I currently live. I also meet a fellow

---

7  Please note that following is written in the first person. I am not sure if all this history is needed for a complaint, but not having the legal training to know what is extraneous, I fear leaving things out.

teacher; when she takes a position as a US State Dept Teaching Fellow in Cambodia, I follow along, teaching English and History at the Royal University of Phnom Pehn (RUPP). We return just prior to 9/11. She does not want to return to HS teaching – too draining.

27. I, however, am hired at Walton HS, near Kingsbridge. For the first time I am an appointed, fully credentialed teacher. Soon after, I earn tenure. I not only receive ratings of highest rank in 2002-03, -04 and -05, but I serve on school committees and work regularly with administration. However, after Mayoral Control (2002), the school is slated to be phased out; 6 to 8 smaller schools will make up a new 'Walton Campus.' My principal is fired by email. I start looking elsewhere.

b. Bronx Guild Employment until 2013

28. In 2005, I move to Bronx Guild High School, entering its fourth year of existence under founding Principal Michael Soguero. It is an internship-based school; every student is supposed to have an individualized program centered on that internship, spinning projects out from there. Classes of about 16 are called 'crews' and each crew has a leader who is responsible for the educational program of every student in the class in all subject areas. The pedagogy, developed at the Met (Providence, RI), is student-centered, experiential and project-based. But there are growing pains, esp. since the methodology is not gauged to having students take and pass mandated state tests. Michael (everyone, including students. addresses eveyone else on a first name basis) asks me to be a Learning Specialist for Social Studies and to come up with integrated program to address passing the Regents. There are, however, staffing gaps because of staff taking family leave; even though my daughter is born in February, I take over as a 'crew leader ' in the Spring. I receive the highest rating, Satisfactory, for 2005 - 06.

29. Michael leaves. A new principal, Sam Decker, trained at the NYC DOE Leadership Academy,

which in many ways is the lynchpin of Mr. Bloomberg and Mr. Klein's reforms, takes over. While changing it somewhat, Principal Decker presents himself a true believer in the new pedagogy.[8] I have doubts, we come into what I think is minor conflict, but which other colleagues later indicate he believes is of greater magnitude. I want to leave, but in 2007 a new funding formula (Fair Student Funding) places strains on school budgets if they hire senior teachers, and by now I am one. A former teaching colleague who has become a principal offers me a job, but then tells me she is not yet officially authorized to do so. I am pretty much stuck. Nonetheless, I teach the same crew in 2006-07 and -08 and I receive the highest rating -Satisfactory- for both years.

30. Still, in June of 2008, Mr. Decker suggests this is not the right school for me, that I don't believe in their model. In an unguarded moment he asks, "Why did you ever come to this school?" adding that this was should somehow 'off the record.'

31. Ironically, the principal later has some of the same doubts. After roughly 6 years, he will adopt a more traditional pedagogy, one he claims is 'research tested.' Mr. Decker testified the change was "necessary because *the school was not providing students with the skills they needed to succeed.*"[9] Nonetheless, at this point it is clear he would like me to transfer and I do look, but I

---

8  Mr. Decker testified otherwise,. "It became clear to me, in the year that I was the interim principal [2005-06], that it wasn't a structure that was really working for students, and so I kept modifying it over the years and bringing it more in line with a traditional school." (Tr 54; R 249) This is inaccurate in both detail (Mr. Decker was not an interim principal, but a Principal's intern in the Leadership Academy program) and in substance (Mr. Decker made some modifications, but he kept the core aspects of the program intact until at least 2011). I am well aware of this because I push for classes in the most linear subjects – Math and Science – and am told I do not believe in 'the model.' It was not until 2011 or 2012 that students had traditional subject classes.

NOTE: All 'Tr' references are to the compiled Transcript in the Matter of NEW YORK CITY DEPARTMENT OF EDUCATION v. BRIAN FORD Section 3020-a Education Law Proceeding, File #31,318. 'R' and 'SR' references are to, respectively, the Record and Supplemental Record compiled for the New York Appellate Division; both were compiled by and should be available to DOE counsel.

9  I am quoting the first DOE brief in the NYS Appellate Division case. (Brief, pp 30-31, referencing R248- 49, 253; Tr 53-4, ea) This will be expanded upon below, but when I was on leave and after Mr. Decker has been principal for roughly 6 years, "the school changed from an internship school to a more traditional setup." (Brief, p 30) Since the school maintained its internship program, this is not exactly correct (see below), but we note that whether the

will not be in New York during that summer. I had applied and been accepted to a Summer 2008 National Endowment for the Humanities (NEH) seminar for teachers held at Ohio State University, which I attend while spending extended family time with my two-year old daughter's grandparents near Columbus and attend three family weddings in the Midwest, barely touching foot in New York. I look for jobs remotely, but it is difficult and the question of the Fair Student Funding formula comes up again. Not having secured a transfer, I return to Bronx Guild in the Fall.

32. In 2008-09, over Columbus Day weekend on an upstate pumpkin picking trip, I am in an automobile accident – my vehicle is rear-ended while I am stopped at a red light and my back is injured. I suffer through back spasms and I go to at least two dozen separate medical appointments, probably more. Nonetheless, Mr. Decker tells me in one meeting, a day or two before Christmas Break, that he has no first hand knowledge of my injury, has not seen any doctor's notes and does not know why he should not think I am faking. I suppose he is right on the first half –all of the voluminous paperwork goes to our Chief of Operations, Dino Martinez-, but I don't believe he ever asked to see them. A dozen years, later, my back still hurts fairly frequently.

33. I cannot be sure of his motivations and there is a lack of trust. Moreover, since the young Chapter Leader refuses, early in the year, I felt obliged as the senior teacher on the staff to file a complaint regarding unpaid overtime – teachers were not getting prep periods during the day at the beginning of the year. I assume this made me quite unpopular with Mr. Decker, who has a tendency to boast that he will not be constrained by the union. Also, I have raised the question

school *ever* provided the majority of students with 'the skills needed to succeed' under Mr. Decker's leadership is an open question.
Bronx Guild High School (BG) was a school that **twice** failed under Mr. Decker's leadership, once forcing a radical change in its program between 2011 and 2013, and later, during the 2015-16 school year, being put on the NY State 'Priority' list for inadequate performance. BG was eventually phased out and merged into a larger school at the end of 2016-17

of Special Education and having a co-teacher in the room in a November 28, 2008 letter.  Mr. Decker responds in a 30 November letter. (See below)

34. Shortly afterwards, as noted above, Mr. Decker implies I am faking the injury, saying he had never seen any doctor's notes.  No reason he would, they went to Director of Operations (Dino Martinez), not the Principal.  This was on or about Dec 18, 2008, one of the last days before the Christmas Break; whatever the intent, it tends to spoil my Christmas. Finally, I am missing more time than I normally do because of my back.[10]   For the only time in my career, in 2008-09 I am given an Unsatisfactory annual rating.  I feel both that Mr. Decker displays vindictiveness and that the meeting at which I am given the Annual Rating is meant to shame me and to demonstrate his authority.

35. Nonetheless, I return for one more year before going on leave.  In 2009-10 I receive a Satisfactory rating.  I am relieved and excited about where the Foreign Service will take our family, but it eventually takes my wife back to the US in 2013.  When I return to Bronx Guild in 2013,  I have new doubts, but I will be less outspoken this time.  Experience has taught me that the new DOE wants compliance, not constructive engagement.  I fear further retaliation from Mr. Decker.

36. Still, all of this means I have been a witness to educational reform and institutional change.  As justified by George W. Bush, this was 'the civil rights struggle of our time.'  However, the subtext of this 'civil rights narrative' seemed to be more about neoliberal privatization. Then, much of its substance was adopted by Arne Duncan. Much of this is in my 2012 book, of which Mr. Decker and Ms. Staple will both become aware.

---

10 I believe I missed 12 days that year, as opposed to 4 or 5 the year before.

37. I write about this, publish a book, plus, eventually, articles in little read academic journals. I want to connect my history to the way the schools have changed, especially in NYC since 2002, but generally. When I last looked in 2018, of the six or so schools in my DOE history, only one still exists in its previous form.. I prefer a sense of permanence when it comes to educational institutions – you should be able to go back to where you went to school, schools should develop traditions and older staff members should maintain institutional knowledge. It is ironic that the Bloombergs, the Kleins and the DFER people give loads of money to their elite *alma maters*, but have as their reform watch words 'creative destruction,' not seeing the value of institutional continuity in public education.

38. I do this at greater length than I should have in my 2012 book, *Respect for Teachers*. (The title is ironic.) I note in the book that Jack Welsh, of GE, is called in to give pep talks to principals; the argument is that the Bloomberg/Klein reforms have set the ground for the implementation of business models in education. In my more recent work I have focused on the nexus between Democracy and Education, with special attention to Gutmann's *Democratic Education*. (1987) In a series of empirically informed commentaries, I argue that business oriented education reform runs almost precisely counter to Gutmann's project.[11] Both seek to establish a fourth sphere of authority beyond the three Gutmann begins with: Parents, the State and Educators. For Gutmann this sphere was meant to be that of Deliberative Democracy. For business-oriented reform, this sphere is meant to be shaped by the Market.

---

11 Brian Ford, "Negating Amy Gutmann: Deliberative Democracy, Business Influence and Segmentation Strategies in Education" (*Democracy and Education,* May 2020); Brian Ford, "Neoliberalism and Four Spheres of Authority in American Education: Business, Class, Stratification and Intimations of Marketization" (*Policy Futures in Education,* March 2020); Brian Ford, "The Odd Malaise of Democratic Education and the Inordinate Influence of Business" (*Policy Futures in Education,* 2020); and Brian Ford, "Profit, Innovation and the Cult of the Entrepreneur: Civics and Economic Citizenship" (Forthcoming, *Policy Futures in Education*). That is too much to fit in here, but https://independent.academia.edu/BrianFord2 has draft copies.

39. That creates huge strains. The task of creating a public will is daunting in any political system, but a democracy dedicated to the principles of participation and public deliberation faces specific challenges, including overcoming organized opposition that may not accept democratic tenets. In the sphere of eduction (and social reproduction more generally), business influenced movements to reform public education question many of the established goals and norms of democratic education and thus may be the vanguard of such opposition. In order to interpret and explore these movements, I enlist Amy Gutmann's work as a heuristic device to interpret business-influenced movements to reform public education. Four later articles consider the question of business influence and how we may outline its major features. In so doing, it looks at both the task of instituting a unified public school system and organized opposition to this task within the context of a democratic polity and its deliberative processes.

d. Bronx Guild Employment after 2013 -15, including Sabbatical

40. When I return after family leave, I contact Bronx Guild and find that Mr. Decker is still principal, but the two Assistant Principals, with whom I had excellent relationships, had moved on. One, Jeff Paladino, became a principal, the other Al Sylvia, moved to another school in the same building. Also, most of the staff I knew is gone; I am told that 81% of the staff left during the summer of 2011 or 2012 and that seems about right – I barely know anyone. I also talk to some of the students I had as Freshman and they tell me the school has changed.

41. I do not want to work for Mr. Decker, so I apply to different schools, eventually making a hand shake agreement with Rodney Lofton the Principal of Bread and Roses High School. Since it is after the Open Market transfer period, I needed permission from Mr. Decker, which he gives and Mr. Lofton emails me, "Welcome aboard." However, on the Friday afternoon before school opens, he contacts both myself and Mr. Decker, rescinding the offer for

unspecified 'internal reasons.'  I suspect my salary is too great, but I do not know.  Given the timing, no transfer seems possible.

42. I report to Bronx Guild to teach Geography and to be a crew leader.  I meet the new staff, in particular my new coach, Stephanie Eliot.  Ms. Eliot is respectful, polite and supportive.  The school, however, is chaotic – fights break out all time.  One of my students is in his fourth year, his third year as a Sophomore.

43. Mr. Lofton had made some mention of a new Evaluation system.  As I recall, not much is made of it, but we are given large binders with copies of the Danielson Rubric.  At the end of the year I receive an Effective annual rating for 2013-14.

44. For 2014-15, I am asked to teach a film of Social Studies class, something I have always wanted to do and pick out three films, *Marie Antoinette, A Tale of Two Cities* and *Ali;* the idea is to supplement the core Global and US History classes by focusing on the French Revolution and the Black Power movement.  I *love* teaching the class – the first half of the class period is traditional, the second is a stop/start viewing of the film in which students have to answer questions based on that day's portion.  I love teaching the class, the students are enthusiastic, but I will not have the opportunity it again, nor will I be able to integrate the techniques I have adopted in either 2015-16 or -17 for reasons outlined below.

45. I find I also have an opportunity to be a guest lecturer at the University of Dhaka, Bangladesh.  I put in a sabbatical application for Spring 2015, " in order to complete a project on education that has two components. . . .  a writing and research component on educational policy . . .  to be completed while lecturing on the same subjects at the Institute of Educational Research (IER), Dhaka University, Dhaka, Bangladesh.  . . . The second is a component on the use of films and videos to enhance and/or provide an alternative to traditional curriculum in high school Social

Studies, focusing on Global History and Geography. . . . The film component consists of Unit

Plans for teaching and "builds on work I have been doing at Bronx Guild . . . both on my own

and in collaboration with other staff members. Each Unit, comprising roughly a dozen 55

minute periods (the norm at Bronx Guild), is centered on one film that is either historically

rooted or exposes students to different cultural milieus."[12]

46. The application is given to my Principal and he sends it to the Superintendent, Carron Staple

for approval, but she does not approve it. I am told by the UFT, "The DOE has not officially

denied the sabbatical. Only the superintendent has. The DOE is working with the

superintendent because the superintendent's initial denial was incorrect."[13]  I am told by phone

that she wants to deny the sabbatical because of my three years of previous leave.

47. It takes nearly two months, I lose the sub-lettor for my apartment, but in mid-January 2015, the

leave (Case Number: 13273) is approved. I spend the Spring working on the project, sending in

about 600 pages to the DOE in late August. Because of the Sabbatical, I receive no annual

rating for 2014-15.

e. Bronx Guild Employment, 2015-16 and 2016-17

48. I contacted Mr. Decker regarding the school year during the summer, telling him I have been

working on Unit plans.  He confirms by email that I will be teaching Participation in American

Government (Fall) and Economics (Spring), but emphasizes that Bronx Guild (BG) will provide

the curriculum and that I would not use the NYSED curriculum or the Unit Plans I had

developed during my sabbatical.  The last is a disappointment; further the BG curriculum is not

---

12 From Ford Sabbatical Application, submitted to DOE Fall 2014. There are two writing projects, a book-length
   manuscript is tentatively titled *Educational Politics and Hegemonies of Social Learning: Education Reform in the
   US since the 1970s*  and the first of  a series of connected essays examining the positions on slavery of 8 major
   American figures, as well as John Locke.  They are delivered to the DOE in August of 2015.
13 Email from Amy Arundell <aarundell@uft.org>, Director of Personnel and Special Projects, United Federation of
   Teachers, December 10, 2014.

ready and I do not get it until the afternoon before classes begin. (Please note that Mr. Decker will testify falsely during the 3020-a hearings that the curriculum was ready and available during the summer.)

49. I do not have an Initial Planning Conference (IPC), but I am informed that I am required to have 6 observations. I am told that since I am coming back from sabbatical, I have no choice in the matter. I am denied any observation option.

50. The school is chaotic as ever. Students seem entitled and the discipline system is strained. Ms. Downing (formerly Ms. Eliot) is teaching while pregnant and will soon take leave. The discipline system will almost cease to function once she leaves.

51. I am the only core subject teacher who does not have a dedicated classroom; I eventually travel from class to class using a cart, but it takes until the end of September until I even get a cart from a colleague. Neither do I have a dedicated work area for the first six to eight weeks of school, but must ask other teachers on their prep if I can work in their rooms; after the first six to eight weeks I claim a desk in a break out area, but must leave when other staff members want to use it. (See TR 1305-6)

52. Mr. Decker tells us at the beginning of the year that he will be being evaluated this year on how he evaluates his teachers. He is my coach. I recall clearly that Mr. Decker did make what seemed genuine efforts at the beginning of 2015-16 to boost morale. In September and October he comes into my classroom about 4 or 5 times; feedback is mostly, if not completely positive; he approves of some things, criticizes others. Generally, his demeanor is positive and supportive –a bit of a surprise to me. He even writes 'Wow -- great work Brian' in response to a email in which I took the initiative to summarize and analyze raw student Lexile scores and reading levels.[14]

_____
14 Full text of the email:

53. However, these came to an abrupt halt in mid-November of that year. Suddenly, in November of 2015, my principal's attitude changed towards me. I cannot with certainty tell you the reason, but there were a few pertinent events.[15] Someone from the District Office, I believe Ms. Staple, visited not only the school, but my classroom. I believe it was a good class, but perhaps Ms. Staple was reminded that I had gone over her head to get my sabbatical.

54. In addition, there was a problem on the camping trip for the Seniors who I teach. Mr. Decker attended the trip, but I did not. Apparently some students had vandalized buildings, played with fire extinguishers and behaved in such a manner as to get the school banned from the facility. Bronx Guild had started in partnership with Outward Bound and had as a requirement that students go on these trips, so this was significant. Mr. Decker was both frustrated and incensed.

55. Also, once I had read the students Individual Educational Plans (IEPs) and realized I had many students for whom Integrated Co-Teaching (ICT) was mandated, I brought up the topic to a chilly reception; in addition, I brought up that several of my classes had over 40% Special Ed students, which is a clear violation.

56. It was a chilly reception and a touchy subject. The DOE has been accused of not providing proper educational setting for Special Ed students in order to save money. More recently, the State Comptroller has been highly critical of the DOE's Special Education program.[16] Since the question of teacher supports is crucial to how well the DOE succeeds in its mission, how much it is influenced by budgetary concerns and how much by political concerns is a relevant

---

Sun, Nov 1, 2015 at 3:06 PM, sam decker <samdec@gmail.com> wrote:
    Wow -- great work Brian. I will dig into these tomorrow. Sam  Sent from my iPhone
15 Although there is no certainty it will clear things up, the FOIA request seeks to address this.
16 NYS State Comptroller, "New York City Department of Education Compliance With Special Education Requirements – Evaluations," May 16, 2019; accessed November 2019 at https://osc.state.ny.us/audits/allaudits/093019/17n3.htm. This audit was performed pursuant to the State Comptroller's authority as set forth in Article V, Section 1 of the State Constitution and Article III of the General Municipal Law. It main purpose was to determine compliance with Section 200.4 of the Regulations, which required "the initial evaluation to be completed within 60 calendar days of receipt of parental consent " (p, 9)

question to ask about the conditions under which teachers are evaluated.

57. Finally, while he did not announce it to the staff until March of 2016, this might well have been the time when Mr. Decker was informed or was given indications that the school was heading for the Priority list. The reasons he would announce in March included a falling graduation rate, low Math scores and a college readiness rate of 3%. It might have also been suggested to him that the school was no longer viable and that perhaps it was time for him to retire, which he did when the school was merged with another school at the end of 2016-17.

