**THE STATE OF NEW YORK**
**EDUCATION DEPARTMENT**

---

**IN THE MATTER between-**

**DEPARTMENT OF EDUCATION OF THE**
**CITY OF NEW YORK**
              **Complainant-Employer**

              **and-**

**BRIAN FORD**
              **Respondent-Tenured Teacher**


**Pursuant to Education Law Section 3020 - a**

---

**SED Case No.  31-318**


**OPINION AND AWARD**

**BEFORE:**
Hearing Officer: Robert H. Barron, Esq.


**APPEARANCES:**

    For:   Department of Education of the City of New York Office
           of the General Counsel

    By:    Angel Cox, Esq.

    For:   Brian Ford, Respondent

    By:    Jennifer Hogan, Esq.
           The Law Offices of Robert T. Reilly

Pursuant to Section 3020-a of the Education Law, the New York City Department of Education ("DOE") filed charges against Brian Ford ("Respondent" or "Ford"), a tenured teacher, charging him for conduct which occurred during the 2015-2016 and 2016-2017 school years. This Hearing Officer was designated to serve and to render a final and binding decision as to whether there is just cause for disciplinary action pursuant to Section 3020-a of the Education Law.

A pre-hearing conference was held before Hearing Officer Julie Torrey, Esq. on July 14, 2017, and the evidentiary hearings were held on eleven day in 2017 - September 26; October 2, 6, 11, 19, 23, and 24; and November 1, 17, 28 and 29 - at the offices of the DOE located at 100 Gold Street, New York, New York.

The parties were afforded a full and fair opportunity to present evidence, examine and cross-examine witnesses and make arguments in support of their respective position. The record was closed on the verbal submission of the parties' closing arguments, the transcript of which was received on December 6, 2017.

The evidence presented during the hearings, the arguments the parties made during the hearings, and the arbitral precedents cited by the parties have been fully considered in the preparation of this Opinion and the accompanying Award.

## Specifications

1. During the 2015-2016 and 2016-2017 school years, Respondent failed to properly, adequately, and/or effectively plan and/or execute separate lessons as observed on or about each of the following dates:

   a. November 20, 2015;
   b. March 7, 2016;
   c. April 1, 2016;
   d. October 26, 2016;
   e. November 30, 16;
   f. February 6, 2017;
   g. February 13, 2017;
   h. March 6, 2017; and/or
   i. April 28, 2017.

2. Respondent failed, during the 2015-2016 and/or 2016-2017 school years, to fully and/or consistently implement directives and/or recommendations for pedagogical improvement and professional development provided in observation conferences with administrators

and/or outside observers; instructional meetings; teacher improvement plans; one-on -one meetings with administrators, school based coaches, and/or outside observers; as well as schoolwide professional development, with regard to:

   a. Proper planning, pacing, and/or execution of lessons;
   b. Using appropriate methods and/or techniques during lessons;
   c. Designing coherent instruction;
   d. Using assessment in instruction;
   e. Student engagement;
   f. Creating an environment of respect and rapport;
   g. Managing student behavior; and/or
   h. Using appropriate questioning and discussion techniques.

The Foregoing Constitutes:

   1. Just cause for disciplinary action under Education  Law § 3020-a;
   2. Incompetent and/or inefficient service;
   3. Conduct unbecoming Respondent' s position;
   4. Conduct prejudicial to the good order, efficiency, or discipline of the service;
   5. Neglect of duty;
   6. Substantial cause rendering Respondent unfit to properly per form obligations to the service; and
   7. Just cause for termination.

## **FACTUAL BACKGROUND**

Brian Ford is a tenured teacher who is licensed to teach social studies for grades seven to twelve.  He graduated from Wesleyan University.  He also has a degree in political science from Columbia University as well as certificates in Latin American and Liberian studies.  Ford began teaching for the DOE in 1995, initially in a series of fill in positions, and in 1996 took a regular position teaching at Borough Academy. Ford described Borough Academy as a non-traditional environment that had a substantial student population from Rykers or who had Superintendent suspensions.  Ford primarily taught a wide variety of high school social studies classes, as well as other types of courses. He moved to Park East for the 1999/2000 school year where he taught tenth grade Global History.  In 2000 he moved to Cambodia and in 2002 he returned to teaching with the DOE. After taking fill in positions, Ford began teaching at Walton High School, mainly teaching special education classes with another teacher.  In 2005 he began teaching at the Bronx Guild High School ("Bronx Guild") located in Bronx, NY.  Ford took child care leave from 2010 to the end of the 2012/13 school year, and took a sabbatical during the 2015 Spring semester.  He otherwise continued to teach at Bronx Guild until the his

termination.  During the 2015/2016 and 2016/2017 school years he taught U.S. Government and Economics.

Bronx Guild was located on the Stevenson campus in the Soundview section of the Bronx, in a building with six other schools.  For the 2017/18 school year Bronx Guild merged with Pablo Neruda Academy, another DOE school on the same floor as Bronx Guild, and the combined schools became the Gotham Collaborative High School.

Bronx Guild was an internship school for grades nine to twelve.[1]  It had 300 students and was designed for small classes and to foster interpersonal relationships with teachers and students. Approximately 30% of Bronx Guild students had IEPs. 100% of graduating students were accepted to a college program. Students in grades ten to twelve had internships they attended during the school day on Tuesdays and Thursdays.  The other three days they attended traditional classes. The school administrative staff included a principal and two assistant principals.  The school had approximately 20 to 22 teachers.

Sam Decker ("Decker") was the principal at Bronx Guild for twelve years, and was principal at all material times.  He was a tenured principal.  Because of the school merger, Decker ceased working as a principal as of July 1, 2017.  Since July, 2017, he has worked for the DOE as a coach for principals.[2]

Professional Development Meetings and Assessments

Decker's goal for the students at Bronx Guild was to make them as college ready as possible.  To this end, over time, he implemented more traditional academics and academic structures for teachers and formalized teacher development programs.

The development programs included weekly individual coaching sessions for each teacher.  During the 2015/16 school year, Ford received formal coaching from Decker, as well as informal coaching from the two assistant principals, Cecily Rauner ("Rauner") and Stephanie Downing ("Downing").[3]  (Tr. 197-201) During the 2016/17 school year Ford received coaching

---

[1] Unless otherwise specified, all references to the Bronx Guild are for the 2015/16 and 2016/17 school years.
[2] Prior to working for the DOE, Decker taught English for five years at an independent French/English school. Before that he worked for ten years at City College, primarily with students who weren't yet prepared for college. He also worked for Yeshiva University in Manhattan.  He taught writing and humanities at the Universities. When Decker joined the DOE he attended the Leadership Academy, which was a specialized fourteen month DOE program designed to train principals for assignment to high needs schools.
[3] Rauner had been an assistant principal at Bronx Guild for five years, including the 2015/16 and 2016/17 school

from Decker as well as assistant principal Christine Ghaznawi ("Ghaznawi").[4]

The development programs also included weekly one-hour grade team meetings, and weekly two-hour development presentations for the entire staff, which were held on Tuesdays. (Tr. 156-159; 419-27; DOE Ex. 20 and 21)[5] The weekly meetings were attended by all Bronx Guild teachers, including Ford. Ghaznawi testified that she was part of the literacy team for the 2015/16 school year that made presentations to the teachers at the Tuesday professional development meetings. (Tr. 919-23) She testified that the presentations included strategies for struggling readers, and assessing student work. Decker testified the 2016/17 meetings covered a variety of teacher development topics, including differentiation strategies, strategies for improving student literacy and strategies for integrating literacy development into lesson plans. (Id.)

Bronx Guild teachers were evaluated using the Advance system ("Advance"). Decker testified that under Advance, teachers have an option of selecting either four formal or informal evaluations, and that teachers on a Teachers Improvement Plan ("TIP") and new teachers were subject to six Advance evaluations. (Tr.60-62) Formal evaluations include a pre-observation meeting with the teacher, and the evaluation is sometimes at a pre-arranged time. (Tr. 72) Informal evaluations do not include a pre-observation meeting and are generally unannounced. (Id.)

The Advance system uses the Danielson Rubric ("Danielson" or the "Rubric") to evaluate teachers across eight factors.[6] Teachers are rated highly effective, effective, developing or

---

years. Before that she was a language arts teacher for six years at other DOE schools. Downing was an assistant principal during the 2015/16 school year, until she went on maternity leave. She did not testify.
[4] Ghaznawi was an assistant principal at Bronx Guild for the 2016/17 school year. That was her first year in the position. Prior to that position, she was a social studies teacher at Bronx Guild for five years. Her courses included Government and Economics. Ghaznawi trained to be an administrator through the DOE's selective LEAP program. Her background includes a Master of Science in teaching social studies for grades seven to twelve. As part of the LEAP program she received extensive training in the Danielson framework as well as in conducting teacher observations.
[5] There was significant testimony by Decker regarding the specific content of the 2015/16 weekly meetings as illustrated by DOE Ex. 5. DOE Ex. 5 was presented as the 2015/16 professional development calendar. However, the dates for DOE Ex. 5 do not line up with Tuesdays for the 2015/16 school year, which was the day of the week all witnesses testified the meetings were held. As testified by Robin Link, the dates line up with Tuesdays for the 2014/15 school year. (Tr. 1160-63) Accordingly, while this Hearing Officer credits the testimony of Decker, Link and Wyatt Matthews that the professional development meetings occurred in 2015/16, and that Ford attended them, this Hearing Officer does not credit the testimony of Decker regarding the specific content of the 2015/16 meetings.
[6] Danielson has 22 domains or factors, but the Department uses only eight of those factors in the evaluation process. Those factors are 1a – Demonstrating knowledge of content and pedagogy; 1e – Designing coherent

ineffective for each of the eight factors ("HEDI"). Evaluators are trained to utilize the Rubric, including initial training, ongoing workshops and meetings with a Department employee whose job was to train evaluators.  (Tr. 64-65) Each component in the Rubric includes detailed information defining the factor and the type of teacher conduct that qualifies for each rating level. (Ex. J-4) The training included exercises to make sure evaluators rate teachers the same way.[7] (Id.)

Evaluators would enter the classroom for at least fifteen minutes, in the case of an informal evaluation, and take a running transcript of everything they observe.  These notes, referred to as low inference notes, include responses to questions the evaluator asks the students.  The notes are simply a running log without evaluation.  (Tr. 69-70) The evaluator then takes those notes and uses them to evaluate the teacher on the eight Danielson factors, using portions of the notes to explain the rating for each factor.  To the extent the evaluator did not observe anything that would apply to a given factor, the evaluator rates the teacher "N/A" for that factor. (Tr. 65-66) The evaluation form the observer uses to rate the teacher is called an Annual Professional Performance Review ("APPR"), and is broken down into three sections. The first section lists the eight Danielson factors being used, and is based on the observations made in the classroom.   The second section is titled "Assessment of Preparation and Professionalism" and is based on observations made fifteen school days prior to the observation date.  This section includes only Danielson factors 1a, 1e and 4e.  The third section is for additional evaluator notes.

After the evaluation is completed, the evaluator gives feedback to the teacher either verbally or in writing, generally within two weeks. (Tr. 73) The teacher is also given a copy of the written evaluation, which both the evaluator and teacher sign and date.  (Tr. 66-67) Teachers can respond to the evaluation verbally or in writing.  (Tr. 67-69)

Based on the evaluations throughout the school year, teachers are given an overall

---

instruction; 2a – The classroom environment; 2d – Managing student behavior; 3b – Using questions and discussion techniques; 3c – Engaging students in learning; 3d – Using assessment in instruction; and 4e – Growing and developing professionally. (Ex. J-4)

[7] Danielson was in place at all material times.  (Tr. 61) Prior to evaluation under the Advance system teachers were rated either satisfactory or unsatisfactory.  The prior system also had no requirements for the number of observations a teacher would have, and there wasn't a defined framework, such as the Rubric, to use for evaluations. (Tr.63)

Measure Of Teacher Practice ("MOTP") score for the school year.  That score uses the HEDI rating scale.  This score is combined with a Measure Of Student Learning ("MOSL") score to come up with an overall score for the teachers performance.  That overall score is based 60% on the teacher's MOTP score, 20% on the State's overall MOSL score and 20% on the school's MOSL score. (Ex. J-5, J-6).

Teachers who receive an overall developing or ineffective rating for a school year are put on a TIP for the following school year.  The purpose of the TIP is for the school administrators to develop a tailored plan with the teacher that will help the teacher improve overall performance. (Tr. 75-6) The TIP is not considered disciplinary. Once the teacher and Principal have agreed on the content of the TIP, they meet throughout the year to gauge improvement.  (Id.)

The Bronx Guild Lesson Template

One of Decker's key focuses for teachers at Bronx Guild was the design of the daily lesson plan.  Decker and his administrators strongly believed that a thoughtful and well-designed lesson plan created the platform for successful teaching. (Tr. 80) To this end Bronx Guild had a lesson plan template that was the preferred format for Bronx Guild teachers, and was considered the best practice for composing a lesson plan.  Each lesson was expected to align with the subject's overall curriculum. (Tr. 90)

The template was a two-page document broken into nine sections. (DOE Ex. 23) Those sections are; Objective, Warm up, Mini lesson/reading strategy, Activity, Assessment, Wrap up, Differentiation, Homework and Notes.

The lesson template segments the lesson itself into four discrete parts – Warm up, Mini lesson, Activity and Wrap up.  The Warm-up, lasting from three to five minutes, was supposed to be something fun and energetic to engage the students in the lesson and bridge that day's lesson to the prior lesson. (Tr. 77-80; 153-56)

The segment following the Warm up was a Mini-lesson, describing what the teacher was teaching that day, why it was important, and the elements the students needed in the Activity segment.  The Activity segment was the core of the lesson, and the opportunity for the students to perform work associated with the Mini-lesson. This segment ideally ended with students sharing what they learned. The last segment was a Wrap-up that was a three to five minute

section that framed and summarized the day's lesson. (Id.)

At Bronx Guild all teachers were expected to put times down for each section of the lesson. Teachers were also supposed to post the learning objective, along with the flow of the lesson, so students could see the goal of the lesson and the length of the four sections. This helped both the teacher and the students track where they were in the lesson and where they were going. (TR. 80-92)

The remaining sections of the lesson plan were to help the teacher frame out the lesson. The Objective section was the single specific description of the lesson's goal or learning objective. The Assessment section defined how the teacher would know if the students were learning. All teachers were expected to perform three general areas of student assessments during each lesson. The first assessment was to determine what the students learned and retained from the prior lesson. This allowed the teacher to identify information they need to rebuild from the prior lesson. The second assessment was whether the students understood the mini-lesson. The third assessment was a determination on which students did and did not learn the elements of the day's lesson, so the teacher knew if there was information they needed to re-cover. (Id.) The first two assessments are referred to as formative assessments, and the last is referred to as a summative assessment.

Bronx Guild focused teacher training on assessment techniques, and teachers were expected to use a variety of assessment techniques. Techniques included collecting student work, asking students for a demonstration, asking student's questions, and observing students during the lesson. Teachers were expected to record their assessments during the class, so they would not forget them later. (Id.)

While the questions a teacher asked students allowed the teacher to assess the students' learning, higher level questions were considered more valuable to the learning process. A level one question is a question that has a specific answer, such as "What is the name of a healthcare bill?" or hunt and find questions that involve finding the answers in a text. These questions show the students ability to find an answer, but do not require higher level thinking. Higher level questions are preferred over level one questions, as they require students to analyze information, pose their own questions, and help students think more broadly about the topic being covered. (Id.)

The lesson plan's Differentiation section laid out the strategies the teacher would utilize during the lesson for the different types of learners in the classroom. Students in each class represented a range of reading capabilities and learning abilities. Teachers were expected to know and understand the reading and learning capabilities of their individual students. To address the needs of all the children in the classroom, teachers were expected to utilize a variety of differentiation strategies to meet those varied needs. Strategies included different in-class reading assignments to match student's reading levels, different Activity tasks to align with a student's given capabilities, and pairing and grouping students during the Activity segment to allow stronger students to support less strong students. (Id.)

Another important element that Bronx Guild required teachers to apply in lessons was pacing. A properly paced lesson is a lesson that moves smoothly from segment to segment rather than becoming bogged down in any one place. If a lesson is not properly paced students can become bored and disengaged, and the teacher may not be able to cover all the lesson's material. (Id.)

Lessons are grouped into units. Each unit has an essential question that forms the basis of the unit. Each lesson within a unit should relate back to the essential question. The essential question is posted someplace in the room so that the students are always able to refer to it and connect it to the lesson. (Id.)

