UNITED STATES DISTRICT COURT
SOUTHERN DISTICT OF NEW YORK
------------------------------------------------------------X
BRIAN FORD,

                    Plaintiff,

-against-

THE NEW YORK CITY BOARD OF EDUCATION
(a/k/a the Department of Education)

                    Defendants,
------------------------------------------------------------X

**FOURTH AMENDED COMPLAINT**
**19 Civ. 06327 (JPC) (KHP)**

Plaintiff, Brian Ford by and through his attorneys, Stewart Lee Karlin Law Group, PC respectfully alleges, upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

**PRELIMINARY STATEMENT**

1. This is an action pursuant to 29 USC. Section 701, et seq. and the Rehabilitation Act 29 USC. Section 794 to vindicate the civil rights of Plaintiff.

**JURISDICTION AND VENUE**

2. This is an action pursuant to 29 USC. Section 701, et seq. and the Rehabilitation Act 29 USC. Section 794 to vindicate the civil rights of Plaintiff.

3. Plaintiff contends that defendants altered his employment terms, conditions, and privileges because he advocated on behalf of disabled, special education students.

4. Defendant's principal offices are located in the County of New York.

5. At all relevant times, the NYCDOE has overseen the NYC system of public schools located throughout all five (5) boroughs of the City of New York and been and

continues to be a recipient of substantial federal funds, and as such, is subject to the mandates under the Rehabilitation Act of 1973, 29 USC § 794, et seq., (the "Rehabilitation Act"), and Section 503 of the Americans with Disabilities Act, 42 USC § 12203 (the "ADA"), which prohibits retaliation against individuals, such as Plaintiff herein, for his opposition to Defendant's discriminatory acts against disabled special education students (or "SE students") and for his advocacy on behalf of disabled SE students.

6. Specifically, Section 504 of the Rehabilitation Act, or 29 U.S.. § 794(d), expressly incorporates the anti-retaliation provision of Section 503 of the Americans with Disabilities Act, 42 USC § 12203, et seq., which prohibits Defendant from retaliating against "any individual" because he or she opposes any act or practice made unlawful by the Act. See, 42U.S.C.A. § 12203. Thus, this Court has federal question jurisdiction.

## PARTIES

7. Plaintiff, Brian Ford (hereinafter referred to as "Plaintiff or Mr. Ford"), is a resident and the State of New York, County of New York. At all relevant times herein, Plaintiff was an "employee" of Defendant NEW YORK CITY DEPARTMENT OF EDUCATION as defined by all applicable statutes.

8. Defendant NEW YORK CITY DEPARTMENT OF EDUCATION (hereinafter referred to as the "DOE") is a school district under the laws of the State of New York, which is in charge of all public schools in the City of New York. Its headquarters are located at 52 Chambers Street, New York, NY 10007. At all relevant times herein, the D.O.E. was Plaintiff's "employer" as that term is defined by all relevant statutes.

# FACTUAL ALLEGATIONS

9. Plaintiff was employed by the DOE as a social studies teacher in 1995 and began working at The Bronx Guild High School ("BGHS") in 2005 until his termination on January 29, 2018.

10. Samuel Decker became Principal of BGHS in 2006 and remained the Principal at BGHS until 2017.

11. Mr. Ford was an effective teacher during his employment with the DOE Mr. Ford received an Effective annual rating under the 22 components in the 2013-14 school year. Mr. Ford had also been given the highest rating under the previous system in all, but one of the roughly 16 years Mr. Ford had taught with the DOE

12. Plaintiff went on a leave of absence and returned for the 2015-2016 school year.

## THE PROTECTED ACTIVITY

13. Plaintiff was responsible for teaching students on his roster who had IEPs that called for "Integrated Co-Teaching Services."

14. Plaintiff's classes contained students who had IEPs calling for Integrated Co-teaching (ICT), requiring a special education teacher (co-teacher), but there was no co-teacher for the class.

