UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
BRIAN FORD,

               Plaintiff,

                                              **19 Civ. 6327 (JPC) (KHP)**

-against-

THE NEW YORK CITY BOARD OF EDUCATION
(a/k/a the Department of Education)

               Defendants.
-------------------------------------------------------------------**X**


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

STEWART LEE KARLIN
LAW GROUP, PC

STEWART LEE KARLIN
Attorneys for Plaintiff
111 John Street, 22nd Floor
New York, NY 10038
(212) 792-9670
slk@stewartkarlin.com

# TABLE OF CONTENTS

*Item*                                                                                    *Page*

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i-ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-vi

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-24

     POINT I: PLAINTIFF'S CLAIMS AGAINST DEFENDANT ARE NOT
     PRECLUDED BY COLLATERAL ESTOPPEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-14

     POINT II: STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

     POINT III: APPELLANT'S CLAIMS IN THE 2015-2016 SCHOOL YEAR
     ARE NOT TIME-BARRED BECAUSE MR. FORD WAS SUBJECTED
     TO A CONTINUING VIOLATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-17

     POINT IV: PLAINTIFF WAS RETALIATED AGAINST IN VIOLATION
     OF THE REHABILITATION ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-24

          A. The Applicable Analytic Framework for Retaliation Claims
          Under the Rehabilitation Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

          B. Plaintiff Engaged in Protected Activity . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

          C. Defendants Knew That Plaintiff Was Engaged in Protected Activity . . . . . 20-21

          D. There Exists a Causal Connection Between Plaintiff's Protected
          Activity and the Adverse Employment Action . . . . . . . . . . . . . . . . . . . . . 21-24

CONCLUSION ........................................................... 25

# **TABLE OF AUTHORITIES**

*Item*                                                                                          *Page*

**Laws and Statutes**

CPLR 75 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

New York Education Law § 3020-a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9, 11, 13

Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794  . . . . . . . . . . . . . . .  17, 20, 21

**Cases**

*Ashcroft v. Iqbal,*
129 S. Ct. 1937, 1949 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Bell Atl Corp. v. Twombly,*
550 U.S. 544, 570 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*Burkybile v. Bd. of Educ.,*
411 F. 3d 306, 308 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*Cifra v. Gen. Elec. Co.,*
252 F.3d 205, 216 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18, 24

*Colon v. Coughlin,*
58 F.3d 865, 869 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Cornwell v. Robinson,*
23 F.3d 694, 703 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Dr. Joseph Irrera v. University of Rochester,*
859 F.3d 196 (2nd Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Flores v. United States,*
885 F.3d 119, 121 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Galdieri-Ambrosini v. National Realty & Dev. Corp.,*
136 F.3d 276, 292 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Garcia v. Yonkers Bd. of Educ.,*
803 F. App'x 441, 444 (2d Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Grieve v. Tamerin,*
269 F.3d 149, 153 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Harris v. Forklift Systems, Inc.,*
10 U. S. 17, 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Industrial Risk Insurers v. Port Authority of NY and NJ,*
493, F.3d 283, 287 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kassner v. 2nd Ave. Delicatessen Inc.,*
496 F.3d 229, 237 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kasten v. Saint-Gobain Performance Plastics Corp.,*
563 US 1, 5-6 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*King v. Fox,*
418 F.3d 121 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lackow v. Department of Educ. of the City of New York,*
51 AD3d 563, 567 (1st Dept 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Lambert v.Genesee Hosp.,*
10 F.3d 46, 53 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Leon v. Department of Education of the City of New York, et al.,*
612 F. App'x 632 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Martin v. State University of New York,*
704 F.Supp.2d 202, 228 (E.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Matusick v. Erie Cnty. Water Auth.,*
757 F.3d 31, 47 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*National Railroad Passenger Corp. v. Morgan,*
122 S.Ct. 2061 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Pesce v. Mendes & Mount LLP,*
Case No. 19-cv-4922, 2020 WL 7028641, at *4 (S.D.N.Y. Nov. 30, 2020) . . . . . . . . . . . . . . 16

*Peter F. Gaito Architecture, L.L.C. v. Simone Dev. Corp.,*
602 F.3d 57, 64 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Raniola v. Bratton,*
243 F.3d 610, 624 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Richardson v. New York State Dep't of Corr. Serv.,*
180 F.3d 426, 446-47 (2d Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Senno v. Elmsford Union Free Sch. Dist.,*
812 F. Supp. 2d 454, 471 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Smith v. N.Y. City Dept. of Educ.,*
808 F. Supp 2d 569, 580, 582 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Sokol,*
113 F.3d 303, 306 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Stephens-Buie v. Shinseki,*
No. 09 Civ 2397 (LBS), 2011 U.S. Dist. LEXIS 68443 (S.D.N.Y. June 27, 2011) . . . . . . . . . . 21

*Treglia v. Town of Manlius,*
313 F.3d 713, 719 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United Air Lines v. Evans,*
431 US 553, 14 FEP 1510 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Hussein,*
178 F.3d 125, 129 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Weissman v. Dawn Joy Fashions, Inc.,*
214 F.3d 224, 234 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Weixel v. Bd. of Educ. of City of New York,*
287 F.3d 138, 148 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Zoulas v. N.Y.C. Dep't of Educ.,*
400 F. Supp. 3d 25, 49 (S.D.N.Y. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## PRELIMINARY STATEMENT

Plaintiff submits this memorandum of law in further opposition to Defendant's Motion to Dismiss. Plaintiff originally commenced an action *pro se* alleging various claims for relief Thereafter, counsel appeared and amended the complaint alleging a violation of the Rehabilitation Act. Subsequently, Defendant moved to dismiss.