58. DOE officers are not always transparent, so I cannot say for sure which reason for retaliation, but I do know that something was amiss. Again, no one announced that Mr. Decker was pressured to resign, but he had already had to redesign the school once because it was not meeting student needs and now the school was about to be placed on the Priority List. Also, it would surprise me greatly to find out he wanted to retire at that time; he would frequently say that he loved his job, not just in front of his staff, but on the phone, which I overheard because my work space was separated from his office by a thin wall and inevitably I heard snippets of conversation to that effect. I was not trying to, but I also heard him say through the wall that he would stick to this new model and words to the effect that either it would work or it wouldn't, time would tell, let the chips where they lay. I inferred from this that he was under pressure.

59. Clearly, there may have been many motives, and the DOE officers actions and interactions are not transparent. Because of the lack of transparency, I filed a FOIA request with the DOE in July of 2019 for emails from DOE officers.[17]

17 Requests were for emails mentioning my name from the following DOE officers:
• Samuel Decker, former Principal, Bronx Guild HS (retired 2017)
• Cecilee Rauner, former Assistant Principal, Bronx Guild HS
• Phil Weinberg, former Deputy Chief Academic Officer for Teaching and Learning,
• Gary Wittenberg, DOE officer (Fact-finder for the Chancellors Office)
• Carron Staple, Bronx District Superintendent

While these names are to have prominent roles in my case, others may also be indicated once I have the FOIA

60. As the month of November progressed, the students returned on Friday the 20th after their Monday to Wednesday camping trip and their Thursday internship day. Some students were suspended, some were agitated by the experience, but most were, as was typical of our student body, good natured, forgiving and forward looking. On the 19th they were to report to internships. On Friday the 20th, they were to go on a class trip to the New York Historical Society. In addition, because of parent teacher conferences, Friday had a shortened schedule. While the trip had been cancelled earlier in the week, no one had told the students. It was the last Friday before Thanksgiving, they did not expect to have classes that day and not only do students leave behind their book bags on such days, they also adjust their expectations.

61. This is the day that Mr. Decker choose to observe my class and then, in contrast to the other 4 or 5 times he had observed my class, write up the first Evaluation Report of the year. Because of the adjusted bell schedule, students were not quite sure where they should be or when they should get there, many coming in at the wrong time. The class time was shorter than normal. There was still a lot of excitement and tension because of the events of the camping trip. In addition, there was disappointment that a class trip scheduled for that day had been cancelled; moreover, many students came without notebooks, pens, etc. since they thought we were going on the trip. Because of the conditions, it was not my best class, certainly not representative of the other times Mr. Decker had observed me; I believe a supportive administrator who wants his

---

report, but I do not have it as yet. On July 30, 2020, I asked to add the following to the list:
      • David Liu, Principal of Pablo Neruda until June 2017; Principal of Gotham Collaborative HS from July 2017;
      • Stephanie Eliot/Downing, Assistant Principal, Bronx Guild HS
      • Christine Peters/Ghaznowi, Teacher and Assistant Principal, Bronx Guild HS

    The DOE first said they would fulfill my July request by August 26, 2019. They then wrote me on that date saying would fulfill the request by September. In September I received another email saying would fulfill the request by December 18th. On December 18th I instead received a third letter saying they could not now, but would fulfill the request by March 4th. On March 4th I received yet another email, this time putting off the date they would fulfill the request until June 29, 2020. On November 30, 2020, I received another such letter putting off the date.

teachers to do well would be aware of that.  It was a poor choice of dates for an observation on which the teacher would be evaluated and Mr. Decker knew or should have known that.

62. Also,  I was responsible for teaching students on his roster who had IEPs that called for "Integrated Co-Teaching Services." The IEPs, which all read the same, stating that there should be a Co-Teaching set up in his subject area, "Social Studies," the Location of which was the "General Education Classroom" for "5 Periods per week."[18] All of my classes contained students who had IEPs calling for Integrated Co-teaching (ICT), but there was no co-teacher for the class.[19]  In addition, a review of that particular class list for that November 20 2015, shows that there were 22 students, 10 to 12 with IEPs, thus 45.5%, 50% or 54.5% of the class, a violation of Special Ed policy.  Despite all this, I was observed and evaluated under those conditions.  However, while the principal, according to the time stamp, finished the evaluation report within 90 minutes of leaving the class, he did not give me a copy and ask for my signature for so long --almost 4 months-- that  I thought he had come to the conclusion that it was not reasonable and would not evaluate because it wa not representative of my teaching.

63. Afterwards, he ceased having regular coaching sessions; from early November 2015 until mid-May 2016 he only arranged one coaching session, in December 2015.  Also, a review of my email account shows my emails to him went unanswered, that the emails from him were logistical, not pedagogical.  The only reply I received was to the November 16th email, which was curt "Brian – please review our notes from our last meeting." I wrote again in reply, hoping

18 "Recommended Education Programs and Services" Section of IEP for numerous students in my classes; I had redacted versions of some of these IEPs which all seem to be identical. They were produced during by the DOE during the 3020-a hearings and the Hearing Officer, the NYSUT attorney and I reviewed the IEPs.

19  According to a sampling of IEPs and prior knowledge, I testified that the students were mandated to have an IEP/ICT setting (see, for example, Tr 1320, 1433, 1451-2, 1469, 1485-6) and my testimony was *uncontested*. This was that both he and the Hearing Officer reviewed, but were not entered into evidence. Ms. Hogan, Mr. Ford's lawyer felt that the uncontested testimony should have been sufficient; the DOE counsel had the opportunity to ask questions of administration witnesses on this issue be did not do so.  Mr. Barron's finding this argument 'unpersuasive' is an example of a judgement that should be subject to reversal.

to engage Mr. Decker in a professional discussion about next steps, but to no avail.[20]

64. Eventually, my professional judgment is disparaged.  I begin to hear that my ideas for reaching students are supposedly not aligned with the new literacy based model.  The teacher run Professional Development does have value, but it is limited.   'Literacy' is like phonics. Phonics has its place, but children already proficient are bored to death.  Some literacy methods work, but there is a gap – you cannot assume away students' need for background knowledge.  Just as phonics should be embedded in whole language, literacy should be embedded in 'whole knowledge.'  Positive mention of E.B. Hirsch or Natalie Wexler is deemed apostasy.

65. The Specifications in the 3020-a hearings included the 3 Evaluation Reports from the 2015-16 school year, all of which were delivered on or after March 9th, all of which were defective in some way.  The next time I would be observed, by Ms. Rauner, would be March 7, 2016, with an evaluation report following on March 9th, too short to allow for proper feedback.[21]  Moreover, the Evaluation Report signed by Ms. Rauner on March 9th did not indicate that the minimum 15 minute time period was adhered to; eventually it was deemed, by HO Barron, no less, to be largely cut and paste from the Danielson Rubric on which the Advance system is based and the charge was dismissed with respect to the six out of the seven rated factors (la, le, 3b. 3c, 3d, 4e) for lack of evidence. (Barron Decision, pp 50-51)

66. The Evaluation Report for the November 20, 2016 observation came later; it was not signed by Mr. Decker or myself until on or about March 17th; it was delivered to me 4 months after the

---

20  See "Exhibit A – Email Exchange between Decker and Ford, November, 2015," attached to Ford's Supreme Court filing REPLY AFFADAVIT TO [DOE] SUPPLEMENTAL MEMORANDUM OF LAW REGARDING PETITIONER'S APPLICATION FOR A TRO. While Mr. Barron did not have access to this exhibit, it does support Mr. Ford's testimony regarding their being a change in November and that Mr. Decker ceased to fully communicate with him.

21  For the record, my reaction was to send Mr. Decker an email that had been languishing in my Drafts folder, asking if a transfer could possibly be arranged.  While there was some back and forth, nothing came of it. Mr. Decker wanted me to accept an 'informal transfer' to another school on the same floor of our building, Pablo Neruda.  While I considered it, I wanted a real transfer, hopefully to another building.  I was also worried about and was advised that it may cause difficulties with maintaining my position at Bronx Guild.  I also worried how Mr. Decker would react and felt I was in a damned it I did, damned if I didn't situation.  Eventually I turned down the option on or about April 22, 2016.

date, long after the 45 school day limit.  Finally, the Evaluation Report signed by Mr. Decker on May 1st, was not presented to me until May18th, 48 calendar days after the observation (April 1st); while this is within the limits, it nonetheless precluded the opportunity of using the feedback to improve my performance and rating.  The final observation (which was eventually removed in an arbitration hearing because of cut and paste methods) was on May 18th.

67. But there is something else. Shockingly, the Evaluation Report signed by Mr. Decker on May 1st and myself on the 18th of May, was *altered* on June 24th and entered into Advance in altered form.  The alteration was simple – instead of being marked as a 'informal' observation, it was changed by Ms. Rauner on June 24th to read 'formal.'  The timestamp reads, "Last revised 06/24/16 11:30:28 am by CRauner." (Compare R2003 and R2274) The significance of this can be found in the Advance Guide, which offers two options:  an annual rating can be based either on 6 informal observations or 3 informal observations and 1 formal observation; by changing this to a formal, the administration met that minimal standard, something they would not have done otherwise.

68. I end up with an Ineffective Annual rating; therefore I am in second year status and can be put on a Teacher Improvement Plan (TIP) for 2016-17.  The administration without, prior consultation, produced the TIP after the deadline  (see below), introduced in a Sept 26, 2016 meeting in which Mr. Ford's work was misrepresented,[22] Mr. Decker and Ms. Rauner were

---

22  Examples come from  the administration's 'Coaching with Brian' notes from 26 September which were entered into evidence.  These notes include many false statements and characterizations:

◆　　　　　The notes state <u>only one</u> Lesson Plan was submitted when <u>5 Lesson plans </u>were submitted.

◆　　　　　The notes state that 'lesson plan was 7 pages' when it was one page.  There were 7 pages overall, but that included 2 pages of reading material, an illustration of a model-T car and 3 pages for students to do their work.

◆　　　　　The notes state, 'Goal for the lesson was unclear' and that 'his goal . . . was not stated in the lesson plan.'  These are two different things, but the Goal were neither unclear, nor unstated. The Goals in the LP were listed as follows:

--SWBAT [that is, 'Students will be able to'] define 'productivity,' 'specialization,' and 'division of labor'

--SWBAT explain how the assembly line increased productivity

--SWBAT discuss how increases in productivity led to higher wages and . . . how changes in mass production affected US society.

hostile, and which ended in an remark about Mr. Ford's hygiene as he was leaving the room to rush to class.

69. In 2016-17 again I do not have an IPC, but I am observed 6 times. Coaching sessions meet almost weekly; I find the sessions with Ms. Ghaznowi to be productive, but I find Mr. Decker to be confusing, high handed, sometimes agitated, largely unhelpful and sometimes insulting. I don't know if there is any federal statute under which I can sue for bullying, but I certainly felt bullied by Mr. Decker.

70. On the 6 observations that ended up as Evaluation Reports that year, all were for classes in which students were mandated for ICT. This aspect of the evaluation process –observing and evaluating a teacher doing the work of two teachers--, if allowed to stand, allows the school to ignore the IEP and not provide a co-teaching setting and then blame the teacher for the failure, *ending in termination*. If generalized to the entire system, then the Special Education Law would be reduced to 'Special Education Suggestions.'[23] The lack of a co-teacher is of the utmost importance, that I was not assigned a co-teacher made it an illegal educational setting and should make the Evaluation a nullity. If a basketball player fails to stop a 3 on 1 break, no one calls the player ineffective. If a police officer, on foot with no backup, is unable to apprehend a group of men with automatic rifles and fast cars, no one is going to say he was ineffective. In

---

Mr. Ford thought that was pretty clear.
◆ The notes state: 'There were no strategies for struggling readers,' when the reading was from a text book that was designed for struggling readers.
◆ The notes state: "The video was to take 15 minutes. Brian was told to only use video clips to supplement instruction, none longer than 3-5 minutes." Just to make this clear, this meeting was the first time that directive was given.
◆ The notes state: "There were too many questions, and they were all level 1 DOK [abbreviation for 'Depth of Knowledge'] recall." The class materials include many higher level questions, including, 'How did [Henry] Ford change the way the businesses were run in the US?', 'How did mass production change the United States?' and 'If you could invent something, what would it be?'

23 Thus, even if someone were to argue that somehow this was not arbitrary, capricious and/or partial –and it is hard how one can imagine such an argument--, it still may reek of bad faith. This is relvent tot he Hearing Officer's decision, for if he reviewed the IEPs as the Hearing Officer stated he did, it certainly indicates partiality--, by allowing this in his decision Mr. Barron was violative of the public policy protecting Special Education students.

some cases, the result can be ineffective because of a lack of resources.

71.  Despite the TIP stating, "Coach will be present in the classroom, as much as possible, not to evaluate, but to observe and offer feedback," there were the only eight times I recall either Mr. Decker or Ms. Ghaznowi entering the class during 2016-17; six of these resulted in an Evaluation Report and ratings, one was mentioned in terms of ratings at the mid-year assessment, one was demonstration of a model class in which I was the observer.  Moving on through 2016-17, I was observed on the following dates and evaluated based thereon:  October 26, 2016; November 30, 2016; February 6, 2017; February 13, 2017;  March 6, 2017; and April 28, 2017.  Also, Mr. Decker also observed me on November 14; although ratings were mentioned in meetings, he never presented me with an evaluation report.  Finally, Ms. Ghaznowi modeled a class at the end of March 2017, at which point 5 of my 6 Evaluations had been completed and there was little or no chance of improving my rating.

72. In keeping with the history of the instrument used, the Danielson Rubric. a 'developing rating' is an adequate rating.  As recently as 2013 the 4 categories were labelled as "unsatisfactory, basic, proficient, and distinguished."[24]  Thus a developing rating is, by definition, less than effective, but *not* less than adequate or basic.  In the Danielson Rubric, as it was developed over

---

24  2013 Edition of *The Framework For Teaching Evaluation Instrument* [http://www.loccsd.ca/~div15/wp-content/uploads/2015/09/2013-framework-for-teaching-evaluation- instrument.pdf.  This scale is used by many districts and states, such as Delaware and Washington; see, for example, Cascade School Distinct, Professional Growth and Evaluation Handbook For Teachers; https://www.cascade.k12.or.us/UserFiles/Servers/Server_78848/File/Departments/Human%20Resources/CSD%20Certified%20%20Evaluation%20Handbook%20rev%20Oct2015.pdf.

Other rubrics use 'adequate' to substitute for basic, still others use or 'acceptable' and list "Level 4 -Standard of excellence. . . .  Level 2 -Meets acceptable standard. Level 1 - Does not yet meet acceptable standard." Other states use different labels, for instance, New Jersey rates the 3rd category as 'partially effective,' which is nestled in between 'ineffective' and 'effective.'  (AchieveNJ: Teacher Evaluation Scoring Guide; https://www.state.nj.us/education/AchieveNJ/resources/TeacherEvaluationScoringGuide.pdf)

As it was subject to ongoing development, the NY State version used the HEDI system in which 'unsatisfactory' became 'ineffective' and 'basic' became 'developing.' Moreover, for New York State this was a new evaluation system – and really should have been treated as no more than a pilot project-- the defects of which have not been worked through; the Administrators had some training, but were generally inexperienced and in the case of the Principal, was himself being rated on how he evaluated teachers.

time, the Basic rating was renamed Developing. In other similar rating schemes, it is called 'Adequate.' It is like getting a C.  It is not great, but not failing.

73.  Also, the Measure of Student Learning (MOSL) component of his ratings were 'effective' both for 2015-16 and -17.  This component is based on improvement in students test scores and is totally separate from the observations of administrators.

74. Irregularities are not limited to the school.  Just prior to the end of the year, my appeal hearing is held.  The actions of DOE officers Wittenberg (presiding officer) and Weinberg (Chancellor's designee) centered on an appeal of the Ineffective Rating given in 2015-16.  My UFT representative at the appeal, Frances Midy, told me as we left, "This cannot stand," but the Appeal was nonetheless denied.  Mr. Wittenberg presided over the May 26, 2017 hearing and Mr. Weinberg issued a letter denying the appeal dated June 14, 2017, but mailed not prior to the 16th and not received until July.[25]  In letting the Ineffective Rating stand, the Denial letter not only ignored the procedural issues, but also contradicted both testimony and documentary evidence.  We note that the decision of  Philip Weinberg (writing after Gary Wittenberg had presided over the hearing), ignored documentary evidence and other evidence affecting all three observations on which the rating was based.

75. First, he dismissed the claim that feedback was not timely by stating that all Evaluation reports were delivered with 45 schools days; as the documents the DOE presented show, the Evaluation report for the November 20, 2015 was not delivered until mid-March 2016, a period of well over 60 school days.

76. Second, the denial letter stated that all observations lasted the minimum required time; he thus

---

25 I mention this seemingly innocuous 2 day difference because the City Comptroller rejected my Notice of Claim on this issue because of a two day gap.  According to a letter dated October 19, 2017, the Comptroller "disallowed [the] claim [because} it was not filed within 90 days from the date of occurrence."  I responded on October 29, stating that my case was based on State Education Law, Section 3813, in which the time constraint is not 90 days, but 3 months and that I was within that limit.  This did not change the mind of the Comptroller.

ignored the Evaluation Report of 1 April 2016 as submitted; it was marked as a Formal Observation, which requires the Evaluator to be present for the entire period. The evaluator was not there the full 59 minute period, but only for 29 minutes from 11:41 to 12:10. Additional requirements are that the visit be announced and that there be both pre-and post-observation conferences; only the last requirement was met. The denial letter also ignored that the Observation Report submitted for the Appeal had been manipulated.

77. Third, Mr. Weinberg's decision stated that Mr. Ford's supervisors "analyzed the observational evidence under the Danielson Rubric, and issued the rating based on what was observed" was contradicted by independent arbitrator Robert A. Barron, the Hearing Officer in the 3020-a case, who found that the March 7, 2016 observation, conducted by Assistant Principal Rauner, "does not include much evidence to support her ratings, and for some ratings she provided no evidence at all," adding both that "the lack of evidence is a significant deficiency" and that all but two components of the eight in the Evaluation were not being sustained due to the lack of evidence." (Barron Decision, p. 51)

78. Thus, all three observations on which the annual rating was based should have been dismissed or, at least modified, but Mr. Weinberg's decision does not acknowledge this. Instead Mr. Weinberg's decision is in larger part seemingly cut and paste from the DOE position statement; the position statement and Mr. Weinberg's decision both contain 14 bullet points; moreover, each bullet point is substantially the same as the DOE position statement and nearly identical in wording, indicating an reprobate indifference to the facts of the case as presented at the hearing. Finally, Mr. Weinberg seemingly accepted false statements and manipulation of evidence by Mr. Ford's administrators without question.

79. Indeed, the Chancellor's Designee, who is an officer of the DOE and not an independent

arbitrator, provided a determination that was so similar –nearly identical-- to the DOE's position statement that it could have been written without a hearing; it could not, however, have been written by anyone with was paying attention to the facts introduced at the hearing. In producing this determination, the factual basis seems to have been left by they wayside and the DOE position put in its place without regard to the evidence.