When reviewing Bronx Guild teachers, the evaluators asked for a copy of the lesson plan and looked at the unit's essential question and the posted flow, to understand where the lesson for the day was going, whether it was aligned throughout its four parts, and whether it was aligned with the unit. The evaluator also asked the students if they understand the objective of the lesson. If students did not understand the objective or said they were confused, it indicated that the lesson's objective was not clear. (Id.)

<u>Ford's Teaching Approach</u>

Ford testified at length regarding his approach to teaching. (Tr. 1241-60; 1506-19) When preparing lessons, Ford did a lot of brainstorming, looking for things that would make the lessons engaging and interesting for students. He then reviewed various resources and decided what element would be central to the lesson. Ford stated that since he returned to Bronx Guild in 2013 he used the Bronx Guild template to lay out his lessons. He also used what he called

an Aim sheet or learning capture device, though he noted that some would call it a worksheet. Sometimes the Aim question was a provocative question, and sometimes it was a general question. (Id.)

Ford testified that when students arrived in class he gave them the Aim sheet along with any packet of papers needed for the lesson. He would post the lesson's elements on chart paper. He also would post the past few lessons so students who missed classes would be able to catch up. Ford stated that he often included estimates on the time for each section of the lesson. The students then started the warm up, which he stated varied in length and was designed to get the students going. He then moved to the mini-lesson, which was supposed to teach a new skill or information. The activity lasted about half the class, and the wrap up was the lesson's culminating activity. Ford also included the State learning objectives on the lesson plan, which are different from the Aim. Ford also included the objectives on the lesson plan for his use (rather than the students) and for anyone looking at the lesson plan. (Id.)

Ford included a section on assessment. He testified that there are multiple types of assessment, including formative and summative assessments, and that assessment is important. He stated that he assesses multiple times every class, but did not always record those assessments. (Id.)

Ford's main assessment tool was the binders, where students placed the Aim sheets they had worked on in each class. Ford checked the binders twice a week and tracked and graded the amount of work the student performed on a scale of one to ten, and would sometimes give more substantive feedback, such as the student needing to expand on an answer.[8] While his grading emphasis sometimes varied, generally the binders counted for fifty percent of the grade, the class counted for thirty percent, and the formative assessments counted for twenty percent. (Id.)

Ford testified at length regarding the need for differentiation, noting that a teacher needed to account for special education designations, English language learners, and other issues. Ford was also familiar with Individual Education Plans ("IEPs"), and had many students in his

---

[8] On cross-examination Ford was shown student work that was attached to Ford's exhibit 9. (Tr. 1578- 81; Ford Ex. 9) Ford acknowledged that rather than being graded on a ten point scale, some of the student's work was graded with checks, checks with one of more plus signs, and stars. (Id.)

class with IEPs.[9] He stated that he also had students that were two to three grade levels beyond their normal grade level. (Id.)

To address differentiation, Ford's main tool was providing reading material at different levels, and he would go to websites that allowed him to print articles at different levels. He stated that he also used varied media, including videos, websites, or poems. He also paired and grouped students by skill level or character. Ford discussed his belief that individual attention was an important part of differentiation, as it gave him the opportunity to interact and challenge his students, and this was also one of his primary differentiation tools. Ford also developed a sheet of sentence and paragraph starters that he had in the class for students to use. (Id.)

Ford placed a high priority on treating students as individuals, greeting them at the door, noticing when they changed their hair, and developing a relationship with them. He also testified that classroom management started with being respectful to each other and having an ordered process. He also formulated rules for conduct in class. (Id.)

Ford also testified that he had the students self-assess themselves on almost every unit's performance task. (Tr. 1506-15; Ford Ex. 28, 29) Ford used a five point assessment rubric on the performance tasks, that he gave the students a sheet detailing the basis for the assessment, and that the students could use that document to self-assess. He also testified that near the end of the marking period, students were given a sheet they could fill out to respond to Ford's binder grades and to tell Ford how many points they thought they should receive on each of the documents in the binder.

Ford's Experience Prior to the 2015/16 School Year

Prior to Ford leaving Bronx Guild for two years in 2010, teachers would have the same group of students for the entire day. (Tr. 1265-78) In that structure, while Ford was a social

---

[9] At the outset of the first day of hearings Ford requested copies of the IEPs for any student that was identified by name in any APPR being entered into evidence against Ford. Ford argued that to the extent the IEPs required a special education teacher in the room, and Ford was not paired with a special education teacher, the IEPs were relevant to Ford's defense. The DOE objected on the grounds of relevance, arguing that since the IEPs required a special education teacher only in Integrated Co-Teaching ("ICT") classes for math and English, and since Ford's was not teaching ICT classes, the IEPs would not be relevant. The Hearing Officer reviewed the redacted documents and determined that they were potentially relevant. The documents were then produced to the Respondent. They were not admitted into evidence.

studies teacher, he was also the crew leader for a group of students and would teach those students through most subjects. Under that model he would also share a room with another teacher who also had a crew. The two teachers would collaborate closely and sometimes trade classes to teach within their area of expertise. There was no bell schedule and teachers were able to craft the day however they wanted. (Id.)

Ford stated that when he returned for the 2013/14 school year, the Bronx Guild model changed considerably. There was a bell schedule with six formal periods a day. Teachers were working in a more traditional structure, instructing multiple groups of students within each teacher's area of expertise, rather than teaching one group of students across multiple subjects. The 2013/14 school year was also the first year that Ford was subject to review under the Advance system. Ford did not recall receiving any training on the Rubric. Ford received an effective rating for 2013/14. (Id.)

When Ford returned for the 2014/15 school year, Decker told him that he had more social studies teachers than he needed, and asked Ford what he wanted to teach. Ford said he wanted to teach a class connecting film and social studies, and Decker agreed. Ford taught the class during the Fall semester and took a sabbatical during the Spring semester. He did not receive a rating for that year, and did not remember being observed.

## THE 2015/2016 SCHOOL YEAR

### 2015/16 Background

In the Spring of 2015, while Ford was still on sabbatical, he spoke to Decker, who told Ford which two classes he would be teaching. (Tr. 1295-1299) In late August, Ford emailed Decker asking about the curriculum for the Fall semester course, but Decker said it was not yet ready. (Ford Ex. 6) Ford did not receive the curriculum until the first day of school. Ford stated that part of his sabbatical project was to create a curriculum for the Government class, and he was hoping to incorporate some of what he prepared into the Bronx Guild class. (Id.)

Ford testified that when he returned in the Fall of the 2015/16 school year he taught Participation in Government ("Government"), and in the Spring taught Economics, primarily to Seniors. (Tr. 1279-93) These two classes are part of the social studies sequence, though Ford testified that the content of those courses at Bronx Guild differed from the standard State

curriculum.

The Government curriculum Ford received was used for both the 2015/16 and the 2016/17 school years. (Tr. 1299-1302) The curriculum identified a book that could be used as a resource. However, Ford did not receive a copy of the book until late September 2015, after he began teaching the course. Ford was not provided with student copies of the book, and he was expected to prepare his own materials for the classes, using the book and other resources. Ford testified that portions of the Bronx Guild curriculum did not align with the State curriculum. When Ford discussed the Government class with Decker, Decker told Ford that he wanted the class to be fun, and to keep it simple. (Id.)

In addition to Ford's main two classes, he also had hall duty both semesters, and taught a class called credit recovery for both semesters.[10] Credit recovery is for students who had not passed a class, and allowed the student to do make up work to earn the credit. In addition, in the Spring Ford taught a sophomore global history class with Sarah Moore. Because he was not a crew leader, Ford also taught a class called Learning Through Research ("LTR"), which was held on Tuesdays and Thursdays for students who did not have internships. During the 2015/16 school year, Ford testified that he had one prep period a day, but that he was not always able to take it on Tuesdays and Thursdays, and a duty-free lunch each day. (Tr. 1279-93)

Ford testified that one of the LTR's purposes was housekeeping and custodial, as the school needed to have a place for students without internships. Downing designed the curriculum for the class, and Ford emphasized that while he made suggestions, the class was not designed by him. LTR consisted of a discussion on current events, and a research project. Ford worked with the students on the research projects. The students then left at noon on Tuesdays. On Thursday afternoons there would be a math, online learning or language element depending on the students' needs. Ford testified that his main role in that portion of the class was to help the students log onto the computers. Ford also showed films in the afternoon related to current events. (Id.)

Ford stated that one of the challenges he had in teaching in both the 2015/16 and 2016/17 school years, was that he did not have an assigned classroom. (Tr. 1302-06) This

---

[10] None of the DOE's witnesses testified that Ford taught this course.

required Ford to move from classroom to classroom, using a cart to assist his movement. Because Ford did not have a fixed classroom, he could not post permanent materials on the walls. To accommodate this situation, Ford would put up and take down his flow charts for the lessons. The situation also required Ford to reduce the technology he could use, including films and the internet. (Id.)

Ford testified that at the beginning of the school year he had a meeting with Decker, but that it was not an Initial Planning Conference. (Tr. 1306-07) During that meeting Ford was not given an opportunity to select an observation option. Instead, Decker informed Ford that he was going to have six observations, because Ford was coming back from sabbatical. Ford was also not given an Initial Planning Conference form to fill out and sign at that meeting. (Id.)

Decker testified that during the school year two teachers were assigned to assist Ford, as they were stronger teachers who Decker hoped could help Ford improve his teaching. The teachers were assigned to Ford according to a consistent schedule. One teacher was Sara Moore ("Moore"), a social studies teacher, and the other was Kaylen Shiller ("Shiller"), a special education teacher. (Tr. 840) Shiller began teaching with Ford early in the Spring semester. (Tr. 1324)

Decker was Ford's coach during the 2015/16 school year. (Tr. 1342-46) However, Ford testified that while he met with Decker one-on-one during the Fall semester, he did not meet with him one-on-one from January through March, and may not have met with him in April. Rauner was Shiller's coach, and since Ford was teaching with Shiller, he would sit in on Shiller's coaching sessions in February and March. At those sessions Rauner would give Ford advice, as well as input on the lesson plans he and Shiller were using. Ford thought Rauner was the best coach he had at Bronx Guild and that she gave him helpful advice and suggestions. However, Ford also testified that Rauner told him she did not think he was open to taking her suggestions. (Id.) Ford also stated that he met with Downing a few times before she went on maternity leave, and that while he did not get a lot of advice from her, she was helpful on strategies for dealing with problem students. (Tr. 1361-67; 1589-92)

Ford testified that at the beginning of the year Decker was very helpful, but that there were some points of tension. Ford raised concerns that one of his classes was a "rough crowd", but Decker seemed angry that Ford had referred to the students in that way, and would not

discuss the issue.  From September to mid-November, Ford stated that Decker came into his room many times, and offered to work with Ford on lesson plans.  However, Decker's approached changed in mid-November, after a DOE Superintendent sat in on a short portion of Ford's class.  After mid-November Decker stopped meeting with Ford, other than a meeting in December, and Decker was not as cordial to Ford as he had been previously. Ford stated that prior to mid-November Decker had positive things to say about Ford's teaching. (Id.)

During 2015/16, Ford also reached out to fellow teachers for assistance. (Tr. 1367-71) He would confer with Tom, a social studies teacher at Bronx Guild.  Ford stated that the binder system he used was something he learned from Tom.  Ford also testified that working with Moore was helpful, as he considered her one of the best teachers in the school.  Ford would review her lesson plans and observed the way she organized her classroom. Ford also substitute taught approximately five classes for Ghaznawi when she was absent.  This gave Ford the opportunity to review her lesson plans, and see how her plans worked when he taught them.  Ford spoke with Amanda, another Bronx Guild social studies teacher who was good with games, as well teachers from other subject areas.

There were four informal observations of Ford during the 2015/16 school year.  Pursuant to the January 10, 2017 arbitration decision by Hearing Officer Edelman, the observation by Rauner dated May 18, 2016 was ruled inadmissible, leaving three informal observations for the school year.  (Jt. Ex. 8)

<u>November 20, 2015 Observation</u>

On November 20, 2015 Decker performed an informal evaluation of Ford during a twenty minute portion of Ford's Government class.  Decker recorded his evaluation of Ford's class on the Department's evaluation form. (DOE Ex.3; Tr. 98-140) In the section for classroom observations, Decker rated Ford ineffective for seven of the eight Danielson measures, giving Ford an "N/A" for 4e.  In the Preparation and Professionalism section he rated Ford ineffective for two of the three factors, and "N/A" for factor 4e.

Decker identified multiple shortcomings with the lesson.  He described the classroom as chaotic, with students repeatedly using profanities, having conversations with other students that were not about the lesson, walking around the room, calling out across the room and eating. Ford asked the student to put the food away and was ignored.  Ford did not address the other

behavior or the profanity, and did not appear to have any strategy for controlling behavior. (Id.)

Decker observed that the lesson's pacing did not follow the Bronx Guild's lesson process, as the lesson initially spent fifteen minutes on one opinion question for the warm up. Only six students participated, and the rest ignored the discussion. Ford then had the students fill out a seven page packet that wasn't numbered or in any apparent order, and it wasn't clear which portions of the packet were to be completed in class, and which would be completed at home. The packet itself asked students to find the answers to basic questions and fill in the blanks, without any opportunity for discussing the answers or illustrating that they understood the concepts. (Id.)

Decker observed that the lesson was disjointed and confusing to the students. Multiple students reported that they did not know what they were supposed to do with the seven page handout Ford distributed. In addition, the Aim on the board did not match the goal of the lesson plan, the handout did not provide context or identify how it related to the lesson, and the lesson itself, covering the Presidential election, did not appear to be related to the objective of the overall unit, which was civil liberties. (Id.)

Decker concluded that Ford's communication with the students was lacking, as he asked only the most basic questions (such as which Presidential candidate they preferred) with no observed follow up on the answers (such as why they preferred the candidate) to engage the students in higher level thinking. The lesson plan and handout also lacked evidence of differentiation, and the groupings of students in the classroom did not show any evidence of intentional grouping. Decker did not observe Ford performing any formative assessments. (Id.)

Decker testified he had instructed Ford, as recently as the week before the observation, to stop teaching about the election and focus on the elements of the civil liberties unit. Decker had also previously coached Ford repeatedly on the importance of differentiation, and on using strategic student groupings as an effective way to differentiate the lesson content. Decker had asked Ford to limit the number of handouts he gave students and to number the pages, and had asked him to ask different levels of questions. (Id.)

Ford testified that the observed lesson was immediately after the Seniors' annual camping trip, and due to an early dismissal the day of the observation, classes were abbreviated from 55 minutes to about 35 minutes. (Tr. 1309-22) Ford prepared a lesson plan

for the class, as well as a packet of materials. (Ford Ex. 8) Ford stated that the warm up was designed to be quick and done in a group. He also stated that forty to fifty percent of the twenty students in the class had IEPs, but there was no special education teacher assigned to him for the class. Ford had reviewed the IEPs. Ford did not receive Decker's written observation report until the middle of March, though they did have a meeting in December at which Decker gave Ford feedback. Ford said the feedback at the meeting was not positive. (Id.)

March 7, 2016 Observation

On March 7, 2016 Rauner performed a fifteen to twenty minute informal evaluation of Ford's Economics class.[11]   Rauner recorded her evaluation on the Department's evaluation form. (DOE Ex. 31; Tr. 841-67) Rauner gave few lesson specific examples of Ford's performance in the APPR, though her testimony elaborated on what she observed.  In the classroom observations Rauner rated Ford ineffective on seven of the eight Danielson measures.  Rauner rated Ford "N/A" for measure 4e, as well as for the Preparation and Professionalism factors.  Rauner also testified that Karen Shiller, the special education teacher who taught with Ford during the 2105/16 school year, was in the classroom.  Rauner did not recall if Shiller participated in the class. (Id.)

Rauner observed that many of the students were talking throughout the class about personal subjects unrelated to the work, were using profanity, and were not on task.  Rauner did not see Ford address these behaviors or walk around to observe the students.  She also observed students who were confused by the assignment and were skipping questions in the worksheet, but she did not observe Ford addressing those issues. (Id.)

The portion of the lesson Rauner observed was the main activity of the lesson, a PowerPoint that students were supposed to read, and then answer questions about in a worksheet.  Ford instructed the students to fill in the blanks on the worksheet. Rauner did not see any evidence that students were being intellectually challenged. Rauner also testified that the lesson was not properly planned, as what was happening in the classroom was not in the lesson plan.  Rauner also did not observe any assessment, and did not observe Ford giving any feedback to the students. (Id.)