15. Special Education mandates, an Individual Education Program (IEP), "demonstrate[s] the educational setting that a student is legally required to be placed in for certain classes." The IEP.s of many of his students called for Integrated Co-Teaching. (ICT.)

in all four core subject areas (English, Math, Social Studies, Science), but the administration did not assign a Special Education co-teacher for Mr. Ford's classes in the Fall of 2015. As a result, he taught the classes alone and was observed and evaluated under those conditions. In addition, some of the class rosters contained over 40% IEP students, which is another violation under which Mr. Ford was observed and evaluated.

16. A review of that particular class in November 20, 2015, shows 22 students, 10 to 12 with IEPs, thus 45.5%, 50%, or 54.5% of the class, a violation of Special Ed policy in which allows a maximum of forty percent of IEP students an ICT classroom.

17. Also, in early Fall 2015, Mr. Ford still did not have access to IEPs. Once he did see them, he raised the issue with the Special Education Coordinator and AP Stephanie Eliot in October 2015 that the IEPs mandated both general education and special education teacher be in the classroom.

18. In August 2015, Plaintiff also submitted material on Special Education school policy complaining that the DOE violated the ADA and Rehabilitation Act rights of the students. It was a book draft on Education Reform in August 2015 that was critical of defendants. were sent to Superintendent Staple as well as Principal Decker, so she would have had an opportunity to read the draft. The material submitted in August 2015 to fulfill the Sabbatical requirement included a book draft, "Social Learning and Hegemony: Neoliberalism and Education Reform in the United States" which indicated that students with Special Ed designation that called for Collaborative Team Teaching (CTT) were not being taught in a Co-Teaching environment.

19. Plaintiff also raised the issue regarding not having a special education teacher

in an ICT class during weekly teams meeting in the 2015 fall semester and throughout the 2016-2017 school year in which teachers and the Assistant Principal, the Special Education and that his classes contained over forty percent, special education students.

20. Plaintiff complained in 2015 and 2016-2017 to BG School Counselor Lorin Schneider about ICT and the lack of co-teachers in classrooms.

21. Plaintiff complained in 2015 and 2016-2017 school years regarding not having a co-teacher with other teachers -including Bill Lynam, Robert Owen, Tom Grimaldi, Wyatt Matthews, and Cailin Shiller.

22. Plaintiff also raised the issue of not having a co-teacher with AP Stephanie Elliot and the Plaintiff confirmed that he did not get a co-teacher.

23. On December 09, 2016, Plaintiff emailed Anthony Klug- UFT about not having a co-teacher. Upon information and belief, Mr. Klug brought Plaintiff's concern to the Principal.

24. On December 09, 2016, Plaintiff emailed Anthony Klug- UFT about his class in which over half the students on his roster were special education students slated for ICT, yet Plaintiff was teaching the students alone. Upon information and belief, Mr. Klug brought Plaintiff's concerns to the Principal.

25. On December 23, 2016, Plaintiff filed an APPR complaint which specifically addressed not having a co-teacher (special education teacher) and stated that the "Roster includes 12 sp ed students, single teacher." The APPR complaint goes directly to the Principal.

26. On November 22, 2017, Plaintiff told DOE Counsel Jennifer Hogan that

many of the classes exceeded forty percent IEP students and had no co-teachers.

## THE RETALIATORY CONDUCT

27. The observation conducted on November 20, 2015, required that timely feedback be provided (45 days), so the teacher could address the deficiencies noted. However, the Principal finished the evaluation report within 90 minutes of leaving the class but did not provide a copy for almost four months.

28. Plaintiff ceased having individual coaching sessions; from early November 2015 until mid-May 2016. Plaintiff only had one individual coaching session.

29. Plaintiff's emails to the Principal went unanswered except for one email.

30. AP Rauner filed a false verbal abuse claim in October of 2017 against Plaintiff.

31. In a direct admission, the Principal was overheard saying he wanted to get rid of Mr. Ford. This statement was brought to Mr. Ford's attention by his students and had the effect of undermining his authority with the students.

32. The DOE claimed Mr. Ford did not hand in Lesson Plans when he handed in lesson plans.

33. In the 2015-16 school year, Plaintiff suddenly began to receive negative observations, ultimately leading to his termination. Mr. Ford's performance did not suddenly change after advocating for special education students.