As set forth below, Defendant's Motion to Dismiss should be denied as Plaintiff has set forth a plausible *prima facie* case of retaliation under the Rehabilitation Act.

## STATEMENT OF FACTS

Plaintiff was employed by the DOE as a social studies teacher in 1995 and began working at The Bronx Guild High School ("BGHS") in 2005 until his termination on January 29, 2018. Samuel Decker became Principal of BGHS in 2006 and remained the Principal at BGHS until 2017. (A.C. ¶ 9-10) Mr. Ford was an effective teacher during his employment with the DOE. Mr. Ford received an Effective annual rating under the 22 components in the 2013-14 school year. Mr. Ford had also been given the highest rating under the previous system in all, but one of the roughly 16 years. Mr. Ford had taught with the DOE. Plaintiff went on a leave of absence and returned for the 2015-2016 school year. (A.C. ¶ 11-12)

Plaintiff was responsible for teaching students on his roster who had IEPs that called for "Integrated Co-Teaching Services." Plaintiff's classes contained students who had IEPs calling for Integrated Co- teaching (ICT), requiring a special education teacher (co-teacher), but there was no co- teacher for the class. (A.C. ¶ 13-14) Special Education mandates, an Individual Education Program (IEP), "demonstrate[s] the educational setting that a student is legally required to be placed in for certain classes." The IEPs of many of his students called for Integrated Co-Teaching.

1

(ICT.) in all four core subject areas (English, Math, Social Studies, and Science), but the administration did not assign a Special Education co-teacher for Mr. Ford's classes in the Fall of 2015 and for all of the 2016-2017 school year. As a result, he taught the classes alone and was observed and evaluated under those conditions. In addition, some of the class rosters contained over 40% IEP students, which is another violation under which Mr. Ford was observed and evaluated. A review of that particular class in November 20, 2015, shows 22 students, 10 to 12 with IEPs, thus 45.5%, 50%, or 54.5% of the class, a violation of Special Ed policy in which allows a maximum of forty percent of IEP students an ICT classroom. (A.C. ¶ 15-16)

In early Fall 2015, Mr. Ford still did not have access to IEPs. Once he did see them, he raised the issue with the Special Education Coordinator and AP Stephanie Eliot in October 2015 that the IEPs mandated both general education and special education teacher be in the classroom. (A.C. ¶ 17)

In August 2015, Plaintiff also submitted material on Special Education school policy to the DOE indicating that the DOE violated the ADA and Rehabilitation Act rights of the students. It was a book draft on Education Reform in August 2015 that was critical of defendants. The material submitted in August 2015 to fulfill the Sabbatical requirement included a book draft, "Social Learning and Hegemony: Neoliberalism and Education Reform in the United States" which indicated that students with Special Ed designation that called for Collaborative Team Teaching (CTT) were not being taught in a Co-Teaching environment. (A.C. ¶ 18)

Plaintiff also raised the issue regarding not having a special education teacher in an ICT class and that his classes contained over forty percent special education students during weekly teams meeting in the 2015 fall semester and throughout the 2016-2017 school year in which

teachers and the Assistant Principal, attended. (A.C. ¶ 19)

Plaintiff complained in 2015 and 2016-2017 to BG School Counselor Lorin Schneider about ICT and the lack of co-teachers in classrooms. Plaintiff complained in 2015 and 2016-2017 school years regarding not having a co-teacher with other teachers -including Bill Lynam, Robert Owen, Tom Grimaldi, Wyatt Matthews, and Cailin Shiller. Plaintiff also raised the issue of not having a co-teacher with AP Stephanie Elliot and the Plaintiff confirmed that he did not get a co-teacher. (A.C. ¶ 20-22)

On December 9, 2016, Plaintiff emailed Anthony Klug- UFT about not having a co-teacher. Upon information and belief, Mr. Klug brought Plaintiff's concern to the Principal. Also, on December 9, 2016, Plaintiff emailed Anthony Klug- UFT about his class in which over half the students on his roster were special education students slated for ICT, yet Plaintiff was teaching the students alone. Upon information and belief, Mr. Klug brought Plaintiff's concerns to the Principal. (A.C. ¶ 23-24)

On December 23, 2016, Plaintiff filed an APPR complaint which specifically addressed not having a co-teacher (special education teacher) and stated that the "Roster includes 12 sp ed students, single teacher." The APPR complaint goes directly to the Principal. On November 22, 2017, Plaintiff told NYSUT Counsel Jennifer Hogan that many of the classes exceeded forty percent IEP students and had no co-teachers. (A.C. ¶ 25-26)

The observation conducted on November 20, 2015, required that timely feedback be provided (45 days), so the teacher could address the deficiencies noted. However, while the Principal finished the evaluation report within 90 minutes of leaving the class, he did not provide a copy for almost four months. Plaintiff ceased having individual coaching sessions; from early

November 2015 until mid-May 2016. Plaintiff only had one individual coaching session. Plaintiff's emails to the Principal went unanswered except for one email. AP Rauner filed a false verbal abuse claim in October of 2017 against Plaintiff. (A.C. ¶ 27-30)

In a direct admission, the Principal was overheard saying he wanted to get rid of Mr. Ford. This statement was brought to Mr. Ford's attention by his students and had the effect of undermining his authority with the students. The DOE claimed Mr. Ford did not hand in Lesson Plans when he handed in lesson plans. (A.C. ¶ 31-32)