80. Moreover, the timeline of the 3020-a hearing suggests that the initiation of the 3020-a hearings and the denial of the appeal were related, interdependent and perhaps coordinated. If the Ineffective rating had been overturned, then it would have almost certainly been fatal to the DOE 3020-a action. Two consecutive Ineffective ratings is the norm for pursuing termination of a teacher, especially a tenured teacher, in a case such as this when there is no misconduct.[26] I had an Effective rating in 2013-14, no rating in 2014-15 because I took a sabbatical and a Developing rating in 2016-17. The only Ineffective rating, for 2015-16, was not only based on less than half a year, but under the 2016-17 calculation matrix would have also been a Developing Rating. Also, the 2015-16 rating should have been overturned on appeal by the merits, but the two DOE officers involved, Gary Wittenberg, who presided over the hearing and Phil Weinberg, who wrote the denial letter, either singly or in combination, deliberately or incompetently ignored documentary evidence introduced at the hearing, including on Evaluation Report that was delivered four months after the fact and another Evaluation Report that existed in two version, one that was signed by Mr. Ford and was marked as an 'informal observation' and one that was entered into Advance and listed as an 'informal observation.'[27]

---

26 In my case there was no charge of misconduct. DOE Counsel Cox confirmed this at the beginning of the proceedings during the preliminary hearing, "no misconduct or letters to file charged here." (Tr 4)

27 Mr. Ford has written the DOE about this, asking what actions they would take to determine if there was either misfeasance or malfeasance, but the only response he received was an short email on January 22, 2019 from Karen Solimando, the Director of the Office of Labor Relations saying "The Department has reviewed the appeal of the 2015-2016 Ineffective rating and will not be revising its decision to uphold the rating." Apparently they have no process to raise complaints about DOE officers who might not have performed their duty properly.

81. I was served with papers on May 31, 2017; Mr. Decker asked me to his office even though there was no one to watch my class. Leaving your class unsupervised is something you can be fired for, but he ordered me to do it nonetheless. On the day after the Senior Prom (which I attended), June 9, 2017, a Friday, about 3 pm, I was given additional papers removing me from classroom duties for the rest of the term; there was only one teaching day left, Monday June 12th.[28] Mr. Decker told to take anything I wanted that afternoon, that I would not be allowed in the school henceforth. I gathered everything I could, but the haste with which I had to do it meant that many artifacts, such as student work or posters from the room, could not be saved for the 3020-a hearings and thus hampered my defense.

82. So ended my decade or so at Bronx Guild. I prepared, but was not permitted to enter grades for my students. I was not permitted to see this class graduate, despite having taught them both as Sophomores and Seniors and having strong ties with many members of the class.


f. 3020-a hearings and Decision

83. After a preliminary hearing on or about July 12, 2017, the 3020-a hearings were held on 11 days from September to November 2017. I have a full transcript and copies of all exhibits, originally compiled by Mr. Green of the DOE for the New York State Supreme Court and latter supplemented my Melanie West of the DOE for the New York Appellate Division.

84. The Hearing Officer, Robert H. Barron, of Philadelphia, was hearing his first 3020-a case and perhaps his first education case of any kind, but almost certainly his first education case in New York state. He is unfamiliar with case law, Special Education law, the evaluation system and

---

28 I was not sent to the 'rubber room,' but was reassigned to the school library on a different floor, until a decision was rendered in January 2018. Just as there was no misconduct, there was no question of needing to separate me from the students – I worked with students all day. Also, my supervisor, Margaret Whitehead, was laudatory, writing a strong letter in my support.

the range of pedagogies engaged in by professional educators.

85. Also, despite his inexperience and unfamiliarity, he hears the case by himself. While the law talks of 'a panel' that is not longer a concrete reality. As originally conceived, 3020-a hearing were conducted under a panel of three officers, but the disciplinary process changed. Panels of three to decide a case were phased out *just before* Mr. Ford's two charged years began; New York State (NYS) Education Law was amended so that cases brought after July 1, 2015 would "be heard by single hearing officers."[29] There were many changes including a streamlined process in many cases and that serious consideration must be given to the recommended penalty.[30]

86. Inexperience would likely be ameliorated while serving on a panel of three, but, explicity for reasons of expedience and cost-saving, this was done away in July 2015. In the present case a newly recruited Hearing Officer acted as a 'panel of one.' In such a situation, there is a greater likelihood of outlier conclusions. A dissent can become a ruling. Thus the change in structure, while expedient and less expensive, decreased rather than increased fairness.

87. In the days when a panel, not a single individual heard these cases, the inexperience and knowledge of one member would be balanced by the knowledge and experience of the others. However, in the name of expediency the panel format was abandoned and a single hearing officer was put in its stead. This is not something, however, that will necessarily lead over time to at least some unjust outcomes and New York State should have known there was significant danger in cutting the panel from 3 to only 1.

---

29 NYSUT Research and Educational Services, "Fact Sheet 15-15: Changes to tenure and the tenured teacher removal process," August 20, 2015; accessed November 2019 at https://www.nysut.org/resources/all-listing/2015/august/fact-sheet-15-15-changes-to-tenure-and-the-tenured-teacher-removal-process.
30 NYSUT Research and Educational Services, "Fact Sheet 15-15: Changes to tenure and the tenured teacher removal process," August 20, 2015; accessed November 2019 at https://www.nysut.org/resources/all-listing/2015/august/fact-sheet-15-15-changes-to-tenure-and-the-tenured-teacher-removal-process.

88. This is, of course, a general issue – the decision to move from a 3 member panel to a single individual was made for reasons of expedience and budget. However, if the process is to have integrity, then a better solution might have been that a newly appointed Hearing Officer would have at least observed the process previously. My livelihood and much of my future on the line, I do not believe that process should be streamlined in the name of the budget in such a way, as it was in this case, that an inexperienced Hearing Officer is learning on the job and without the knowledge base necessary and for that reason prone to mistakes. The implementation of this new system gave no one involved as a teacher being observed a chance to define or give an objective, unbiased view of what actually happened in the class or to determine if it met a reasonable standard of 'effectiveness' for a teacher given the multiple failings of the school.

89. The decision of Barron to find credible the testimony of DOE witnesses who gave false testimony repeatedly under oath, who destroyed and tampered with evidence, who placed documents with false information into the teacher's file and into evidence, is literally incredible; it is also unconscionable and reeks of bad faith.

90. Also, eventually, the HO dismissed challenges presented both by schools in areas of concentrated poverty and by students with disabilities, the later as "unpersuasive." The argument that I should have a Special Ed co-teacher, that to do otherwise is to undermine the Special Ed system, that to evaluate under such conditions is unreasonable, was found to unpersuasive because "Ford's role as teacher was to teach the students he had, regardless of their needs." (Decision, p. 49)

91. This is a curious logic, for if we spell it out he is saying a teacher should "teach *the special needs* students in his or her class *regardless of their needs*." He further concluded that

"teaching students with IEPs outside of a co-teaching environment had *nothing* to do with" the failures in the classroom as reported in the Evaluation Reports. (Decision, p 62, emphasis added) How he came this conclusion is hard to figure; if a teacher is teaching a class that calls for a co-teacher to accommodate students with IEPs, then the absence of such a teacher makes the job much more difficult. If, as in this case, students who acted inappropriately were IEP students, then the absence of a co-teacher has to considered as a factor.

92. By doing so Mr. Barron contravened the Strong Public Policy on issues of education for special needs students both by developing a novel and unacceptable standard for how teachers should be assessed when teaching special needs students and seriously damaging the accountability system for Special Education when it comes to how schools fulfill their mandate in implementing Individual Education Plans. How, after all, is one to teach Special Needs students "regardless of their needs"?

93. Mr. Barron was judging a complicated and specialized system without having previously done so or having prepared prior to the commencement of the proceedings. There is no evidence that he was able to make up for these gaps of knowledge and experience. He had not, to Mr. Ford's knowledge, observed any other 3020-a hearings or learned how the Advance system was supposed to work. He relied, to great degree, on the statements of the DOE Attorney and the NYSUT Attorney to understand the workings of the hearing and seemed to defer to the DOE.

94. I believe the HO demonstrated both bias and a deference to the DOE and that there is much in his decision that reasonable minds would reject outright. These include the finding that "There is no evidence in the record to support Ford's claim that he was treated differently from other Bronx Guild teachers," which contradicts testimony that indicated "Decker had a negative agenda towards Ford." (Decision, p. 47, Ftnt #22 and p. 31)

95. He also rejected the lack of LINs as irrelevant. "The fact that the administrators did not produce their low inference notes does not diminish their credibility . . . there is no basis to conclude that they were making up facts that had not been observed." This is better in one way, but worse in another. Maybe they did not make up facts, maybe they did, but that is not the point. But it is not merely that they were "not produced" – they were intentionally destroyed. Where the evidence is determined to have been intentionally or willfully destroyed, the relevancy of the destroyed documents is presumed. (see *Zubulake*, 220 F.R.D. At 220)

96. Nor is that the only problem. Maybe they didn't make up things (or maybe they did), but, also, they *withheld* information that was relevant. Without the LINs there is no way to know that the Evaluation Reports at least adhered to the so-called running transcript they were supposed to keep. Maybe they wrote the reports quickly -as Mr. Decker did on Nov. 20, 2016 when it was finished 90 minutes after the class ended (but not sent for 4 months)-, maybe they did not remember things properly, maybe the reports did not align with the LINs, maybe a lot of different things. Accordingly, what is pertinent to the point at hand is that the presence of the low inference notes, if produced at a hearing, could demonstrate *subjectivity* and even bias. Or maybe they even contained exculpatory evidence. Maybe they did not produce the LINs because they would raise questions or create issues. I do not know, but neither did Mr. Barron and as the Arbitrator he should have presumed the relevance of the material..

97. Apparently the fact that evidence was deliberately destroyed provides no basis to take action. However, when they are not produced and when the lead DOE witness admits he shredded them, that of course raises questions of both substance and process. The questions of substance cannot be answered because of the absence of the notes, but the absence of the notes gives us the answer to the questions about process. *The fact, uncontested, that the DOE witnesses did*

*not produce those notes denied Mr. Ford the opportunity to examine evidence in the case.*

98.  Similarly, there are other problems with Mr Barron's mode of inference. One example,  "while Ford had every reason to expect six observations, there is no basis to conclude that the additional observations would have made any difference."  This is just making an excuse and allowing protocols to be ignored.  "There is no basis to conclude that two or three more observations raising the same issues would have made a difference."  But Mr. Barron should not have ruled out the possibility.

99.  Finally, "there is no basis  to conclude that he could improve."  Actually there is.  He had good ratings in the past, so why couldn't he have them in the future?  He asked for help, even applying for a remediation program.  But that is not even the point.  It was Mr. Barron's job to hold that he could improve unless the DOE met the burden of proof to show that he could not.

100.    Thus, the situation was this:  having to learn on the job in the middle of an adversarial procedure Mr. Barron had to come to judgments and use standards on issues with which he was not familiar.  In the end, he did so in such a manner so as to contravene existing standards that have been established by New York State and the NYC DOE.

101.    These are all problems of due process.  Evidence was not produced. Of 9 observations, there was only one set of notes.  The absence of evidence is not inconsequential.  The basis for creating Evaluation reports in the Advance system used by the NYC DOE is a set of 'low inference notes' taken by the evaluator; they are then used to create the evaluation, thus purportedly making the evaluation somehow 'objective.'  As Principal Decker testified, "objective data [is] obtained through the low-inference notes during a classroom observation" (Tr 21) and are to be incorporated into the observation report. (See Tr 38, 69-71,  451-2, 492, 514, 537 and many others) As Assistant Principal Rauner explained, "I pull the rubric up and

then I take the notes and I plug it into the rating," she determined what she would rate versus what she would not rate "all based on [her] low inference notes." (Tr 833) .

102.    The Arbitrator thus ignored evidence and the absence of evidence.  While his credibility should not be assumed, perhaps it is true that "Decker saw **no evidence** that Ford was using the strategies Ford had been given during his coaching sessions," but there was substantial evidence that I did implement strategies brought up in coaching and PD sessions and in the Supreme Court, Hon. Justice St. George noted as much.    This is seen in the form of methods used including Rock'n'Roll Recall (Nov 30, 2016), story wheels (October 16, 2015), 'Assert-Cite-Explain' structure (see April 28, 2017), cold calling (Nov 20, 2015; Feb 13, 2017), sentence starters, differentiated readings (Feb 3, 2017), grouping, pair shares (Oct 26, 2016) and many others.  Mr. Decker may have not liked the way they were implemented, but they were there and Mr. Barron should have recognized them.

g. Post 3020-a Hearing

103.    The hearings ended on November 29th and Mr. Barron issued his Opinion and Award over 30 days later, on January 4, 2018, a day school was not in session because of a snow day.[31] He called for termination and by statute the DOE is obliged to implement that order within 15 days, but they did not, instead waiting until January 29th to have School Security Officers escort me outside.  Even then, their paperwork was not right – there was not letter of termination and there would not be until on or about March 12, 2018.

104.    We note both that the DOE did not properly implement the Barron order and that Mr. Ford's Termination was improper.  As the Pre-Motion letter states, "Hearing Officer Robert Barron issued an Opinion and Award on January 4, 2018 sustaining the charges of

---

31 Section 3020-a sets a 30 day limit and that Opinions be issued on a school day.

incompetence and imposing the penalty of termination. Plaintiff was escorted from BOE premises on January 29th and received a March 12, 2018 letter of termination."  However, the period from January 4th to the 29th is 25 days (17 business days), violating the controlling law for the proceedings: "Within fifteen days of receipt of the hearing officer's decision the employing board shall implement the decision." (3020-a, 4. b)  In addition, the teacher should not have been escorted from the building prior to receiving a termination letter; the termination was thus improper.  It is my position that, while I was removed form payroll on January 29th,  I was not terminated until at the earliest March 12th, when the termination letter was delivered 55 days after January 4th, but really not at all because the 15 day limit to implement was exceeded by 40 days.

g. Political Motives

105.　　　While the DOE has argued "[a]t the heart of DOE's mission is ensuring teacher quality," that the "disciplinary review process is vital [so as] to provide all of its students with a quality education," that hardly means that the disciplinary process as it has changed is perfect, fair, even-handed or even productive. A review of its history points to a rating system that was rushed into place and a disciplinary process that was altered to be faster and more expedient, but that in the process became less just.  This would do harm to the agency.

106.　　　Unsurprisingly, teacher evaluation is a politically charged topic and poor choices present the possibility of doing harm to the agency and general public.  Teachers were once rated "satisfactory" or "unsatisfactory," but in 2010, "in order to win a federal 'Race to the Top' grant . . . New York adopted a new evaluation system."[32]  It would not be the last – 2013-14

---

32 Monica Disare, "New York wants to overhaul its teacher evaluations — again. Here's a guide to the brewing battle, *Chalkbeat*, February 22, 2018; accessed Nov. 2019 at https://www.chalkbeat.org/posts/ny/2018/02/22/new-york-wants-to-overhaul-its-teacher-evaluations-again-heres-a-guide-to-the-brewing-battle/.

saw the introduction of the Danielson Rubric (DR); the DR was modified significantly in 2015-16 and again in 2016-17. Furthermore, prior to her July 2019 resignation, "State Education Commissioner MaryEllen Elia has made it clear she wants to oversee a careful redesign process" and "teacher evaluation [remains] one of New York's most politically charged education issues."[33]

107.    Thus I was evaluated under an evaluation system that needed a careful redesign, but had not received it.

108.    Joel Klein, former NYC DOE Chancellor, and Michelle Rhee, former DCPS head together published a "manifesto" in the Washington Post claiming that the difficulty of removing incompetent teachers "has left our school districts impotent and, worse, has robbed millions of children of a real future."[34] So, they wanted " to end the "glacial process for removing an incompetent teacher" and give superintendents like themselves the authority to 'get rid of the dead wood' and to pay higher salaries to teachers whose students do well academically. Otherwise, children will remain "stuck in failing schools" across the country.

109.    But this is merely opinion. Richard Rothstein's response was to deny the claim was "accurate on its own terms. . . . It has become conventional in educational policy discussion to assert that "research shows" that "teachers are the most important influence on student achievement." There is, in fact, no serious research that shows any such thing.[35]

110.    The DOE has argued "[a]t the heart of DOE's mission is ensuring teacher quality," that

---

33 Monica Disare, "New York wants to overhaul its teacher evaluations — again. Here's a guide to the brewing battle, *Chalkbeat*, February 22, 2018; accessed Nov. 2019 at https://www.chalkbeat.org/posts/ny/2018/02/22/new-york-wants-to-overhaul-its-teacher-evaluations-again-heres-a-guide-to-the-brewing-battle/.

34 "How to Fix Our Schools: A Manifesto by Joel Klein, Michelle Rhee and Other Education Leaders," *Washington Post,* October 10, 2010, B01: http://www.washingtonpost.com/wp-dyn/content/article/2010/10/07/AR2010100705078.html.

35  Richard Rothstein, "An overemphasis on teachers" Commentary, *Economic Policy Institute,* October 18, 2010; https://www.epi.org/publication/an_overemphasis_on_teachers/. See, also, Rothstein, "How to fix our schools," Issue Brief #286, *Economic Policy Institute,* October 14, 2010; https://www.epi.org/publication/ib286/.

the "disciplinary review process is vital [so as] to provide all of its students with a quality education,"[36] that hardly means that the disciplinary process as it has changed is perfect, fair, even-handed or even productive. It is not at all that teacher quality is unimportant, but the question of how to measure it and what other factors enter into classroom performance is hardly settled. If one were to do a factor analysis, teacher quality would be one factor, likely ranked of lesser importance than parent involvement and socioeconomic status, probably intertwined with the efficacy of the school as a whole and the quality of the principal. However, if one is attempting to give administrators more discretion and move closer to an at-will employee model, then highlighting the role of the teacher's quality is likely to be a useful way of going about these things.

111.    Mike Bloomberg is, of course, not mayor anymore, but his influence has not evaporated. For 12 years he changed the course of city schools, staffing the DOE with people who were likely to have similar perspectives. According to Steve Brill, Mr. Bloomberg has always favored the at-will employee model, something that shaped his thinking after "the State Legislature granted control of a new Department of Education to the new mayor, who had become a billionaire by building an immense media company, Bloomberg L.P., that is renowned for firing employees at will and not giving contracts even to senior executives."[37]

112.    Thus, in considering the time sequence we should consider that this is a way to reshape labor relations to more closely resemble the Bloomberg L.P. Model. There is a change of law in summer 2015 and all of a sudden I am getting negative ratings under a new evaluation system implemented without training those who would be evaluated and an appeal process that

---

36  DOE Brief in Appeal Case No. 2019-21161, NYSupreme Court Appellate Division: First Dept.

37  Steven Brill, "Annals Of Education; The Rubber Room: The battle over New York City's worst teachers, The New Yorker, 31 August 2009, read in print, but still accessible as of Sept 2011 at http://www.newyorker.com/reporting/2009/08/31/090831fa_fact_brill. The argument is made at greater length in Ford, Respect for Teachers.

might be compromised,  Moreover, the conditions of evaluation do not require that State mandates for Special Education requirements be met.  Also, there is a 3020-a process that allows the DOE not to produce evidence, that does not sanction false testimony, that moves from a panel of 3 to judge cases, to a single individual who may be inexperienced and will need to learn on the job, that accepts a series of strained judgments as a reasonable opinion, that allows the DOE Counsel to make inflammatory statements in her summation[38] without having asked the proper evidentiary questions in the hearings prior to summation, then you don't have a working system of justice.  You have an administrative agency that lacks judicial conscience.