---

[11] Rauner was trained by the DOE to conduct teacher observations using the same methodology that was used by Decker.

In the additional notes section of the APPR, Rauner suggested Ford refer to a textbook on strategies to structure lesson plans.  The book had been distributed at the beginning of the school year to all Bronx Guild teachers.  The book included strategies for posing different levels of questions, and differentiation.  She also referred him to an article on how to put students into groupings and pairs to facilitate learning.  Ford testified that her suggestions were helpful, but that he did not have time to read more than the first chapter of the book. (Tr. 1581-82)

Ford testified that he had not seen the written report from Decker's November twentieth observation prior to Rauner's March observation. (Tr. 1320-37) While Ford was the teacher of record, he said Shiller collaborated on the lesson plan, and that Shiller handled the warm up and wrap up on this lesson.  Ford prepared a lesson plan and a PowerPoint for the class.  (Ford Ex. 9 and 10) Ford stated that the PowerPoint was the mini-lesson, and the main way Ford was presenting the concepts to the class.  He viewed the PowerPoint as a form of differentiation. He also stated that the lesson plan included a literacy strategy, and that all the students completed the work.  Ford thought the lesson was effective.  Ford received the written report within two days, but did not receive any other feedback from Rauner.  (Id.)  When he received the report, Ford went back to talk to the student Rauner identified as using profanity, and the student denied having used profanity. (Id.)

Ford testified that profanity was used a lot by Bronx Guild students and sometimes by teachers. (Tr.1337-41) When Ford heard profanity he would point out to the student that he/she had used a profanity.  Ford said his main approach was to talk to the student, although on at least one occasion he wrote a student up for swearing loudly in the hall.  He also said he would take swearing students out in the hall on occasion, and would sometimes turn the issue into a classroom discussion, time permitting. (Id.)

April 1, 2016 observation

On April 1, 2016 Decker performed a 29-minute informal evaluation of Ford's Economics class.  Decker recorded his evaluation of Ford's class on the APPR. (DOE Ex.4; Tr. 202-19) In the classroom observations, Decker rated Ford ineffective on all eight Danielson measures. Decker rated Ford "N/A" for the Preparation and Professionalism factors.

Decker identified multiple short comings with the lesson.  He testified that when he entered the classroom he saw a lot of "chaos".  During his observation students were repeatedly

using profanities, which Ford only addressed once. Students were singing, sleeping, eating candy, talking about personal issues, and just sitting, none of which Ford addressed. (Id.)

The lesson itself was too lengthy. The students were given twenty minutes to go to eight web sites and answer questions that were in a packet of materials Ford distributed. Decker believed this was too much work for a strong reader to complete in twenty minutes, and therefore too much for a struggling reader. Decker also failed to see how the questions and websites were related to the essential question for the lesson. Only a few students were doing the work, and there was no attempt by Ford to generate a discussion on the issues being covered. Students were also copying the answers from other students rather than doing the work themselves. (Id.)

There was no formative assessment of the work. Students were instructed to put their work in the binder. Decker had previously told Ford that simply checking the work the students put in the binders was not a sufficient level of assessment. (Id.)

Finally, Decker saw no evidence that Ford was using the strategies Ford had been given during his coaching sessions. These included grouping students for differentiation, using fewer work sheets, literacy strategies and differentiation strategies. Ford had told Decker on numerous occasions that he did not think Decker's suggestions, evaluations, and assessments were correct. (Id.)

Ford testified that he prepared a lesson plan and materials for the class without collaborating with Shiller, and that he taught the class, though Shiller might have checked in with students who were having trouble. (Ford Ex. 11; Tr. 1347-61) Ford testified that the main tool for assessing the students in this lesson was the Aim sheet and the binder, but that he did check to see if students had reached the correct answer and where they were on completing the work. He identified the wrap up question as the other element of assessment. Ford stated that the websites were a form of literacy and differentiation. Ford noted that it was an April class of seniors, that this close to graduation the students were antsy, and that other teachers were experiencing the same issues. Ford received the written report in May.[12]

---

[12] Ford testified that there were two versions of the observation report (Tr. 1356-60; Ford Ex. 12) This second report had the same wording, but was filled out as a formal evaluation, showed a revision date of June 24, 2016, and said it had been performed by Rauner. Ford was never presented with the second report or asked to sign it. He obtained it as part of the arbitration hearing at which he challenged this observation, as well as the observation that was thrown out. (Id.)

Ford's 2015/16 rating and 2016/17 TIP

Ford was rated ineffective for the 2015/16 school year, both for his Measure Of MOTP as well as his Annual Professional Performance Review ("Annual Review") rating. (DOE Ex. 6 and 7)  The State and Bronx Guild MOSL ratings were effective.  Ford testified that while the MOSL score was not based on a subject he taught, the student scores used to calculate the MOSL score were primarily his students. (Tr. 1379-81)

Because of Ford's ineffective rating, he was put on a TIP for the 2016/17 school year. (DOE Ex. 8; Tr. 228-46) Decker testified that he developed the first draft of the TIP without Ford's input using the DOE's template. He then met with Ford to solicit his input.  Ford believed he asked for a Union representative to be present at the initial meeting, but testified that the request could have occurred for a subsequent meeting.  (Tr. 1392-95)  However, both parties agree that when the request was made, Decker initially told Ford he could not have a Union representative.[13] (Id.; Tr. 249-51) Decker testified that at this or a subsequent TIP meeting, Ford asked that he not be required to submit his lesson plans for review as it was too much work.  Decker declined to remove that requirement from the TIP. (Id.)

The TIP identifies specific areas for improvement and a series of action steps to improve. Areas for improvement were: classroom management, creating a respectful environment, and planning instruction that is engaging for all learners and differentiated to meet the needs of all learners.  (Doe Ex. 8)

The TIP laid out action steps for Ford.  These included weekly coaching, Ford bringing his weekly lesson plans to the coaching sessions, using the Bronx Guild lesson template to ensure lessons were consistent with best practices[14]; following the provided curriculum and devising lesson plans that addressed the common core learning standards and essential questions for each unit, ensuring that the pacing covered the required material, improving the timeliness and quality of Ford's feedback to students and reviewing that feedback with his coach, addressing all areas of misbehavior and disrespectful speech, and working with coaches to develop classroom behavior management strategies.

---

[13] Decker testified that he changed his mind about the request for a Union representative and told Ford that he could have a Union representative at the meeting.  However, both parties agree that the meeting was held without a representative.

[14] Ford found this instruction confusing, as he was already using the Bronx Guild lesson template. (Tr. 1401-02)

Decker testified further that the weekly coaching sessions "pretty much" occurred, and that Ford "sometimes" submitted his lesson plans, as Ford stated that submitting them was too much work. (Tr. 233-35) Decker sent Ford an October 6, 2016 letter reminding him that he was required to submit lesson plans, as Ford was not following that instruction. (DOE Ex. 9; Tr. 246-48) With respect to the curriculum requirement, Decker was unsure whether Ford observed other teachers, but noted that it was up to Ford to schedule those, and that teachers at Bronx Guild were used to having other teachers in their classrooms.

The TIP also identified activities to support Ford's improvement. These included meeting with the administrator in charge of social studies for support, observing social studies teachers for models of effective planning, observing teachers with effective classroom management strategies and meeting with his coach.

The TIP identified how Ford's improvement would be assessed. It stated that Ford would show improvement in his observations, moving from ineffective to effective in Danielson domains 1E, 2A, 2D and 3C. In addition, the weekly coaching minutes were expected to reflect improvement in the areas of concern.[15]

## THE 2016/2017 SCHOOL YEAR

During the 2016/17 school year, Ford again taught the Government and Economics courses, and he testified that the courses were the same as he taught the prior year, except the Government curriculum was reduced from five units to four, which Ford preferred. Unlike the prior year, Economics was taught in the Fall, and Government in the Spring. (Tr. 1382-90) Ford was surprised by the change, as he had prepared to teach the Government class in the Fall semester. Ford also taught a math class in the Fall semester, and was teaching some credit recovery classes. (Id.)

Ford met with Decker at the beginning of the school year, but Ford testified that he did not think it was an Initial Planning Conference. (Tr. 1391-92) It was a brief meeting, and Ford stated that he was not given any options with respect to the types of observations he would receive, and was not given a form to fill out with his preferred method of observation. Decker told Ford that because he was on a TIP, he would be given six observations. (Id.) Decker

---

[15] There was a second meeting on October 6, 2016 to go over Ford's TIP and get his input. Decker testified that Ford ultimately did not insist on any specific changes to the TIP at that second meeting.

testified that he was instructed to conduct the six informal observations by the DOE.

2016/17 Coaching Sessions and Professional Development

Throughout the 2016/17 school year Decker and Ghaznawi held frequent coaching sessions with Ford.[16] (Tr. 388-418) While intended to be weekly sessions, the coaching sessions did not occur every week.  At the sessions Ford was given an agenda that described what they would be covering that day. (DOE Ex. 18) Decker or Ghaznawi would take notes of the meetings that were put in a running document on a Google Doc drive that Ford could view at any time.[17]  Both Decker and Ghaznawi attended the sessions, because Decker wanted to give Ford another perspective, as Ford had said he did not trust or value Decker's feedback. Rauner also attended at least one session.  The sessions focused primarily on helping Ford improve his lesson plans, as Decker and Ghaznawi thought that improving Ford's lesson plans gave him the best opportunity to improve his overall performance. (Tr. 388-418)

In addition, during the Spring semester Ghaznawi held a second weekly meeting with Ford. Ghaznawi testified that these additional coaching sessions focused on lesson planning. (Tr. 1086-87)  Ford stated that he met with Ghaznawi a couple times a month, and that the meetings covered every aspect of the lessons, including readings, groupings, websites, and pacing. (Tr. 1527-29) He also stated that they would rewrite lesson plans together. (Id.)

Ford testified that he met with numerous teachers and sat in on their classes during the school year.  (Tr. 1529-32) He stated that he was an active participant in the weekly school-wide professional development sessions.  In February or March of 2017, Ford applied to the Peer Intervention Program, for additional coaching, but the program did not have anyone they could assign to Ford before the end of the school year. Ford also met with a woman from the New York City Writing Project, who gave him input on one of his lessons. (Id.)

September 26, 2016 coaching session

The notes and Decker's testimony indicate that the lesson plan reviewed was too long

---

[16] The DOE introduced notes for sixteen coaching sessions, from September 26, 2016 to May 5, 2017. (DOE Ex. 19 and 19a) The notes reflect that many of the same issues were discussed with Ford at the coaching sessions. Summaries of the individual sessions are listed in the below chronology.

[17] It is not clear from the notes whether Decker or Ghaznawi were taking the notes on a given day, and whose comments were being recorded.  Both Ghaznawi and Decker testified that both took turns taking the notes. Accordingly, unless specifically stated, references to the notes below are not meant to reference which of the two individuals were making the statements.

at seven pages. (DOE Ex. 19; Tr. 395-98) The goal for the lesson was unclear and not stated in the lesson plan. There were no strategies for struggling readers, too many level one questions, no protocol for engaging students in conversations, and no assessment strategies. The notes indicate Ford said the students would put the work in a binder for him to assess, but he had no way to determine if students had copied the work from other students. Ford was told he must have assessment strategies to determine if students understood the lesson. Rauner offered to meet with Ford to help him plan his next lesson, and Ford was reminded he must bring lesson plans for the entire week, not just for one day. Decker told Ford the lesson plan was unusable as written. (Id.)

Ford testified that he provided the lesson plans for the coaching session as Decker requested, and Ford presented an email from Ford to Decker dated September 23, 2016 attaching lesson plans, including the plan for September 26. (Tr. 1398-1407; Ford Ex. 18) Ford testified that the lesson plan was only one page, not the seven pages indicated in the notes.[18] Ford also testified that he continued to use the Bronx Guild template. Ford explained that there is a difference between the objective on his lesson plan, and the Aim of the lesson plan, noting that the objectives were something for him to use, and the Aim is what he presented to his students. Ford also maintained that his lesson contained numerous examples of higher level questioning. (Id.) Ford raised many of these issues with Decker in two October 5, 2016 emails. (Ford. Ex. 19; Tr. 1412-13)

October 7, 2016 TIP meeting

Decker and Ford held another TIP meeting on October 7, 2016. (Tr. 1414-17) Ford asked for a Union representative at that meeting, but Decker told him he could not have one. At the meeting Decker asked Ford if there was anything he wanted to add to the TIP, but told Ford he would not take anything out of the TIP. Ford testified that he did not view the TIP as an improvement plan, he saw it as a series of standard that he had to meet.

October 26, 2016 Observation

On October 26, 2016 Decker performed a 30-minute informal evaluation of Ford's Economics class. Decker recorded his evaluation on the APPR. (DOE Ex.11; Tr. 252-73) In

---

[18] A review of the lesson plan shows that the plan itself was one page, but the material accompanying the lesson plan was six pages, for a total packet of seven pages.

the classroom observation section, Decker rated Ford ineffective on all eight Danielson measures. In the Preparation and Professionalism section, Decker rated Ford "N/A" for all three factors.

Decker testified that he was unable to identify the point of the lesson, as there was not alignment between the lesson plan, the goals, the posted flow, and what was happening in the classroom.  He also testified that the warm-up was untimed on the lesson plan and lasted for twenty minutes. The lesson plan indicated that Ford would be covering a substantial amount of material, including Teddy Roosevelt, the AT&T merger, Government theory as well as three handouts and a film.  Decker testified that everything was thrown into the lesson and it was too much to cover in one lesson. (Id.)

While Decker was in the class students were asked two multiple choice questions and two "do you think…" questions. There was no discussion of the concepts, and students were not asked to explain their answers.  Five students refused to answer the questions.  Two students ultimately answered.  Ford then handed out a worksheet with questions, and students were asked to fill it out, and Ford then asked them what they had written on the sheet with no follow up questions.  Only one student offered an opinion on the economic theory raised in the worksheet. (Id.)

Decker testified that handing out worksheets with level one questions and failing to ask follow-up questions was the same poor pedagogical approach that Decker had previously observed and which he had told Ford was unacceptable. Decker testified that the students were confused and disinterested in the lesson.  Six students told Decker they did not know what they were supposed to be doing. One student refused to answer a question Ford posed saying "I'm tired of this shit". Another student, who Ford was speaking to, turned and began talking to someone else while Ford was speaking. Five students were not working on the lesson, and one student was obviously cleaning out her purse during the lesson. None of this behavior was addressed. (Id.)

Decker did not observe any differentiation strategies.  All students received the same handouts. Two students, who were both struggling readers, were paired for the class and both had trouble with the texts. Decker testified that such a pairing is not helpful as neither student can help the other.

While Ford walked around the room during the lesson, Decker did not observe any assessment activity, as Ford did not make notes he could use to track his assessments. When Ford spoke to students it was about what Ford was thinking and information about the readings, rather than drawing the students into thinking about the concepts being covered. Decker also observed that when students told Ford they were unclear on the assignment, he would move to another table without addressing their issues. (Id.)

At the post-observation conference, Decker emphasized that Ford should turn in his lesson plans before the lesson, so Decker and the assistant principals could help him simplify and focus them. Decker also suggested specific strategies to help engage struggling readers, and to help facilitate differentiation strategies.

Ford presented a copy of his lesson plan, and testified that the objectives at the top of the plan were taken from the curriculum. (Ford Ex. 20: Tr. 1420-36) Ford stated that the class had not met for over a week, and students had not finished the homework, so some of the lesson was review, something Ford did not normally do. Ford pointed out examples of higher level questions in his worksheet, stated that he thought it was a well-designed lesson plan, and that he sometimes did not understand Decker's criticism. With respect to the behavioral issues, Ford testified that the misbehaving students had IEPs and were supposed to be in a co-teaching environment with a special education teacher. (Id.) Ford believed this was an effective class. (Tr. 1604-05)

November 14, 2016 coaching session

The notes and testimony indicate there were multiple problems with the reviewed lesson plan. (DOE Ex. 19; Tr. 398-99) These included no differentiation strategies, other than "student by student individual attention", which Ford had been told was not a strategy. The assessment strategy was putting the work in a binder for later assessment, which did not provide the required student assessment during the class. The lesson had too many handouts which were not numbered. The lesson had students reading passages without any discussion between readings. There was one higher level question in an article, with no place in the lesson to discuss the question. Ford was reminded to send lessons before the coaching session, as the lessons sent for this session were sent three minutes before the coaching session (Id.)