34. In the 2015-2016 and 2017-2018 school years, Plaintiff was subjected to disparate treatment by not allowing choices as to type and number of observations, not having the minimum number of observations, altering an observation, not properly

implementing the Teacher Improvement Plan, not allowing Union representation at crucial meetings, and placing false information into Mr. Ford's file.

35. The Collective Bargaining Agreement indicates that the teacher is allowed to select their observation option. The Advance Guide for 2015-16 gave Mr. Ford two options, including Option 1 that involved only four observations. Still, Mr. Decker told Mr. Ford that the District office had informed him that Mr. Ford needed to have six observations contrary to the policy of the DOE.

36. In the 2015-2016 and 2017-2018 school years, Mr. Ford was the only core subject teacher who did not have a dedicated classroom and traveled from class to class using a cart. It even took until the end of Fall 2015 before he finally received a cart from a colleague.

37. In the 2015-2016 school year, Plaintiff did not have a dedicated work area for the first six to eight weeks of School and had to ask other teachers on their prep period if he could work in their rooms. Eventually, Plaintiff could use a desk in a breakout area but had to leave when other staff members wanted to use the desk. This was humiliating given Plaintiff's seniority.

38. Plaintiff's students had IEPs calling for Integrated Co-teaching (ICT), but there was no co-teacher (special education teacher) for the class. Plaintiff was observed in these classes when a special education teacher was supposed to be teaching too, which impacted the observations.

39. The observation signed by Mr. Decker on May 1, 2016, and by Mr. Ford on May 18, 2016, was altered and entered into Advance by changing the 'informal' observation

to a formal observation

40. The requirements of a formal observation are more extensive such as having a pre and post-observation conference. During the pre-observation conference, the lesson plan is reviewed with the evaluator and teacher with suggested changes and carries greater weight in the evaluative process. The observation must be for the entire period. None of this occurred. The significance of this can be found in the Advance Guide, which offers two options: an annual rating can be based on either six informal observations or three informal observations and one formal observation. The DOE unilaterally changed this to a formal when it was an informal observation, thus meeting the minimal standard, something they would not have done otherwise.

41. For the 2015-16 school year, there were not enough observations, untimely delivery of an observation, tampering with one observation after it had been signed, a lack of coaching, and harassing actions by the school administration.

42. Mr. Ford was also asked to sign at the end of the year a Measure of Teacher's Practice Form that listed the "Observation Option" as "Option #1" which consisted of only Four Observations (1 Formal and 3 Informal) as opposed the six informal observations he was told he would have in the Fall.

43. In the 2016-2017 school year, Plaintiff classes were mandated for ICT in which there should have been a special education teacher as a co-teacher. All six observations conducted that year ( October 26, 2016; November 30, 2016; February 6, 2017; February 13, 2017; March 6, 2017; and April 28, 2017) were from classes in which students were mandated for ICT. Observing and evaluating a teacher doing the work of two teachers

and not having a special education teacher present was illegal and made the observations biased and unreliable. It was also a great disservice to the special education students who were required to be taught by a special education teacher.

42. Measure of Student Learning (MOSL) component of his ratings were 'effective' for 2015-16 and 2016-2017 school years. This component is based on improvement in students' test scores and is separate from administrators' observations. It is an objective test that measures students' progress from the beginning of the school year to the end of the school year. Mr. Ford's teaching showed substantial progress was made by his students. These are objective tests, not subjective observations that are easily manipulated.

43. Two Ineffective consecutive annual ratings are the norm for pursuing the termination of a teacher for incompetency through a 3020a proceeding for a tenured teacher.

44. Mr. Ford had an Effective rating in 2013-14, no rating in 2014-15 because he took a sabbatical, and a Developing rating in 2016-17. For 2015-16, the only Ineffective rating had an insufficient number of observations and was under the 2016-17 calculation matrix would have also been a Developing Rating.

45. The breach of protocols continued into the 2016-17 school year. There was no initial planning conference. Mr. Ford was not given a choice of observation options, deadlines were not met, items were placed in Mr. Ford's file that had false information, items were placed in Mr. Ford's file without his knowledge, and the Teacher Improvement Plan (TIP) was used for disciplinary purposes. In addition, not only did the TIP not conform to DOE standards, but the administration did not fulfill their obligations under the TIP, as the coaches entered the classroom not to "to observe and offer feedback," but almost always they

were "present in the classroom" to evaluate.