In the 2015-16 school year, Plaintiff suddenly began to receive negative observations, ultimately leading to his termination. Evaluations of Mr. Ford's performance suddenly dropped after advocating for special education students. In the 2015-2016 and 2017-2018 school years. Plaintiff was subjected to disparate treatment by not allowing choices as to type and number of observations, not having the minimum number of observations, tampering with an observation, not properly implementing the Teacher Improvement Plan, not allowing Union representation at crucial meetings, and placing false information into Mr. Ford's file. (A.C. ¶ 33-34)

The Collective Bargaining Agreement indicated that the teacher is allowed to select their observation option. The Advance Guide for 2015-16 gave Mr. Ford two options, including Option 1 that involved only four observations. Still, Mr. Decker told Mr. Ford that the District office had informed him that Mr. Ford needed to have six observations contrary to the policy of the DOE. (A.C. ¶ 35)

In the 2015-2016 and 2017-2018 school years, Mr. Ford was the only core subject teacher who did not have a dedicated classroom and traveled from class to class using a cart. It even took well into the term before he finally received a cart from a colleague. In the 2015-2016 school year,

4

Plaintiff did not have a dedicated work area for the first six to eight weeks of School and had to ask other teachers on their prep period if he could work in their rooms. Eventually, Plaintiff could use a desk in a breakout area but had to leave when other staff members wanted to use the desk. This was humiliating given Plaintiff's seniority. (A.C. ¶ 36-37)

Plaintiff's students had IEPs calling for Integrated Co-teaching (ICT), but there was no co-teacher (special education teacher) for the class. Plaintiff was observed in these classes when a special education teacher was supposed to be teaching too, which impacted the observations. The observation signed by Mr. Decker on May 1, 2016, and by Mr. Ford on May 18, 2016, was altered and entered into Advance by changing the 'informal' observation to a formal observation. (A.C. ¶ 38-39) Not only was he doing the work of two teachers but was being asked to perform tasks requiring Special Education students for which he was neither trained nor certified.

The requirements of a formal observation are more extensive such as having a pre and post-observation conference. During the pre-observation conference, the lesson plan is reviewed with the evaluator and teacher with suggested changes and carries greater weight in the evaluative process. The observation must be for the entire period. None of this occurred. The significance of this can be found in the Advance Guide, which offers two options: an annual rating can be based on either six informal observations or three informal observations and one formal observation. The DOE unilaterally changed this to a formal when it was an informal observation, thus meeting the minimal standard, something they would not have done otherwise. (A.C. ¶ 40)

For the 2015-16 school year, there were not enough observations, untimely delivery of an observation, tampering with one observation after it had been signed, a lack of coaching, and harassing actions by the school administration. Mr. Ford was also asked to sign at the end of the

year a Measure of Teacher's Practice Form that listed the "Observation Option" as "Option #1" which consisted of only Four Observations (1 Formal and 3 Informal) as opposed the six informal observations he was told he would have in the Fall. (A.C. ¶ 41-42)

In the 2016-2017 school year, Plaintiff classes were mandated for ICT in which there should have been a special education teacher as a co-teacher. All six observations conducted that year (October 26, 2016; November 30, 2016; February 6, 2017; February 13, 2017; March 6, 2017; and April 28, 2017) were from classes in which students were mandated for ICT. Observing and evaluating a teacher doing the work of two teachers and not having a special education teacher present was illegal and made the observations biased and unreliable. It was also a great disservice to the special education students who were required to be taught by a special education teacher. (A.C. ¶ 43)

Measure of Student Learning (MOSL) component of his ratings were 'effective' for 2015-2016 and 2016-2017 school years. This component is based on improvement in students' test scores and is separate from administrators' observations. It is an objective test that measures students' progress from the beginning of the school year to the end of the school year. Mr. Ford's teaching showed substantial progress was made by his students. These are objective tests, not subjective observations that are easily manipulated. Two Ineffective consecutive annual ratings are the norm for pursuing the termination of a teacher for incompetency through a 3020a proceeding for a tenured teacher. (A.C. ¶ 42-43)

Mr. Ford had an Effective rating in 2013-14, no rating in 2014-15 because he took a sabbatical, and a Developing rating in 2016-17. For 2015-16, the only Ineffective rating there was an insufficient number of observations and was under the 2016-17 calculation matrix would have

also been a Developing Rating. (A.C. ¶ 44)

The breach of protocols continued into the 2016-17 school year. There was no initial planning conference. Mr. Ford was not given a choice of observation options, deadlines were not met, items were placed in Mr. Ford's file that had false information, items were placed in Mr. Ford's file without his knowledge, and the Teacher Improvement Plan (TIP) was used for disciplinary purposes. In addition, not only did the TIP not conform to DOE standards, but the administration did not fulfill their obligations under the TIP, which stated the coaches entered the classroom not to evaluate but "to observe and offer feedback," instead they with a single exception ,but almost always they were "present in the classroom" to evaluate. (A.C. ¶ 45)

Moreover, the administration ignored the timeline for introducing a Teacher Improvement Plan (TIP. The TIP timeline calls for collaboration between the teacher and the Principal before the deadline for finalization of the TIP, which was on or about September 22, 2016. Instead, without any consultation and after the deadline, Principal Decker presented the TIP to Mr. Ford at the first coaching meeting on September 26, 2016. (A.C. ¶ 46)