## IV. PRE-MOTION LETTER

113.    Before pursuing this further, let us address the DOE's Pre-motion letter dated November 30, 2020. The letter claims that Plaintiff's Complaint fails to state a plausible claim upon which relief can be granted and that this Court lacks subject matter jurisdiction over Plaintiff's National Labor Relations Act ("NLRA") claims. These will be addressed below.

114.    This is an Amended Affirmation.  Plaintiff, a teacher formerly employed by the BOE commenced this action on July 5, 2019. The Court granted  Plaintiff's application to proceed *in forma pauperis on* October 29, 2019; while he has sought out legal assistance, he is still *pro se.*  At the the initial conference, originally scheduled for October 22, 2020, but adjourned to December 8, 2020 at the Respondent's request, Court granted Plaintiff leave to file an Amended Complaint in

---

38   In her summation, DOE Counsel Cox suggested that I had committed, "Insubordination . . . defined as refusal to obey orders." (TR 1775-6) There were no misconduct charges and no charges of insubordination.  She should not have been allowed to bring it up, especially as no response is allowed; because she gets to go last, neither myself nor my counsel had an opportunity to respond or correct Ms. Cox on this. In fact, I asked Mr. Barron whether there was an opportunity to respond and his response was that there was not.  Similarly, when I testified I had to contend with a Hostile Work Environment.  (Tr 1556, 1596) DOE counsel Cox dismissed this, "The Respondent's claims of hostility from Principal Decker are *completely unfounded and uncorroborated by anything in the record*. Respondent made unsupported claims about a shift in Principal Decker's attitude towards him." (Tr 1741, ea) But there was quite a bit of evidence of hostility.   I assume the idea is since they have the burden of proof, they can go last, but Mr. Barron did not honor the burden of proof.

order to respond to issues raised in the Respondent's pre-motion letter of November 30, 2020.  This was later extended to February 1, 2021.

115.     In the pre-motion letter, respondent claimed that Plaintiff's ADA and ADEA claims must also be dismissed on the grounds had not filed a charge of discrimination with the EEOC or received a right to sue letter.  However, Mr. Ford had previously submitted a claim to the New York Division of Human Rights.  After it was denied, Mr. Ford in turn received a letter on or about April 9, 2019 (signed by Kevin J. Berry, dated April 2, 2019)  that (a) advised him that the US EEOC had adopted the findings of the state and (b) advised him he had a right to bring a suit in Federal court.  Mr. Ford believes he previously submitted this letter in order to file his initial complaint, but is nonetheless including it here.  [Ex. A]

116.     The Pre-motion letter claims "there are no facts plausibly suggesting Plaintiff was discriminated against based on his age"  and that "the Plaintiff also fails to plausibly state a cognizable cause of action."  Neither of these is correct.  Plaintiff's claims under the ADEA, ADA and Rehabilitation Act state cognizable claims which are perfectly plausible given the combination of some facts already known with other facts subject to discovery.  While none of the administrators signed a confession or said out loud, "this was an act of discrimination," a reasonable person viewing the circumstances and facts already known would strongly consider the possibility that the administrators were retaliating for previous actions or were engaged in discriminatory actions.  Add to that the the DOE has failed to honor FOIA requests that overlap with what will be asked for in discovery, the plausibility becomes all the more.

117.     The pre-motion letter specifically  suggested that the plaintiff did not plead facts "which plausibly suggest that (1) the employer took an adverse action and (2) age was the 'but for' cause of that adverse action."  As for the first, termination is certainly an adverse action, as

were several other actions preliminary to the 3020-a hearings. As for the second, determining whether Age Discrimination was a "but for" cause or merely a contributing cause would comprise much of the trial and cannot be ruled out by any means. Moreover, it is all the more plausible because of the sudden drop in Mr. Ford's ratings immediately after reaching his 15 year longevity increment and immediately after having taken a Sabbatical, which is only taken by tenured senior teachers; both suggest Age Discrimination is at play. While, as Mr. Ford understands it, employers may discriminate against older employees because they have higher salaries –something that is definitely the case with DOE teachers whose salary is in large part based on longevity- they are not allowed to 'not play by the rules' with those employees.

118.    More generally, the changes in both the Evaluation System and the Disciplinary System that were instituted beginning in 2010 in response to the US DOE's Race to the Top (RTTT) program inordinately affected older employees.

119.    In addition, contrary to the pre-motion letter, the Plaintiff has previously alleged and does now argue that "younger employees engaged in similar conduct and were not disciplined," that Principal Decker made statements which suggested animus on many  bases  and that other older teachers were treated less well on the basis of their age.  Mr. Ford did testify during the 3020-a hearings that the school was chaotic, a description encompassing and referencing multiple instances in which other employees, including younger employees, had similar difficulties in managing the classroom and were not similarly disciplined or given equally low ratings.[39] Moreover, Mr. Ford also claimed repeatedly that he was treated differently than other

---

[39] Mr. Ford was sometimes not able to teach because of the noise in his classroom, not from his students, but from students in the adjacent room.  The peak moment of school chaos, however, was on or about January 9 , 2017, when the school had a full-fledged riot.  Mr. Ford has requested video footage of the riot, with identities of the students obscured, but the DOE denied his FOIA request on this matter (#F17,462) because the video footage was deemed "an education record" pursuant to the federal Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232(g) and that as a practical matter the identities of the students could not be concealed.  Mr. Ford internally appealed this DOE decision, questioning the claim that the DOE did not have the "technical capacity" to pixelate the videos to conceal identities, but to no avail.   Nonetheless, "the requested surveillance footage has

teachers, most of whom were younger, in that he was the only core subject teacher not given a dedicated classroom, one of few not assigned a mandated Special Education co-teacher. In addition, the other Senior class teacher, the Science teacher (born in 1957), was not given a mandated Special Education co-teacher and was of the same age as Mr. Ford (born in 1958). Moreover, the oldest teacher (born in 1954) in the school had previously been subject to 3020-a proceedings.[40]

120.        It would therefore be premature at this point to reject that Age Discrimination was in play or that the sudden change in evaluator ratings was not a pretext for getting rid of a senior teacher who was taking up too much of the budget. Similarly, that Principal Decker did not make any known statements which explicitly suggested animus on the basis of age, as the pre-motion letter states, does not rule out the motivation; there were, after all, plenty of statements that suggested animus of unspecified motivation. Mr. Decker attacked Mr. Ford's hygiene; he asked Mr. Ford to come into school during the summer of 2016 to clean out a closet that had been assigned to him in June for summer storage; Mr. Ford was not assigned a locking closet or locker for his personal items; Mr. Decker yelled at Mr. Ford numerous times, once merely for putting his coat down on a book cart; an AP filed a spurious charge of verbal abuse based on a written disciplinary report that was of limited circulation; moreover, the verbal abuse charge, never followed up upon, contained false statements of pertinent facts; and, finally, students overheard Mr. Decker saying that he wanted to 'get rid of Mr. Ford' or words to that effect, undermining Mr. Ford's standing with his students.[41] Neither that Mr. Decker was cagey enough not to be heard make remarks that smacked of age discrimination, nor the fact that he is a few years older than Mr. Ford rule out the motivation.

---

been marked for preservation and may be released upon submission of a court order or subpoena." (Milena Schatzle, Deputy Records Access Officer, Letter to Mr. Ford, September 3, 2020)

40  The fourth teacher of roughly the same age was a mid-career transition to teaching and would presumably have a lower salary.

41  Mr. Ford overheard the discussion in the 2015-16 school year. He confirmed with the student that he had indeed said that in November of 2017; another student also confirmed this in either December 2017 or January 2018.

121. This Court should also consider whether the DOE has inculcated a culture that diminishes the value of senior teachers and sees them as obstacles rather than allies. It is perfectly plausible that Mr. Decker, who entered the NYC DOE Leadership Academy in 2005, was shaped by the norms of Mayor Bloomberg, his preference for the at-will employee model, and his emphasis on controlling legacy costs.[42] It is also to be expected he was influenced by Chancellor Klein, who was Chancellor when Mr. Decker was trained as and became a principal, and who identified as obstacles "the three pillars of civil service: lock-step pay, seniority and life tenure. Together, they act as handcuffs and prevent us from making the changes that will encourage excellence in our system."[43] Age discrimination may not have been based on Mr. Decker's personal idiosyncrasies, but on his DOE training and socialization. While, to the extent I understand it, salary discrimination is allowable even if it entails age discrimination, it is still age discrimination and it should not be allowable if the reasons given for termination are pre-textual or the process of termination has been compromised. Similarly, it should not be allowable if a desire to cut costs is conflated with a culture of intolerance for senior teachers and thus informs judgments.

122. Salary or remuneration discrimination in system such as the DOE's, where the salary schedule is based on two factors only, longevity and level of education, will have an inordinate effect on employees in the protected class. Mr. Ford suddenly began to have negative evaluations after he passed his 15 year longevity increment; teachers who receive a 15 year increment are almost all in the protected class of those over 40 years of age; the few exceptions are those who were appointed before the age of 25, and they will soon be over 40 in any case . Unless carefully guarded against, anti-legacy cost and similar initiatives will be tempted to use a broad brush to

---

42 All these items are discussed in Mr. Ford's book, *Respect for Teachers* [pages], possible retaliation for which is the basis of the the 1st Amendment Protected Speech Claim.

43 Remarks by Joel Klein, Business Breakfast Forum: Crain's New York Business/ Partnership for New York City, Jan 27, 2004; http://www.parentadvocates.org/nicecontent/dsp_printable.cfm?articleID=1803.

sweep away qualified and effective teachers along with unqualified and ineffective teachers. If an employer employs excessive zeal in this pursuit, then not only will an inordinate numbers of older employees be swept away unjustifiably, but a culture will be created in the administrative hierarchy that encourages this.

123.     Moreover, as discussed further below, we should also look into the changes in New York State law that began in 2010, introduced significant changes in 2013, including a new Evaluation system based on the Danielson Rubric, and came to a head in 2015 with changes in 3020-a disciplinary procedures and the quick redesign of the Danielson Rubric to cut the components rated from 22 to 8.

124.     Far from it being the case, as argued in the respondent's pre-motion letter, that "there are no facts plausibly suggesting Plaintiff was discriminated against based on his age," there is a cornucopia of facts. It would be far too early to rule out age discrimination.

125.     The pre-motion letter seems on stronger ground in rejecting the NLRA claims since NYC DOE is not an 'employer' under the statute and government entities are not subject to NLRA. Nonetheless, we wish to raise an issue of fairness here, for, in addition, under New York state law, pursuant to CPLR 5519, when a Supreme Court order is appealed, if the appellant is the state, or a political subdivision thereof, or an agency of the state, or a political subdivision thereof, there is a automatic stay of Supreme Court orders. The appellant is given up to nine months to perfect the appeal, putting an enormous burden on individuals whose livelihood is at stake. The state is excluded from the federal statute while state laws give advantage to the state. How exactly to plead this we are not sure, but we nonetheless wonder again if this deprivation of property and livelihood under federal and state stature is an unconstitutional deprivation of property under the 5th and 14th amendments. This claim will be raised below.

126.     The pre-motion letter is also incorrect in stating that Plaintiff's ADA and Rehabilitation Act

retaliation claims do not plausibly state a cognizable cause of action. Rather the events and circumstances show a *prima facie* case of retaliation under these statutes, by showing the following: (1) Mr. Ford engaged in a protected activity; (2) his employer was aware of the activity; (3) the employer took an adverse \action against him;  and (4) a causal connection exists.

127.    1. Protected Activity

a) Mr. Ford engaged in several protected activities, including writing a professional letter to the Principal;[44] filing a Special Education complaint with the UFT;  publishing a book (December 2012/January

---

44  The Pre-Motion Letter states, "Plaintiff alleges he wrote to Principal Decker during the 2008-2009 school year complaining regarding unspecified Special Education Practices." The original email from Mr. Ford, dated 28 November 2008 and Mr. Decker's response, dated 30 November 2008, was very specific about Collaborative Team Teaching.  Note that excerpts from this letter were included in the book draft for the Sabbatical Project, "Market Emulation and Education Reform:  Four Essays on Paradigm Change and the Hegemonies of Social Learning," pp 154-5 (of 532 pages)

Here is the original email thread, students' last names redacted:

-- On **Sun, 11/30/08, Sam Decker <*samdec@gmail.com*>**  wrote:
From: Sam Decker <samdec@gmail.com>
Subject: Re: Collaborative Team Teaching Model for IEP students
To: ford08nyc@yahoo.com
Cc: "Dana Luria" <d.luria@gmail.com>, "Sean Denmark" <otazka@hotmail.com>, "Lorin Schneider" <lorin_schneider@hotmail.com>, "Al Sylvia" <alsylvia@yahoo.com>, "Jeff Pallldino" <jpalladino46012@sbcglobal.net>
Date: Sunday, November 30, 2008, 3:08 PM

Brian--

The CTT was instituted because the self contained model does not work with our vision or model of education, and we do not want to sequester students into "special ed" crews. We believe that working with each student individually benefits all students, those with IEPs and those without. It has nothing to do with two teachers in a room, but is instead focused on a team of people to work with a student. You are, as always, the primary person responsible for your students education and progress.

Our schedule allows for more one on one time with students from the crew leader, for individual conferencing.  Al will help you set up a conferencing schedule that ensures you have time with students who need more help.  We are using the learning specialists as part of the team to help specifically with kids whose IEPs indicate greater need, but also students who just manifest that need.

Sean has been asked to work with the students you listed, but you must also work with Sean to help direct what you need him to do with the students. Raul and Bill are also resources to help with individual students, but they serve the entire school, unlike Sean who works just with the Learning Institute, and so might have less time for one on one.  They can, however, help you differentiate your work with these students, and help you with materials and resources. In addition, several teachers, including teachers on your team, have experience or expertise with special ed and learning styles. Al, as your coach, can help facilitate your working with other teachers, including planning time, and observing how they work with students, including students with IEPs or ELL issues.

Students are also eligible for counseling from the social work interns. Lorin or Dana can help you make sure your students receive either required, or needed services.

Hope this helps,

Sam

On Nov 28, 2008, at 3:36 PM, Brian Ford wrote:

2013), with attendant free speech claims, submitting a Sabbatical application (Fall 2014), pursuing the

Sabbatical despite resistance from the District Superintendent (Nov. 2014- Feb 2015) and eventually taking

a Sabbatical in Spring 2015.  If, as the DOE suggests[45] and as seems plausibly to be the case, retaliation

began in Fall 2015, these are all 'temporally proximate' actions.

(b) While there are some written documents, and at least one, if not more relevant emails in the early Fall,

---

Hi Everyone --

I wrote back to everyone that Dana had previously e-mailed below (and added Jeff).
I would like some clarification as to the
Collaborative Team Teaching Model for IEP students.
As I understand it, this was instituted when we had teaching
partners in our rooms two years ago.  Now we have people with
whom we share a room on alternating days and rarely are the
two people in the room at the same time.

Dana wrote me about Denise, but Emerald XXXXX and Brian XXXXX
are also IEP students in my crew who would benefit from additional attention.
(Emerald, especially, could benefit a great deal from one-on-one work.)
In addition, John Carlos XXXXXXX has big problems with English,
which I've discussed with Lorin previously.

I know Denise receives counseling, but who else makes up the
teams for the IEP students?

Thanks,
Brian

--- On **Tue, 11/18/08, Dana Luria <*d.luria@gmail.com*>** wrote:

From: Dana Luria <d.luria@gmail.com>
Subject: Literacy Support for Denisa XXXXXX and Darella XXXXXXXX
To: "Sam Decker" <samdec@gmail.com>, "Sean Denmark" <otazka@hotmail.com>, "Al Sylvia"
<alsylvia@yahoo.com>, "Otto Forde" <ford08nyc@yahoo.com>, "Amanda Colon"
<amandajcolon@gmail.com>, "Lorin Schneider" <lorin_schneider@hotmail.com>
Date: Tuesday, November 18, 2008, 1:14 PM

As a result of their EPC Triennal Reviews.
Darella XXXXXX
Denise XXXXXX
require additional support from a literacy instructor.
I included Sean on this email since he is assigned to the 9th grade.
I am unsure of the process for scheduling time with Sean and these students, which is why I included so many of you on this
email.  If someone can make this happen, please let me know.
  Thanks,
Dana

--
Dana Luria
Internship Coordinator
The Bronx Guild
1980 Lafayette Ave.
Bronx, NY 10473
t 718.597.1587 x675
f 718.597.1371
c 248.310.6072

---

45  As accurately stated in the Pre-Motion letter, "Plaintiff began receiving negative ratings in the 2015-2016 school year."
   Mr. Ford lists adverse actions below, beginning in late August 2015, and escalating first in November 2015, and then

Mr. Ford's actions in Fall 2015 were not as well memorialized. While Mr. Ford did speak to Principal

Decker about Special Education protocols and student's achievement levels, he was cautious in bringing up

the topic that the school was not providing the integrated co-teaching that was required by some students'

Individualized Education Plans and some of Plaintiff's classes allegedly had over 40% special education

students. As the Pre-motion letter points out, "Plaintiff affirmatively states he did not complain

regarding special education issues in the 2015-2016 school year [to Mr. Decker, the DOE or UFT]

because he feared retaliation." This is true. Even if Mr. Ford spoke to colleagues (and informally

complained) he did not file a formal complaint because of the fear of another round of retaliation; instead

of being filed as complaints, concerns were framed as inquiries to the administration.

In addition, any complaint Mr. Ford might have had for the 2015-2016 school year was

rendered moot by his being assigned a co-teacher for Spring 2016, so he had no personal reason for a

complaint.[46]

(c) While the pre-motion letter states "it is unclear when or to whom he claims to have spoken about

these issues," Mr. Ford did, speak extensively to colleagues, including Amanda Martin-Morris, Bill

Lynam, Rob Owen and other members of Senior Team, esp. Cailin Schiller, who is a Special Ed teacher,

and Lorin Schneider, the School Counselor and voiced concerns.

128. 2. Employer was aware of the Activity

Mr. Ford's employer was aware of the activity. Principal Decker knew about the letter, the Special Ed

complaint, the book and all the issues involving the Sabbatical. He may or may not have known of Mr.

Ford's conversations with other staff members, but if the retaliation began in Fall 2015, then it is not

_____

again in March 2016.

46 Also, in early Fall 2015, Mr. Ford still did not have access to IEPs. Once he did see them, he raised the issue
with the Spec Ed coordinator, but he did not file a complaint as the last time he filed a complaint he had received
a negative annual rating. He also raised these questions at grade team meetings and communicated with Principal
about Lexile scores, which show reading level. He did not have a co-teacher in Fall 2015, but did have a co-
teacher in Spring 2016, so no reason for a complaint. He might have filed a complaint in 2016-17, but he thought
that would just make things worse.

necessary that he knew of conversations that happened after its onset. The District Superintendent might have known about much of this and, as regards the Sabbatical Application, both Principal and Superintendent were had a role in the process and were charged with reviewing the materials.