November 30, 2016 Observation

On November 30, 2016 Ghaznawi performed a 22 minute informal evaluation of Ford's Economics class.  Ghaznawi recorded her evaluation on the APPR. (DOE Ex.25; Tr. 936-989) In the classroom observation section, Ghaznawi rated Ford developing on six of eight Danielson measures, and ineffective on 1e and 3c. In the Preparation and Professionalism section, Ghaznawi rated Ford "N/A" for all three factors, as she had not received his lesson plan prior to the class. (Id.)

Ghaznawi observed under factors 2a and 2d that the students rarely used poor language or were inappropriate. Ford also addressed students with their heads down, and when they later put their heads back down, Ford addressed their behavior again. Ford also addressed a student who was not participating, but the student did not complete the assignment.  Ghaznawi rated both factors as developing, as Ford tried to address behavior, but was not successful. (Id.)

Ghaznawi rated Ford as developing on the 1a "knowledge of content". She found that Ford's lesson was confusing for students, as the activity was not tied to the material and some elements of the lesson required knowledge of terms students may not have known.  She also noted the lesson required math skills that many had trouble calculating, as there was no model on the worksheet. Ghaznawi rated Ford developing on factor 3b "using questioning and discussion techniques".  She noted that Ford's worksheet directions specified student to student interaction, but that the students did not interact in a meaningful way.  She also noted Ford's questions required short answers that only illustrated if the students answered the worksheet questions correctly, but did not test deeper knowledge. Ghaznawi rated Ford developing for factor 3d "assessment". She noted that Ford called on students to see if they answered the questions correctly, but noted that the questions did not determine if they had developed knowledge, it only assessed if they filled in the blanks. (Id.)

Ghaznawi rated Ford ineffective for factor 1e "designing coherent instruction" observing that the activity the students performed was not aligned to the lesson's chief objective.  She also found that most of Ford's questions were level one and two questions, and that few questions engaged students at a deeper level.  She also rated him ineffective for factor 3c "Engaging student learning", as the activity was not aligned to the lesson's goal, the groupings

were not effective, and the lesson was not properly paced as multiple students were not able to finish the work. (Id.)

Ghaznawi focused her evaluator notes on components 1e and 3b, the areas that offered Ford the best opportunity to improve.  She discussed strategies for building a more effective lesson, with specific suggestions on how he could have better designed the lesson she observed.  She also emphasized the need for time allocations to improve pacing, and reminded him that she had given him a timer to help with pacing, which he was not using.  Finally, Ghaznawi told Ford that the following week she and Decker would plan a lesson with him that focused on pacing, more effective student questioning and opportunities for assessment.  Despite the developing ratings, Ghaznawi testified that she did not see evidence of student learning in the class. (Id.)

Ford presented a copy of the lesson plan and materials he used for the observed lesson, along with some examples of student work. (Ford Ex. 21; Tr. 1444-56)  He noted that the activity he used was something he had picked up from the weekly professional development sessions.  Ford thought the behavior in the class was fine, and again stated that a student referred to as a behavioral issue had an IEP, as did other students in the class.  Ford explained that he had paired students in the lesson to help with differentiation. Ford stated that he built a template for pairing students for the school year, and that he considered many factors when determining the groupings.

December 9, 2016 coaching session

The notes and testimony instruct Ford to use a timer to help pacing, and to list the timing for each section of the lesson's sections. (DOE Ex. 19; Tr. 399-402; 1044-52)  The plan being reviewed listed differentiation methods without explaining how they would be used.  Ford was instructed that assessment strategies needed to be explicitly stated in the lesson plan, and that "circulating, student to student assessment" did not identify how students will be assessed.  There was also concern that the entire lesson was a review of previous material, rather than introducing new concepts, and that the lesson had too many handouts.  In addition, Ghaznawi made suggestions to Ford on a literacy strategy he could have the students use while they read texts, which would also generate discussions between students. (Id.) Finally, the questions listed for the lesson were level one short answer questions drawn from the assigned reading.

At the session, Ghaznawi also provided Ford with verbal feedback of her November 30 observation. (Id.)

December 16, 2016 coaching session

The notes and testimony indicate that the lesson plan reviewed listed differentiation strategies, but does not say how they would be used; the assessment section did not reflect how students would receive feedback or how assessment would be used: the wrap up question did not refer to the lesson; there was no differentiation as the handouts and reading were all at the same level; the work was too complex for the time allowed; the questions were level one; there were too many handouts and they were confusing; and students were asked to formulate questions and indicate vocabulary issues, but there was no place in the lesson plan to address either. (DOE Ex. 19; Tr. 401-03) Ford had not brought any student work to the meeting, as had been requested, and he was again asked to bring it to the next meeting. (Id.)

December 23, 2016 coaching session

The notes and testimony indicate that Ford did not bring student work to the meeting as requested. In addition, for the lesson reviewed, there was no description for the mini-lesson; there was no differentiation strategies (only a list of strategies with no description of how they would be used); and there were no assessment strategies, only a list of strategies with no description of how they would be used. (DOE Ex. 19 and 27; Tr. 403-04; 1052-55) At the session Ghaznawi said she would provide a sample lesson and would teach a model lesson for Ford to observe. Decker testified that at this point Ford was not implementing many of the coaching suggestions. (Id.)

January 6, 2017 coaching session

The notes and testimony indicate that Ghaznawi walked Ford through a lesson she prepared using one of Ford's lesson plans, and how it incorporated differentiation strategies for high achievers, struggling readers and absent students, provided multiple assessment opportunities, and reduced multiple disconnected objectives into a single strategic objective. (DOE Ex. 19; Tr. 404-05)

February 3, 2017 coaching session

The notes and testimony indicate that Ford still had not brought in examples of student

work, and he was again requested to bring the work to the session. (DOE Ex. 19; Tr. 405-07) It was suggested that Ford use a clipboard listing each students reading level and check during class to see if the material was appropriate for each student.  For the lesson plan reviewed, it was noted that the reading material was too long for the class period; the questions were level one; the articles' content were not related to the unit or curriculum, and there were no questions in the lesson plan about the unrelated material.  Ford told Decker and Ghaznawi that his materials were adequate, and that there is too much material to cover.  He was instructed to create a pacing calendar to identify the most important parts of the unit and build lessons based on that decision.  Ghaznawi offered to help with the pacing calendar.  (Id.)

<u>February 6, 2017 Observation</u>

On February 6, 2017 Decker performed a 28 minute informal evaluation of Ford's Government class.  Decker recorded his evaluation of Ford's class on the APPR. (DOE Ex.12; Tr. 275-311)  For the classroom factors, Decker rated Ford ineffective on six of the eight Danielson measures, ranked him "N/A" on measure 1e, and developing on measure 2a.  Decker testified that the "N/A" for measure 1e was a mistake, but he did not state what the correct measure should have been.  In the Preparation and Professionalism section, Decker rated Ford "N/A" for all three factors. (Id.)

Decker observed that students were generally respectful. There was an incident of swearing which Ford did not address.  About six minutes before the end of class, students from the next class began entering the room and interacting with the students in the class and being disruptive.  Ford spoke to them, but did not require them to leave.  A student walked out without a hall pass, which is a violation of school policy, but Ford did not stop him.  Two students had their heads down, but Decker did not see Ford check to see if they were okay. (Id.)

Decker observed that Ford distributed a handout with questions and a reading passage.  As he distributed it he was still prepping the handouts by punching holes in them, which showed that Ford was not prepared and slowed the teaching process. Ford's instruction for the handout was that the students could rip questions out of the packet (which he illustrated by ripping pages out of a handout). The same package was given to all students.  Ford instructed the students to read the passage and answer the questions.  It was unclear to Decker and some students which portions of the assignment were to be completed in class, and which were for homework,

and Ford appeared to give conflicting instructions on this point. (Id.)

Decker observed that the lesson did not correspond to the lesson plan. According to the lesson plan the Aim of the class was to ask how the Government was behaving in Washington, but the posted chart said the class was to cover the operation of checks and balances in Government. Decker found the Aim vague and without sufficient context, and he also did not see how it aligned to the unit. The activity in the lesson plan was to read three articles, but this was not the activity the students were working on, and three articles was too much to cover. The lesson's differentiation strategies were "groupings/pairing, daily monitoring, check ins", but Decker did not see any pairs and did not observe Ford monitoring. Decker had repeatedly stressed to Ford that he was just listing items in the differentiation section of his lesson plan, but was not employing any active differentiation strategies. Finally, the wrap up question asked about checks and balances, but nothing in the class addressed this topic, and the wrap up question was not discussed. (Id.)

Decker observed that the questions asked in the handout were all level one questions. While Ford asked the students questions in class, Decker observed only one attempt by Ford to ask a student the reason for his answer, but the student declined to answer. Ford cold called three students during class, but did not call on any others. There was also no evidence of assessment by Ford. The lesson work sheet indicated that the sheets would be collected and given a grade from zero to ten, which Decker did not believe gave the students accurate or actionable feedback. (Id.)

Decker's evaluator notes indicated that Ford was not employing differentiation, higher level questioning, proper timing, in-class assessments or activities that are aligned with the goal of the class. Decker testified that Ford continued his practice of not implementing the coaching suggestions. This failure was particularly concerning with respect to differentiation, as the entire school was focused on improving literacy, and nothing in Ford's practice was addressing that goal. Decker raised those concerns at the post-observation conference. At that conference Ford stated that he did not value the feedback, and that he felt that his lesson plans were good. (Id.)

Ford submitted a copy of the lesson plan and packet of materials. (Ford at Ex. 22; Tr. 1457-73) He testified he had reviewed the plan in a coaching session prior to the observation,

and stated he made changes to the lesson plan based on the coaching. Ford testified that in addition to the materials listed and included in the lesson plan, he also showed a video and handed out an additional reference reading.  He noted that he provided two differentiated readings in the lesson plan.  Ford stated that he assessed the day's work by grading the Aim sheet in the binder, by walking around the class and seeing how the students were doing, and by going over material together in the front of the room.  With respect to the student who walked out of class, Ford said the student had problems sitting still, and that Ford called to him, but the student kept walking.

### February 7, 2017 letter to Ford

On February 7, 2017 Decker gave Ford a second letter admonishing him for not providing his lesson plans prior to coaching sessions so that Decker and Ghaznawi could provide him with constructive feedback.  (DOE Ex. 13; Tr. 318-320) The letter identified six instances since the October 6, 2016 letter to Ford where he failed to provide lesson plans, in two of those instances Ford failed to provide lessons plans for the entire week of classes.   The letter identified an additional instance where Ford submitted the lesson plan on the same morning he was teaching the lesson. (Id.)

The letter reminds Ford that the point of submitting the plans was to help Ford create instruction that was aligned to the units and accessible to all learners.  The letter ends by informing Ford that the failure to provide the lesson plans was a "violation of your TIP and an act of insubordination," and that future failures to provide lesson plans could result in disciplinary action. (Id.)

Ford presented evidence in the form of an email to Decker that he had provided lesson plans for November 21 and 23. (Ford Ex. 31; Tr. 1520-27)[19] Ford also testified that for many of the other dates raised by Decker, he provided lesson plans on the day of the coaching or the day before the coaching. (Id.)

### February 7, 2017 TIP meeting

On February 7, 2017, Decker held a mid-year TIP meeting with Ford to go over his performance to date.  Robin Link ("Link"), the Union chapter chair also attended the meeting.

---

[19] The emails were not legible beyond the names of the sender, the recipients, and the date.

(Tr. 321-346; 1165-1167) Decker took notes of the meeting, which he typed and provided to Ford. (DOE 15) The notes indicate that based on three observations Ford had not achieved a single effective rating in the four measurement areas the TIP identified as needing to improve to the effective level.  The notes indicated that Ford had received a developing rating in two of the observations for areas 2a and 2d.  Decker noted that the minimum acceptable level of performance at Bronx Guild was effective, and that while a developing rating was better than ineffective, it did not indicate effective teaching.

Decker was particularly concerned that Ford was not implementing the coaching suggestions.  Decker pointed out that the lesson plans continued to be long and unfocussed, and without substance in the differentiation section.  Decker had also previously told Ford the lesson plans should include the questions he would be asking the students, so Decker could help Ford formulate more effective questions. Ford raised concerns that there was too much to cover in each unit. However, Decker noted that Ford was teaching what he wanted and wasn't following the unit's curriculum.  Ghaznawi offered to hold additional meetings with Ford to create lesson pacing and determine what elements of the unit were essential to cover. These meetings did occur. (Tr. 321-46)

Link testified that Decker was agitated, emotionally charged, and not very cooperative. He felt Decker had a negative agenda towards Ford. In contrast, Link thought Ford was trying to make the meeting amicable.  Ford made multiple suggestions for changes or things that would help him improve, but Decker was not receptive to those suggestions and made no changes.  Finally, Link testified that, at the meeting, he offered to review the coaching notes with Ford and work with him to figure out how he could improve.  Decker told Link not to have those meetings. (Tr. 1164-67) Link nonetheless met with Ford to answer teaching questions. (Tr. 1178)

Decker testified that Ford also asked to be allowed to show videos that were longer than the three-minute limit Bronx Guild placed on videos. (Tr. 321-46) Decker did not want Ford to show longer videos, she was concerned that students would lose focus with a longer format. Decker was willing to allow multiple clips of three minutes or less, if the individual clips were part of a planned conversation and questioning between clips.  Decker offered to help Ford build an activity around video, but Ford did not obtain Decker's help. (Id.)

Ford also wanted help dealing with two specific problem students as well as the problem of students arriving late and disrupting the class. Decker offered to help Ford develop strategies for the two students. Decker noted that late arriving students was a school-wide problem, but that other teachers had developed effective strategies for dealing with the disruptions. He offered additional pay for Ford and some of the teachers with effective strategies to meet after school. At those meetings they could walk Ford through their disruption strategies, differentiation strategies and other issues Ford needed to improve. Ford did not pursue Decker's offer. (Id.)

Ford complained that he was not comfortable with the weekly coaching sessions, as the sessions were too critical, and evaluated his lesson plans rather than trying to improve them. Ford did not find them useful. Decker explained that because Ford's lesson plans were not useful or effective, it was necessary to deeply analyze them and give Ford a lot of constructive feedback. Decker also testified that because the lesson plans required a lot of work, they didn't have much time in the coaching sessions to go beyond the lesson plans. Decker hoped the additional coaching sessions with Ghaznawi would help Ford improve. (Id.)

Decker stated that Ford also worried that he was being asked to do too much in the TIP. Decker pointed out that they were devoting a lot of resources to help Ford improve his teaching, and that the administrators were making themselves available as much as possible to help Ford. (Id.)

Finally, the TIP specified that Ghaznawi would meet with Ford in her role as the administrator responsible for social studies. The TIP specified that these meetings would occur once per marking period, but Ghaznawi testified that they instead occurred bi-weekly. (Tr. 932-32)

<u>February 13, 2017 Observation</u>

On February 13, 2017, Ghaznawi performed a 34-minute informal evaluation of Ford's Government class. Ghaznawi recorded her evaluation on the APPR. (DOE Ex.26; Tr. 990-1030 ) In the classroom observation section, Ghaznawi rated Ford developing on five of eight Danielson measures, and ineffective on 1e, 3c and 3d. In the Preparation and Professionalism section, Ghaznawi rated Ford "N/A" for all three factors, as she had not received his lesson plan prior to the class. (Id.)

Ghaznawi rated Ford developing for 1a, pedagogy, but she did not include any lesson specific examples in the section, explaining that she focused her notes in section 1e, as she believed that if Ford could improve in that component, he would be in the best position to improve overall.  Ghaznawi testified with respect to 1a, that Ford's lesson did not lay the groundwork for student learning. (Id.)

Ghaznawi rated Ford ineffective for 1e and 3c, coherent instruction and engaging students, observing that the mini-lesson and activity did not support the objective, but instead covered another topic. She noted the activity required no higher-level thinking, as the students were simply copying definitions from the text of the mini-lesson reading, and were not asked to use the definitions during the lesson. The lesson spent approximately thirty minutes on the warm up, and then Ford told the students to try to get through the next section of the lesson in ten minutes, which Ghaznawi did not think was enough time to focus on the material. Some of the stronger students in the class were not able to complete the activity in the allotted time. She stated there was no timing listed on the flow, and that students selected their own partners, though the lesson plan said higher and lower functioning students would be paired for support. (Id.)

Ghaznawi rated Ford developing for factors 2a and 2d.  Students were discussing non-classroom subjects, and one student spoke to Ford in a sarcastic and inappropriate manner. Ghaznawi observed that Ford attempted to address some of the poor student behavior, but that he was often ignored and did not follow up when students failed to follow his instructions. (Id.)