46. Moreover, the administration ignored the timeline for introducing a Teacher Improvement Plan (TIP. The TIP timeline calls for collaboration between the teacher and the Principal before the deadline for finalization of the TIP, which was on or about September 22, 2016. Instead, without any consultation and after the deadline, Principal Decker presented the TIP to Mr. Ford at the first coaching meeting on September 26, 2016.

47. During the 2016-2017 school year, unlike other teachers, including social studies teachers, Mr. Ford still did not have a dedicated classroom.

48. Further, seven of the nine observations were conducted without the required Special Education co-teacher in the room. Moreover, four of the nine observations were in classes with rosters of over forty percent of Special Education Students.

49. There were instances of yelling, including in coaching meetings, and Decker only grunted when passing Mr. Ford in the hall. Rauner refused to greet Plaintiff in the hall. In one instance, Plaintiff approached her and his student to clarify the student was not out of class without permission. Rauner said, in front of the student, "I was not talking to you." In a coaching session, she also told Mr. Ford when he said he would be open to suggestions, "I don't think that you would." She was unvaryingly disdainful towards Plaintiff.

50. Plaintiff spoke out (advocated on the special education students' behalf) regarding the welfare of the special education student population at the School.

51. As a direct result of Mr. Ford's advocacy for special educations students and his complaints regarding the lack of services, support and resources, and other advocacy set forth above for special education students, Plaintiff was retaliated against by commencing a 3020a

proceeding on or about May 26, 2017, and being terminated on January 29, 2018, for pretextual reasons.[1]

## FIRST CAUSE OF ACTION-504 RETALIATION CLAIM

51. Plaintiff repeats and re-alleges each and every preceding paragraph as if fully set forth at length herein.

52. As a direct result of Plaintiff complaining about neglecting to enforce laws pertaining to special education and disabled students and advocating on their behalf, Plaintiff was retaliated against by Defendant by being terminated.

53. Defendant, the New York City Department of Education, violated the Rehabilitation Act, 29 USC. Section 504, et seq. by retaliating against Plaintiff because he advocated on behalf of disabled, Special Education students.

54. As a direct result of the Defendants' violation of 504, as alleged herein above, Plaintiff has suffered damages, which are set forth more fully below.

---

[1] A certified special education teacher must be assigned to provide specially designed instruction to a special class. In addition, special education teachers who teach special education classes must be highly qualified in the subjects they teach. Special education teachers who teach special education classes in Grades 7-12 must be certified/licensed in special education and highly qualified in each core academic subject that they teach. 8 NYCRR § 200.6(b). In addition, the No Child Left Behind Act of 2001 28 U.S. C § 7801(23). also requires special education instruction shall be provided by individuals appropriately certified or licensed. All special education teachers need to be Highly Qualified under the No Child Left Behind Act and must be HQ in special education. Special education teachers are HQ in special education if they are certified in special education. Further, special education teachers who teach special education classes in Grades 7-12 must be HQ in special education and each core academic subject they teach.

PLAINTIFF DEMANDS A TRIAL BY JURY

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a judgment against Defendant as follows:

a. A declaration from the Court that Defendant violated Section 504, reinstating Plaintiff to the position of special education teacher retroactively, the expungement of the NYC DOE "Problem Code" from his file, and that he will not be flagged as ineligible for employment with the DOE and vendors;

b. That his observations, evaluations, and letters to the file be expunged and the Defendant be ordered to change his observations and evaluations to effective and vacate the termination;

c. Back pay and compensatory damages for pain and suffering;

d. Damages to reputation;

e. Attorney fees and costs;

f. Any other relief as this Court may deem just and proper under the circumstances.

Dated: New York, New York
August 30, 2021

Respectfully submitted,

STEWART LEE KARLIN
LAW GROUP PC

STEWART LEE KARLIN,
Attorneys for Plaintiff
111 John Street, 22nd Floor
New York, N.Y. 10038