During the 2016-2017 school year, unlike other teachers, including social studies teachers, Mr. Ford still did not have a dedicated classroom. Further, seven of the nine observations were conducted without the required Special Education co-teacher in the room. Moreover, four of the nine observations were in classes with rosters of over forty percent of Special Education Students. There were instances of yelling, including in coaching meetings, and Decker only grunted when passing Mr. Ford in the hall. Rauner refused to greet Plaintiff in the hall. In one instance, Plaintiff approached her and his student to clarify the student was not out of class without permission. Rauner said, in front of the student, "I was not talking to you." In a coaching session, she also told

Mr. Ford when he said he would be open to suggestions, "I don't think that you would." She was disdainful towards Plaintiff. (A.C. ¶ 47-49)

Plaintiff spoke out (advocated on the special education students' behalf) regarding the welfare of the special education student population at the School. As a direct result of Mr. Ford's advocacy for special educations students and his complaints regarding the lack of services, support and resources, and other advocacy set forth above for special education students, Plaintiff was retaliated against by commencing a 3020a proceeding on or about May 26, 2017, and being terminated on January 29, 2018, for pretextual reasons.[1] (A.C. ¶ 50-51)

---

[1] A certified special education teacher must be assigned to provide specially designed instruction to a special class. In addition, special education teachers who teach special education classes must be highly qualified in the subjects they teach. Special education teachers who teach special education classes in Grades 7-12 must be certified/licensed in special education and highly qualified in each core academic subject that they teach. 8 NYCRR § 200.6(b). In addition, the No Child Left Behind Act of 2001 28 U.S. C § 7801(23). also requires special education instruction shall be provided by individuals appropriately certified or licensed. All special education teachers need to be Highly Qualified under the No Child Left Behind Act and must be HQ in special education. Special education teachers are HQ in special education if they are certified in special education. Further, special education teachers who teach special education classes in Grades 7-12 must be HQ in special education and each core academic subject they teach.

## ARGUMENT

## POINT I

## PLAINTIFF'S CLAIMS AGAINST DEFENDANT ARE
## NOT PRECLUDED BY COLLATERAL ESTOPPEL

The Second Circuit in <u>Leon v. Department of Education of the City of New York, et al.</u>,

612 F. App'x 632 (2d Cir. 2015) reversed the District Court that so held that a previously

adjudicated finding of just cause termination pursuant to New York Education Law § 3020-a

collaterally estops federal litigation of her discrimination, retaliation, and accommodation claims.

(For the Court's convenience a copy is attached as Exhibit "A")

The doctrine of collateral estoppel bars re-litigation of a legal or factual issue that was

previously decided in a prior action where: "(1) the issues in both proceedings are identical, (2)

the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full

and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was

necessary to support a valid and final judgment on the merits." <u>Grieve v. Tamerin</u>, 269 F.3d 149,

153 (2d Cir. 2001); quoting <u>United States v. Hussein</u>, 178 F.3d 125, 129 (2d Cir. 1999). While

the Second Circuit has held that the findings reached through section 3020-a hearings, which are

quasi-judicial administrative actions, are entitled to preclusive effect, (see Burkybile v. Bd. of

Educ., 411 F. 3d 306, 308 (2d Cir. 2005), for collateral estoppel to bar the litigation of an issue in

a subsequent action, the elements set forth above must still be met.

The party asserting collateral estoppel, here the Defendants, have the burden of identifying

the issues and the necessity of the claim having been litigated in the prior action. See <u>In re Sokol</u>,

113 F.3d 303, 306 (2d Cir. 1997). Further, "[a]n opportunity to contest fully the merits of the issue

is a prerequisite for the application of collateral estoppel under both federal and New York State

law." Industrial Risk Insurers v. Port Authority of NY and NJ, 493, F.3d 283, 287 (2d Cir. 2007). It is must be noted that collateral estoppel, "is an equitable doctrine, not a matter of absolute right; its invocation is influenced by considerations of fairness in the individual case." King v. Fox, 418 F.3d 121 (2d Cir. 2005).

Collateral estoppel applies only if "the issue in question was actually and necessarily decided in a prior proceeding." Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d 454, 471 (S.D.N.Y. 2011); citing Colon v. Coughlin, 58 F.3d 865, 869 (2d Cir. 1995).

In Leon, the Second Circuit concluded that "the District Court erroneously concluded that the Section 3020-a hearing's "determination that there was cause for [Leon's] termination precludes [Leon] from making a prima facie case of discrimination or retaliation, There is no indication that the Section 3020-a hearing addressed, much less "actually decided," whether the charges leading to Leon's termination were driven, even in part, by discriminatory or retaliatory intent. The court's error thus stems from the faulty assumption that termination for cause necessarily precludes the possibility of termination motivated by unlawful animus. "[T]he hearing officer's determination that [the plaintiff] had engaged in the charged conduct, and that these violations called for h[er] termination, does not preclude a jury from later finding that [the plaintiff] was also terminated at least in part because of [discriminatory reasons]. The plaintiff could be successful on the [discrimination or retaliation] claims even if the jury were to accept that there were legitimate reasons for terminating h[er], too." citing Matusick v. Erie Cnty. Water Auth., 757 F.3d 31, 47 (2d Cir. 2014).

Plaintiff's is not estopped from bringing his claims of retaliation in a subsequent action. Specifically where "Plaintiff's retaliation claim was expressly not decided at the hearing, he is not

estopped from pursuing that claim now Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001) (holding that an administrative finding concerning a plaintiff's termination "could have preclusive effect on her Title VII claim in federal court only if [she] had unsuccessfully sought to contest her discharge...leading to a judgment on the same claim or issue" (emphasis added)).