129.     3. Employer took Adverse Action

The employer took an adverse action against Mr. Ford as he was terminated. Can't get much more adverse than that, but there were also a series of events prior to that, including many which are memorialized in an harassment complaint that was filed with, but not acted upon by he UFT.[47]

130.     4. Causal Connection

Causal connection clearly exists and is plausible, as items (a) through (t) demonstrate.

(a) In 2008-09 Mr. Ford was a given negative rating after writing a letter and filing a complaint with the UFT regarding Special Education practices under Mr. Decker. In late 2012, early 2013, Mr. Ford published a book; while he was on leave at the time, which recounted (with names withheld) that event and, while generally avoiding other events at the school, was critical of many NYC DOE programs and policies. It was common knowledge in the school that Mr. Ford was the author.[48]

(b) When Mr. Ford returned from leave in Fall 2013, he tried to transfer, but ended up teaching at Bronx Guild.[49]   Mr. Ford returned from family leave in 2013 and was rated effective for that year. There was no complaint in 2013-14, as Mr. Ford felt he had been burned and did not want to go down

---

47  The Harassment Complaint is part of the Supplemental Record complied by the DOE in New York State AD Case 2019-2696. (SR 21-71)

48  Brian Ford, *Respect for Teachers: The Rhetoric Gap and How Research on Schools has Laid the Ground for New Business Models in Education*. (Rowman and Littlefield, 2012.) The pre-motion letter states "Plaintiff alleges this book contained criticisms of the BOE including his earlier letter from the 2008-2009 school year." This was typorgraphical error. In fact, it is not the book but the Sabbatical project book , "Market Emulation and Education Reform:  4 Essays on Paradigm Change and the Hegemonies of Social Learning," which contains excerpts from the letter on pp 154-5. This book draft was delivered to the DOE on or about August 24, 2015.   Nonetheless, roughly about a third of the published book concerns the DOE .

49  Mr. Ford  had an odd experience in that he was granted a transfer and then had in rescinded. While this particular incident may not meet the four fold test, it is unusual. Mr. Ford had arranged a transfer to Bread & Roses High School in Manhattan and had both informed and gotten the ascent of Principal Decker. But it was never finalized and the Bread & Roses Principal suddenly, on the Friday before Labor Day, emailed me that he was rescinding the offer.  It was the last day of summer break, so it was too late to find anything else and Mr. Ford returned to Bronx Guild, which created scheduling challenges.

that road again. As for the Bronx Guild Administration, AP Stephanie Eliot was supportive of Mr. Ford and found him helpful in running the school and Mr. Decker seemed to remain neutral. In the fall of 2014 he was at first denied sabbatical by his District Superintendent before finally having the Sabbatical granted in January of 2016, only a week before its commencement. The District Superintendent did not want the Sabbatical to be granted because of his previous leave; eventually the sabbatical was granted after an appeal of her denial.

(c) Mr. Ford taught a Film for Social Studies case[50] in Fall 2014 that, according to other teachers, resonated with students. He was not rated in 2014-15, allegedly because of the Sabbatical, but it was within Mr. Decker's power to rate or not rate. Mr. Ford was pleased with how the classes worked, remarking in a Jan 19th email to Mr. Decker that "the film class is working . . . I even have quite a few students saying I am their favorite teacher, but more importantly I think the students trust me." He then went on to discuss plans for the second semester. In emails after the Sabbatical was granted, Mr. Ford spoke about the possibilities or using a similar program in the fall. He developed teaching units for possible use during his Sabbatical.

(d) In 2014 Mr. Ford thought he had a wonderful Fall term, but also applied his the Sabbatical and, as part of the process, handed in voluminous materials for review by Principal and the District Superintendent. In the fall of 2014 he was at first denied sabbatical. The District Superintendent blocked the Sabbatical, but it was eventually granted after Mr. Ford went 'over the District Superintendent's head.' The Sabbatical was granted in January of 2015, only a week or two before its commencement. The District Superintendent did not want the Sabbatical to be granted because of Mr.

---

50 The films were *Marie Antoinette, A Tale of Two Cities* and *Ali*. All films were part of an integrated set of lessons in which the films were paired with readings, projects and other activities. This is in contrast to Mr. Decker's testimony that Mr. Ford "wanted to show long film clips, and it was our--it is our belief that showing films is not effective instruction, that if you--just to show a film and then have students, you know, watch a film for a whole class period or half a class period." (TR 335) Mr. Decker knew, or should have known, from his observations of Mr. Ford's teaching in Fall 2014 and his review of the lesson plans for school years 2014-15, 2015-16 and 2016-17 (Mr. Decker was Mr. Ford's coach all three years) that Mr. Ford had never "just shown a film and then just had students watch."

Ford's previous leave; eventually the sabbatical was granted after an appeal of her denial. Project materials were handed in in August 2015.

(e) When Mr. Ford came back in 2015, with Ms. Eliot on the verge of Maternity leave and Mr. Decker as his coach, he was treated differently from others in several ways and began getting negative classroom evaluations for first time in his career and eventually was terminated.

(f) Upon Mr. Ford's return in Fall 2015 he was treated differently. Mr. Ford was told he would be teaching from a Curriculum that the school would provide and that he would not be using either the New York State Curriculum nor the teaching units he had designed. As noted below, he did not have an Initial Planning Conference, but was told he would not have a choice as regards Observation options, but would have six observations.[51] He was also told that he would not have an assigned room, but would be moving from room to room; he was the only core subject teacher (Math, English, Social Studies, Science) at the school in 2015-16 who did not have a dedicated classroom. Nonetheless, the first two months of that year went relatively smoothly.

(g) Mr. Ford noted a change in attitude after a visit by the District Superintendent in early November (on or about November 9, 2015). Mr. Decker did not reply to emails, including emails which involved coaching and teaching assignments. The failure to follow protocols increased, Mr. Decker chose a half day with a contracted time period for the first observation that would actually be written up into an Evaluation Report[52] and, with one exception in December, Mr. Decker ceased to have coaching sessions with Mr. Ford until May of 2016.

---

51 The Collective Bargaining Agreement indicates that the teacher is allowed to select their observation option, The Advance Guide for 2015-16 gave Mr. Ford two options, including Option 1 that involved only four observations, but Mr. Decker told Mr. Ford that the District office had informed him that Mr. Ford needed to have six observations (Option 2) because he was returning from Sabbatical.

52 Mr. Ford had been observed teaching in his class at least 5 times in September and October of 2015, but no Evaluation Reports were forthcoming and, we note, the Low Inference Notes, which Mr. Ford believed based on feedback might well have been positive, were "shredded." (Tr 471) It is also noteworthy that of the Fall 2015 observations which did not result in an Evaluation Report, some of them prompted quite positive feedback. Principal Decker wrote up, of all those in the Fall, *only* the observation that was *least effective*, but not the others.

(h) For the full 2015-16 year, there were an insufficient number of Evaluations, untimely delivery of evaluations, there was tampering with Evaluation Report after it had been signed, a lack of coaching and harassing actions by school administration. Mr. Ford was also asked to sign at the end of the year a Measure of Teacher's Practice Form that listed the "Observation Option" as "Option #1" which consisted of only Four Observations (1 Formal and 3 Informal) as opposed the the six informal observations he was told he would have in the Fall.

(i) This is by no means trivial. The altered Evaluation Report was changed on June 24th, near the end of the year, from Informal to Formal, presumably to align with Option 1 and meet the minimum requirements. If not then, as Mr. Decker testified, "I would have been listed as incomplete and then when Brian grades his overall rating that would have been an issue." (TR 501) The manipulation of the Evaluation Reports allowed Mr. Decker to enter an Ineffective Annual Rating without it being "an issue." That also meant Mr. Ford would be placed on a Teacher Improvement Plan for the 2016-17 year.

(j) Mr. Decker was a constant in the process and eventually fell into what Mr. Ford described as a bullying pattern and what can plausibly be construed as vindictive actions. His ratings on evaluations were universally low, even when Mr. Ford felt the class had worked out well. However, he would not have been able to proceed in such a manner, but for the lax enforcement of teach protections by the DOE.

(k) Indeed, the in-school history for the two years prior to the 3020-a hearings shows a flouting of protocols and, among other things, unacceptable ways of gathering and maintaining evidence and evaluation materials. The protocols ignored include an insufficient number of observations, no Initial Planning Conference, denying Union Representation, no collaboration as mandated on Teacher Improvement Plan, the untimeliness of Teacher Improvement Plan and the use of the Teacher Improvement Plan for disciplinary purposes.

(l)   The breach of protocols continued into 2016-17.  There was no IPC, Mr. Ford was not given a choice of observation options, deadlines were not met, items were placed in Mr. Ford's file that had false information, items were placed in Mr. Ford's file without his knowledge and the Teacher Improvement Plan (TIP) was used for disciplinary purposes.  In addition, not only did the TIP not conform to DOE standards, but the administration did not fulfill their obligations under the TIP, as the coaches entered the classroom not to "to observe and offer feedback," but almost always they were "present in the classroom" to evaluate.[53]

(m)   Arbitrator Barron nonetheless concluded that  Mr. Ford had "a fair chance to improve" by saying that DOE's flouting of protocols, ignoring Special Ed mandates, tampering with Evaluation Report and false testimony were unpersuasive, did "not make any difference" or were not relevant.  This is despite that under NY State law, these protocols are specifically designed to protect the teacher.  (Holt v. Board of Ed. of Webutuck Central School Dist.,52 NY2d 625,632 [981])

(n) Special Attention should be paid to the misuse of the Teacher Improvement Plan, which was seemingly substituted for the Peer Intervention Program (PIP) for Remediation that is specifically referenced in the Collective Bargaining Agreement as being relevant to the 3020-a statute.  But the TIP is not the PIP and, while the DOE has claimed it is a remediation program, it is not truly a remediation program as it is run by in-school evaluators instead of out-of-school professional coaches who do not evaluate.

(o) A Teacher Improvement Plan (TIP) is meant to be a collaborative document, "[t]he purpose of [which] is to assist teachers to work to their fullest potential . . . In creating the TIP, evaluators will consult with teachers to identify specific improvement areas as well as a timeline and plan for assessing improvement in teacher practice [and the teacher will] work with their evaluator to develop and implement a meaningful Teacher Improvement Plan (TIP) early in the school year.  . . . The TIP will be

---

53 Ms. Ghaznowi did model a class in late March of 2017, but that is the only instance that Mr. Ford recalls and it was far too late in the year to have a positive impact on Mr. Ford's rating.

discussed as a part of the Initial Planning Conference (IPC), to be held by teachers receiving a TIP by September 22, 2016. Teachers may request the attendance of a union representative at these TIP planning meetings."[54]

(p) The Advance Guide is quoted at length because the process of producing the TIP did not conform to these guidelines. There was no Initial Planning Conference,[55] nor was there are collaboration; according to the notes compiled by the school administration, the first meeting of the year was scheduled for 20 minutes on September 26, 2016, at which the "TIP [was] presented," but no discussion was indicated and Mr. Ford recalls no discussion.[56] The meeting, which occurred immediately before Mr. Ford's second period class, was tension filled, with Mr. Decker calling out to Mr. Ford as he left for class that there were complaints about Mr. Ford's hygiene and that he should 'consider finding a new laundry.'

(q) Mr. Ford was not asked to sign the TIP at that meeting, so another meeting was convened on Friday the 30th so he could sign. There was no UFT representation at the meeting and Mr. Ford was asked to sign without having input into the TIP. Mr. Ford signed one copy with words to the effect that it was not a collaborative document; Mr. Decker refused to accept it, so as an alternate Mr. Ford wrote "Rec'v'd" and signed his name.

(r) Shortly afterwards, Mr. Ford received an email from Mr. Decker saying that he had not complied with the TIP by not putting in lesson plans for the week, but the TIP actually said Mr. Ford should *bring lesson plans to the meeting;* as there was no meeting that week because of school holidays, Mr. Ford did not bring them. Nonetheless, Mr. Ford sent in the Lesson Plans forthwith and also asked for a

---

54  NYC DOE, *Advance Guide for Educators*, 2016-2017, January 23, 2017, pp 8-9.
55  Initial Planning Conferences involve a choice of observation options are memorialized in a signed document. This happened in neither 2015-16 nor 2016-17; Mr. Ford was not given and did not sign such a documents, nor did the DOE produce the Initial Planning Conference documents.
56  There was no discussion of the TIP at that meeting. The Document "Coaching with Brian," presented by the DOE in the 3020-a hearings, had three bullet points for September 26, 2016: "Copy of Rating Presented," "TIP Presented" and "Lesson Plan Reviewed." There are no additional sub-bullet points under the first two items; there are 18 sub-bullet points under "Lesson Plan Reviewed."

separate TIP meeting and to have UFT Representation at the meeting. Although Mr. Decker later would testify that he told Mr. Ford he was permitted to have UFT representation at his October 7, 2016 TIP meeting, but "the union rep didn't show up," (Tr 251) an email exchange between Ford and Decker on 6 October shows that Ford asked for UFT rep and Decker denied the request, "chapter chair does not get to sit in on TIP … Sam". (SR 84)

(s) This is one of numerous instances in which Mr. Decker's testimony or the documents he produced were false.

(t) Proceeding to the end of 2016-17, Mr. Ford appealed his 2015-16 rating and went to a hearing on or about May 26, 2017, the same date as Mr. Decker signed the Determination of Probable Cause needed to initiate the 3020-a proceedings. The denial of the Appeal of his first year ineffective rating ignored evidence.

131.     All in all this shows that alleging retaliation is more than plausible.

<u>V. FURTHER BACKGROUND</u>

132.     Mr. Ford began as a teacher with the NYC BOE in 1995 and taught in the system until 2018. During that time Mr. Ford was a highly respected teacher who had entered the teaching service with two advanced Degrees from Columbia University, a Masters in International Affairs (1989) and a Masters of Philosophy in Political Science (1995); the later degree recognized that he had completed all requirements for a PhD with the exception of the dissertation. Mr. Ford had previously taught middle school in Kanye, Botswana as a Peace Corps volunteer and at both Columbia, as a Teaching Assistant, and at the University of Pennsylvania, as an adjunct lecturer.

133.     Mr. Ford received the highest rating possible in 1995-96, -97, -98, -99, 2000, at which point he moved to Cambodia (with the future mother of his child, who had been awarded a US

State Department Teaching Fellowship) and taught at the Royal University of Phnom Penh. After returning to New York, he joined the faculty of Walton High School in the Bronx, again receiving the highest rating possible in 2002-03, -04 and -05. He also earned tenure during this time.  Upon notification that Walton would be closing, he moved to Bronx Guild High School and again received the highest rating possible in 2005-06 under founding Principal Michael Soguero; he also earned the highest rating possible in 2006-07,  2007-08 and 2009-10 and an Effective Rating in 2013-14 under Principal Decker.  Only once in the 13 years I was taught and rated prior to the 2015-16 year did he receive a less than Satisfactory rating; that was 2008-09, a year during which he not only was in an auto accident that required extensive medical attention, but also initiated complaints regarding both uncompensated overtime and unallowable Special Education practices at Bronx Guild High School.[57]

134.     Shortly after returning from his half-year Sabbatical in the Fall of 2015,[58] he was subject to a set of observations and Evaluation Reports ("ERs") that resulted in a negative Annual rating despite the school's administration not following either a) proper protocols as set out in the the Collective Bargaining Agreement ("CBA") and the UFT-NYC DOE Advance Guide to Evaluation or b) mandates for Special Education that called for there being a co-teacher in the classroom.  Among the protocol deficiencies were: an inadequate number of classroom observations (4 instead of 6), the absence of a Initial Planning Conference, an absence of feedback, Evaluation reports that were delivered long after the observation, a lack of coaching, Evaluation Reports that did not have sufficient factual content but were composed mainly of cut

---

57 A fuller account is given elsewhere.  I was on leave for three years (2010-11,-12,13) to accompany my wife and family after she accepting a position as a Foreign Service Officer with the US Department of State.  I should note there were two times I was not rated, Spring 2002, because I was not considered a full-time teacher, and 2014-15, since I was on sabbatical leave in the Spring.
58 This corrects a error that the Pre-Motion Letter mentioned in footnote 1.  However, the letter is incorrect that "Plaintiff intends to allege he began received negative ratings in fall 2015," the correct date is spring 2016 as Mr. Ford did not receive any Evaluation Report, whether positive or negative, until March, 2016, the seventh month of the year.

and paste snippets from the overarching rubric (the Danielson Rubric ("Danielson")) and Evaluation Reports that were tampered with before being entered into the Advance data system for use in calculating Mr. Ford's annual rating.

135.    As regards Special Education mandates, an Individual Education Program (IEP), "demonstrate[s] the educational setting that a student is legally required to be placed in for certain classes." (Tr 35)[59]  The IEPs of many of his students called for Integrated Co-Teaching (ICT) in all four core subject areas (English, Math, Social Studies, Science), but the administration did not assign a Special Education co-teacher for Mr. Ford's classes in the Fall of 2015.  He taught them by myself and was observed and evaluated under those conditions..  In addition, some of the class rosters contained over 40% IEP students, which is another violation under which Mr. Ford  was observed and evaluated.

136.      Mr. Ford taught under trying conditions that year and was treated differently then other teachers.  The trying conditions included a break down of discipline, especially after our AP Stephanie Downing (nee Eliot), who was responsible for the Restorative Justice program went on maternity leave near Thanksgiving. According to Mr. Decker's testimony at the 3020-a hearings, at one point, in February of 2017, Mr. Ford requested specific strategies for dealing with specific students in his classes, the response to that was that he should look at the "Danielson Framework as a lens." (TR 583)  The school had just had a riot in January 2017, and Mr. Ford had made these requests before, but here he is directed to a Framework which does not in any way address the problem of individual students, many of whom have to deal with immense family, economic and/or security issues.  Moreover, it was Framework in which he

---

59  All 'TR' references are to the compiled Transcript in the Matter of  NEW YORK CITY DEPARTMENT OF EDUCATION v. BRIAN FORD Section 3020-a Education Law Proceeding, File #31,318.  'SR' references are to the Supplemental Record included in the New York Appellate Division.  Both were compiled by and should be available to DOE counsel.

was never trained and which the DOE was changing from year to year.

137.     In addition, there were other school-wide problems, the result being that Bronx Guild was put on the NYSED Priority list for a declining graduation rate, low Math scores and a 3% college readiness rate. This, of course, affected all teachers and the conditions under which they were observed and evaluated, but in addition Mr. Ford was singled out.   We have already mentioned that he was not given a co-teacher. In addition, he was the only core subject area teacher in the school that did not have a dedicated classroom, something which is actually a major obstacle to creating an atmosphere of trust and order for one's students.  Furthermore, at least two students have related to Mr. Ford that they heard Mr. Decker say he wanted to have me fired, or words to that effect, thus undermining his authority with the students.