Ghaznawi rated Ford developing for factor 3b.  She noted that while Ford called on students, the questions were not higher level, required one sentence answers, and there was no follow up questioning. She rated Ford ineffective for 3d, assessment, noting that other than asking a few students level one questions without recording anything regarding their answers, she did not see Ford perform any assessment of student learning during the lesson.  She rated Ford developing for 4e, stating that Ford asked to meet with and did meet with a coach from the NYC Writing Project during the Spring semester. (Id.)

Ghaznawi's evaluator notes indicate that she had previously explained the issues and concerns she had with Ford's teaching.  She reiterated that improvement in lesson design and engaging student learning presented the best opportunity for Ford to improve.  She then made

detailed suggestions for how Ford could improve, and tied those suggestions to her specific observations.  She noted that she made these same suggestions in her coaching sessions with him and that she had scheduled supplemental sessions to help him with lesson planning and the related problems she had observed. The suggestions included - aligning the elements of the lesson plan, implementing proper timing and pacing, applying differentiation strategies to help with student engagement, and grouping students for support.  Ghaznawi testified that she did not see any student learning, and that the lesson's instructional objectives were not met.

Ford put the lesson plan for this observation into evidence. (Ford Ex. 24; Tr. 1473-87; 1615-22) Ford acknowledged that he had mixed up papers for the lesson, and had included a portion of a different lesson.  Ford stated that the overall lesson was designed to set up the performance task the students would be working on the rest of the week, and that he graded the performance task using a five point grading rubric that came from Ghaznawi's template. Ford thought the lesson went well and that the students behaved well.  He again noted that the class had students with IEPs, but fewer than in other classes.  Ford explained that this was the same class of students that Decker had observed in the prior class. Ford testified that the students were well paired, and gave examples. He also stated that while the timer he had been given disappeared, some of the students did not like the timer, and it was hard to implement without an assigned classroom. (Id.)

February 17, 2017 coaching session

The notes and testimony indicate that most of the session covered Ghaznawi's and Decker's February reviews. (DOE Ex. 19; Tr. 407-09; 1056-57) In addition, it was noted that Ford had only entered one grade in the computer system that allowed students and parents to track progress.  It was again recommended that Ford use a timer to pace lessons.  Ford told the coaches that he lost the timer he was given and was not comfortable using one. The coaches discussed the purpose of student feedback and why Ford's responses to student questions were not effective.  Ghaznawi offered to help Ford with grouping strategies based on student's reading levels. Ghaznawi did meet with Ford to help him with grouping strategies (Id.)

March 6, 2017 Observation

On March 6, 2017, Decker performed a 35 minute informal evaluation of Ford's Government class.  Decker recorded his evaluation on the APPR. (DOE Ex.16; Tr. 347-376)

For the classroom observation section, Decker rated Ford ineffective on six of the eight Danielson measures, and ranked him developing on measures 2a and 2d. For the Preparation and Professionalism section, Decker rated Ford ineffective on two of the three factors, and "N/A" for factor 4e. (Id.)

Overall, while the students were respectful, some students spoke throughout the class. Ford asked them to stop once, but did not ask again.  Three students arrived late, and Ford brought them up to speed on the lesson.  They sat down without being disruptive.  Some of the students were not focusing on the work, and one was watching an unrelated you tube video. (Id.)

When Decker arrived, the students were watching a video that Ford turned off when Decker entered.  Ford never referenced or connected the video to the class after it was turned off.  Decker asked Ford what portion of the lesson he was covering.  Ford replied the mini-lesson, but then told Decker he had changed the lesson and the students were on the activity. The lesson plan itself was vague and confusing, with instructions for the students to look at their binders from past classes, without context for why they were looking at them. (Id.)

The activity was to look at a website and answer questions on a worksheet.  Decker thought there were too many questions and too much information for the students to absorb in one class.  Later Ford asked the students to answer the questions out loud and he would write the answers on the board. The questions were hunt and find level one questions that did not require the students to explain their thinking or what they understood.  The directions were confusing, and on two occasions students asked Ford what to do, and he replied, "just write something down".  Decker thought this was a disrespectful response to students who were apparently struggling with a portion of the lesson, and indicated Ford just wanted the students to fill out the worksheet. (Id.)

Decker observed that the activity and the wrap up question were not what Ford had put on the posted flow, and the activity also was not what was written in the lesson plan.  Also, the flow did not have the time segments Decker had repeatedly asked Ford to include, so that both Ford and the students could pace the lesson. (Id.)

Decker stated that the website required an understanding of charts and graphs, which not all students possessed. The text in the websites was dense and difficult for many struggling

readers. There were no alternatives for struggling readers. While the differentiation portion of the lesson plan said there would be groupings/pairings for differentiation, students told Decker they selected their work groups themselves. The lesson plan also said there would be individual attention for differentiation, but Decker did not observe any individual differentiation. The assignment could not be finished in one period, and some students had little written down. (Id.)

Decker did not see any assessment, and did not see Ford using any of the assessment techniques he had been coached to use. He also did not observe Ford walking around the room and checking on the students as they were working. (Id.)

Decker again instructed Ford that the lessons needed to be aligned to the unit, that Ford had to follow the lesson plans they discussed at coaching, and that the lesson segments needed to be timed. Decker also emphasized that Ford needed to "immediately" employ differentiation strategies for struggling students and different learning styles. Finally, Decker again emphasized that Ford needed to undertake the types of assessment strategies that they had discussed in coaching. Overall, Decker didn't think any learning had occurred in the lesson. (Id.)

Ford put the lesson plan for this observation into evidence, and observed that this was the same class of students that had been observed in the prior two informal observations. (Ford Ex. 25; Tr. 1487-96; 1622-24) He testified that this was an earlier version of the lesson plan, as he was not able to obtain the revised version he used in class that day. Ford explained that he had been absent for the prior class, and had to change what he taught because the substitute had not completed the prior day's lesson.[20] Ford stated that his main mode of assessment was the binder. He also stated that he would assess by circulating around the class, through the wrap up question, and at the end of the marking period. Ford also noted that to increase assessment, he added a blank at the end of the wrap-up question that students would fill in and he could grade. (Id.)

March 7, 2017 coaching session

The testimony and notes indicated that the lesson plan being reviewed did not have time

---

[20] Ford also testified that Decker had the wrong lesson plan, but a review of Decker's comments and testimony, as well as lesson plan submitted by Ford for the class do not appear to support that statement.

allocations, which were added during the coaching session. (DOE Ex. 19 and 27; Tr. 409-12; 1057-65) The activities were not aligned with the objectives, so during the session the coaches revised the lesson to identify the goal and new objective, and removed and modified activities that did not support the objective. There was no assessment objective, so the coaches added an opportunity for assessment. There were no strategies to facilitate a warm up or wrap up, so they added them at the coaching session. These changes provided Ford with a revised lesson plan that illustrated the elements that Decker and Ghaznawi wanted Ford to apply to all his lesson plans. (Id.)

<u>March 10, 2017 coaching session</u>

The testimony and notes indicate that this session focused on feedback from Decker's March 6, 2017 informal observation. (DOE Ex. 19; 1064-66) The notes go on to say that suggestions were made on how to develop differentiation strategies, and they discussed student feedback strategies. (Id.)

<u>March 17, 2017 coaching session</u>

The notes indicate that Ford read and signed the February 13, 2017 observation report, that they discussed the prior observations and notes, and they answered Ford's questions. (DOE Ex. 19)

<u>March 24, 2017 coaching session</u>

The notes and testimony indicate that they reviewed the APPR from March 6, 2017. (DOE Ex. 19; Tr. 412-14;1066-67) Ford was told he needed to use suggestions from prior coaching sessions, including the differentiation chart Ghaznawi prepared that identified Ford's students by their reading levels.  Decker suggested Ford place multiple texts at stations in the classroom to give students access to different levels of texts.  The coaches noted that the lesson was too much for one class.  Decker said finding answers to questions was busy work and level one questioning, Ford did not think it was busy work. Ghaznawi suggested methods for multi-level student questioning. (Id.)

<u>March 31, 2017 coaching session</u>

The notes and testimony indicate that Decker and Ghaznawi went over the plan for the model lesson Ghaznawi prepared, and which Ford would watch her teach, as well as teach

himself.  (DOE Ex. 19; Tr. 414-15; 1067-73)  Decker also instructed Ford that he needed a better method for making sure students understood their grades and how to improve them. Ford responded that the grades were "holistic", which was a vague term Decker did not understand. Decker testified that when he reviewed the binders for Ford's students, Decker noted that Ford simply tallied how many questions the student answered, and that this didn't tell the students how they were doing in the class. (Id.)

The strategy for Ghaznawi's model lesson was for Ford to teach his first class using Ghaznawi's prepared lesson. Ford would then observe Ghaznawi teach the second class using the same lesson.  Ford would then teach the third class using the same lesson, during which he would apply what he observed during the lesson Ghaznawi taught. Ghaznawi provided Ford with a lesson plan, flow chart, materials pre-punched with binder holes, all materials needed for the lesson, a description of how students would be assessed, literacy strategies, differentiated readings, and student self-monitoring sheets.  (Id.)

April 7, 2017 coaching session

The notes and testimony indicate that the participants discussed what was useful in the model lesson. (DOE Ex. 19; Tr. 415-18; 1073-78) Ford thought it worked best in the class Ghaznawi taught, as that was class with the strongest readers. Ford thought it was difficult to use in the classes he taught, and that it would be difficult to get student buy into group work. Ghaznawi replied that it would take time and frequency for buy in, and asked what percentage of students completed the work.  Ford had not calculated that measure.  Ghaznawi suggested tracking which students reach objectives, and she provided Ford with a tracking tool.  They discussed differentiation strategies, and Ford said differentiation was only for lower level students. Decker explained it was for all students, and was surprised that after two years of coaching, Ford did not understand the scope of differentiation.  (Id.)

With respect to a lesson plan they reviewed, Ghaznawi suggested a different warm up question and commented that one of the questions in Ford's plan was a nice higher-level question. Ghaznawi also thought there was too much in the lesson to cover in one class. (Id.)

April 28, 2017 coaching session

The notes and testimony indicate that Ford had not yet observed other teachers as previously suggested, Ford said he would observe a ninth grade history teacher. (DOE Ex. 19a

and 27; Tr. 1079-84) Ghaznawi told Ford the lesson plan for May 1, 2017 began with multiple objectives, noting that Ford had been instructed many times that a lesson should have one objective.  She also raised a concern that the mini-lesson had the students organizing their binders.  She noted this was housekeeping, not a mini-lesson, as it did not teach any new material. Decker noted that the lesson jumped from one topic to another topic that did not seem connected.  Ghaznawi commended Ford for including some differentiation in the lesson plan. (Id.)

They also reviewed a second lesson plan for May 3, 2017.  Ghaznawi again noted that there were multiple objectives in the lesson, and that the mini-lesson activity did not support any of those objectives. Ford said he would find another activity. A third lesson for May 5, 2017 was not aligned to the unit, and Decker told Ford that if it was not aligned, Ford would receive low marks on Danielson.  Decker encouraged Ford to review Danielson on planning and alignment. (Id.)

<u>April 28, 2017 Observation</u>

On April 28, 2017 Decker performed a 26 minute informal evaluation of Ford's Government class.  Decker recorded his evaluation on the APPR. (DOE Ex.17; Tr. 377-87) For the classroom observation section, Decker rated Ford ineffective on six of the eight Danielson measures, and ranked him developing on factor 2d and "N/A" for factor 3c. For the Preparation and Professionalism section, Decker rated Ford "N/A" for all three factors. (Id.)

Decker noted that Ford tried to manage student behavior, but with uneven results. Decker observed students cursing repeatedly without Ford addressing the behavior. One student was eating, which Ford acknowledged, but did not ask the student to stop. Students were talking, but Ford did not redirect them to work.  One student asked for a hall pass, and Ford asked the student to do some work before he gave her the pass.  The student began cursing and Ford wrote her the pass. (Id.)

The lesson consisted of the warm up for the entire time Decker was in the class, which involved the students reading long passages and answering questions without any differentiation for struggling students.  There was no observable instruction and no student discussion.  The questions themselves were level one questions, many requiring one-word answers.  Ford asked students what they answered on the sheet, but did not ask any follow up

questions. When a student did not answer, Ford moved on to another question. (Id.)

The lesson plan said the students would be grouped for differentiation, but Decker noted that the students had grouped themselves or were sitting alone. Decker also noted that the only timed activity was ten minutes for the warm up, but that the warm up activity went on for the entire time Decker was in the class. There was no observed assessment. Most students did not answer Ford's questions, but Ford did not take any notes when they did not answer. (Id.)

In the evaluator notes, Decker reiterated that neither Ford's lesson plan nor his classroom instruction evidenced any of the differentiation strategies that they had repeatedly discussed in the coaching sessions. Decker also reiterated that Ford needed to utilize the coaching suggestions regarding higher level questioning and grouping. At the post-hearing meeting Decker told Ford he was not seeing any improvement. Ford indicated that he did not value Decker's suggestions. (Id.)

Ford presented testimony and his lesson plan regarding this lesson. (Ford Ex. 26; Tr. 1496-04; 1624-27) Ford testified that the observation was inaccurate. He stated that there was differentiation, as in addition to the handout covering twenty-five Supreme Court cases, the students could go to a website to look up those cases. Ford asserted that this class was a set up class for upcoming lessons, and that it was necessary for the students to familiarize themselves with the cases before moving to those lessons. Ford stated there were only four students in the class that day, which prevented him from grouping the students as he had planned, so he treated the entire class as a single group. He stated that this was made more difficult as there was tension between some of the students in the class. With respect to one of the students who was misbehaving, Ford stated that she was a problem student, did not take the class seriously, an indicated she was likely under the influence of something. Ford noted that he used his normal assessment tools - the binder, the warm-up and the wrap-up. Finally, Ford asserted that he had used the differentiation strategies in this lesson, specifically grouping and using a template. (Id.)

May 5, 2017 coaching session

The coaches reviewed Decker's informal observation of April 28, 2017. (DOE Ex. 19a)

Ford's 2016/17 annual performance review

Ford's MOTP rating for 2016/17 was ineffective, and his overall rating for the 2016/17 was developing.  (DOE Ex. 22; Tr. 427-430) This measure was based on a calculation of Ford's MOTP and a MOSL rating of effective.

Decker did not observe that the support given to Ford made any difference, because Ford would not implement the coaching suggestions.  Decker did not believe that there was any further professional development that would make Ford fit to be a teacher, as Ford refused to acknowledge that he was ineffective and needed to improve, despite hearing that feedback from multiple sources.

Ghaznawi testified that Ford did not agree with the feedback he was receiving, and did not want to implement the suggestions Decker and Ghaznawi provided. She did not believe there was any additional professional development that would make Ford fit to continue as a teacher, and that he was not a good pedagogue. (Tr. 1086-87)

Peer Evaluator's Observations

Because Ford received an ineffective rating for 2015/16, he was provided with a peer validator for the 2016/17 school year.  The purpose of this peer validator was to determine if Ford's rating for the previous 2015/16 school year was valid.  Ford did not see any of the validator's reports during the 2016/17 school year.  Ford's validator was Joshua Frost ("Frost"), and he reviewed Ford on three separate occasions, October 26, 2016, March 1, 2017 and April 26, 2017.  In each case Frost attended Ford's entire class, and he filled out a Peer Validator Observation Form.  The Peer Form differs from the APPR, as it only included a section for classroom observations for five of the eight Danielson factors (2a, 2d, 3b, 3c and 3d), as well as a section for additional notes.  Frost testified that he had extensive training and experience reviewing teachers.  Frost took low inference notes of what he observed, and then applied those notes to the sections of the evaluation form. Frost also took pictures of the materials used in the class.  (Tr. 671-92)[21]

---

[21] Ford objected to the admission of the Peer Validator reports and testimony, arguing that the validator's observation dates were not dates listed in the first specification, and that since the reports were not viewed by Ford during the school year, they were not relevant to the allegations in the second specification.  The DOE responded that the evaluations were not being offered as additional charges or specifications, and that the observations were relevant to the allegations made in the second specification.  The DOE also argued that the observations could be introduced to corroborate the findings of the administrators 2016/17 observations.  After

For the October 26, 2016 observation, Frost rated Ford ineffective for all five factors. (DOE Ex. 28) For the March 1, 2017 observation, Frost rated Ford ineffective for all five factors. (DOE Ex. 29) For the April 26, 2017 observation, Frost rated Ford developing for factors 2a and 2d, and ineffective for factors 3b, 3c, and 3d. (DOE Ex. 30)

Frost emphasized in his testimony that Ford was always respectful to the students. However, observations for factors 2a and 2d indicate that students were not respectful to Ford or each other. In the October and March observations students verbally refused to follow Ford's requests or simply ignored the requests, and in some cases swore in their conversations with Ford as well as in their conversations with other students. While in several cases Ford warned the students not to curse, and responded to students who refused to follow his instructions, his warnings and instructions were often ignored. Frost also noted students talked throughout the class, which Ford did not successfully address, and students called out comments unrelated to the class, threw paper, left their seats without permission, and ate.