In Garcia v. Yonkers Bd. of Educ., 803 F. App'x 441, 444 (2d Cir. 2020) cited by Defendant held that the District Court properly gave preclusive effect to the N.Y Education Law § 3020-a hearing officer's findings of fact related to Garcia's classroom behavior and failure to report for duty for an entire school year. However, the Court held that that Plaintiff's claims regarding discrimination and retaliation were not litigated, only the finding of failing to report for had been fairly litigated. Because the Plaintiff could not overcome the failure to report for the entire year, the termination was sustained. In Smith v. N.Y. City Dept. of Educ., 808 F. Supp 2d 569, 580, 582 (S.D.N.Y. 2011) and Davis v. N.Y. City Dep't/Bd. of Educ., No. 14 Civ. 2281(KAM)(LB) also cited by Defendant, the issues were similar in nature.

However, Plaintiff's claims in the instant are not barred by collateral estoppel as they were not litigated in Plaintiff's 3020-a hearing.

In reviewing the Opinion and Award of the Hearing Officer, it is clear that Plaintiff's present claims of 504 retaliation due to protected 504 activity, were not litigated in the Plaintiff's 3020-a hearing. In particular, the Hearing Officer summarizes the position taken by Mr. Ford in the 3020-a hearing and Mr. Ford never contended in the hearing any of the claims that are now alleged in this federal complaint. Plaintiff's claims are not barred by the doctrine of collateral estoppel as the issues presented have not been litigated and expressly decided in Plaintiff's 3020-a hearing as Defendants have failed to meet there burden of presenting evidence that Plaintiff has

11

previously litigated the specific issues and further the Hearing Officer's Opinion and Award at no point addresses, the retaliation that Plaintiff has alleged in the instant action.

For example, it does not appear that the Hearing Office took into consideration Mr. Ford's performance suddenly changed after advocating for special education students. (A.C. ¶ 33-34) In the 2015-2016 and 2016-2017 school years, Mr. Ford was the only core subject teacher who did not have a dedicated classroom and traveled from class to class using a cart. It even took until the sometime in the Fall 2015 before he finally received a cart from a colleague. In the 2015-2016 school year, Plaintiff did not have a dedicated work area for the first six to eight weeks of School and had to ask other teachers on their prep period if he could work in their rooms. Eventually, Plaintiff could use a desk in a breakout area but had to leave when other staff members wanted to use the desk. This was humiliating given Plaintiff's seniority. (A.C. ¶ 36-37)

Plaintiff's students had IEPs calling for Integrated Co-teaching (ICT), but there was no co-teacher (special education teacher) for the class. Plaintiff was observed in these classes when a special education teacher was supposed to be teaching with Mr. Ford, which impacted the observations. In the 2016-2017 school year, Plaintiff classes were mandated for ICT in which there should have been a special education teacher as a co-teacher. All six observations conducted that year (October 26, 2016; November 30, 2016; February 6, 2017; February 13, 2017; March 6, 2017; and April 28, 2017) were from classes in which students were mandated for ICT, (a special education teacher and a general education teacher). Observing and evaluating a teacher doing the work of two teachers, especially not having a special education teacher present was illegal and made the observations biased and unreliable. It was also a great disservice to the special education students who were required to be taught by a special education teacher. (A.C. ¶ 43) Further, the

Measure of Student Learning (MOSL) component of his ratings were 'effective' for 2015-16 and 2016-2017 school years and Mr. Ford never received a less than effective MOSL rating in any year. This component is based on improvement in students' test scores and is separate from administrators' observations. It is an objective test that measures students' progress from the beginning of the school year to the end of the school year. Mr. Ford's teaching showed substantial progress was made by his students. These are objective tests, not subjective observations that are easily manipulated.

During the 2016-2017 school year, unlike other teachers, including social studies teachers, Mr. Ford still did not have a dedicated classroom. Further, seven of the nine observations were conducted without the required Special Education co-teacher in the room. Moreover, four of the nine observations were in classes with rosters of over forty percent of Special Education Students. These critical issues were not the subject of a 3020-a hearing and impacted the observations. These issues were never decided.

The standard of review of a compulsory arbitration hearing held pursuant to Education Law § 3020-a is the same as with an Article 78 proceeding and is as such: Education Law 3020-a(5) provides that judicial review of a hearing officer's findings must be conducted pursuant to CPLR 7511. Under such review an award may only be vacated on a showing of "misconduct, bias, excess of power or procedural defects." Nevertheless, where the parties have submitted to compulsory arbitration, judicial scrutiny is stricter than that for a determination rendered where the parties have submitted to voluntary arbitration. The determination must be in accord with due process and supported by adequate evidence and must also be rational and satisfy the arbitrary and capricious standards of CPLR article 78. The party challenging an arbitration determination has the burden

13

of showing its invalidity. <u>Lackow v. Department of Educ. of the City of New York</u>, 51 AD3d 563, 567 (1st Dept 2008) (citations omitted).

Thus, the Article 75 proceeding in which Plaintiff engaged is limited in scope in that the determination at the 3020-a hearing may only be reversed for the reasons enumerated above. Further, the memorandum decision in Plaintiff's Article 75 makes no mention of any of the allegations contained in this instant federal claim, and is limited to the penalty of termination that was annulled by the Supreme Court Justice because it was shocking to one's sense of fairness but the penalty of termination was reinstated by the First Department.

The Defendant's reliance on Plaintiff's prior Article 75 proceeding as a bar to this current action is also without merit. These claims were never litigated in Plaintiff's 3020-a proceeding and thus were incapable of having been reviewed and adopted by the state court in the Article 75 proceeding.