138.     This was all at a time that a significantly revised version of a new evaluation system was introduced.   The Danielson Rubric was first introduced in 2013 and set out 22 domains of teaching on which teachers would be assessed.   In 2015, a new, 'more focused' version of the rubric was introduced, looking at only 8 domains mainly having to do with instruction.  I was never trained in these rubrics.   While the administration was trained in them, their actual evaluation processes indicates that they did not observe all the lessons.    Still, the DOE introduced significant changes in the evaluation system without insuring that teachers at Bronx Guild were properly trained.  In addition, for reason that will become clear below, we want to point out that 2015 was also the year that the 3020-a switched from a 3 man panel to a single hearing officer.

139.     Jumping ahead a bit on the chronology, in addition, this rating was appealed, with Gary Wittenberg as Presiding Officer for the May 26, 2017 hearing and Fact Finder for the Chancellor, and Philip Weinberg as the Chancellor's Designee in writing, signing and sending

the denial letter by US Post in June or July of 2017. The denial letter, however, contradicted the testimony and documents introduced at the hearing, including evidence submitted by the DOE. In fact, the letter seems to be little more than a cut and paste of the Position Statement the DOE had introduced prior to the hearing.

140.      Returning to the chronological account, when Mr. Ford returned for the 2016-17 year violations of some of the protocols persisted. Again there was no IPC, moreover, the administration ignored the timeline for introducing a Teacher Improvement Plan (TIP), a plan which can be imposed on a teacher who was rated as ineffective the previous year. The TIP timeline calls for there to be collaboration between the teacher and the principal prior to the deadline for finalization of the TIP, which was on or about September 22, 2016. Instead, without any consultation and after the deadline, Principal Decker presented the TIP to me at our first coaching meeting on September 26, 2016. Only when he refused to sign other than to acknowledge receipt was there any discussion of the items in the TIP and even then Principal Decker was clear that he would not remove any items. Within the 3020-a process, remediation is expected to be offered, but it was not in this case. The TIP was not a method of remediation, instead it became a way of keeping track of failings and to impose pressure while Mr. Ford was simultaneously being asked to develop new competencies, especially in the area of literacy-based pedagogy that are distinct from the project-based pedagogy on which the school was originally founded. Other new competencies also included: much longer and more detailed lesson plans – he was told at times it should read like a screen play --; multiple techniques of differentiation (without the help of a Special Ed co-teacher) among students whose skills varied from the 4th grade to the college level; on the spot assessment techniques; and assorted data collection techniques.

141.     What did not change in 2016-17 was that Mr. Ford was treated differently and in some ways it was worse. He still did not have a dedicated classroom. As regards having a Special Education co-teacher, while he did have one for some classes in Spring 2016, he was not assigned a co-teacher for the entire 2016-17 school year, a year in which he was being asked to improve. Moreover, there were many instances of hostility. Mr. Decker yelled at Mt. Ford for putting his coat down on a book cart after coming back from lunch (he did not have an assigned place to put his coat and personal belongings) and angrily made remarks about Mr. Ford's hygiene and that he 'should check into getting a new laundry' or words close to that; he also barely acknowledged Mr. Ford when passing in the hallway, not saying hello, barely making a grunting noise.

142.     Mr. Ford felt shunned by Mr. Decker, but Ms. Rauner was worse. She was disdainful and contemptuous, including in front of students, and once claimed Mr. Ford had verbally abused a student based on a written anecdotal report that was limited in its circulation to staff members. We add that neither Ms. Downing/Eliot nor Ms. Ghaznowi/Peters acted in this way, but the former was respectful and supportive and the latter was at least respectful.

143.     More troubling are the false statements that accumulated in administration documents, including the Coaching Notes and February 7, 2017 letter to file. These were a harbinger of the 3020-a hearings, in which these documents were entered into evidence and administration testimony, esp that of Mr. Decker, was full of inaccurate statements.

144.     The 3020-a proceedings were held in the fall of October 2017. The charges were not for misconduct, but for ineffective teaching. These charges were based for the greatest part on Mr. Decker's own observations and written evaluation reports of Mr. Ford's teaching. Of 9 sub-specifications in Specification One, six were based on classroom observations conducted by Mr.

Decker.  Overall, since there was no misconduct (Tr p. 4) and Mr. Ford's Measure of Student

Learning (MOSL) was not only Effective, but superior, the *only* evidence that alleged Mr. Ford

was 'ineffective' came his from the Evaluation Reports of the Administrators.[60]  All of this was

at a school that was had itself  been deemed ineffective by the state, being deemed a 'Priority

School' by New York State (Tr 433-4), the lowest ranking outside of the renewal school

system.[61]

145.    Moreover, the principal of the school placed pressure on teachers to pass students,

especially seniors, which would improve one of the main metrics on which the school was

evaluated.  The entire process seems to have been rife with corruption.  We see a principal who

takes or is forced into retirement and sees his school merged into another, who manufactures

grades for students (See OSPRA Complaint re 08x452; SR 115-19) and who does not always

stay as close to the truth as one would hope.  We also see a situation in which the decisions of

administrators often go against the established norms of education, or violate the regulations

governing the schools.  This is clearly the case with the school's Special Education program and

with  the way it short changes student on instructional hours; it may well be the case with its

program for English Language Learners; and it seems to be the case as the school has  gotten

into the habit of awarding credit to students who did not attend or were regularly absent from

the majority of their scheduled classes.  While all the arguments above were not introduced at

the Appeals Hearing, they are relevant in showing an overall pattern of disregard on the part of

DOE officers for following regulations and thus creating an atmosphere of suspicion and

---

60  The Annual Rating is based on two components.   The MOSL is based on student test scores and counts for 40%.  The
     Measure of Teaching Practice (MOTP) is calculated based on evaluation Report ratings.
61  This is from Mr. Decker's testimony, who said the school was ranked as a Priority school because of having not
     met "federal guidelines on students having scores in math." (Tr 434)  Petitioner notes that while this is true so far
     as it goes, it is not the whole truth as Mr. Decker himself presented it to the staff when announcing the Priority
     school status.  He mentioned, in addition, that the college readiness rate was 3% and that the Graduation rate had
     been declining.

mistrust that had to be navigated by a teacher on his own.

146.　　　First and foremost Chancellor's Designee in the Appeal hearing did not consider the evidence presented fairly and even handedly.  Indeed, it appears that in significant aspect the Chancellor's Designee may not have considered the evidence at all.  Rather, the Chancellor's Designee Denial Letter of June 14, 2017 indicated that he accepted as fact the assertions of the DOE in its Position Statement when they were, in important and specific instances, clearly contrary to the facts laid out in the hearing by both sides.  This suggests a predetermination rather than a determination, a predetermination that betrays the imperatives of justice and impartiality, making the hearing into a farce that must be overturned.  Moreover, we bring to the Court's attention that this is just one of many steps in the overall process that led to my termination that are not in accordance with the protocols established by the governing statutes, the regulations of the DOE and/or the agreements entered into by the DOE with the UFT.

147.　　　The Appeals hearing presented an opportunity to correct this flouting of protocols, but it did not.  Mr. Ford's  termination was based in large part on his rating for the 2015-16 school year, which was the subject of the appeal hearing on or about May 26, 2017.   We note the following: the decision ignored documentary evidence and other evidence affecting all three observations on which my rating was based.  First, it dismissed the claim that feedback was not timely by stating that all Evaluation reports were delivered with 45 schools days; as the documents the DOE presented show, the Evaluation report for the November 20, 2015 was not delivered until mid-March 2016, a period of well over 60 school days.  Second, the decision of the hearing officer stated that all observations lasted the minimum required time; this thus ignored the Evaluation Report of 1 April 2016, marked as a Formal Observation, which requires the Evaluator to be present for the entire period, which he was not; he also ignored that the

Observation Report submitted for the Appeal had been manipulated. Third, the decision stated that my supervisors "analyzed the observational evidence under the Danielson Rubric, and issued the rating based on what was observed" was contradicted by independent arbitrator Robert A. Barron, the Hearing Officer in the 3020-a case, who found that the March 7, 2016 observation, conducted by Assistant Principal Rauner, "does not include much evidence to support her ratings, and for some ratings she provided no evidence at all," adding both that "the lack of evidence is a significant deficiency" and that all but two components of the eight in the Evaluation were not being sustained due to the lack of evidence." (Barron Decision, p. 51)

148.     Thus, all three observations on which the annual rating was based should have been dismissed or, at least modified, but Mr. Weinberg's decision does not acknowledge this. Instead the denial letter is in large part seemingly cut and paste from the position statement provided by the DOE prior to the hearing:

1. The position statement and Mr. Weinberg's decision both contain 14 bullet points.

2. Moreover, each bullet point is substantially the same as the DOE position statement and nearly identical in wording, indicating an reprobate indifference to the facts of the case as presented at the hearing.

3. Finally, Mr. Weinberg seemingly accepted false statements and manipulation of evidence by Mr. Ford's administrators without question.

149.     The lack of proper due process continued into the 3020-a hearings. There are supposed to be two artifacts to emerge from classroom observations – Low Inference Notes (LINs) which are taken in the class and an Evaluation Report (ER) that is supposedly drawn directly from the the notes. While the ERs were produced for the hearing, the LINs were not. Mr. Decker later testified in the 3020-a hearings that the documents were shredded and, according to his account,

it was done because he no longer had an office. (TR 471-2) Since he still had an office when he signed the Determination of Probable Cause, he thus shredded the LIN documents after he initiated the proceeding. Whether they contained exculpatory evidence is an open question that cannot be determined because of their destruction. But it is not only that they might have been exculpatory – any assessment of the veracity of the ERs should rightly be made by seeing if they align with the LINs.

## VI. MOTIVATIONS

150.     As stated in the original complaint with the New York Division of Human Rights, Mr. Ford  cannot look into the souls of his NYC Department of Education (DOE) administrators and determine their motives precisely, but the facts lead one to no other conclusion than that something was terribly amiss.  A reasonable person would wonder what motives were behind the school administration's actions.

151.     Motivations other than improving education or fairly evaluating a teacher seem to have been at play.  I cite the closing statement of  DOE Atty, Angel. Cox during the 3020a:

Principal Decker testimony [was] that he did not believe that he was required to allow a union rep at a teacher improvement plan [TIP] meeting because it was not disciplinary in nature. Now whether or not he was correct is not the point here.  . . . Principal Decker testified he believed the Respondent was not entitled to a union rep, but that he agreed to let him have one because it would make him more comfortable.  Now this is in reference to that initial teacher improvement plan meeting, in September of 2016.  Principal Decker testified that he set up another meeting to allow the union rep to come and that he did not show.  Now the Respondent's testimony is that Principal Decker emailed him and told

him that the representative couldn't come. However, although the Respondent introduced other emails between himself and Principal Decker, he did not introduce that email to corroborate that claim. What motive would Principal Decker have to lie about doing something that he wasn't required to do? *And what would be the motivation or reason behind going through the motions of setting up another meeting that was for the purpose of allowing the union representative to come, and then not allowing the union representative to come?* (TR 1747, emphasis added)

152.     Ms. Cox indicates that one must conclude Principal Decker did not lie because there was no email, implying the opposite of Mr. Ford. However, there was a corroborating email of Oct 6, 2016 regarding this additional meeting reads:

> "Brian- The chapter chair does not get to sit in on TIP or coaching meetings. This is not a disciplinary meeting. Sam." (R 85)[62]

153.     So what is the converse of Ms. Cox's conclusion? "What would be the motivation or reason behind going through the motions of setting up another meeting that was for the purpose of allowing the union representative to come, and then not allowing the union representative to come?"

154.     Similarly, what would the motivation for repeated false testimony?

◆   Why would Mr. Decker falsely state the curriculum for the Fall 2015 class 'Participation in American Government' was offered to Mr. Ford during the summer of 2015 (Tr 466), despite Mr. Decker's having emailed the Mr. Ford that the curriculum would not be ready until after Labor Day?

---

62  The notation 'R' refers to the record compiled by the DOE in their Appeal of the Supreme Court Article 75 petition, Index Number 100062. A copy of his email was provided to my NYSUT counsel on 3 October 2017; I had thought she introduced it, but she seems not to have done so. I sent it to her because it directly contradicted Mr. Decker's testimony, adding, he "is just making things up while on the stand. Whatever is convenient."

◆ Why would Mr. Decker falsely state Mr. Ford gave students a reading from a 'college level' text book by Howard Zinn; (Tr 413; transcript reads 'Zen"), despite the fact that the reading, included with lesson plans submitted to Mr. Decker, was from Zinn's 'Young People's History of the US,' a middle school level book, something Mr. Decker seems to be aware of from his testimony, " Howard Zen [sic] is a very popular history writer that lots of teachers reference and use." (Tr 368)

◆ Why would Mr. Decker falsely state he and Mr. Ford wrote the the Teacher Improvement Plan (TIP) together and that it had been produced collaboratively (Tr 228, 515) despite that, according to the Coaching Notes, it having been presented as a finished product ready for Mr. Ford's signature before it was even mentioned, shown to or discussed with Mr. Ford?

◆ Why would Mr. Decker falsely state that in Fall 2016, Mr. Ford taught only "three class periods," plus Hallway duty with two "periods or to use as he wished." (Tr 248) despite Mr. Ford having 4 teaching assignments and a hallway assignment out of the 6 class periods that term, leaving his with one prep period

◆ Why would Mr. Decker falsely state "He did not. I asked Robin," when asked, "do you know if Mr. Ford took [fellow teacher Robin Link] up on that offer [of help] in designing lessons?" (Tr 343) Mr. Decker responded without hesitation that Mr. Ford did not. This was despite the fact that when Mr. Link was asked, "did Mr. Ford ever seek your assistance in terms of academic support or help?" he answered "Yes . . .he would show me something he was doing or ask me . . . what I thought of that question." (Tr 1178)

◆ Why would Mr. Decker falsely state that Mr. Ford did not hand in Lesson Plans as directed in the TIP and did not submit them on particular dates memorialized in a letter dated 7 February 17 (Tr 520-23, 559, 608; DOE exhibit 13 in 3020-a case), despite the 7 February

Letter listing dates that do not exist, such as 31 November and 'the week of 7 December' (which was a Wednesday) and dates (21 Nov, 23 Nov, 6 February) that other evidence shows Mr. Ford did hand in lesson plans; this includes, Mr. Decker's own coaching notes for February 3, 2017, which state, "The lesson for Monday, 2/6/17 also focuses on immigration," indicating Mr. Ford had given his coaches a lesson plan for that day.

155.     Mr. Decker gave false testimony on a number of other issues as well.  Add to this the shredding of the LINs.  Then there is a different level of inaccuracy – making general statements that are not supported by events and claiming that things 'happened all the time' when it was either an isolated event or happened not all.  It is a long list and suggests an indifference to the truth, which Mr. Ford has brought to the attention of the DOE on several occasions hoping they would take action. They did not.[63]

156.     Again, what was the motivation for all this?  As regards Mr. Decker, since there seemed to be a sudden change in the middle of November 2015 and Mr. Ford eventually connected it to a visit from the Superintendent that occurred earlier that month; this seemed the most plausible explanation, but there were numerous candidates for that change. (TR 1556)

157.     One candidate would be simply to not acknowledge the conditions under which I was observed and evaluated.

a. Special Education

158.     One condition is non-adherence to Special Education requirements.  According to Mr. Ford's students' IEPs, they should have had ICT classes.  This was true for only two of the 9

---

[63]  I wrote one letter to then Chancellor Carmen Farina dated February 21, 2018 and sent to her by email.  A similar letter was delivered by hand to 52 Chambers Street and received by Lizette Roman in late January/early February of 2018.  Similar letters were sent to Chancellor Carranza as well.  All asked actions the DOE would take to determine if there was either misfeasance or malfeasance, but the only response I received was an short email on January 22, 2019 from Karen Solimando, the Director of the Office of Labor Relations saying "The Department has reviewed the appeal of the 2015-2016 Ineffective rating and will not be revising its decision to uphold the rating." Apparently they have no process to (or lack the political will to) raise complaints about DOE officers who might not have performed their duty properly.

times he was evaluated; 7 of the 9 observations resulting in an ER were of lessons for which there should have been a Special Education co-teacher in the room.  Moreover, 4 of the 9 observations resulting in an ER were of classes with rosters of over 40% Special Education Students.

159.     After 2008, Mr. Ford did not file complaints about the Special Education practices, both over the years and in the specific years where he was charged with being ineffective.  This goes back to the 2008-09 school year, during which he wrote Mr. Decker on the issue and raised it with my union, the United Federation of Teachers ("UFT"); the union eventually filed a complaint in the Spring of 2009, prompting a DOE investigation and an eventual reprimand of Mr. Decker. There were consequences.  Bronx Guild had to devote additional resources to Special Ed in 2009-10 and afterwards.  Also, Mr. Ford believes another consequence was that, for the first and only time in his career, he received an Unsatisfactory rating.

160.     In addition, in his  2012 book, published while he was on leave, he spoke at length about Special Education practices, including, after removing identifying markers, quoting the letter Mr. Decker had written me in response to my original query.[64]  Also, while he doesn't know that anyone read it, it was known at the school that he had written a book.  Moreover, much of the content, including critiques of the NYC DOE, were included in the Sabbatical materials as submitted to the DOE; those first round of materials, in the application state, were sent to Ms. Staple as well as Mr. Decker, so she would have had an opportunity to read them and, one believes, an obligation to review.   Finally, he did bring up Special Education issues in brought in 2015-16, but did not make a complaint as he felt he had suffered for doing the same thing in 2008-09 and feared retaliation.

---

64  Brian Ford, *Respect for Teachers: The Rhetoric Gap and How Research on Schools has Laid the Ground for New Business Models in Education*. (Lanham, MD: Rowman and Littlefield, 2012.)

161.     Thus, in asserting the DOE retaliated against Mr. Ford  for complaining about Special

Education Practices at Bronx Guild, he has met the four conditions established under the

Americans with Disabilities Act of 1990 (ADA) or the Rehabilitation Act of 1973 (RA) to

assert a retaliation claim.  The facts that Mr. Ford presenting plausibly propose:

1.  First, that Mr. Ford was engaged in a protected activity, pointing to problems at his school

    in professional discourse and exercising his First Amendment rights to contribute to the

    critical discourse on education reform.

2.  Second, Mr. Decker knew of all, or nearly all these these activities; he knew of my letter to

    him, he heard my comments, he knew there was a complaint filed with the UFT, he suffered

    a reprimand, he needed to redesign the school budget and none of these things was he likely

    to forget,.  Also, he was aware Mr. Ford had written a book and that he recounted the

    Special Ed complaint in a separate book draft that was part of Mr. Ford's Sabbatical

    project.[65]  Mr. Decker was the person to whom Mr. Ford first communicated with about my

    Sabbatical project, submitting the application to him en route to Ms. Staple.  Similarly, Ms.

    Staple, who became District Superintendent in 2011, should likely have known of the

    complaint against Bronx Guild in reviewing the school's history as part of her duties.  Also,

    while we don't know if she knew about the book, Ms. Staple had access to and was charged

    with reviewing the Sabbatical materials.   Finally, regarding the DOE officers, while it is

    plausible that other DOE officers mentioned may have seen the book or heard about my

    views, perhaps from other DOE officers; if not proven, it is at least possible and it is

    plausible that if the FOIA requests had been honored that we would know.