In contrast, during the April 26, 2017 observation for 2a and 2d, Frost noted multiple "warm" interactions between Ford and his students, and observed that there were no incidents of students being disrespectful to other students. Frost also observed students following Ford's established standards of conduct. However, students continued to have conversations unrelated to class work, which Ford addressed in only a minority of cases.

For factor 3b and 3c, Frost observed that Ford had a chart up for all three classes that laid out the flow. However, the charts indicated timing for only one element of one day's lesson. The charts also had entries such as "Warm Up – Packet #2", "Mini-Lesson - Presidency", "Warm Up: Questions on the Aim sheet", "Wrap-up: Question in in Sheet", "Activity: Bill of Rights", and "Wrap Up: PT". Frost also observed that in the March lesson elements of the lesson were not aligned, so that the work students were doing was not related to the stated purpose of the lesson.

Frost observed on all three dates that Ford's verbal and written questions to students almost exclusively required short answers (often one or two words), and only required the students to copy answers onto a worksheet or verbally recite information they read. Frost also

reviewing the supporting citations provided by each party, this Hearing Officer allowed the admission of the reports, specifying that they would not be used as additional dates under the first specification, but that they were potentially relevant. (Tr. 638-669).

observed that Ford rarely responded with follow up questions that asked the students to explain their answers, evidenced the student's knowledge or generated a discussion. Frost also noted on all three observations that only a small number of students participated in discussions.

Frost observed in all three observations that the pacing was either too slow or rushed. On October 26 Ford spent over 23 minutes on the warm up. On March 1 Frost noted that the entire 60-minute class was spent on the warm-up. On April 26 Frost observed that the pace was rushed, as students were given 22 minutes to complete a chart, and that only six of the eleven students working on the chart were able to complete it in the allotted time.

For factor 3d, Frost observed many of the same issues in all three of his observations. There were no assessment criteria posted, written or stated (all three observations); students were not aware of the assessment criteria (all three observations); there was little or no monitoring of student learning (all three observations); no students engaged in self or peer feedback (all three observations) and there was little or no verbal or written feedback, and what little feedback Ford gave was of poor quality (October and April observations). Frost noted that for the March observation he would have rated Ford as developing for one of the four areas of assessment under factor 3d, but that the other three areas of assessment under 3d were rated ineffective, resulting in an overall rating of ineffective for 3d.

The Peer Independent Evaluator Result Report calculated Ford's MOTP on the five Danielson factors Frost rated, and gave Ford an MOTP of 1.13, an ineffective rating. When combined with Ford's MOSL score, which was rated effective, Ford's overall score was developing. (Ford Ex. 27; Tr. 1504-07)

<u>Bronx Guild Students' Testimony</u>

Ford presented the testimony of three former students. Ford was student W's crew leader during the 2013/14 school year and taught her Economics and Government during the 2015/16 school year, her Junior year. Regarding the 2015/16 school year, she testified that Ford was always respectful, and that while students weren't always quiet, he was able to get their attention. She testified that she knew what she needed to do to get a good grade "You had to be on time. You had to do all your work. You had to do the projects he was asking you to do. You had to be present, complete his work and do the homework." (Tr. 1136) She also testified that work had to be put in a binder, and "that will determine our grades at the end of

the semester." (Tr. 1137) She stated that "Ford would walk around and tell us our grade or we'll get our worksheet at the end of the semester that said our grade and sometimes it will have a little comment on it." (Id.) With respect to the work she did in class, she testified he would "try his best to give us like a worksheet and... it will already say what we had to write... we would just have to fill in the blanks for the worksheet." (Tr. 1138) She stated that Ford used a story wheel in class. Finally, W testified that Ford was one of the best teachers and was always available to help her with problems and issues.

Ford was student S' teacher for Economics and Government during the 2016/17 school year, her senior year. (Tr. 1205-13) She testified that each day the students would receive a sheet that they would put in their binder, along with homework, and that Ford would grade the work using a rubric of standards that he distributed to the class. He also would tell or write down feedback to the students. She stated that Ford was organized, engaged with all students, did not play favorites, and that all the students asked questions.

Ford was student X' teacher for Economics and Government during the 2014/15 school year, her Junior year, and was also her crew leader in the 2013/14 school year. (Tr. 1217-19) She testified that Ford would check the binders and leave notes telling them whether they did what was expected, give them a grade and leave a comment. She also stated that Ford was calm and polite, and when someone was cursing he would ask to speak with them outside the classroom.

<u>Bronx Guild Teachers' Testimony</u>

Ford presented the testimony of two Bronx Guild teachers who worked with him. Robin Link ("Link") was a Bronx Guild science teacher and crew leader for six years (including 2015/16 and 2016/17), and currently works as a Science teacher at Gotham Collaborative. He was also the Bronx Guild's Union chapter leader during the 2016/17 school year. (Tr. 1151-61)

Link testified that there was a "huge level" of differentiation among the students, that some students struggled both academically and socially, and that the levels of misbehavior, vulgar language and profanity could be high. Link stated that during the applicable years the administration did not provide any professional development for dealing with behavior or profanity. Link stated that Ford attended and actively participated in the Bronx Guild's weekly professional development sessions.

Wyatt Matthews ("Matthews") was a Bronx Guild English teacher and crew leader for five years. His last year at the school was 2015/16, after which he moved to Connecticut to teach. During the 2015/16 school year, he was the Union chapter leader (Tr. 1181-97) Matthews testified that his contact with Ford was primarily through the Learning Through Research program that Ford taught. Ford would email Matthews with issues that arose with Matthews' students. Matthews stated that the Bronx Guild students were edgy, a little oppositional, and used profane language. However, he emphasized that while profanity was always present to some degree, it was not used in a hostile way, it was simply a common mode of speech. During the 2015/16 school year the Administration did not provide specific professional development in dealing with student behavior or profanity. Matthews testified that Ford actively participated in professional development. Finally, he testified that Decker was defensive when he dealt with Matthews on Union issues.

Ford's Position on his Competency as a Teacher

Ford testified that he believed that some of the negative ratings from Decker, Rauner and Ghaznawi were motivated by non-pedagogical concerns, and that he felt he was being targeted. (Tr. 1557-61)

Ford thought that the main area where he had to improve for the 2015/16 school year was pacing, but that some of his issues were the result of a very ambitious curriculum, and that many social studies teachers had the same problem. Ford testified that he thought he was an effective teacher for the 2015/16 school year, although it was not his best year, noting that he was adjusting to a new curriculum, and the Rubric. (Id.)

For the 2016/17 school year, Ford thought the administration put a lot tasks on him to improve, including differentiation, that had not been raised very often in the 2015/16 school year. Ford asserted that he did better in the 2016/17 school year, and had been an effective teacher. (Id.)

Ford found the coaching sessions with Decker confusing. (Tr. 1362-67; 1593-96) Ford was concerned that Decker and Rauner were not social studies teachers, and Decker's request to keep the lessons simple at the beginning of the 2015/16 school year appeared to conflict with the breadth of material to be covered in the curriculum. Ford felt Decker was not an effective coach and that his ideas were not well thought out. Ford asserted that Decker was

trying to get Ford to change from Ford's preferred method of teaching to a new method of teaching. Ford also believed that there was a level of hostility in Decker's coaching. Ford noted that Decker had never taught in public schools (Id.)

Ford testified that he had been teaching since he was nineteen, and that he was very good at understanding students. (Tr. 1548-51) He believed that he was a highly effective teacher in some areas, particularly in making connections with students, that he had changed a lot of students' lives, and wanted to continue to have that impact. He subsequently stated that he knew his area well, and that he was highly effective. Ford indicated that at another school he would be valued, and that he would be an amazing teacher at the right school. Ford felt that he would be successful in a supportive environment, but that the last two years at Bronx Guild were not supportive. While he indicated he had some faults, he asserted that he was, overall, a good teacher. (Id.)

## Opinion

## Specification One Decision

Ford raises general objections to the observations that form the basis of Specification one. He argues that the observations performed by the entire administration are not credible, as only one administrator produced low inference notes, and Ford only received four of the six observations for 2015/16 (one of which was thrown out).

Ford also claims that Decker, who performed most of the observations, was not credible. Ford asserts that Decker repeatedly could not remember dates when events occurred, and insisted he had given Ford the 2015/16 curriculum in the Summer, when Ford did not receive it until the first day of school. Ford also argues Decker claimed Ford failed to provide lesson plans that Ford proved he did provide, and that Ford was held to a different standard that other teachers. Ford argues that Decker failed to observe Ford in the LTR class that Ford taught on Tuesdays and Thursdays. Finally, Ford points out that Decker violated a series of rules governing the observation process, including not allowing Ford to select his observation option, not allowing Ford to have a union representative at some of his TIP meetings, and not developing the TIP along with Ford.

The testimony of the administration was credible. The fact that the administrators did not produce their low inference notes does not diminish their credibility. All were clear in what

they observed and what they told Ford, and there is no basis to conclude that they were making up facts that had not been observed. As discussed below, while there were points in the observations that appear to be internally inconsistent, a closer review of the observations and lesson plans supports the observers evidence and ratings. Finally, Decker's rules violations and the fact that Ford did not receive six reviews for 2015/16 do not impair the administrators' credibility, but are an issue that must be addressed in determining the fairness of the process.[22]

Decker was credible, although his testimony on a few points was inaccurate, including his testimony on the professional development for 2015/16, and when he gave Ford the 2015/16 curriculum. He also failed to remember some dates and facts accurately. However, while those gaps and mistakes undermine his credibility on those specific circumstances, they are not sufficient to draw a broader negative inference about his overall credibility.[23] The fact that Ford was not observed in his LTR class also does not undermine Decker's credibility or the fairness of the process, as Ford testified he had limited teaching requirements for the LTR course, and his primary duties were to teach the social studies courses for which he was observed.

Specification 1.a, November 20, 2015

It is the Respondent's position that Decker's testimony is not credible, and that his observations are inaccurate and inconsistent with the record. Respondent argues that the lesson plan supports Ford's solid knowledge of the subject matter, that the plan asks higher level questions, and includes the required Bronx Guild lesson elements. Ford also argues that students with behavioral issues had IEPs, and should have been in a co-teaching environment. Ford's position is that the ratings in the Assessment of Preparation section of the APPR can only be based on observations fifteen days prior to the observation, and Decker based his on the lesson plan he received at the beginning of the class and therefore his ratings for those

---

[22] There is no evidence in the record to support Ford's claim that he was treated differently from other Bronx Guild teachers.

[23] There is a discrepancy regarding whether Ford provided lesson plans for coaching sessions as requested by Decker. It appears that for at least some of the dates Decker cited Ford for not providing a plan, Ford did provide a lesson plan. However, as no part of this decision rests on a finding that Ford failed to provide lesson plans as requested, this factual dispute does not need to be resolved. Moreover, assuming that Decker was incorrect about some of Ford's failure to provide lesson plans, that discrepancy is not sufficient to conclude Decker's overall testimony was not credible.

components violate the evaluation rules.  Ford argues that a lesson on the election was consistent with the civil liberties unit.  Ford's position is that the lesson plan contained numerous higher level questions, which Decker ignored.  Finally, Ford asserts that Decker misquoted the objective of the lesson, and that his instruction to Ford to limit himself to a single handout was unreasonable.

While there does appear to be some inaccuracies in Decker's observations, on the whole his testimony on this observation was credible, and evidenced a chaotic and confusing class that failed to effectively transfer knowledge to the students.

Turning to Ford's arguments for rejecting the specification, Ford's view of the rating system for Danielson 1a is too narrow, as the criteria is not limited to whether the teacher understands the subject matter, but also includes whether the teacher displays an understanding of the various pedagogical approaches. While there is no basis on the record to doubt Ford's understanding of the subject matter, Decker's observations, support the conclusion that Ford failed to evidence an understanding of the various pedagogical approaches.

Ford's argument with respect to the students with IEPs also is not persuasive.  Putting aside that the IEPs were not entered into evidence, Ford's role as teacher was to teach the students he had, regardless of their needs.  Ford admitted that he had read his students IEPs, and that he previously co-taught students with IEPs. It was reasonable to expect Ford to build and teach a lesson that included differentiation that would address and engage the spectrum of students in the class, and to develop strategies to work with the spectrum of misbehaviors. Ford failed to meet either expectation.[24]

Ford's argument that the Assessment of Preparation section of the APPR can only be based on observations in the fifteen days prior to the observation is not accurate.  Section J(2)(b)(6) of Joint Ex. 1 states that in addition to rating the section based on observations in the prior fifteen days, the evaluator "may assess a teacher's preparation and professionalism…based on observable evidence…during an observation…." (Jt. Ex.1 at 63) Decker's observations for that section met that requirement.

---

[24] The IEP argument is raised by Ford in response to many of the ratings.  The rationale set forth in this paragraph applies to that argument, and will not be repeated for each instance the argument is raised.

With respect to Decker's comment about not teaching the election, the context of the comment was that Decker had previously instructed Ford to move off the election topic and move on with the unit's curriculum.  The fact that Ford may have thought the election was important does not justify ignoring Decker's prior instruction to stop teaching the election.

Decker testified that he did not observe Ford using higher level questions, or engaging students in follow up questions.  Since most of the lesson Decker observed was the warm-up's opinion question, which should not have taken fifteen minutes, Decker did not observe other elements of the lesson.  However, a review of the lesson plan submitted by Ford supports Decker's observations.  Most of the lesson plan consists of questions that require the students to copy answers from the five pages of the reading, or answer opinion questions.

Finally, while Decker did instruct Ford not to give students more than one piece of paper as a handout, that instruction was under the heading "Next Steps" and did not form the basis of the ratings on this observation.

After considering all the evidence and arguments presented, Specification 1.a is sustained for the foregoing reasons.

<u>Specification 1.b, March 7, 2016</u>

Ford argues that this specification should be dismissed.  He first points out that he did not receive Decker's observation report form the October observation until after this observation, so did not have the benefit of Decker's comments.  He also notes that he did not have coaching with Decker from December through the date of this report, so that he was not getting the feedback he needed to be successful. Ford also observes that Rauner's report provides only minimal evidence for the ratings, and for some ratings, provides no evidence at all.  Ford Maintains that the combination of a PowerPoint, reading and worksheet evidence a variety of pedagogical approaches, and that the worksheet was not simply a series of fill-in the-blank questions, but instead evidences higher level questioning.  Finally, Ford asserts that he did not hear any swearing during the class, and that the student subsequently denied swearing.

It is significant that Ford did not receive written feedback from Decker prior to this observation, although Ford admitted that Decker had previously given him oral feedback on the observation that was not positive.  While Ford may not have received individual coaching from Decker for several months preceding this observation, he testified that he received some

coaching from Rauner during the Spring semester.   Ford also testified at length that he understood the elements of quality pedagogy. That knowledge, combined with Deker's oral feedback on the November observation, coaching Ford received, and the weekly school-wide professional development sessions he actively attended, creates a reasonable expectation that Ford would understand the areas that he needed to improve, and would improve them.

Of greater concern is that Rauner's observation does not include much evidence to support her ratings, and for some ratings she provided no evidence at all.   While Rauner's testimony elaborated on her ratings, the lack of evidence is a significant deficiency.   Moreover, while a review of the lesson plan supports Rauner's observation, that the lesson is largely fill-in-the-blanks based on information the students are instructed to look up from prior readings, the worksheet also evidences several thought questions that required higher level learning. While most of the elements of this Specification are not being sustained due to the lack of evidence, it must be noted that the numerous deficiencies raised in this APPR are consistent with Ford's other observations.

Rauner's observation for components 2a and 2d are sustained.   The fact that Ford did not hear the "repeated" swearing does not reflect well on Ford's attention to the class, and is consistent with Rauner's testimony that Ford was not walking around during the observation. In addition, Rauner's rating for those components was also based on a student talking the entire class without Ford addressing the behavior.

After considering all the evidence and arguments presented, Specification 1.b is sustained in part and dismissed in part.   It is sustained for components 2a and 2b, and dismissed for the other components.