**POINT II**

**STANDARD OF REVIEW**

Under the Federal Rules, a claimant must provide a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a). When deciding a motion to dismiss for failure to state a claim under Federal Rule 12 (b)(6), the court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in Plaintiff's favor. See <u>Kassner v. 2nd Ave. Delicatessen Inc.</u>, 496 F.3d 229, 237 (2d Cir. 2007)). In order to survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a Plaintiff must plead enough facts to state a claim to relief that is plausible on its face. See <u>Bell Atl Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). A facially plausible claim is one where the Plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Where the court finds well-pleaded factual allegations, it should assume their veracity and determine whether they plausibly give rise to an entitlement to relief. Iqbal, 129 S. Ct. at 1950. In ruling on a motion to dismiss, a court may consider the facts asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference. Peter F. Gaito Architecture, L.L.C. v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir. 2010).

## POINT III

### APPELLANT'S CLAIMS IN THE 2015-2016 SCHOOL YEAR ARE NOT TIME-BARRED BECAUSE MR. FORD WAS SUBJECTED TO A CONTINUING VIOLATION

The Supreme Court has stated that as long as a continuing violation exists, a plaintiff should be allowed to prove that she was subjected to a hostile work environment. See National Railroad Passenger Corp. v. Morgan, 122 S.Ct. 2061 (2002). Therefore, Plaintiff's claims cannot be barred because she was still subject to a present and continuing retaliatory hostile work environment. The leading cases with regards to a "continuing violation" alleged by an employment discrimination plaintiff are National Railroad Passenger Corp. v. Morgan, 122 S.Ct. 2061 (2002) and United Air Lines v. Evans, 431 US 553, 14 FEP 1510 (1977). In Evans, Justice Stevens stated that past discriminatory acts which are not themselves the basis of timely charges of discrimination by the Plaintiff nevertheless ". . . may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue. . ." In Morgan, the Court stated that hostile work environment claims are different in kind from discrete acts. Because their very nature involves

15

repeated conduct, the "unlawful employment practice," §2000e-5(e)(1), cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. See Industrial v. Forklift Systems, Inc., 10 U. S. 17, 21.

The continuing violation doctrine provides that "[w]hen a plaintiff experiences a continuous practice and policy [that violates his or her rights], ... the commencement of the statute of limitations period may be delayed until the last [violation]." Flores v. United States, 885 F.3d 119, 121 (2d Cir. 2018) Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994) (citations and internal quotation marks omitted) "To qualify as continuing, the claimed actions must not be discrete acts, but repeated conduct that occurs over a series of days or perhaps years." Zoulas v. N.Y.C. Dep't of Educ., 400 F. Supp. 3d 25, 49 (S.D.N.Y. 2019); "[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." Lambert v.Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993) (abrogated on other grounds by Kasten v. Saint–Gobain Performance Plastics Corp., 563 US 1, 5–6 (2011). In Pesce v. Mendes & Mount LLP, a federal court denied a motion to dismiss and found that the employer's alleged multi-year failure to ensure that the employee could work "without fearing sexual harassment and assault" may be a continuing violation of Title VII. See Pesce, Case No. 19-cv-4922, 2020 WL 7028641, at *4 (S.D.N.Y. Nov. 30, 2020). Accordingly, an alleged incident in 2016-2017, which was timely because it occurred within three years allows the employee to use other instances that she claims took place in 2015 to support his claim. The continuing violation theory may be applied where there is a showing of specific and related instances of retaliation against a single plaintiff." Pesce supra. In the present case, the actions

16

taken by the DOE in retaliation against Mr. Ford have been continuing in nature, arising in

retaliation for his protected activity through the 2015-2016 school years and continuing to 2016-

2017 school years.

## POINT IV

### PLAINTIFF WAS RETALIATED AGAINST IN
### VIOLATION OF THE REHABILITATION ACT

**A.** **The Applicable Analytic Framework for Retaliation Claims Under the Rehabilitation Act**

Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794 (hereinafter referred to

as "Section 504"), provides that,

> [n]o otherwise qualified individual with a disability...shall, solely by
> reason of her or his disability, be excluded from the participation in,
> be denied the benefits of, or be subjected to discrimination under
> any program or activity receiving Federal financial assistance..." 29
> U.S.C. § 794(a).

Retaliation claims are analyzed under the same framework as Americans with Disabilities

Act ("ADA") claims, the elements of which to prove a *prima facie* case being, "(I) a plaintiff was

engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in

protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv)

a causal connection exists between the protected activity and the adverse action." Weixel v. Bd.

of Educ. of City of New York, 287 F.3d 138, 148 (2d Cir. 2002); citing Weissman v. Dawn Joy

Fashions, Inc., 214 F.3d 224, 234 (2d Cir. 2000). The Plaintiff's burden at this *prima facie* stage

is *de minimis*. Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. Thereafter, if a defendant meets this burden, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

## B. Plaintiff Engaged in Protected Activity

The record evidence shows that Plaintiff has clearly satisfied the first element of a *prima facie* claim under the Rehabilitation Act, as Plaintiff was engaged in protected activity. To satisfy the "protected activity" element of the *prima facie* case, plaintiff need not establish that the underlying conduct was in fact a violation of the Rehabilitation Act, but rather need only show that he had a "good faith, reasonable belief" that the conduct was unlawful. *See* Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (in defining protected activity under the Title VII framework). Whether that belief was "objectively reasonable," and not merely subjective, is determined based on the facts and the record presented. Martin v. State University of New York, 704 F.Supp.2d 202, 228 (E.D.N.Y. 2010).