3.  Third, it is not in dispute that an adverse course of action was taken against Mr. Ford, one

---

65 Brian Ford, *Market Emulation and Education Reform:  Four Essays on Paradigm Change and the Hegemonies of Social Learning,* Book Draft of 532 pages, submitted to complete Sabbatical Projcct, August 2015, pp 154-5.

resulting in his removal from the classroom.

4. Fourth, a causal connection exists between the protected activity and adverse action. Actually, there are potentially two causal connections: one from the original events in 2008-2010, the other from the 2015-17. The first would be a fairly long causal chain, but a long rope can still pull a boat and Mr. Decker has a long memory that could well result in retaliatory animus. This is especially the case if prompted by a conversation with his District Superintendent, so the second would be much shorter, from November 2015, when Mr. Decker's attitude towards Mr. Ford changed suddenly and his actions included no longer holding coaching sessions; to Mr. Ford's negative 2015-16 rating based on too few observations, all ERs being given to me after March 7th, 2015, giving little time to improve the teacher's performance before the end of the year; to his signing the Determination of Probable cause to initiate the 3020-a on May 26, 2017; to his shredding the LINs; to his giving multiple examples of false testimony at the 3020a hearings. And these two chains could possibly wrap around one another like two strands of DNA, making them all the stronger.

5. The extent of the involvement of other DOE officers is not fully known, but it is reasonable to ask questions as regards the roles of Ms. Staple, who visited Mr. Ford's classroom in early November 2015, and of Mr. Wittenberg and Mr. Weinberg, who in the Appeal Hearing and Post-Hearing Process had what seems to have amounted to due-process problems regarding the denial letter. It is worth noting that the hearing happened on the same day, May 26, 2017, Mr. Decker signed the Determination of Probable for the 3020-a process.[66] For the DOE to start the 3020-a process suggests that they were not worried the Appeal would go in Mr. Ford's favor; if it had gone in his favor, the DOE would have had to

---

66 That the Determination of Probable Cause was signed by the chief witness in the case is deeply troubling. The Determination also had significant defects, including listing the *District* as "Bronx Guild High School."

scrap the case or, at the very least, drastically rewrite it.  We would not bring this up, but

Mr. Ford has never understood why the denial letter contradicts evidence, including

evidence the DOE introduced.

6. We want to also note that in order to see if there was any communication between the

parties mentioned regarding the case, Mr. Ford made a FOIA request for email

communications between the parties.[67]

7. Other conditions under which Mr. Ford was evaluated are listed below.  In addition, the

question of false testimony and other due process, such as evidence manipulation,

mentioned above may be covered under the National Labor Relations Act of 1935 (NLRA).

But even if they are not, there are in violation of the Fifth Amendment's due-process clause

in that they deprived Mr. Ford of his property, specifically the tenure he had earned and

maintained from 1995 to 2015 with first the Board, and then the Department of Education.

b. Feeling Pressure to Pass Seniors

162. Another condition is that Mr. Ford was pressured to pass students even if they were not

meeting minimal requirements, thus creating a situation in which Mr. Ford was putting his

teaching license in jeopardy if he succumbed to the pressure.[68] All the observed classes that

were the basis for ERs were composed of seniors.  His core classes, Economics and

Participation in American Government, were also required for graduation, so a failing grade

from Mr. Ford would mean, at a minimum, having to go to summer school. It would also hurt

the school's graduation rate.  Mr. Ford was regularly told by administration of the importance of

---

67 This has been marked by a lack of transparency.  Mr. Ford's FOIA request (#F16,228) of July 2019 asked for
communications between the two officers referencing Mr. Ford, but the DOE has not fulfilled it.

68 This would likely constitute a violation of the National Labor Relations Act  of 1935 (NLRA) if the DOE were
considered an 'employer' under the act, but even if that is not the case, it certainly raises questions as to the use of
pressure on people who consider the DOE their employer to be complicit with unlawful activity.

letting our students go on with their lives, not detaining them at the secondary school and not risking alienating them to the point they would drop out just short of the finish line. Mr. Ford mostly agreed with these thoughts, but as a classroom teacher Mr. Ford needed to set standards and as a licensed teacher he had obligation to uphold the; instead he felt an opposite pressure to pass students.

163.     Moreover, by the Spring of 2017, this became unreasonable. Mr. Ford was being asked about the progress of some students with very low attendance, as low as 20%. Overall, Mr. Ford had roughly 60 senior students and the majority, 55 or so, were going to receive the necessary credit. Eventually, however, his grades were not used. When Mr. Ford was removed from the classroom (on or about June 9. 2017), he was also cut off from his Skedula account through which he entered his grades. After communication with the Principal, he prepared a spread sheet for the grades; the Principal had said he would enter them 'manually.' But Mr. Ford was never asked to enter them at all, and the principal approved the graduation of students who did not pass his class, along with all those who did pass the class, but which the principal did not know about because he had never gotten the teacher's grades.[69]

c. New Evaluation System and New Pedagogy

164.     Another condition under which Mr. Ford was evaluated was the introduction of a new evaluation system in 2013 and its significant revision in 2015. The new system, based on the Danielson Rubric, originally had 22 domains or components that covered all aspects of teaching, including domains in which Mr. Ford felt he excelled. The DOE Rating System for

_____

69  In January of 2018, Mr. Ford entered a Request for Investigation with the NYS Office of School Personnel Review and Accountability (OSPRA), regarding the principal knowingly graduating students with insufficient credits. This was after a telephone conversation Mr. Ford had with Anne Zugalla in early January and a follow up email directed to OSPRA@nysed.gov on Tue, Jan 9, 2018 at 12:12 PM. Mr. Ford does not know the outcome of their investigation.

2015-16 no longer used the 22 Components of the Full Danielson Rubric.  Instead of summative

Evaluations based on 22 Components, the DOE narrowed its scope and used a more 'focused'

version of the Danielson Rubric by limiting  Summative Evaluation to only 8 Components.[70]  ]

165.     The following table lists all 22 components with the 8  components in the narrower

version in **bold**:

| **1a Demonstrating Knowledge of Content and Pedagogy** | **2a Creating an Environment of Respect and Rapport** |
|---|---|
| 1b Demonstrating Knowledge of Students | 2b Establishing a Culture for Learning |
| 1c Setting Instructional Outcomes | 2c Managing Classroom Procedures |
| 1d Demonstrating Knowledge of Resources | **2d Managing Student Behavior** |
| **1e Designing Coherent Instruction** | 2e Organizing Physical Space |
| 1f Designing Student Assessments | |
| 3a Communicating with Students<br>**3b Using Questioning and Discussion Techniques** | 4a Reflecting on Teaching<br>4b Maintaining Accurate Records |
| **3c Engaging Students in Learning** | 4c Communicating with Families |
| **3d Using Assessment in Instruction** | 4d Participating in the Professional Community |
| 3e Demonstration | **4e Growing and Developing Professionally** |
| g Flexibility and Responsiveness | 4f Showing Professionalism |

166.     We would like to note the following:

**(1)** Mr. Ford was not trained in the Rubric.  While administrators giving Evaluations were given

extensive training by the DOE and other entities in the use of the Rubric (see Transcript from

3020-a case; Tr 64-5, 439-441, 677-682; 832, 854, 895, 901-05, 1271-73, 1715),  teachers at

Bronx Guild did not receive such training (Tr 905, 1091, 1127, 1271-73, 1715).  Christine

Ghaznowi, a witness for the DOE who was first a teacher and was, beginning in 2016, an

Assistant Principal at Bronx Guild, made this clear and found it something the DOE could

---

70 The Danielson Framework for Teaching was Joint Exhibit 4 in the 3020-a proceeding.

improve on, "what I found even personally when I was a teacher I didn't feel like I understood the rubric enough because there's not training around the Danielson for teachers."  (Tr 905)

**(2)** Mr. Ford had been rated Effective under the 22 components in 2013-14.  Mr. Ford  had also been given the highest rating under the previous system in all but one of the roughly 16 years Mr. Ford had taught with the DOE prior to 2013.

**(3)** Some of Mr. Ford's strongest characteristics as a teacher were in those areas that were no longer part of the summative evaluation process.  These include (1b) Demonstrating Knowledge of Students, (1d) Demonstrating Knowledge of Resources, (2b) Establishing a Culture for Learning, (3a) Communicating with Students, (3e) Demonstrating Flexibility and Responsiveness, (4a) Reflecting on Teaching, (4c) Communicating with Families and (4d) Participating in the Professional Community.  Indeed, I had prided himself on these 9 components and much of my practice was build around them.

167.     Thus, the 'newly focused' evaluation rubric, in focusing on 8 domains instead of the 22 of the previous year, excluded many of Mr. Ford's strengths and competencies. Moreover, he had developed a project-based pedagogy after transferring to Bronx Guild in 2005, but was being asked to develop new/additional competencies, including differentiation strategies and literacy-based pedagogies, that according to the administrators own principles, take years to develop.[71]

---

[71]   As a professional educator, Mr. Ford takes issue with the administration claim, one that surfaces in the decision, that 'the same elements . . .  have always constituted effective teaching.'  Mr. Ford was, eventually, in 2016-17, told to adopt new teaching methods, to adopt a 'set of best practices' from a limited part of the pedagogical spectrum that claimed to encapsulate 'the same elements that have always constituted effective teaching.  Mr. Ford attempted to do so in that year, but he was aware that there are respected views on pedagogy other than literacy-based pedagogies and that  literacy-based pedagogies have been highly criticized, including in Natalie Wexler's recent book,  Natalie Wexler, *The Knowledge Gap: The hidden cause of America's broken education system — and how to fix it,* 2019.  This is a new book, but it is an argument that goes back at least to E.D. Hirsch's *Cultural Literacy.*(circa 1990)

   Another pedagogical approach, one on which the school was founded, centered on projects. Bronx Guild was a member of a consortium of such schools and paid an annual fee for pedagogical support.  (For a mission statement, see the Big Picture Learning web-site at https://www.bigpicture.org)  The literacy-based pedagogies were a new approach for the school, something of which Mr. Ford was well aware. In 2008, according to some of my own notes, Mr. Decker complained that Mr. Ford was not giving 'enough individualized [attention in order to] complete project[s]" and was told to focus on project based work and backward planning.  In 2016-17, Mr.

d. Speaking in Front of Students, Hostility of Administration

168.    Mr. Ford wrote above that he "felt shunned by Mr. Decker, but Ms. Rauner was worse," but

Mr. Decker was hostile. According to two students, Mr. Decker was heard by students to say he

wanted to get rid of Mr. Ford.  Mr. Ford first overheard  this when the students were speaking

among themselves during the 2015-16 school year and confirmed it in conversations with two

students in the Fall of 2017.

169.    Moreover, Ms. Rauner many times was blunt to the point of insult.  In one instance, Spring

of 2017, Mr. Ford was escorting a student through the halls when he was approached by Ms.

Rauner and they began to converse; worried that the student would get in trouble for not having

a pass, Mr. Ford began to explain that he was not breaking the rules because Mr. Ford was

escorting him.  Her response to me was, "I am not talking to you."

170.    It should be noted that Mr. Ford did put in claim of harassment with the UFT, but they did

not forward it on to the DOE, telling him there was a limit (13%) on how many such claims

could be submitted.  This seems to be an inadequate institutional framework for addressing

these concerns about what amount to bullying, especially as Mr. Ford was not trained in the

Rubric.  Moreover f the motivation was based on his being part of a protected class, that would

violate The Age Discrimination in Employment Act of 1967 (ADEA).


e. Violations of Due Process, the CBA and the Advance System

171.    We have referred to several instances of not following protocols and indicated that the

destruction of evidence, false testimony and tampering with evidence should be thought of as

_____

Decker no longer feel individual attention was sufficient.

constituting violations of due-process rights and the strong public policy in favor of maintaining them.

172.     Their actions, whether engaged in as individuals or in coordination, raise the question as to whether the rating process, the process of appeal ratings and the standard of review at the hearing followed by the DOE so deviated from the guidelines as to deprive Mr. Ford of substantial rights.  The so-called 'facts' were found, charged, and testified to by the same people, all employees of the DOE who have interests in seeing the rating system as it was redesigned and implemented beginning in 2015/16 to be found authoritative, persuasive and compelling when it was, in reality, new, untested and only one of many valid approaches to teaching and was moreover implemented by inexperienced practitioners who were, as the decision and other documents make clear, as likely as not to make errors.  Mr. Ford was thus deprived, as a teacher who had 15 years of experience and only a single unsatisfactory rating – and that for a year during which he also had the combination of audacity, temerity and naivete to file a report on his school's non-compliance with Special Education requirements - , of the opportunity to be observed under proper conditions and, if found lacking, then improve his performance.

173.     The actions at the school level, and perhaps the superintendent level, which led to the negative ratings on which the 3020-a hearings were predicated, also ignored the procedures mandated by the Collective Bargaining Agreement and the Advance Guide to Evaluation in order to validate false allegations which were not true and more importantly which were not proven at the hearing, but instead found credible accounts based on false testimony, manipulation and destruction of evidence, blatant disregard of procedures designed to ensure the fairness and integrity of the rating system.

174.     Indeed, if there were sufficient evidence to demonstrate that they engaged in a corrupt

enterprise, at least the civil provisions of the Racketeering Influenced and Corrupt

Organizations (RICO) act of 1970 could be applicable.  While most of the enumerated crimes

under RICO are things such as 'white slavery' (not applicable) and 'fraud' (the court will apply

strict scrutiny), but there are others:  section 1341 (relating to mail fraud), section 1343 (relating

to wire fraud), section 1503 (relating to obstruction of justice), and section 1512 (relating to

tampering with a witness, victim, or an informant.

f. The DOE systematically failed to protect my due process rights, thus constituting Age Discrimination

175.    The institutional history of the DOE is relevant as that is the organization under which

Bronx Guild operated, which trained Mr. Decker and whose more senior officers were the

superiors of my immediate supervisors.  My immediate supervisors, as well as intermediate

supervisors were part of an organization that had been reshaped once Mayoral control was

established in 2002 in such a way as to ignore that the quality of classroom teaching is largely

dependent on supports students receive from the school.

176.    Mr. Ford had a conversation with a District Superintendent when he was still at Walton

High School.  He told Mr. Ford when he was getting his administrative degree the emphasis

was on enabling teachers, but now it was on assessing them.[72]

---

72  Examples of enabling and empowering approaches were numerous, such as Henry M. Levin, "Building School
Capacity for Effective Teacher Empowerment:  Applications to Elementary Schools with At Risk Students,"
CPRE Research Report Series R1-019, Rutgers, September 1991. I have not been able to locate the page, but we
believe this anecdote is in Mr. Ford's *Respect for Teachers: The Rhetoric Gap and How Research on Schools has
Laid the Ground for New Business Models in Education*. (Rowman and Littlefield, 2012.)   Mr. Ford was,
however, able to find a passage about an administrator who "truly wanted to enable his teachers," who I compared
to "many newer administrators in the early years of the Bloomberg/Klein reforms [who] seemed to forget as they
pushed for 'bell to bell instruction' and, in the opinion of many of my colleagues, engaged in a series of exercises
in nit picking and fault finding.  Indeed, Mr. Herron [not his real name] in some ways could be the hero of this
book.  As recounted below, instead of fulfilling an imposed quota of 'unsatisfactory' teacher ratings, he placed
himself between the mechanisms of assessment  and the desire of administrators to cull the ranks.  He, along with
at least one other Assistant Principal, refused to give unsatisfactory rankings  he felt were unjustified and was, in
turn, himself given an unsatisfactory ranking.  This was, at first, only a rumor, but it was a rumor that was
confirmed to me by more than one party to the proceedings."

177.    We see this paradigm shift with the measurement of achievement dominating the discourse:

I know that at the end of the day there's only one metric that counts. That is, did we

move student achievement? And when I say move, not incrementally move, but did we

substantially improve over a period of time, student achievement.[73]

178.    This single metric has weight as the common currency of educational discourse and the

direction of institutional change. Increases in test scores is a *sine qua non* for education reform

in the current political climate. It thus pushes asides many other functions of the schooling

system: providing for socialization and public health, instilling democratic values, aiding a

child's emotional and social as well as cognitive development and somehow creating a better

society. Thus, by articulating the problem in a such a narrow fashion it predetermines a narrow

set of solutions and a narrow set of policy options.

179.    The change was particularly apparent in the early 2000s, with No Child Left Behind and, in

New York (as well as other cities), mayoral control. While it is not a legal argument *per se*, it is

noted that attacks on tenure have roots that came not from the legislature, but from the

Administration of Mayor Bloomberg and Chancellor Klein.[74]

180.    Mr. Ford wrote on this extensively and now seems to have swept up in a political

movement in which research on education was weaponized to attack teacher rights, including

tenure, seniority and the contractual promise of a dignified retirement.

181.    Much of this is, even if unwise, legally allowable, but not if it is retaliatory, not if punishes

---

73 Interview with Robert E Knowling, Jr., CEO of the Leadership Academy, 5 Nov. 2003, conducted by Rafael Pi
   Roman, "A Year of Change: Leadership in the Principal's Office," *New York Voices*, Channel 13, New York,
   January 2004.
74 Chancellor Klein identified "the three pillars of civil service: lock-step pay, seniority and life tenure" as obstacles
   to "excellence in our system."Remarks by Joel Klein, Business Breakfast Forum: Crain's New York Business/
   Partnership for New York City, Jan 27, 2004; http://www.parentadvocates.org/nicecontent/dsp_printable.cfm?
   articleID=1803.

protected speech, ignores strong public policy on tenure and academic freedom or involves ignoring due-process protections for the teacher involved. Under such a framework, if a teacher were retaliated against for insisting on taking a Sabbatical or for the views expressed in his Sabbatical work, that might be considered respectively as violations of Fifth and First Amendments. It should also constitute a violation of The Age Discrimination in Employment Act of 1967 (ADEA) since in order to get to the stage of applying for a sabbatical, one has to be older; it is unlikely that someone under 40 could apply for sabbatical leave. In other words, taking a sabbatical in order to develop views on one's profession could be considered a protected activity.

182.    Moreover a systematic undermining of due-process rights in order to remove the obstacle of "the three pillars of civil service" would potentially constitute an unlawful employment practice and be an exception to Court giving preclusive effect to the Hearing Officer's determination; a jury could determine questions of motive by DOE officers not explicitly decided in a 3020-a proceeding and the Hearing Officer's decision would not have preclusive effect. (see Matusick v Erie County Water Auth., 757 F.3d 31, 49 (2d Cir. 2014); cited in McMahon Order to Amend, p 6)

183.    Similarly, if a systematic undermining of due-process rights was found to indicate "bad faith, harassment or irreparable injury that is both serious and immediate" would allow the Federal Court to intervene in the ongoing 3020-a proceedings and their subsequent related actions in NYS Supreme Court. This would require that facts would need to be alleged that would warrant application of this exception. (For a discussion, see McMahon Order to Amend, November 6, 2019. p 7)

184.    Here we first ask whether the DOE's not ensuring DOE officers adhered to established

protocols of the CBA and the Advance system prior to embarking on the 3020-a process would warrant application of this exception.  Second, we ask that Court consider whether the intentional destruction of evidence (the LINs), the false testimony and the tampering with evidence do warrant application of this exception, especially when coupled with the DOE's refusal to take any action to sanction such actions. Third, we ask this Court to consider whether the actions of Mr. Wittenberg and Mr. Weinberg do the same.  Fourth, we ask the Court to consider the history and the motivations of the DOE in this matter. While the DOE may be justified in trying to reduce legacy costs, they cannot be allowed to do so in a manner that ignores due process rights and procedures mandated by the CBA, the Advance System, the NYSED and NYS Education Law.