Specification 1.c, April 1, 2016

Ford first argues that Decker's observations in 1a and 1e, that the student's work was not tied to the essential question for the lesson, is not supported by a review of the lesson plan. He asserts that the lesson plan's activity on mandatory versus discretionary spending is directly applicable to the essential question of how the Government spends money.   Ford maintains that the ratings for 3a, 3c and 3d are also deficient, because they ignore Decker's own observation that Ford's lesson asked some intriguing questions about Government spending. Finally, Ford asserts that Decker's observation, that Ford's lesson lacked assessment, ignores

Ford's system of assessing work the students put in the binder.

A review of the lesson plan supports some of Ford's criticism regarding components 1a and 1e, and also supports some of Decker's observations.  The topics covered by the lesson plan are primarily focused on issues related to how the government spends money, which is tied to the essential question.  However, Decker's observations for 1a and 1e also noted that the quantity of work required was excessive, and observed that students were searching through websites for answers to the questions, rather than evidencing an understanding of the concepts.  A review of the lesson plan shows that almost all the questions were fill-in-the-blank or short answer questions that required students to answer by searching through various sources.  They are not higher level questions that generate discussion or analysis.  The worksheet also evidences a substantial amount of work for a single lesson.

With respect to 3a, 3c and 3d, while Decker noted that the lesson asked some intriguing questions, he also noted that students had to look through eight websites and some pie charts to answer them, that there was no attempt by Ford to discuss the questions, and that students were not paying attention to the lesson.

While Ford maintained throughout the hearing that his primary method of assessment was grading the work in the binder, Ford was repeatedly told that his binder reviews were not an adequate form of assessment.  He was consistently told he needed to assess students throughout the class in ways that provided both Ford and the students with an immediate understanding of the students' comprehension.  While Ford testified at length on the need for assessment throughout the lesson and its value, the observations and his overwhelming (if not sole) reliance on reviewing the students' binders support a finding that he was not effectively assessing the students.  As the 3d Rubric states, "feedback must be timely, constructive and substantive and must provide the students the guidance they need to improve performance."  Ford's various numerical and pictorial systems for grading the binders after the class had been dismissed do not meet that requirement and justify the ineffective rating.  Moreover, testimony indicates that the primary basis for the grades given on the worksheets was completeness, which on its own is not the type of feedback that provides substantive guidance to students.[25]

---

[25] Ford raises the assessment argument in response to many of the ratings.  The rationale set forth in this paragraph applies to that argument, and will not be repeated for each instance the argument is raised.

(See, Jt. Ex. at 17)

The rating for 4e is not credible.  The Danielson Rubric defines this component in terms of active participation in professional development, not in terms of applying the knowledge gained into the classroom.  There was ample evidence presented by Ford as well as Link and Matthews that Ford was an eager and active participant in the weekly professional development activities.  Ford also obtained and sought out assistance and input from numerous sources, including administrators, fellow teachers and third parties.  While there is a question regarding whether Ford applied this input to improve his teaching, as discussed below, there is no basis to doubt that he actively pursued professional development, and so no basis for the 4e ineffective rating.[26]

After considering all the evidence and arguments presented, Specification 1.c. is sustained, except for Component 4e, which is dismissed.

Specification 1.d, October 26, 2016

Ford asserts that Decker's observation in 1a are contradicted by Ford's lesson plan, which indicates a variety of pedagogical strategies using a video, Aim sheet and readings. He argues that Decker's rating for 2a is not credible, as one of the students identified by Decker was not in the class, and the other was the subject of an IEP.  The rating in 3b is not credible, as the Aim sheet evidences several higher level questions. The rating for 3d also is not credible as Ford did assess students, which Decker observed when he noted Ford walking around the room.

While Ford's lesson plan does reference a video, Aim sheet and readings, those three elements do not necessarily evidence quality pedagogy.  Moreover, Ford was not being rated solely on his lesson plan, he was being rated on what was observed in the class, including his implementation of fundamental elements of quality pedagogy – higher level questioning, a well-paced lesson, differentiation, and effective assessment.  Decker's observations for 1a indicate that a few basic questions were asked during a twenty minute warm-up, with no discussion of the answers or the underlying concepts, and that the students were then instructed to fill out a worksheet. While the worksheet had some higher order questions, it had many level one

---

[26] This same rational applies to all the subsequent observations that rated Ford ineffective for component 4e, and will not be repeated for each instance the rating was given.

questions, and there is no evidence in the record that Ford completed the lesson and addressed those higher level questions after the lengthy warm-up.   Decker's observations in other areas of the report also support his rating, as there were no differentiation strategies observed, and the lesson itself covered too many topics for a single class.

With respect to 2a, accepting as fact that Decker named the wrong student in his notes, he also noted the student who swore, students who refused to answer Ford's questions, five students who were not working, and one student who was visibly cleaning out her purse rather than working.  Ford's failure to address these situations justifies the rating in 2a.

The rating in 3b is credible.  As set forth in the discussion for component 1c, there were no questioning or discussion techniques observed by Decker, other than a couple of low level questions that only a few students answered without any follow up from Ford.   These observations are consistent with an ineffective rating under Danielson component 3b.

The rating for 3d is also credible.  The fact that Ford was walking around the room and talking to students, is not the equivalent of an assessment.  As the Rubric emphasizes, there are multiple reasons for walking around a room, but walking around the room for the purposes of assessment is a planned activity, and there was no evidence that Ford was walking around the room with a plan to assess the students, or that he was in fact assessing them.  (See, Jt. Ex. At 16-7)

After considering all the evidence and arguments presented, Specification 1.d is sustained, except for component 4e, which is dismissed.

Specification 1e, November 30, 2016

Ford argues that the rating for component 1a is not credible, as Ghaznawi's evidence for the observation covers the students' understanding of what is being covered, not Ford's understanding as required by the Rubric.  Ford maintains the rating for 1e also is not credible, as Ghaznawi observation that the majority of questions on the worksheet were level one or two questions is contradicted by a review of Ford's lesson plan for the day, which included many higher level questions. Ford asserts the rating for Component 2a should be rejected, as Ghaznawi's observations note that the teacher and students were respectful, which is consistent with an effective rating.   The rating for component 3b should also be rejected because the observation that Ford failed to reiterate his instructions is contradicted by an

observation in another component.

Ford is correct with respect to component 1a. The Rubric defines component 1a in terms of the teacher's knowledge, not in terms of the student's. However, as discussed above, the 1a definition also includes the teacher's knowledge of pedagogy, which would be reflected in the various learning strategies Ford used in this class. As evidenced by Ghaznawi's overall observations, and a review of the lesson plan, evidence of Ford's pedagogy is lacking. However, the 1a rating is dismissed, as there isn't a basis to determine how Ghaznawi would have rated Ford if she had relied on the proper evidence.

With respect to 1e, while there are some higher level questions in the worksheet, a great deal of the lesson was built around a series of calculations that required the ability to multiply and add, which are not necessarily higher level questions in a social studies unit. In addition, while there were a few higher level questions in the worksheet, Ghaznawi's observed that Ford's class discussion was built almost entirely around level one questions.

For component 2a the Rubric addresses respect and rapport within the class. Ford's interactions with the students were respectful, and there are no cited instances of students being disrespectful to one another. The specific issues cited by Ghaznawi, that students had their heads down, which Ford addressed repeatedly, are applicable to component 2b, not to 2a. While students disregard for a teacher's requests can reflect negatively on an environment of respect, the observations in this case do not rise to that level. The developing rating for 2a is dismissed

The observations for component 3b falls within the developing rating, and arguably fits the definition of an ineffective rating. While Ghaznawi's testimony does appear to contradict one element of the 3b observations, the remaining 3b observations do not justify a higher rating.

After considering all the evidence and arguments presented, Specification 1.e is sustained, except for components 1a and 2a, which are dismissed.

Specification 1.f, February 6, 2017

Ford argues that because the observation was held shortly after a disciplinary meeting between Decker and Ford it should be rejected, as it is tainted and reflective of Decker's animus towards Ford. Ford maintains that component 2d is invalid, as Decker's observation that Ford failed to say anything to students arriving early for the next class and being disruptive is

contradicted by his observation in component 3c, that Ford addressed the students. Finally, Ford again argues that Decker's rating for 3d is unreasonable, as it ignores Ford's use of the binder system, and because Decker unreasonably expected Ford to use a clipboard to record his in-class assessments.

While the timing of the observation may not have been ideal for Ford, employees are often required to return to work after receiving a disciplinary warning, and the proximity of the warning and the observation does not excuse Ford from performing at an effective level.

Ford's argument for dismissing component 2d is not persuasive. Decker's observation in 2d and 3c regarding the students who arrived early is contradictory. However, when the observations regarding the early students are taken together, they reflect that two students arrived six minutes before the end of the prior class, Ford told them they were early, one of them was disruptive, and the two students did not leave the class. That does not qualify as effective or developing behavior management. Decker also observed students talking to each other when Ford talked, and Ford failing to address two students with their heads down. These observations support Decker's rating.

Ford's arguments regarding his binder system have been addressed above. In addition, Decker's objection to Ford's failure to record assessments during the class also supports Decker's rating. Ford admitted that formative assessments are an important part of student assessment, but that he did not always record those assessments. Ford had previously been told that he needed a method of assessing and recording student learning during the class. Whether or not Ford chose to use a clipboard or some other method to record formative assessments, Ford still was not using any method to record his formative assessments.

After considering all the evidence and arguments presented, Specification 1.f is sustained, except for component 4e, which is dismissed.

<u>Specification 1.g, February 13, 2017</u>

Ford asserts that the APPR has little probative value, as the observation was held only six days after the prior observation, and Ford did not receive a copy of the APPR for the February 6 observation until after the February 13 observation. Ford maintains that component 1a is invalid, as Ghaznawi failed to record any lesson specific evidence for the component, simply reciting the content from the Rubric. Component 2a should also be dismissed, as

Ghaznawi generally observed appropriate interactions and she only included one example that, on its face, did not appear to be inappropriate. Ford rejects Ghaznawi's testimony that the example listed was said sarcastically, as that characterization was not in the APPR.

While Ford's arguments regarding the proximity of the two observations are accurate, they are not fatal to the observation. The fact that Ford did not receive the APPR for the prior observation before this observation is a greater concern. However, at this point in the school year Ford had received feedback on five observations, had been through six coaching sessions with Decker and Ghaznawi, had begun meeting with Ghaznawi for additional coaching, and had received feedback at the February 7, 2017 TIP meeting that his trending performance was not at the effective level. All the feedback Ford received prior to this observation told him that he needed to make significant improvements to his pedagogy, and gave him suggestions on how to improve. It is difficult to conclude that without the February 6 APPR, Ford did not know that he needed to make changes to his teaching methods or that he did not know how he was supposed to change them.

Ford's observation for 1a is correct, the text of the observation does not include any in-class observations. Ghaznawi testified that she focused most of her notes for her observation in components 1e and 3c, as she thought that if Ford could improve in those areas, his overall performance in all areas would improve. A review of the evidence listed for 1e and 3c, along with the evidence in other components, identifies multiple basic problems with Ford's demonstration of his knowledge of pedagogy. These included problems with pacing, asking higher level questions, differentiation and assessment. Based on the overall observations, Ghaznawi's developing rating for 1a is reasonable, and arguably generous.

Ford's argument with respect to 2a is not persuasive. The student comment Ghaznawi quoted in the observation has a sarcastic tone to it. Moreover, there was no reason for Ghaznawi to include the quote if it wasn't meant to reflect negative evidence, as there is nothing positive or otherwise illustrative about the quote. In addition, the evidence for component 2d states that a student ignored Ford and left the room when Ford asked if the student had a hall pass, and that Ford called on students with their heads down, who did not respond. Taken together, the developing rating for 2a is reasonable.

After considering all the evidence and arguments presented, Specification 1.g is

sustained, except for component 4e, which is dismissed.

Specification 1.h, March 6, 2017

Ford maintains that the observation evidences inconsistencies with the lesson, as component 3b says the lesson consists of only hunt and find questions, but that Decker then notes a specific higher level question that the students were asked. Ford states that component 3d is also without merit. In addition to again rejecting Decker's admonition that Ford should use a clipboard to record student learning, Ford also points out that he was using a wrap-up question that would be collected as an additional form of assessment. Finally, Ford asserts that Decker's observation in component 1e, that the activity was not related to the essential question, is plainly contradicted by the lesson plan and Decker's own observations.

Ford's argument regarding component 3b is not persuasive. The question Ford argued was a higher level question, when viewed in context, was not a higher level question. Based on Decker's APPR, the students were asked to go to websites and to answer questions on a worksheet based on the information in the website. This is an example of a hunt and find level one question, not a higher level question. Moreover, the class discussion Decker recorded in 3b involves Ford asking the students to call out the answers they put on the worksheet, which is not a higher level discussion.

Ford's argument regarding his failure to use a clipboard have been previously addressed. Ford's argument, that his wrap up question was an additional form of assessment justifying a higher rating, is not persuasive. While Ford asked his students to write up the wrap up question and turn it in for later review, that request was no different than his requirement that the students turn in their Aim sheets for later grading. The issue Decker and Ghaznawi had repeatedly raised with Ford was that he needed to engage in and record formative assessments. The use of the wrap up question did not meet the formative assessment goal.

Ford's argument with respect to 1e also is not persuasive. Decker's observations throughout the APPR identify a lesson that Decker found confusing on many levels, including what was being covered, what the students were supposed to do, and how the elements were related. It is difficult to draw conclusions from the lesson plan Ford put into evidence, as he testified it was not the plan he used, as he made changes to the plan after a coaching session. However, those elements of the lesson plan that align with Decker's observations, as well as

the student work that was completed in class, evidence a lesson that covered many different topics. While some of those topics may have related to the Aim or the essential question for the unit, there were so many diverse topics in the lesson, that Decker's ultimate observation, that the elements of the class were not aligned, was reasonable.

After considering all the evidence and arguments presented, Specification 1.h is sustained, except for component 4e, which is dismissed.

Specification 1.i, April 28, 2017

Ford asserts that the Decker's rationales are not supported by the evidence. Ford cites the fact that Decker indicated in component 1a that the lesson consisted of reading long passages without differentiation, while a review of Ford's lesson plan indicates Ford had a variety of activities. Ford also notes that there were only four students in the class and some had IEPs, and that the small group allowed Ford to give the students individual attention, which is a form of differentiation. Ford also challenges Decker's conclusion in component 3b, that the questions asked were of low cognitive challenge, noting that the lesson plan contained higher order questions. Ford also disagrees with Decker's analysis in 3d, that Ford did not assess the students. Ford asserts that with such a small class, he was able to closely assess student learning.

Decker's rating for component 1a is credible. Ford's lesson plan indicated a ten minute warm up consisting of reading through an eight page packet of 25 Supreme Court cases to answer five hunt and find questions. This was the only activity Decker observed, as it went on for Decker's entire twenty-six minute observation. The mini-lesson asked the students to read a sheet from a prior lesson and answer three questions, only one of which was potentially a higher level question. The activity is in two parts, the first part asked what appear to be two higher level questions, and the second part asked the students to read one of two articles and answer questions that were not included in the lesson plan that was put into evidence. Even assuming that the choice between the two articles in the activity section was differentiation, there was no apparent differentiation on the warm up, which lasted almost half the class, or in the mini-lesson.

Decker's review of component 3b is also credible. While Ford argues that the lesson contained higher level questions, the lesson plan asked the students to review various readings

to answer those questions. The questions themselves appear on their face to require the students to find the single right answer to each question from the readings.

Decker's rating for 3d is also credible. There is no evidence that Ford did any formative assessment during the lesson or recorded those assessments. The fact that it was a small class does not take the place of an assessment methodology. The classroom discussion Decker observed consisted solely of Ford asking who had answered the questions on the Aim sheet, with no follow up.

After considering all the evidence and arguments presented, Specification 1.i is sustained, except for component 4e, which is dismissed.

## Specification Two

Respondent's Position

Ford argues that it is the DOE's burden to prove both that Ford provided ineffective service and that the DOE took appropriate steps to help Ford improve his pedagogy. He asserts that they have failed to meet both burdens, and cites a series of cases in support of that position, as well as cases in support of a lesser penalty than termination.

Ford argues that the coaching and support he received was inadequate. With respect to the 2015/16 school year he asserts that there was insufficient one-on-one coaching between Ford and the administrators, that he only received three valid evaluations, and that the feedback he received on one of those evaluations was untimely. With respect to the 2016/17 school year, he argues that the TIP provided no individualized professional development, that all Bronx Guild teachers had individual coaching, so his individual coaching did not meet the standard for support, and that Ford was not given a copy of the coaching notes. Ford also maintains that he was never put on notice that his failure to implement recommendations could result in his termination.