Plaintiff clearly engaged in protected activity as the amended complaint shows that he engaged in protected to wit: In early Fall 2015, Mr. Ford still did not have access to IEPs. Once he did see them, he raised the issue with the Special Education Coordinator and AP Stephanie Eliot in October 2015 that the IEPs mandated both general education and special education teacher be in the classroom. (A.C. ¶ 17) In August 2015, Plaintiff also submitted material on Special Education school policy complaining that the DOE violated the ADA and Rehabilitation Act rights

of the students. It was a book draft on Education Reform in August 2015 that was critical of defendants.. The material submitted in August 2015 to fulfill the Sabbatical requirement included a book draft, "Social Learning and Hegemony: Neoliberalism and Education Reform in the United States" which indicated that students with Special Ed designation that called for Collaborative Team Teaching (CTT) were not being taught in a Co-Teaching environment. (A.C. ¶ 18) Plaintiff also raised the issue regarding not having a special education teacher in an ICT class during weekly teams meeting in the 2015 fall semester and throughout the 2016-2017 school year in which teachers and the Assistant Principal, and that his classes contained over forty percent, special education students. (A.C. ¶ 19)

Plaintiff indicated in 2015 and 2016-2017 to BG School Counselor Lorin Schneider about ICT and the lack of co-teachers in classrooms. Plaintiff complained in 2015-2016 and 2016-2017 school years regarding not having a co-teacher with other teachers -including Bill Lynam, Robert Owen, Tom Grimaldi, Wyatt Matthews, and Cailin Shiller. Plaintiff also raised the issue of not having a co-teacher with AP Stephanie Elliot and the Plaintiff confirmed that he did not get a co-teacher. (A.C. ¶ 20-22)

On December 9, 2016, Plaintiff emailed Anthony Klug- UFT about not having a co-teacher. Upon information and belief, Mr. Klug brought Plaintiff's concern to the Principal. Also, on December 9, 2016, Plaintiff emailed Anthony Klug- UFT about his class in which over half the students on his roster were special education students slated for ICT, yet Plaintiff was teaching the students alone. Upon information and belief, Mr. Klug brought Plaintiff's concerns to the Principal. (A.C. ¶ 23-24) On December 23, 2016, Plaintiff filed an APPR complaint which specifically addressed not having a co-teacher (special education teacher) and stated that the "Roster includes

12 sp ed students, single teacher." The APPR complaint goes directly to the Principal. On November 22, 2017, Plaintiff told NYSUT Counsel Jennifer Hogan that many of the classes exceeded forty percent IEP students and had no co-teachers. (A.C. ¶ 25-26) Section 504 requires a school district to provide a "free appropriate public education" to each qualified person with a disability who is in the school district's jurisdiction, regardless of the nature or severity of the person's disability. Plaintiff was complaining about IEPs and the Special Education requirements not being followed. Accordingly, the record is clear that Plaintiff engaged in activity protected under the Rehabilitation Act.

## C.    Defendants Knew That Plaintiff Was Engaged in Protected Activity

Plaintiff has satisfied the second element of setting forth a *prima facie* claim for retaliation under Section 504 of the Rehabilitation Act, as she has demonstrated that defendants were aware of his protected activity. *Weixel*, 287 F.3d 138 at 148.

Mr. Ford raised the issue with the Special Education Coordinator and AP Stephanie Eliot in October 2015 that the IEPs mandated both general education and special education teacher be in the classroom. (A.C. ¶ 17) In August 2015, Plaintiff also submitted material on Special Education school policy complaining that the DOE violated the ADA and Rehabilitation Act rights of the students. Plaintiff also raised the issue regarding not having a special education teacher in an ICT class during weekly teams meeting in the 2015 fall semester and throughout the 2016-2017 school year in which teachers and the Assistant Principal, the Special Education and that his classes contained over forty percent, special education students. (A.C. ¶ 19)

Mr. Ford emailed the Union and on December 23, 2016, Plaintiff filed an APPR complaint which specifically addressed not having a co-teacher (special education teacher) and stated that

the "Roster includes 12 sp ed students, single teacher." The APPR complaint goes directly to the Principal. On November 22, 2017, Plaintiff told NYSUT Counsel Jennifer Hogan that many of the classes exceeded forty percent IEP students and had no co-teachers. (A.C. ¶ 25-26)

Plaintiff's complaints were that Special Education students were not receiving full Special Education services. This failure to provide Special Education services and thus a FAPE to the Special Education Students and is a violation of Section 504 of the Rehabilitation Act. Thus, Plaintiff's protected activity has met the requirement of making the Defendants aware of conduct to be understood, or that could reasonably have been understood to be conduct prohibited by the Rehabilitation Act. Stephens-Buie v. Shinseki, No. 09 Civ 2397 (LBS), 2011 U.S. Dist. LEXIS 68443 (S.D.N.Y. June 27, 2011). (quoting Galdieri-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998). Additionally, on a motion to dismiss, any question of fact is to be resolved in Plaintiff's favor. It cannot be disputed that Defendant DOE was aware of the Plaintiff's complaint, as he made it to individuals in the DOE, with those individuals being responsible for the monitoring of the special education programs in the DOE schools. Id.

Thus, Plaintiff has shown that Defendants were aware of Plaintiff's protected activity in 2015-2016- and 2016 and 2017 school years.

**D.     There Exists a Causal Connection Between Plaintiff's Protected Activity and the Adverse Employment Action**

Plaintiff has satisfied the causal connection for setting forth a prima facie claim for retaliation under Section 504 of the Rehabilitation Act.