185.    By not following their own procedures, most of them guaranteed by statute and/or contract, the DOE engaged in unfair labor practices that led to my termination.

# VII. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Retaliation and Other Treatment contrary to The Age Discrimination in

### Employment Act of 1967 (ADEA) and other relevant statutes

186. As plaintiff, I repeat and re-allege paragraphs 1-185 as if fully set forth herein.

187. By the acts and practices described above, including but not limited to delaying my sabbatical's approval and retaliation for taking said sabbatical. These actions included, but are not limited to creating a hostile work environment for plaintiff, evaluating him under improper conditions and ignoring plaintiff's complaints regarding coaching and observation procedures.

188. When this process began, Plaintiff was 57 years of age, had two master's degrees from Columbia University, had taught at the University or Pennsylvania and other universities, had received Effective ratings or ratings of highest rank in 15 of his previous 16 years and had just reached his 15 year increment.

189. Defendant DOE and several DOE officers listed above are liable under the ADEA and other statutes as aiders and abettors actions indicated above.

190. Defendant DOE is also liable as plaintiff's employer.

191. Plaintiff is now suffering and will continue to suffer due to his termination and removal from payroll by the DOE; in addition, plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish, bullying and humiliation as a result of defendant's acts.

192. Defendants acted intentionally and self-interestedly, and acted with malice and/or reckless indifference to plaintiff's statutory rights.

## SECOND CAUSE OF ACTION

### Discrimination Under The Age Discrimination in Employment Act of 1967 (ADEA)

193.    As plaintiff, I repeat and re-allege paragraphs 1-185 as if fully set forth herein, but concentrating on paragraphs 113-183.

194.    By the acts and practices described above, including but not limited to differential treatment and openly disrespectful actions meant to bully and humiliate.   These actions included, but are not limited to creating a hostile work environment for plaintiff, evaluating him under improper conditions and ignoring plaintiff's complaints regarding coaching and observation procedures.

195.    Defendant DOE and several DOE officers listed above are liable under the ADEA as aiders and abettors to actions indicated above.

196.    Defendant DOE is also liable as plaintiff's employer pursuant to the ADEA.

197.    Plaintiff is now suffering and will continue to suffer due to his termination and removal from payroll by the DOE; in addition, plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish, bullying and humiliation as a result of defendant's discriminatory acts.

198.    Defendants acted intentionally and self-interestedly, and acted with malice and/or reckless indifference to plaintiff's statutory rights.

-

## THIRD CAUSE OF ACTION

A Patten of Due Process Violations at the School level, District Level, DOE level and during the

Administrative Hearings held under the auspices of the NYSED, which effectively constitutes

Age Discimination under ADEA and also constiues Treatment contrary to the Fifth and Fourteenth

Amendments and 42 U.S.C. § 1983

199. As plaintiff, I repeat and re-allege paragraphs 1-185 as if fully set forth herein, with special attention to paragraphs 158-183.

200. By the acts and practices described above, including but not limited to giving false testimony under oath, intentional destruction of evidence, tampering with evidence, submitting evidence that is false and inaccurate, ignoring CBA and Advance protocols in order to negatively evaluate the plaintiff, a compromised appeal process, using the DOE evaluation process as an instrument of animus, using the 3020-a hearings as an instrument of character assassination. These actions included, but are not limited to creating a hostile work environment for plaintiff, evaluating him under improper conditions, ignoring plaintiff's complaints regarding coaching and observation procedures and the actions listed above.

201. Defendant DOE and several DOE officers listed above are liable as aiders and abettors to actions indicated above.

202. Defendant DOE is also liable as plaintiff's employer.

203. Plaintiff is now suffering and will continue to suffer due to his termination and removal from payroll by the DOE; in addition, plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish, bullying and humiliation as a result of defendant's unlawful acts.

204. Defendants acted intentionally and self-interestedly, and acted with malice and/or reckless

indifference to plaintiff's statutory rights.


## FOURTH CAUSE OF ACTION

The DOE. systematically failed to protect and violated Mr. Ford's due process rights,

thus depriving Mr. Ford of property without proper due process under

the Fifth and Fourteenth Amendments of the US Constitution and 42 U.S.C. § 1983

205.    As plaintiff, I repeat and re-allege paragraphs 1-185 as if fully set forth herein,

concentrating on paragraphs 7-10, 101 and 161 -175.

206.    By the acts and practices, as well as the omissions described above, including but not

limited to them, this amounted to a failure to protect plaintiff's due-process rights.    These

actions included, but are not limited to: limiting opportunities for complaints about harassment;

creating a hostile work environment for plaintiff; evaluating plaintiff under improper

conditions; ignoring plaintiff's complaints regarding coaching and observation procedures; a

compromised appeal process and administrative hearings in which false testimony was

common; evidence was not produced and was manipulated in other ways; the DOE Counsel

made inflammatory statements in her summation; the plaintiff's NYSUT provided inadequate

representation in several particulars; the Hearing Officer showed skewed judgments and bias;

and the DOE failed to properly implement the Hearing Officer's Opinion and Award in a timely

fashion.

207.    Defendant DOE and several DOE officer listed above are liable under the Fifth Amendment

to the United States Constitution.

208.    In addition, the Defendant DOE, in conjunction with the NYSED, changed the rating

system regularly (2013, 2015, 2016), without ensuring that teachers were adequately trained, or

trained at all for that matter. The implementation of this new system gave no one involved as a teacher being observed a chance to define or give an objective, unbiased view of what actually happened in the class or to determine if it met a reasonable standard of 'effectiveness' for a teacher given the multiple failings of the DOE and the school and the condition under which the plaintiff was evaluated.

209. Defendant DOE is a government agency and is liable as plaintiff's employer pursuant to the Fifth Amendment.

210. Plaintiff is now suffering and will continue to suffer due to his termination and removal from payroll by the DOE; in addition, plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish, bullying and humiliation as a result of defendant's acts.

211. Defendants acted intentionally and self-interestedly, and acted with malice and/or reckless indifference to plaintiff's Constitutional rights. Defendant DOE and several DOE officers listed above are liable under the Fifth Amendment to the United States Constitution.


FIFTH CAUSE OF ACTION

The DOE systematically failed to protect Plaintiff's due process rights, thus constituting

Age Discrimination under The Age Discrimination in Employment Act of 1967 (ADEA) and violating

other relevant statutes, including, if deemed applicable,

the Racketeering Influenced and Corrupt Organizations (RICO) act of 1970

212. As plaintiff, I repeat and re-allege paragraphs 1-185. (References to RICO and its civil provision are found in paragraph 174.)

213. By the acts and practices, as well as the omissions described above, including but not

limited to a failure to protect plaintiff's due-process rights.    These actions included, but are not limited to: limiting opportunities for complaints about harassment; creating a hostile work environment for plaintiff; evaluating plaintiff under improper conditions; ignoring plaintiff's complaints regarding coaching and observation procedures; a compromised appeal process and administrative hearings in which false testimony was common; evidence was not produced and was manipulated in other ways; the DOE Counsel made inflammatory statements in her summation; the plaintiff's NYSUT provided inadequate representation in several particulars; the Hearing Officer showed skewed judgments and bias; and the DOE failed to properly implement the Hearing Officer's Opinion and Award in a timely fashion.

214.    Defendant DOE and several DOE officers listed above are liable under the ADEA, NLRA and other statutes as aiders and abettors actions indicated above.

215.    In addition, the Defendant DOE, in conjunction with the NYSED, changed the rating system regularly (2013, 2015, 2016), without ensuring that teachers were adequately trained, or trained at all for that matter.  The implementation of this new system gave no one involved as a teacher being observed a chance to define or give an objective, unbiased view of what actually happened in the class or to determine if it met a reasonable standard of 'effectiveness' for a teacher given the multiple failings of the DOE and the school and the condition under which the plaintiff was evaluated.

216.    Defendant DOE is also liable as plaintiff's employer pursuant to the ADEA, NLRA and other statutes.

217.     Plaintiff is now suffering and will continue to suffer due to his termination and removal from payroll by the DOE; in addition, plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish, bullying and

humiliation as a result of defendant's acts.

218.    Defendants acted intentionally and self-interestedly, and acted with malice and/or reckless indifference to plaintiff's statutory rights.

## SIXTH CAUSE OF ACTION

The New York State Education Department (NYSED) failed to provide Arbitration procedures that adequately protected Mr. Ford's due process rights and the New York State Court system limited review of these precedings, thus depriving Plantiff of property without adequate due process protections as requied by the Fifth Amendment and pursuant to the Fifth and Fourteenth Amendmen of the United States Constitution and 42 U.S.C. § 1983

219.    As plaintiff, I repeat and re-allege paragraphs 1-185 as if fully set forth herein, concentrating on paragraphs 6-9, 13-21, 112-130 and 150-158.

220.    By the acts and practices, as well as the omissions described above, including but not limited to them, this amounted to a failure to protect plaintiff's due-process rights.   These actions included, but are not limited to: allowing hearsay evidence, not safeguarding against or sanctioning false testimony and destruction of evidence.

221.    Further, the 3020-a disciplinary hearings, a form of mandatory arbitration conducted under the auspices of the New York State Education Department (NYSED), served as an insufficient safeguard against violations of due process, by allowing for hearsay evidence, allowing false testimony and not sanctioning false testimony.  Further, New York state case law, in not permitting adequate review of Arbitrator's credibility judgment and not taking into consideration the effects of false testimony and admitted destruction of evidence on the process also provided an insufficient safeguard against violations of due process.

## SEVENTH CAUSE OF ACTION

Stigma Plus Cause of Action based on defamatory actions which deprived Plaintiff of reputation and property without adequate due process protections as requied by the Fifth Amendment and pursuant to the Fifth and Fourteenth Amendmen of the United States Constitution and 42 U.S.C. § 1983

222.   As plaintiff, I repeat and re-allege paragraphs 1-185 as if fully set forth herein, but concentrating on paragraph 7.

223.   By the acts and practices, as well as the omissions described above, including but not limited to them, this amounted to imposing a stigma on the plaintiff that would interfere with his ability to procure employment, infringe on this liberty, harm his reputation and result in a loss of property.

224.   These actions included, but are not limited to: false testimony and destruction of evidence, filing a verbal abuse claim in October of 2017, allowing conversations to overheard by students saying administration wanted to get rid of Plaintiff, falsely claiming that Plaintiff did not perform duties, showing anger and disdain in public actions, and entering a code on Plaintiff's record to indicate that he had been terminated.

225.   On information and belief, these statements have been disseminated within and beyond the DOE, as a result of which Plaintiff's employment prospects have been destroyed.  Defendant DOE and several DOE officers listed above are liable as aiders and abettors actions indicated above.

226.   Defendant DOE is also liable as plaintiff's employer pursuant to the ADA and RA. Plaintiff is now suffering and will continue to suffer due to his termination and removal from payroll by the DOE; in addition, plaintiff is now suffering and will continue to suffer irreparable injury and

monetary damages and damages for mental anguish, bullying and humiliation as a result of

defendant's failure to ensure lawful Special Education settings and curtail or respond to

defendant's retaliatory acts.

227.     Defendants acted intentionally and self-interestedly, and acted with malice and/or reckless

indifference to plaintiff's statutory rights.

## EIGHTH CAUSE OF ACTION

Retaliation for Special Education Advocacy Under the Americans with Disabilities Act of 1990 (ADA)

and/or the Rehabilitation Act of 1973 (RA)

228.     As plaintiff, I repeat and re-allege paragraphs 1-185 as if fully set forth herein, but

concentrating on paragraphs 23-7, 52-56, 70, 84, 90-93, 127-137  and 158-169.

229.     By the acts and practices described above, including but not limited to retaliatory actions

for Plaintiff's advocacy for Special Education students.  These retaliatory actions included, but

are not limited to creating a hostile work environment for plaintiff, evaluating him under

improper conditions and ignoring plaintiff's complaints regarding Special Education

requirements, such as that for Integrated Co-Teaching, and observation procedures.

230.     Defendant DOE and several DOE officers listed above are liable under the ADA and RA

as aiders and abettors actions indicated above.

231.     Defendant DOE is also liable as plaintiff's employer pursuant to the ADA and RA. Plaintiff

is now suffering and will continue to suffer due to his termination and removal from payroll by

the DOE; in addition, plaintiff is now suffering and will continue to suffer irreparable injury and

monetary damages and damages for mental anguish, bullying and humiliation as a result of

defendant's failure to ensure lawful Special Education settings and curtail or respond to

defendant's retaliatory acts.

232.    Defendants acted intentionally and self-interestedly, and acted with malice and/or reckless

indifference to student's and plaintiff's statutory rights.


NINTH CAUSE OF ACTION

The DOE's actions occurred after the Plaintiff published a book, engaged in professional conversations

on public policy issues, submitted academic work as part of his Sabbatical project and conducted

research and writing while on Sabbatical and thus constituted or could have  constituted retaliation for

protected speech under the First Amendment and pursuant to the Fourteenth Amendmen of the United

States Constitution and  42 U.S.C. § 1983

233.    As plaintiff, I repeat and re-allege paragraphs 1-185 as if fully set forth herein,

concentrating on paragraphs 2, 11-19, 28-32, 45-47, 118-131 and 181.

234.    By the acts and practices, as well as the omissions described above, including but not

limited to a failure to protect plaintiff's free speech rights.  These actions included, but are not

limited to: limiting opportunities for complaints about harassment; creating a hostile work

environment for plaintiff; evaluating plaintiff under improper conditions; ignoring plaintiff's

complaints regarding coaching and observation procedures; a compromised appeal process and

administrative hearings in which false testimony was common; evidence was not produced and

was manipulated in other ways; the DOE Counsel made inflammatory statements in her

summation; the plaintiff's NYSUT provided inadequate representation in several particulars; the

Hearing Officer showed skewed judgments and bias; and the DOE failed to properly implement

the Hearing Officer's Opinion and Award in a timely fashion.

235.    Defendant DOE and several DOE offers listed above are liable under the Fifth Amendment

to the United States Constitution.

236.    In addition, the Defendant DOE, in conjunction with the NYSED, changed the rating system regularly (2013, 2015, 2016), without ensuring that teachers were adequately trained, or trained at all for that matter.  The implementation of this new system gave no one involved as a teacher being observed a chance to define or give an objective, unbiased view of what actually happened in the class or to determine if it met a reasonable standard of 'effectiveness' for a teacher given the multiple failings of the DOE and the school and the condition under which the plaintiff was evaluated.

237.    Defendant DOE is a government agency and is  liable as plaintiff's employer pursuant to the First Amendment.

238.    Plaintiff is now suffering and will continue to suffer due to his termination and removal from payroll by the DOE; in addition, plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish, bullying and humiliation as a result of defendant's acts.

239.    Defendants acted intentionally and self-interestedly, and acted with malice and/or reckless indifference to plaintiff's Constitutional rights.

240.    Defendant DOE and several DOE officers listed above are liable under the Fifth Amendment to the United States Constitution.


<u>TENTH CAUSE OF ACTION</u>

<u>The DOE's termination of Mr. Ford was improper and contrary to law, establishing a separate cause of</u>

<u>action which at the same time further supports the charges of retaliation</u>

241.    As plaintiff, I repeat and re-allege paragraphs 1-185 as if fully set forth herein, concentrating on paragraphs 101-104.

242.    By the acts and practices, as well as the omissions described above, including but not

limited to a failure to protect plaintiff's due-process rights.  These actions include, but are not

limited to: improper and untimely implementation under NY Educ Law 3020-a (4. b), being 25

days after the award of Arbitrator  Barron, and that Termination and removal from payroll, on

January 29th, was improper for other reasons, including, but not limited to there being no letter

of termination delivered until March 12, 2018.

243.    Defendant DOE and several DOE officers listed above are liable under the CBA and New

York State Law.


RESPECTFUL REQUEST FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter an award:

(a)  declaring that the actions and practices complained of are in violation of  the Americans

with Disabilities Act of 1990 (ADA),  the Rehabilitation Act of 1973 (RA). The Age Discrimination in

Employment Act of 1967 (ADEA), the National Labor Relations Act  of 1935 (NLRA) and other

relevant statutes, including,  if deemed applicable, the Racketeering Influenced and Corrupt

Organizations (RICO) act of 1970;

(b)  enjoining and permanently restraining these violations of  the Americans with Disabilities

Act of 1990 (ADA),  the Rehabilitation Act of 1973 (RA). The Age Discrimination in Employment Act

of 1967 (ADEA), the National Labor Relations Act  of 1935 (NLRA) and other relevant statutes,

including,  if deemed applicable, the Racketeering Influenced and Corrupt Organizations (RICO) act of

1970;

(c)   declaring that the actions and practices complained of are in violation of the Fifth

Amendment of the US Constitution in that it deprived Plaintiff of property while not ensuring sufficient due process safeguards;

(d)   declaring that the actions and practices complained of are in violation of the First Amendment of the US Constitution in that the DOE actions provide compelling circumstantial evidence that there was retaliation for protected speech;

(e) directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(f) directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to the employment and advancement opportunities of all teachers subject to the system;

(g) directing defendants to place plaintiff in the position he would be in if not for defendants' discriminatory and retaliatory treatment of him, and to make him whole for all earnings and other benefits he would have received if not for defendants' discriminatory and retaliatory treatment of him, including, but not limited to wages, wage increases, retroactive pay, pension and other lost benefits;

(h) directing defendants to reinstate plaintiff;

(i) directing defendants to pay plaintiff punitive damages to the extent allowable by law;

(j) directing defendants to pay an additional amount to compensate plaintiff for the emotional distress, including periods of separation from his teen-age daughter (as it is difficult for a father without a job to maintain custody), damage to reputation, damage to health and other pains, to the extent allowable by law;

(k) directing defendants to investigate the actions of, especially, Mr. Decker, but also Mr. Wittenberg and Mr. Weinberg, as well as Ms. Rauner and other DOE officer involved, to determine their culpability for the actions described above and to make those results available to the plaintiff and

the public in a timely fashion, but certainly prior to the expiration of any applicable statute of limitations;

(l) directing defendants to act on the above investigation and, if merited, refer this to the appropriate authorities, including the NYSED, the NYS Office of School Personnel Review and Accountability (OSPRA), relevant District Attorneys and the New York State Attorney General prior to the expiration of any applicable statute of limitations;

(m) awarding plaintiff such interest as allowed by law;

(n) awarding plaintiff reasonable attorney's fees and costs; and

(o) granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby respectfully demands, pursuant to Rule 38(b) of Federal Rules of Civil Procedure, a trial by jury in this action.

## PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a non-frivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal

Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated:  New York, New York
        February 1, 2021

Brian Ford

—————————————————

Brian Ford
  19 West 110th Street, #45
  New York, New York 10027
  (646) 713-8285