Ford argues that Specifications 2a and 2c, proper planning, pacing and/or execution of the lesson, and designing coherent instruction, should both be dismissed. He asserts that he was using the Bronx Guild template, that he often included time frames, and that he did properly execute his lessons.

Ford maintains that specifications 2b and 2e should be dismissed, because he used

appropriate methods and/or techniques during lessons, and engaged students. Ford notes that he implemented numerous suggestions in his lessons, including story wheels, cold calling, sentence starters, and differentiated readings. He also asserts that his lesson plans all contain higher order questions, and wrap up questions. Finally, he cites the testimony from one of his students, that he engaged all the students in the class. Ford also argues that Specification 2h, using appropriate questioning and instruction techniques is duplicative and should be dismissed on that basis.

Ford argues that Specification 2d, using assessment, should be dismissed, because there was little evidence that Ford was provided with professional development on assessment, and that Ford consistently assessed students through Aim sheets, student work, wrap up questions and the binders. He maintains that Specifications 2f and 2g, creating an environment of respect and rapport, and managing student behavior, should be dismissed, as there was no professional development in those areas, and the persistent use of profanity among students was a problem throughout Bronx Guild.

Finally, Ford argues that consideration should be given to the fact that he had never received training on the eight component Rubric, and that he had previously been rated as effective. He also asserts that he was a caring and thoughtful teacher, who treated his students with respect, and helped them outside of the classroom. Ford also points out that the peer evaluator gave Ford a higher rating than the Bronx Guild administrators, which shows that Ford was improving.

<u>DOE's Position</u>

In response, the DOE argues that there is ample evidence to support a finding that Ford was ineffective, and that there is no reason to conclude that further professional development will improve his pedagogy. The DOE cites numerous cases in support of this position. The DOE notes that Ford did not believe he had any deficiencies, and in support of that position points to Ford's repeated tendency to blame outside factors for the negative observations. These outside factors included the administrators bias against him, and the students learning and behavior challenges. The DOE also points out that Ford received abundant coaching.

The DOE argues there are numerous examples of Ford's failure to implement advice and coaching, arguing that the span of observations read almost like a single observation, as

they consistently evidence the same shortcomings. It asserts that this consistent failure to implement directives can not be corrected with further professional development. The DOE also argues that while Decker may have taken positions that violated the parties' agreements and the rules governing the process, this hearing is not the forum to address those deficiencies, the question at issue here is to determine competency.

The DOE also maintains that Ford has raised red herrings that should be ignored. They assert that Ford's MOSL score should not be given significant weight, as it was not tied to his teaching in his subject matter. They argue that the fact he was teaching students with IEPs outside of a co-teaching environment had nothing to do with his numerous and specific pedagogical failures.

Finally, the DOE maintains that Ford had been on notice for two years that he needed to significantly improve his pedagogy and that he received abundant professional development. The DOE notes that during 2015/16, even if Ford did not receive individual weekly coaching, he still attended the weekly professional development meetings, and had clear information on what he needed to improve. They point out that the level of coaching and support during the 2016/17 school year was even more comprehensive.

<u>Specification Two Decision</u>

For the following reasons, Specification two is sustained.

A review of the observations and testimony illustrate that Ford consistently failed to design and implement effective lessons, and a review of his testimony and lesson plans do not contradict that finding. Specifically, as set forth in the Decision regarding Specification One, Ford failed to: a) evidence proper planning, pacing, and execution of lessons; b) use appropriate methods and techniques during lessons; c) design coherent instruction; d) use assessment in instruction; e) engage students; f) create an environment of respect and rapport; g) manage student behavior; and h) use appropriate questioning and discussion techniques.

Each of these failures are illustrated in virtually every observation, including the peer evaluator's observations. While Ford consistently and sincerely believed that he was providing quality lessons and that his pedagogy was sound, the overwhelming evidence disputes that belief.

It is noteworthy that, after two years of input on the need to improve his pedagogy, rather

than recognize that he had deficiencies, Ford argues that the administrators failed to support him and were biased against him. While Ford's testimony focused on the perceived holes in his support, it ignored all the support he received. For the 2015/16 school year Ford attended the weekly professional development for all Bronx Guild teachers. He was coached for some period by Decker, as well as Rauner, and met with Downing, who gave him input on dealing with problem students. Decker also paired Ford with two stronger teachers for some classes, Moore, a social studies teacher, and Shiller, a special education teacher. While Ford did not receive Decker's November APPR until the Spring, Ford admitted that Decker gave him feedback shortly after the observation, which was not positive.

While the quantity of professional development for 2015/16 was significant, the 2016/17 professional development surpasses it. In addition to the weekly Bronx Guild professional development sessions, Ford received coaching from Decker and Ghaznawi. While Decker was Ford's coach, Decker chose to team coach Ford with Ghaznawi, a former social studies teacher. Decker took this extra step because he wanted to give Ford another perspective, as Ford had said he did not trust or value Decker's feedback. In addition to those frequent coaching sessions, Ghaznawi met with Ford twice a month during the Spring semester to go over every element of Ford's teaching and to help him with lesson plans. Ghaznawi also designed an example lesson for Ford using one of his lesson plans, and designed and taught an entire lesson for Ford, so he could see exactly what an effective lesson looked like. Finally, Ford observed other teachers, and Decker even offered to pay Ford and other teachers for working together after school, though Ford did not take him up on that offer. Finally, a review of the TIP illustrates that it clearly set forth the areas where Ford needed to improve, and identified a path for him to evidence that improvement.

Against this background, it is difficult to see how Ford can argue that the administrators and particularly Decker were biased against him, and that their observations were tainted by the desire to terminate him. Instead, it appears that they went out of their way to try to support him and help him improve.

Unfortunately, a review of the evidence supports a conclusion that Ford's pedagogy was ineffective and did not improve. The cornerstone of Ford's argument in support of his skills as a teacher is his lesson plans and Aim sheets. However, a review of that evidence does not

support Ford.[27] While Ford's lesson plans contained each of the sections of the Bronx Guild format, they are often confusing and difficult to follow, with multiple objectives, vague descriptions of what will occur, questionable alignment and minimal timing for sections.[28] Moreover, despite continual admonitions from his coaches that the descriptions Ford used for the plans' differentiation and assessment sections were insufficient, Ford generally continued to use the same descriptions and approaches.

Ford maintains that he did implement a variety of suggestions he received from coaching and the weekly professional development sessions. There is no basis to conclude Ford is correct. While Ford can point to a few isolated elements he used on a few occasions, the evidence is that Ford consistently implemented few if any of the many suggestions. Indeed, Ford's lesson plans and APPRs at the beginning of the period at issue look substantially the same as those at the end of the period.

Almost every lesson plan consists of some sort of reading, and in a few cases a web search, video or PowerPoint, followed by a worksheet with a series of level one questions that are answered from the source material. While there are potentially a few higher level questions in many worksheets, a closer reading of the worksheets illustrates that the answers are often to be found in the source material, making them level one hunt and find questions. Significantly, while Ford testified that his primary method of differentiation was varied readings, very few of his lesson plans included differentiated readings.

Moreover, because of Ford's pacing issues, it is not clear how often he was able to complete the lesson plans. A teacher can have a well-designed lesson plan, but if he/she fails to execute that plan, the fact that it was well-designed is not a compelling argument for the teacher's skill. Ford's lesson plans were not well-designed. He also repeatedly became bogged down in the warm up. Whether the fault of a poorly designed lesson plan or its execution, the results were the same, repeated ineffective lessons.

It is also important to note that, even if Ford's Aim sheets contained higher level questions, one of Ford's shortcomings was his failure to generate higher level group

---

[27] Ford's testimony as he walked through the lesson plans was sometimes confusing and difficult to follow. Given that lesson plans were meant to be clear, easy-to-follow guides for students and observers, the fact that they were not always clear and easy guides for Ford's testimony is telling.

[28] Ford points to Ghaznawi's lesson plans as evidence that he was held to a different standard. However, by comparison, Ghaznawi's lesson plans are straight forward and the flow is easily followed.

discussions.  The observers consistently noted that Ford's lessons had few discussions, and that most involved a few students answering Ford's level one questions with little or no follow up from Ford, and minimal participation from other students.[29]

Ford's various shortcomings in assessment were addressed in Specification One.  He argues in Specification Two that there was no professional development on student assessment.  As stated above, Ford received abundant professional development on assessment, and the observations and coaching sessions have multiple suggestions on how Ford should be assessing students, and why the method he was using was not adequate.  While Ford's testified that he understood the need for the various forms of assessment, he did not change his method in any significant way, and did not evidence any attempt at conducting or recording formative assessments.

Ford's ability to create an environment of respect and to manage behavior, while not effective, was not his weakest area.  As a starting point, it is clear from the record that Ford is a caring teacher who treated his students with respect, and appears to genuinely want to help them.  It is also clear that some of his students presented challenges to maintaining a constructive classroom environment, which is more difficult when working with students nearing graduation.  However, as an experienced teacher, Ford worked with difficult students in the past, and should be expected to have a variety of tools and strategies to help students maintain a constructive environment.  While there was testimony that behavior and classroom management was a Bronx Guild challenge, and that the weekly professional development did not focus on those issues, Ford did receive some coaching in this area, and had ample opportunity to talk to his coaches and fellow teachers for best practices in this area.

While Ford argues that he was not trained on the eight Danielson components, the underlying elements that make up the Rubric are the same elements that have always constituted effective teaching.  Ford's argument is undermined by his testimony that he understood the elements of effective teaching, so that even if he wasn't familiar with the Rubric, he understood its underlying principles.  Additionally, Ford was not rated ineffective and developing because he failed to understand and demonstrate subtleties defined in the Rubric.

---

[29] The testimony of Ford's former students, while credible, do not call into question the many observations illustrating that Ford's students were not engaged in anything other than filling out the Aim sheets.

He was poorly rated because he did not demonstrate the basic elements of effective teaching.

## Penalty

In determining whether termination is warranted in this case, the two questions that must be answered are whether Ford was an effective teacher, and if not, whether he can improve his pedagogy with additional professional development. An important subset of that second question is whether Ford was given a fair opportunity to improve, considering Decker's failure to allow Ford to choose his observation methods, to conduct the six observations in 2015/16 that Decker told Ford he would receive, to allow Ford to have a Union representative at all meetings when requested by Ford, and to include Ford in the formation of the TIP.

For the reasons set forth in the foregoing sections, this Hearing Officer concludes that Ford was not an effective teacher, and that there is just cause for disciplinary action under Education Law § 3020-a. Specifically, Ford provided incompetent and inefficient service; engaged in conduct unbecoming his position; engaged in conduct prejudicial to the good order, efficiency, and discipline of the service; and neglected his duty.

Turning to the questions of whether Ford was given a fair opportunity to improve, this Hearing Officer concludes that Ford was given a fair opportunity. While Decker did not allow Ford to select his method of observation, there is no evidence in the record that Ford wanted something other than the informal observations he received or that he ever requested a different process. There is also nothing in the record to support a finding that a different observation method might have resulted in a different outcome in the APPRs, given the consistent observations and ratings or that Ford would have improved with a different observation structure.

Of greater concern is the fact that Ford received only four of the six 2015/16 observations Decker told him he would receive. However, while Ford had every reason to expect six observations, there is no basis to conclude that the additional observations would have made any difference, as Ford failed to implement changes to his pedagogy over the period at issue, despite the abundant input he received. Ford had the same problems throughout the 2015/16 and 2016/17 school years, was given consistent input on those problems and was told what he needed to do to correct the problems. However, Ford failed to make changes. There is no basis to conclude that two or three more observations raising the same issues would have

made a difference.

It is also concerning that Ford was not allowed a Union representative when he requested one. Union representation is an important right that must be protected. However, in the context of this inquiry regarding Ford's ability to teach and improve, there is no basis to conclude that the failure to have Union representation impaired Ford's ability to improve his pedagogy. Ford had a Union representative at the February 2017 meeting. While that inclusion did not correct Decker's initial failure to allow all of Ford's requests for representation, it does evidence that well before the end of the 2016/17 year, Ford was able to communicate with and have input from his Union representative. For Ford to persuasively argue that his Union representative's earlier presence in the process would have helped him improve his pedagogy, he would need to show evidence that his pedagogy improved after the February meeting that the Union representative attended. The record does not support that argument.

Finally, with respect to the formation of the TIP, while the process is meant to be a collaborative process, the fact that Decker made an initial draft of a TIP before meeting with Ford is not inconsistent with that process. Decker had well-defined concerns regarding Ford's pedagogy. If Decker expected Ford to improve, it was incumbent on Decker to clearly define Ford's issues and what Ford needed to do to improve. Putting those elements in the initial draft of the TIP was a reasonable way to communicate Decker's concerns to Ford. While Decker was adamant that he would not remove elements of the initial draft, many of the changes he refused to make, such as eliminating the requirement that Ford submit his lesson plans, were elements that were designed to help Ford improve.

As set forth throughout this Opinion, the overall record supports a finding that Ford was given a fair opportunity to improve. He was given ample support and feedback, and the feedback he received was clear and consistent, as were his issues. The support also came from multiple sources and was provided in multiple ways, including weekly school wide meetings, team coaching, individual coaching, pairing with other teachers and lesson modeling. Significantly, in 2016/17 Ghaznawi, a former social studies teacher, provided substantial support to Ford.

The final question that must be addressed is whether Ford could improve with additional professional development. Unfortunately, there is no basis to conclude that he could improve.

While Ford has over twenty years of experience with the DOE, and that level of experience must be recognized and considered in a decision to terminate, his seniority is not sufficient to outweigh his refusal to recognize the need to improve his pedagogy.

In any endeavor, improvement requires three elements: recognizing the need to improve, having access to the resources needed to improve, and having the capacity to improve. Ford's inability, throughout the school years at issue and at the hearing, to accept that he needed to improve precludes a finding that additional professional development would make a difference. Ford testified that he was an effective or highly effective teacher. He did not acknowledge that he needed to improve in the many areas identified in the observations and coaching sessions. He also discounted the feedback and coaching he received because he apparently thought the administration was against him, did not support him, and was hostile towards him.

While Ford's belief is rebutted by the amount of quality support he received, the peer evaluations should have ended any question in Ford's mind that he needed to improve his pedagogy. The peer evaluator rated Ford ineffective for every component in two observations, and for three of the five components in the third observation.[30] The peer evaluator's observations were consistent with the APPRs and coaching feedback Ford received throughout the period at issue. While Ford did not have the benefit of the peer evaluations during the 2016/17 school year, he reviewed the peer evaluator's reports prior to this hearing. However, even after reading the reports, which confirmed what Ford had been told for two years, Ford still was unable to acknowledge his deficiencies, at most stating that he had some faults.[31]

Particularly significant is Ford's complaint that Decker was trying to get Ford to change from Ford's preferred method of teaching to a new method of teaching. That was exactly what Decker, Ghaznawi and Rauner were trying to get Ford to do for two years. The fact that Ford continues to see those attempts as a problem, illustrates his inability to recognize that he must

---

[30] Ford argues that the peer evaluator's MOTP combined with Ford's MOSL rating shows that Ford was a better teacher than his 2015/16 annual rating indicates. However, the overwhelmingly ineffective ratings Ford received from the peer evaluator does not support that argument.

[31] Ford's argues that he did not know he could be subject to termination. However, this argument assumes Ford would have improved if he knew his job was at stake. Putting aside whether Ford can realistically argue he did not know that ineffective teaching could result in termination, after two years of being told he needed to improve, arguing that he would only improve if his job was in peril does not state a case for an additional opportunity to improve.

change and improve his pedagogy, and will prevent him from changing with further professional development.

## Award

Having considered all the evidence, arguments and cases presented, this Hearing Officer makes the following award:

1. Specification One is sustained in part and dismissed in part, as specifically set forth above.

2. Specification Two is sustained.

3. For the violations set forth in paragraphs one and two above, there is Just Cause for termination, and termination is the appropriate penalty in this case.

Dated: January 4, 2018

*Robert H. Barron*

Robert H. Barron, Esq.
Hearing Officer

## AFFIRMATION

I, Robert H. Barron, do hereby swear and affirm upon my oath as a Hearing Officer, that I am the person describe herein who executed this document, which is my Opinion and Award.

Dated: January 4, 2018

*Robert H. Barron*

Robert H. Barron