Even if the Court did not find a continuing violation, it should have at the very least taken into consideration all past relevant information to establish that there was a causal connection. As per the *Morgan* case, these facts should have been considered. In the case at hand, acts of alleged

retaliatory harassment fell within the limitations period and outside the limitation period. Accordingly, the Court should examine Mr. Ford's retaliation claim to include all the non-discrete acts and discrete acts of retaliatory harassment from 2015 as background evidence on the question of liability and regarding the issue of a causal connection.

In the recent case of <u>Dr. Joseph Irrera v the University of Rochester</u>, the Second Circuit reversed and reinstated Irrera's retaliation claim by setting forth there is no bright-line rule to show a causal connection. See <u>Dr. Joseph Irrera v. University of Rochester</u>, 859 F.3d 196 (2nd Cir. 2017). See also <u>Richardson v. New York State Dep't of Corr. Serv.</u>, 180 F.3d 426, 446-47 (2d Cir.1999). This Court explained that the Supreme Court provided scant guidance for drawing that elusive line and that judges should rely on their experience, common sense and consider the context in which a claim is made. In the *Irrera* case, there was "more than a two-year temporal relationship between Irrera's alleged protected activity in February 2012, and the defendants' alleged denial of a paid internship and/or provision of negative references in or after May 2014", which the District Court had held insufficient to suggest a causal relationship given the time that elapsed. This Court accordingly mandated the reversal of that decision. Id.

Here, this Honorable Court should consider that these acts could serve as relevant evidence to establish a causal connection. Here, even if the Court held that was no continuing violation, at the very least, all the facts presented should be considered as relevant background history to establish that there was a causal connection.

As established above, Plaintiff engaged in protected activity throughout 2015-2016 and 2016-2017 school year and suffered adverse employment actions including termination.

The observations including the observation conducted on November 20, 2015. AP Rauner

filed a false verbal abuse claim in October of 2017 against Plaintiff. (A.C. ¶ 27-30) In a direct admission, the Principal was overheard saying he wanted to get rid of Mr. Ford. (A.C. ¶ 31-32)

In the 2015-16 school year, Plaintiff suddenly began to receive negative observations, ultimately leading to his termination. Mr. Ford's performance suddenly changed after advocating for special education students. (A.C. ¶ 33-34) In the 2015-2016, Mr. Ford was the only core subject teacher who did not have a dedicated classroom and traveled from class to class using a cart. It even took until the end of Fall 2015 before he finally received a cart from a colleague. In the 2015-2016 school year, Plaintiff did not have a dedicated work area for the first six to eight weeks of School and had to ask other teachers on their prep period if he could work in their rooms. Eventually, Plaintiff could use a desk in a breakout area but had to leave when other staff members wanted to use the desk. This was humiliating given Plaintiff's seniority. (A.C. ¶ 36-37)

Plaintiff's students had IEPs calling for Integrated Co-teaching (ICT), but there was no co-teacher (special education teacher) for the class. Plaintiff was observed in these classes when a special education teacher was supposed to be teaching with Mr. Ford, which impacted the observations. The observation signed by Mr. Decker on May 1, 2016, and by Mr. Ford on May 18, 2016, was altered and entered into Advance by changing the 'informal' observation to a formal observation. (A.C. ¶ 38-39)

In the 2016-2017 school year, Plaintiff classes were mandated for ICT in which there should have been a special education teacher as a co-teacher. All six observations conducted that year (October 26, 2016; November 30, 2016; February 6, 2017; February 13, 2017; March 6, 2017; and April 28, 2017) were from classes in which students were mandated for ICT, (a special education teacher and a general education teacher). Observing and evaluating a teacher doing the

work of two teachers, especially not having a special education teacher present was illegal and made the observations biased and unreliable. It was also a great disservice to the special education students who were required to be taught by a special education teacher. (A.C. ¶ 43)

However, the Measure of Student Learning (MOSL) component of his ratings were 'effective' for 2015-16 and 2016-2017 school years. This component is based on improvement in students' test scores and is separate from administrators' observations. It is an objective test that measures students' progress from the beginning of the school year to the end of the school year. Mr. Ford's teaching showed substantial progress was made by his students. These are objective tests, not subjective observations that are easily manipulated.

During the 2016-2017 school year, unlike other teachers, including social studies teachers, Mr. Ford still did not have a dedicated classroom. Further, seven of the nine observations were conducted without the required Special Education co-teacher in the room. Moreover, four of the nine observations were in classes with rosters of over forty percent of Special Education Students.

Lastly, a finding of a causal relationship between Plaintiff's protected activity and the adverse employment actions may be based upon the temporal proximity of Plaintiff's complaints and the adverse employment actions taken against. A causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action. *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

Here, you have a combination of extensive continuous protected activity, an admission by the principal and continuing adverse conduct directed at Mr. Ford culminating in a 3020-a proceeding being commenced in May 2017. Plaintiff has stated a plausible causal connection.

In sum, Plaintiff has plausibly stated a claim for relief under Section 504.

## **CONCLUSION**

Plaintiff respectfully requests that Defendant's Motion to Dismiss be denied, together with

such other and further relief as the Court deems just and proper.

Dated: New York, New York
      December 13, 2021

                                        Respectfully submitted,

                                        STEWART LEE KARLIN
                                        LAW GROUP, PC

                                        STEWART LEE KARLIN
                                        Attorneys for Plaintiff
                                        111 John Street, 22nd Floor
                                        New York, NY 10038
                                        (212) 792-9670
                                        slk@stewartkarlin.com